# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| RUBEN COREY MCNABB,<br>AIS #23612 | ) ) | |
| Petitioner, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 1:08-CV-224-MEF |
| DAVID WISE, ET AL., | ) ) | |
| Respondents. | ) ) | |

## NOTICE OF FILING EXHIBIT

Come now Respondents, by and through the Attorney General of

Alabama, and in support of the Answer filed in the above-styled cause on

May 21, 2008, submit the following exhibit:

1)    Copy of trial transcript, Exhibit A;

Respectfully submitted,

Troy King – KIN047
*Attorney General*
State of Alabama

s/James B. Prude
James B. Prude (PRU005)
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of August, 2008, I electronically filed the foregoing ( Exhibit A) with the Clerk of the Court using the CM/ECF system and I hereby certify that I have mailed by United States Postal Service the foregoing (Exhibit A) to the following non-CM/ECF participants to the address listed on the Department of Corrections' website: <u>Ruben McNabb, AIS #236182, St. Clair Correctional Facility, 1000 St. Clair Rd, Springville, AL 35146-9790</u>.

s/James B. Prude
James B. Prude (PRU005)
Office of the Attorney General
Alabama State House
11 South Union
Montgomery, AL  36130-0152
Telephone:  (334) 242-7300
Fax:  (334) 242-2848
E-Mail:  JPrude@ago.state.al.us

682363/120611-001

2

COURT OF CRIMINAL APPEALS NO. _CR·03-1141_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

CIRCUIT COURT OF ___Houston___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC2002-225  Volume I___

CIRCUIT JUDGE ___Jerry M. White___

Type of Conviction / Order Appealed From: ___ROBBERY I___

Sentence Imposed: ___LIfe w/o Parole, and costs___

Defendant Indigent: ☒ YES ☐ NO

___Ruben McNabb___

| | | |
|---|---|---|
| Hon. David Hogg | 334-794-8559 | NAME OF APPELLANT |
| (Appellant's Attorney) | (Telephone No.) | |
| 188 N. Foster St. Ste 200 | | |
| (Address) | | |
| Dothan, Al.  36303 | | |
| (City) | (State) | (Zip Code) |

V.

STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

CLERK'S INDEX

CASE ACTION SUMMARY                                                          1-9

INDICTMENT                                                                   10-11

ORDER OF 2-6-2002, DEFT. BEFORE THE COURT, ADVISED OF HIS RIGHTS, HON. 12
H. BAXLEY  APPOINTED.

AFFIDAVIT OF SUBSTANTIAL HARDSHIP AND ORDER                                  13-14

REMOVAL BILL                                                                 15

PLEA OF NOT GUILTY AND WAIVER OF ARRAIGNMENT                                 16

MOTION FOR PRELIMINARY HEARING AND DISCOVERY                                 17-18

MOTION TO SET BOND                                                           19

ORDER OF 2-27-2002, Discovery granted. Motion to set bond set for            20
hearing 3-11-2002 at 9:00 a.m.

RECIPROCAL DISCOVERY ORDER  DATED 3-6-2002                                   21

ORDER OF  3-11-2002, BOND SET AT $500,000.00                                 22

MOTION TO SUPPRESS EVIDENCE                                                  23-25

ORDER OF 3-18-2002, MOTION TO SUPPRESS WILL BE HEARD PRIOR TO TRIAL          26

MOTION TO RECONSIDER BOND                                                    27-28

ORDER OF 5-31-2002, MOTION TO RECONSIDER BOND SET FOR HEARING                29
8-14-2002 at 9:00 a.m.

MOTION FOR SPEEDY TRIAL                                                      30

ORDER OF 6-19-2002, SPEEDY TRIAL GRANTED                                     31

LETTER FROM DEFENDANT                                                        32

DEFENDANT'S REQUEST FOR PRODUCTION BY THE STATE                              33-36

ORDER OF 8-5-2002, REQUEST FOR PRODUCTION GRANTED                            37

ORDER OF 8-14-2002, MOTION FOR BOND REDUCTION DENIED                         38

MOTION TO CONTINUE                                                           39-40

ORDER OF 8-21-2002, MOTION TO CONTINUE GRANTED                               41

NOTICE TO DEFT OF PREVIOUS CONVICTIONS AND NOTICE OF INTENT TO USE           42
SUCH CONVICTIONS FOR IMPEACHMENT PURPOSES

ORDER OF 8-21-2002, UPON MOTION OF DEFT. CASE CONTINUED.                     43

ORDER OF 8-27-2002, CONTINUED FOR DEFT. TO NEXT AVAILABLE TERM               44

CLERK'S INDEX CONTINUED -- PAGE 2

MOTION TO SCHEDULE TRIAL                                        45

ORDER OF 9-10-2002, CASE TO BE PLACED ON NEXT AVAILABLE JURY DOCKET    46

ORDER OF 1-16-2003, CONTINUED UNREACHED                        47

NOTICE OF STATE'S INTENT TO SEEK ADDITIONAL PENALTY            48

STRIKE LIST                                                    49-51

MOTION IN LIMINE                                               52-54

ORDER OF 2-13-2003, MOTION IN LIMINE DENIED. MOTION TO SUPPRESS    55
EVIDENCE DENIED.

ORDER OF 2-13-2003, AT CLOSE OF STATE'S EVIDENCE, DEFT. MOVES FOR    56
JUDGMENT OF ACQUITTAL

ORDER OF 2-13-2003, ATTACHMENT ISSUED FOR JIMMY BOLIN AND PATSY    57
LYNN ROACH

ORDER OF 2-14-2003,  INSTANA SUBPEONA ISSUED FOR MAY BESSIE AND    58
STEPHANIE REEVES

DEFENDANT'S REQUESTED JURY INSTRUCTIONS                        59-71

ORDER OF 2-14-2003, JURY DEADLOCKED, MISTRIAL DISCLARED        72

ORDER OF 2-19-2003, DEFT RELEASED IN ERROR, ALIAS WRIT ISSUED BAIL    73
SET AT $1,000,000.00

ALIAS EXECUTED                                                 74

AFFIDAVID OF SUBSTANTIAL HARDSHIP AND ORDER                    75-76

MOTION TO REQUEST HEARING TO REDUCE BOND                       77-78

MOTION FOR EXTRAORDINARY EXPENSES                              79-80

ORDER OF 2-26-2003, DEFT. ADVISED OF RIGHTS, HON. H. BAXLEY APPT'D    81

ORDER OF 3-4-2003, MOTION TO REDUCE BOND AND MOTION FOR EXTRAORDINARY    82
EXPENSES DENIED.

ORDER OF 4-3-2003, CONTINUED FOR DEFT. W/O OBJECTION FROM STATE    83

MOTION TO REDUCE BOND                                          84-85

ORDER OF 5-2-2003, MOTION TO REDUCE BOND SET FOR HEARING 5-15-03    86
AT 9:00 AM

ORDER OF 5-15-2003, BOND REDUCED TO $100,000.00 BOND TO BE APPROVED    87
BY THE COURT

MOTION TO RECONSIDER BOND                                      88-90

## CLERK'S INDEX CONTINUATION --PAGE 3

ORDER OF 8-5-2003, MOTION TO RECONSIDER BOND DENIED, CLERK ORDERED      91
NOT TO SUBMIT ANY FURTHER SUCH MOTIONS TO THE COURT

ORDER OF 8-20-2003, CASE CONTINUED, ISSUE ON APPEAL      92

CERTIFCATE OF JUDGMENT, WRIT OF MANDAMUS      93

ORDER FROM COURT CRIMINAL APPEALS      94

ORDER FROM COURT CRIMINAL APPEALS DENYING WRIT OF MANDAMUS      95

MOTION TO RELEASE TRIAL EXHIBITS TO DISTRICT ATTORNEY      96

ORDER RELEASING TRIAL EXHIBITS TO DISTRICT ATTORNEY      97

MOTION TO SUPPRESS EVIDENCE      98-99

ORDER OF 2-11-2004, MOTION TO SUPPRESS DENIED      100

JURY STRIKE LIST      101-103

DEFENDANT'S REQUESTED JURY INSTRUCTIONS (1-14)      104-118

JURY VERDICT      119

JURY CONVICTION, SENTENCING ORDER      120-121

ORDER OF 2-11-2004, AT CLOSE OF STATE'S EVIDENCE DEFT. MOVED FOR      122
JUDGEMENT OF ACQUITTAL, MOTION DENIED.

NOTICE TO DEFT OF PREVIOUS CONVICTIONS AND NOTICE OF INTENT TO USE      123
SUCH CONVICTIONS FOR IMPEACHMENT PURPOSES.

ORDER OF 3-18-2004, ON MOTION OF DEFT. SENTENCING HEARING CONT'D      124
TO 3-24-2004

NOTICE TO DEFENDANT OF PREVIOUS CONVICTIONS AND NOTICE OF INTENT TO      125
USE SUCH CONVICTIONS FOR IMPEACHMENT PURPOSES.

MOTION TO WITHDRAW AND APPOINT NEW COUNSEL TO REPRESENT DEFT ON      126
APPEAL

ORDER OF 3-30-2004, HAMP BAXLEY ALLOWED TO WITHDRAW.   CLIFF MENDHEIM      127
APPOINTED TO REPRESENT DEFT. ON APPEAL.   DEFT. GIVES ORAL NOTICE OF
APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS.   FREE TRANSCRIPT ON
APPEAL.

MOTION FOR NEW TRIAL      128

MOTION TO WITHDRAW      129-130

ORDER OF 4-7-2004, MOTION FOR NEW TRIAL DENIED.   CLIFF MENDHEIM      131
ALLOWED TO WITHDRAW.   DAVID HOGG APPOINTED TO REPRESENT DEFT. ON
APPEAL.

CLERK'S INDEX CONTINUATION -- PAGE 4

CLERK'S NOTICE OF APPEAL                                         132

REPORTER'S TRANSCRIPT ORDER -- CRIMINAL                          133

COURT OF CRIMINAL APPEALS DOCKETING STATEMENT                   134

REQUEST FOR LOCAL EXTENSION OF TIME TO COMPLETE THE REPORTER'S   135
TRANSCRIPT

MOTION TO COURT OF CRIMINAL APPEALS FOR EXTENSION OF TIME TO FILE   136
TRANSCRIPT.

TRANSCRIPT OF RECORD - CONVICTION REPORT                        137

COURT REPORTER'S INDEX OF TRIAL EXHIBITS                        138-139

STATE'S EXHIBIT NUMBER 2, CERTIFICATION OF EVIDENCE             140

STATE'S EXHIBIT NUMBER 3, CERTIFICATION OF EVIDENCE             141

STATE'S EXHIBIT NUMBER 4, CERTIFICATION OF EVIDENCE             142

STATE'S EXHIBIT NUMBER 5                                        143

STATE'S EXHIBIT NUMBER 6, CERTIFICATION OF EVIDENCE            144

STATE'S EXHIBIT NUMBER 9                                        145

STATE'S EXHIBIT NUMBER 10                                       146

STATE'S EXHIBIT NUMBER 15                                       147

STATE'S EXHIBIT NUMBER 16                                       148

STATE'S EXHIBIT NUMBER 17                                       149

STATE'S EXHIBIT NUMBER 18                                       150

STATE'S EXHIBIT NUMBER 19                                       151

STATE'S EXHIBIT NUMBER 20                                       152

STATE'S EXHIBIT NUMBER 21                                       153

STATE'S EXHIBIT NUMBER 22                                       154

STATE'S EXHIBIT NUMBER 23                                       155

STATE'S EXHIBIT NUMBER 24                                       156

DEFENDANT'S EXHIBIT NUMBER 1                                    157

STATE'S EXHIBIT NUMBER 1, SENTENCING                            158-170

COURT REPORTER CARLA WOODALL'S TRANSCRIPT OF SUPPRESSION HEARING   1-27

CLERK'S INDEX CONTINUEATION --PAGE 5

COURT REPORTER CARLA WOODALL'S TRANSCRIPT OF TRIAL PROCEEDINGS          1-376
AND SENTENCE HEARING

CERTIFICATE OF COMPLETION                                               574

```
                 ALABAMA JUDICIAL INFORMATION SYSTEM    CASE: CC 2002 000225.00
                          CASE ACTION SUMMARY
                          CIRCUIT  CRIMINAL              RUN DATE: 02/06/2002
=================================================================================
   CIRCUIT COURT OF  HOUSTON                                       JUDGE:
TE OF  ALABAMA                    VS      MCNABB RUBEN COREY
                                          % HOUSTON COUNTY JAIL
ASE: CC 2002 000225.00
                                          DOTHAN, AL  36302 0000
DOB:                     SEX: M  RACE: B  HT: 6 00  WT: 197   HR: BLK EYES: BRO
SSN:              ALIAS NAMES:
=================================================================================
CHARGE01: ROBBERY 1ST          CODE01: ROB1  LIT: ROBBERY 1ST   TYP: F #: 001
OFFENSE DATE: 06/07/2001                AGENCY/OFFICER: 0380100 SINGLET

DATE WAR/CAP ISS:                     DATE ARRESTED: 02/05/2002
DATE    INDICTED: 08/30/2001          DATE    FILED: 02/06/2002
DATE   RELEASED:                      DATE  HEARING:
BOND    AMOUNT:        5,00/00,000     SURETIES:

DATE 1: 03/06/2002  DESC: ARRG        TIME: 0900 A
DATE 2: 05/06/2002  DESC: JTRL        TIME: 0830 A
TRACKING NOS:
   DEF/ATY: Hon. Hamp Bayley (A)          2-14-03 dft released
                                              from Jail by
                     00000                             00000
PROSECUTOR: VALESKA DOUGLAS A           2-24-03 - Arrested on A.W.
                                             & Writ (Duplicate)
=================================================================================
 H CSE:   000000000000 CHK/TICKET NO:                    GRAND JURY: 000000027
JURT REPORTER:                  SID NO:      000000000
DEF STATUS: JAIL                DEMAND: Y                          OPER: PAS
=================================================================================
DATE            ACTIONS, JUDGEMENTS, AND NOTES
=================================================================================
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|---|---|
| 2-6-2002 | Defendant arrested on writ on indictment.  Arraignment set for March 6, 2002 at 9:00 AM and trial is TENTATIVELY set for May 6, 2002 term of Circuit Court.  Clerk to notify. |
| 2-6-2002 | Defendant before the Court and advised of his/her rights. Hon. _____ Bayley is appointed counsel for the Defendant. _____ DISTRICT JUDGE (2-6-02-M-HB-DA) |
| 2-13-02 | Motion To Set Bond |
| 2-13-02 | Motion For Preliminary Hearing & Discovery |
| 2-1-02 | WAIVER OF ARRAIGNMENT _____ Judge |

2-27-02    Motion for Discovery Granted. Motion to
Set Bond is set down for a Hearing on
the 11th day of March, 2002, at 9:00 a.m.
Notify.    _____, Judge
(2-28-02 - N - HB, DA)

RECIPROCAL DISCOVERY ORDER
3-6 , 20 02

Within 14 days of this Order, the State and Defendant will make
available for inspection and copying all materials discoverable under
the Alabama Rules of Criminal Procedure. In addition, the State will
make any exculpatory material available to the Defense. The State will
make its materials available at the District Attorney's office and the
Defense will do likewise at the Defense Counsel's office.

C. LAWSON LITTLE
CIRCUIT JUDGE

3-11-02 - Upon Hrg. Bond Set At $500,000
_____
3-1/02 Srdaur

3-13-02 - Motion to Suppress Evidence.

3-18-02    Motion to Suppress will be heard prior to trial.
Notify.    _____, Judge
(3-19-02 - N - HB, DA)

5-7-2002   Motion to Reconsider Bond

5-31-02    Motion to Reconsider ~~bond~~    _____
set for hearing on the 14th day
of August, 2002, at 9:00 a.m. Notify.
(6-18-02 N - HB, DA)

6-19-02    Motion for Speedy Trial.
7-1-02    Motion for Speedy Trial Granted    _____, Judge
(7-3-02 - N - HB
DA + Jury)

ALABAMA    JUDICIAL    INFORMATION    CENTER

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2002 000225.00
JUDGE ID:  DLH

STATE OF ALABAMA                    VS    MCNABB RUBEN COREY

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 7-31-02 | Defendants Request for Production by the State |
| 8-5-02 | Request for Production Granted. Notify |
| 8-4-02 | notify Hamp Baxley + DA ___ Deny Holladay Judge |
| 8-14-02 | Motion for Bond Reduction Den-10 Holl- Judge |
| 8-21-02 | Motion to Continue Trial |
| 8-21-02 | Upon motion of defendant case continued. Notify (8-22-02) HB, DA ___ Deny Holladay Judge |
| 8-22-02 | Continued for deft to next available term Holladay Judge |
| 8-20-02 | NOTICE TO DEFENDANT OF PREVIOUS CONVICTIONS & NOTICE OF INTENT TO USE SUCH CONVICTIONS FOR IMPEACHMENT PURPOSES. |
| 9-9-2002 | Motion to schedule trial |
| 9-10-02 | This Case is to be placed on the next available jury trial docket. Notify Deny Holladay Judge (9-13-02-x-HB (Judy & DA) |
| 1-16-03 | Continued unreached. Deny M White |
| 1-29-03 | Notice Of States Intent To Such Additional Penalty. |
|  | February 13 2003. Motion to limine denied if dft takes witness stand and state wants to use conviction to impeach defendant. Motion to suppress evidence denied. Deny M White Judge |

February 13, 2003 - At close of State's evidence, defendant moved for judgment of acquittal.

February 13 2003 - Attachments to issue for Jimmy Bolin #1571 Westgate Pkwy, Dothan and Patsy Lynn Road #4 Walmat on Montgomery Hwy, Dothan *[illegible signature]*
2-13-03 *[illegible]*

February 14 2003 - Custody *[illegible]* and issue for Mary Bessie *[illegible]* Dothan, Ala. and telephone receiver *[illegible signature]* Barstow Apts & Highland Body *[illegible]*.

February 14, 2003 - Jury deadlocked, 'Mistrial' declared. *[illegible signature]*
02-14-03 *[illegible]*

February 19 2003 - *[illegible]* being made known to the Court that the defendant was mistakenly released by the Sheriff's Office, an alias writ of arrest is ordered to be issued. Bail set at $1,500,000. *[illegible signature]*
(2-19-03 alias issued)

2-26-2003--Defendant arrested on alias and writ. Writ was the original for which the Sheriff's Dept. had asked for a duplicate as it had been lost. This was done in December, 2001. Bond set at $ 1,000,000.00 on this case. Criminal jury trial is TENTATIVELY reset for April 7, 2003 at 8:30 AM. CLerk to notify.

2-26-03
*[illegible signature]*
2/26/03

Defendant before the Court and advised of his/her rights, Hon. _H. Baxley_ is appointed counsel for the Defendant.
*[signature]*
DISTRICT JUDGE

(2-27-03 *[illegible]* - HB, DA)

ACR0369  ALABAMA  JUDICIAL  INFORMATION  CENTER

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2002 000225.00
JUDGE ID:   JMW

| STATE OF ALABAMA | VS | MCNABB RUBEN COREY |
|---|---|---|

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|---|---|
| 2-25-2003 | Motion to request hearing to reduce bond. |
| 2-26-2003 | Motion for extraordinary expenses. |
| | March 4, 2003 - Motion to reduce bond denied. Motion for extraordinary expenses denied. (Jerry M. White, Jr.) |
| | (3-6-03 - M - HB, DA) |
| 4/3/03 | Cont. for D w/o objection from State - Motion |
| 5-1-2003 | Motion to reduce bond |
| 5-2-2003 | Motion to Reduce Bond is set down for a hearing on the 15th day of May, 2003, at 9:00 a.m. Notify. (Jerry M. White, Judge) |
| | (5-5-03 - M - HB, DA) |
| | May 15, 2003 - Bail reduced to $100,000 Bond to be approved by Court. (Jerry M. White, Judge) |
| 5/16/03 | (5-16-03 - M - HB, DA, O, D & Jail - Bessel) |
| 7-24-03 | Appellants Reply Brief |
| 7-15-03 | Motion to Reconsider Bond. |
| | August 5, 2003 - Above motion denied + Clerk is ordered not to submit any further oral motions to Court. (Jerry M. White, Judge) |
| 8-6-03 | copy. Hamp Baxley, DA + deft at Jail |
| 8-20-03 | Case Cont'd (Issue on Appeal) (Jerry M. White, Jr.) |
| 2-2-04 | Motion to release trial exhibits to District Attorney |
| 2-2-04 | Order (in file) |

Ruben McNabb                                    CC-02-225

a 5-04 Motion to Suppress Evidence.
February 11, 2004 - Defendant's motion to Suppress
denied.                                    *[signature]*

February 11, 2004 - At close of State's evidence
defendant moved for judgment of acquittal,
motion denied                              *[signature]*

3-17-04  Notice to Defendant of Previous convictions and Notice
of intent to Use such Convictions for Impeachment Purposes.

March 18, 2004 - On motion of defendant
sentencing hearing continued to March 24, 2004,
at 11:00 AM).                              *[signature]*

3-18-04  Notfd. Hamp Baxley, DA + P.O.

3-18-04 - Notice to Defendant of Previous Convictions and Notice of Intent to Use
Such Convictions for Impeachment Purposes.

3-18-04 - Notified Attorney Hamp Baxley

3-23-04 - Motion to Withdraw and Appoint New Counsel to Represent Defendant on Appeal.

March 30 2004 - Hampton Baxley allowed to
withdraw as attorney for defendant. Cliff
Mendheim appointed to represent defendant
on Appeal.
Defendant gives oral notice of Appeal to
Alabama Court of Criminal Appeals.
Defendant allowed free transcript on Appeal.
Clerk to notify Mendheim Ct. Crim Appeals. *[signature]*

4-1-04   NOTIFIED ATTORNEY HAMP BAXLEY, ATTORNEY CLIFF MENDHEIM,   COURT OF CRIMINAL APPEALS,
P.O. AND DA.

3-25-04  MOTION FOR NEW TRIAL.
April 7, 2004 - Def's Motion for new trial is denied.
Cliff Mendheim moves that he be allowed to withdraw
motion granted  David Hogg appointed to
represent defendant on Appeal. Clerk to notify
deft Cliff Mendheim, David Hogg, Ct. of Criminal Appeals.  *[signature]*

JURY CONVICTION

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA

CRIMINAL DIVISION

VS.

_Ruben Corey Mc Nabb_          CASE NO. _CC 2002 - 225_

The Defendant having been indicted and arraigned upon the Indictment on a charge of _Robbery 1st Degree_ and heretofore having plead not guilty thereto the case was tried before a jury composed of _Milton H. Wood_ as foreperson and eleven others. The Jury having been duly empanelled, sworn and charged by the Court according to law, with the Defendant being present in open court with his attorney at each and every stage of proceedings, said jury has now on this date pursuant to their oath found the Defendant guilty of _Robbery 1st Degree as_ charged in the Indictment (a lesser included offense of that charge in the Indictment).

In accordance with the verdict of the Jury, Defendant is hereby adjudged guilty of _Robbery 1st Degree_ Defendant being asked if he/she had anything to say why sentence of law should not be pronounced upon him/her, and Defendant says nothing.

**IT IS THEREFORE ORDERED AND ADJUDGED BY THE COURT** that the Defendant is guilty of said charge.

(✓) A Sentence hearing is set for the _18th_ day of _March_, 20~~0~~4 at _9.'00_ o'clock _A_ M. _No bail._

**DONE**, this the _11th_ day of _February_, ~~2002~~ _2004._

_Quy Sm White_
_____
CIRCUIT JUDGE

SENTENCING ORDER

AS PUNISHMENT, DEFENDANT IS HEREBY FORMALLY SENTENCED:

( ) to hard labor for Houston County for a term of _____.

(X) to the penitentiary of the State of Alabama for a term of _____ ~~years.~~ ( ) FHOA _natural life without parole._

8

On the 30th day after the Clerk transmits to the Department of Corrections a copy of this judgment entry and sentence, if the Department has not directed the Sheriff where the Defendant shall be taken for confinement, the Sheriff is hereby ordered to transport Defendant forthwith to the Department's receiving center at Kilby/Tutweiler (circle) and effectuate the transfer of the Defendant to the custody of the Department. In the event the Department refuses to accept the Defendant in compliance with state law, the Sheriff is ordered to secure the Defendant to the property at the Department's receiving center.

Said sentence shall run ( ) consecutive or ( ) concurrent with case number (s) _____.

_____

( ) said sentence is suspended for _____ years on the condition of good behavior and payment of all fines, costs, and restitution.

( ) The Defendant is hereby given credit for the days spent incarcerated pending trial.

Defendant is also ordered to pay:

( ) A fine of $_____
( ) A Victim Compensation Assessment of $_____.
(X) All Court Costs.
( ) Restitution of $ _____ to _____.
( ) Drug Demand Reduction Act Assessment of $1,000.00.
( ) Alabama Forensics Sciences Trust Fund $100.00.
( ) Pay direct to Alabama Dept. of Forensic Sciences-Dothan Division
    $_____.
( ) Investigation restitution direct to ( )DPD ( ) HCSO $_____.

ADDITIONAL SENTENCE PROVISION ORDERED ARE:

( ) Completion of a substance abuse program CRO
( ) The Department of Public Safety is ordered to comply with Alabama Code 13A-12-290 by suspending Defendant's drivers license for six months.
( ) Continued on same bond.
( ) Appeal bond is set at $_____.
( ) Indigency status granted and free transcript is ordered.

PROBATION:

( ) Defendant applies for probation.
( ) Defendant waives application for probation.
( ) Probation hearing is set for the _____ day of _____ 20___ at _____
( ) Defendant to remain on same bond pending probation hearing

DONE this the 24th day of March, 2004.

ACR0369   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2002 000325.00
JUDGE ID:   JMW

STATE OF ALABAMA                        VS    MCNABB RUBEN COREY

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|---|---|
| 4-15-04 | Mailed Clerk's Notice of Appeal to CCA, AG, DA, CR, Deft., and David Hogg |
| 7-23-2004 | Penitentiary Transcript Mailed to DOC |

## INDICTMENT

The State of Alabama

Houston County

}

CIRCUIT COURT
TWENTIETH JUDICIAL
AUGUST TERM, 2001

### COUNT 1

The Grand Jury of said county charge that, before the finding of this indictment, RUBEN COREY MCNABB, whose name is otherwise unknown to the Grand Jury, did in the course of committing a theft of U.S. CURRENCY, POSTAGE STAMPS AND FOOD STAMPS, the property of WINN DIXIE, use force against the person of RON REEVES AND PATSY LYNN ROACH, with intent to overcome THEIR physical resistance or physical power of resistance, or threaten the imminent use of force against the person of RON REEVES AND PATSY LYNN ROACH with intent to compel acquiescence to the taking of or escaping with the property, while the said RUBEN COREY MCNABB was armed with a deadly weapon or dangerous instrument, to-wit: A HANDGUN, in violation of Section 13A-8-41 of the Code of Alabama, against the peace and dignity of the State of Alabama.

Douglas Albert Valeska
District Attorney

---

THE STATE OF ALABAMA
Houston County

## THE CIRCUIT COURT
Twentieth Judicial Circuit

THE STATE
vs.

RUBEN COREY MCNABB

Witnesses for Agency No.0101004436

REGGIE M HILL, WINN DIXIE 1571 W/G PKWY, DOTHAN, AL 36301
BETTY JEAN PRESCOTT, 1571 W/G PKWY-WINN DIXIE, DOTHAN, AL 36301
RON REEVES, 1571 W/G PKWY, DOTHAN, AL 36301
PATSY LYNN ROACH, WINN DIXIE 1571 W/G PKWY, DOTHAN, AL 36301
JIMMY SINGLETON, PD, DOTHAN, AL 36301
WILLY WILLIAMSON, DPD, DOTHAN, AL 36303

---

Charges: 1. ROBBERY FIRST DEGREE

## A TRUE BILL

_Emanuel Nablien_
Foreman of the Grand Jury

Presented to the presiding Judge in open court foreman of the Grand Jury, in the presence of ___ 10 ___ Grand Jurors and filed in open court by order of the court on this the ___ 30th ___ day of ___ Aug ___, 20 ___ 01 ___.

_Judy Boyd_
CLERK

## INDICTMENT

NO PROSECUTOR

Upon the arrest of Defendant let him be admitted to bail on giving bond in the sum of

___ No Bond ___ Dollars

With security to be approved by the Sheriff.

_Dempsey_
Judge Presiding

12

Defendant before the Court and advised of
his/her rights. Hon. _H. Beyly_
is appointed counsel for the Defendant.

2-6-2002

_DISTRICT JUDGE_

( 2-6-02-M-HB-DC)

| State of Alabama<br>Unified Judicial System<br><br>Form C-10<br>Page 1 of 2        Rev. 2/95 | AFFIDAVIT OF SUBSTANTIAL<br>HARDSHIP AND ORDER | Case Number |
|---|---|---|

IN THE __Circuit__ COURT OF __Houston__, ALABAMA
(Circuit, District, or Municipal)        (Name of County or Municipality)

STYLE OF CASE: __State of Alabama__ v. __Ruben Corey McNabb__
Plaintiff(s)        Defendant(s) WRit

TYPE OF PROCEEDING: __Criminal__ CHARGE(S) (if applicable): __Robbery 1st__

☐ CIVIL CASE-- I, because of substantial hardship, am unable to pay the docket fee and service fees in this case. I request that payment of these fees be waived initially and taxed as costs at the conclusion of the case.

☐ CIVIL CASE-- (such as paternity, support, termination of parental rights, dependency) - I am financially unable to hire an attorney and I request that the court appoint one for me.

☐ CRIMINAL CASE-- I am financially unable to hire an attorney and request that the court appoint one for me.

☐ DELINQUENCY/NEED OF SUPERVISION-- I am financially unable to hire an attorney and request that the court appoint one for my child/me.

## AFFIDAVIT

SECTION I.

1. IDENTIFICATION
Full name __Ruben Corey McNabb__ Date of birth ████████
Spouse's full name (if married) _____
Complete home address __1841 Ravenhall Ave__
__Orlando, FL 32805__
Number of people living in household __4__
Home telephone number __648 - 0982 (407)__
Occupation/Job __Auto Body Repair__ Length of employment _____
Driver's license number _____ *Social Security Number ████████
Employer __Unemployed__ Employer's telephone number _____
Employer's address _____

2. ASSISTANCE BENEFITS

Do you or anyone residing in your household receive benefits from any of the following sources? (If so, please check those which apply.)

☐ AFDC    ☐ Food Stamps    ☐ SSI    ☐ Medicaid    ☐ Other _____

3. INCOME/EXPENSE STATEMENT    *Recently Lost Job*

Monthly Gross Income:
| | | |
|---|---|---|
| Monthly Gross Income | $ | |
| Spouse's Monthly Gross Income (unless a marital offense) | 0 | |
| Other Earnings: Commissions, Bonuses, Interest Income, etc. | | |
| Contributions from Other People Living in Household | | |
| Unemployment/Workmen's Compensation, | | |
| Social Security, Retirements, etc. | 0 | |
| Other Income (be specific) _____ | | |
| TOTAL MONTHLY GROSS INCOME | $ 0 | |

Monthly Expenses:        *any States Do Not Pay any Bills at this time*
A. Living Expenses
Rent/Mortgage _____
Total Utilities: Gas, Electricity, Water, etc. __0__
Food _____
Clothing __0__
Health Care/Medical _____
Insurance _____
Car Payment(s)/Transportation Expenses __0__
Loan Payment(s) _____

'OPTIONAL

| Form C-10  Page 2 of 2    Rev. 2/95 | AFFIDAVIT OF SUBSTANTIAL HARDSHIP AND ORDER |

Monthly Expenses: (cont'd page 1)
    Credit Card Payment(s)
    Educational/Employment Expenses
    Other Expenses (be specific) _____

        Sub-Total                                                      A  $  0

B.    Child Support Payment(s)/Alimony          $  0

        Sub-Total                                              B  $  0

C.    Exceptional Expenses                       $  0

        TOTAL MONTHLY EXPENSES (add subtotals from A & B monthly only)  $  0

Total Gross Monthly Income Less total monthly expenses:

        DISPOSABLE MONTHLY INCOME                              $  0

4.    LIQUID ASSETS:
        Cash on Hand/Bank (or otherwise available such as stocks,      $  0
        bonds, certificates of deposit)
        Equity in Real Estate (value of property less what you owe)
        Equity in Personal Property, etc. (such as the value of        0
        motor vehicles, stereo, VCR, furnishing, jewelry, tools,
        guns, less what you owe)
        Other (be specific)
        Do you own anything else of value? ☐ Yes  ☐ No                 0
        (land, house, boat, TV, stereo, jewelry)
        If so, describe _____

        TOTAL LIQUID ASSETS                                    $  0

5.    Affidavit/Request
    I swear or affirm that the answers are true and reflect my current financial status.  I understand that a false statement or answer
    to any question in the affidavit may subject me to the penalties of perjury.  I authorize the court or its authorized representative to
    obtain records of information pertaining to my financial status from any source in order to verify information provided by me.  I further
    understand and acknowledge that, if the court appoints an attorney to represent me, the court may require me to pay all or part of
    the fees and expenses of my court-appointed counsel.

    Sworn to and subscribed before me this

    _____ day of _____ _____            Affiant's Signature
                                             _X Ruben McRobb_
    _____                  Print or Type Name
    Judge/Clerk/Notary

ORDER OF COURT

SECTION II.
    IT IS THEREFORE, ORDERED, AND ADJUDGED BY THE COURT AS FOLLOWS:
    ☐ Affiant is not indigent and request is DENIED.
    ☐ Affiant is partially indigent and able to contribute monetarily toward his/her defense; therefore defendant is ordered to pay
        $ _____ toward the anticipated cost of appointed counsel. Said amount is to be paid to the clerk of court or as otherwise
        ordered and disbursed as follows: _____
    ☒ Affiant is indigent and request is GRANTED.
    ☐ The prepayment of docket fees is waived.

    IT IS FURTHER ORDERED AND ADJUDGED that ___H. Baxley___, is hereby appointed as counsel to represent
    affiant.
    IT IS FURTHER ORDERED AND ADJUDGED that the court reserves the right and may order reimbursement of attorney's fees and
    expenses, approved by the court and paid to the appointed counsel, and costs of court.
    Done this _____ day of ___Feb___, ____
                                             _____
                                             Judge

# THE STATE OF ALABAMA,

Payable to ___Lamar Glover___ , Sheriff of ___Houston___ County.

For removal of ___Ruben Corey McNabb___ charged with: ___Robbery 1st.___
(Use Felony only)

from ___Orange County, Fl.___ County, to jail in ___Houston___ County.

Date or dates of removal ___February 5, 2002___

| | | | | | |
|---|---|---|---|---|---|
| To Lamar Glover , Sheriff ___ days at $8.00 per day ......... | | | | $ | |
| To ___ , Guard ___ days at $8.00 per day ......... | | | | $ | |
| DATE | Commercial transportation must be tax exempt. ITEMIZATION OF EXPENSES | | | | |
| 2/5 | TransCor America | | | 415 | 07 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | Total | 415 | 07 |

Mileage In State  Title 12-19-191.          Mileage Out of State  Title 16-9-62

I ___Lamar Glover___ , Sheriff of

___Houston___ County, do state, the above account for the sum of

___Four-hundred, fifteen & 07/100 --------------------___ dollars, is correct;

that I have never received the same or any part thereof; that I had ___ guard 1 employed; that said

account embraces, aside from per diem for self or deputy and guard, only actual traveling expenses, and that

without any unnecessary delay the nearest route usually traveled was followed.

_Lamar Glover_
Sheriff.

## SUPPORTING PAPERS MUST BE ATTACHED

| IN STATE | OUT OF STATE |
|---|---|
| TITLE 15-10-70, 71, 72 & 73 | TITLE 15-9-62, 65 & 81 |
| A: Solicitor's statement & Authorization District | A: Governor's Extradition or Waiver of Extradition Signed by Prisoner |
| : Receipt & Notification from Officer who has Prisoner in Custody | B: Receipts for expenditures |
| C: Receipts for Expenditures | C: Agreement on Detainers |

THE USE OF A GUARD MUST BE AUTHORIZED
(Attorney General Opinion 3-27-59)

| State of Alabama<br>Unified Judicial System<br><br>Form CR-9    Rev. 3/95 | PLEA OF NOT GUILTY AND WAIVER OF<br>ARRAIGNMENT | Case Number<br>CC-02-225 |
|---|---|---|

IN THE ___Circuit___ COURT OF ___Houston County,___ , ALABAMA
_(Circuit, District, or Municipal)_ _(Name of County or Municipality)_

☑ STATE OF ALABAMA v. ___Ruben Corey McNabb___ , Defendant

Comes now, the defendant in the above-styled matter, and to the offense charged enters a plea of

☑ Not Guilty
☐ Not Guilty by Reason of Mental Disease or Defect
☐ Not Guilty and Not Guilty by Reason of Mental Disease or Defect

Defendant acknowledges receipt of the copy of the charge against him/her and further waives the right to have an arraignment at which the defendant is present in person, or at which the defendant is represented by an attorney.

But, the defendant specifically and expressly reserves the right upon the filing hereof to hereafter, but before trial or before such date as may be set by the court, to interpose any defenses, objections, or motions which the defendant had the right as a matter of law or rule to interpose in this cause, prior to the filing hereof.

Defendant's date of birth is ████████████    Defendant's age is ████████████
The defendant is not eligible for consideration by the court for youthful offender status as provided by law.

___2/28/02___          ___Ruben McNabb___
Date                              Defendant

___2/28/02___          ___M. Hampton Baxley___
Date                              Attorney for Defendant

This is to certify that I am the attorney for the defendant in this matter, and that I have fully explained this form and all matters set forth herein, and pertaining hereto, to the defendant. I further state to the court that I have explained to the defendant his right to be arraigned in person and his right to have me represent him at arraignment. I further certify to the court that my client hereby knowingly, voluntarily, and intelligently waives these rights after a full and complete explanation of each and every one of them to him/her by me. BOTH MYSELF AND THE DEFENDANT UNDERSTAND THAT I AM RESPONSIBLE FOR ASCERTAINING WHAT DATE, IF ANY, HAS BEEN SET BY THE COURT FOR THE MAKING OR FILING OF ANY DEFENSES, OBJECTIONS, OR MOTIONS. I FURTHER UNDERSTAND THAT I AM RESPONSIBLE FOR NOTIFYING MY CLIENT OF THE DATE HIS/HER CASE IS SET FOR TRIAL, AND THAT I HAVE ADVISED AND INFORMED HIM/HER THAT IN THE EVENT HE/SHE FAILS TO APPEAR ON THE DATE HIS/HER CASE IS SET FOR TRIAL, ALL APPROPRIATE LEGAL ACTION WILL BE TAKEN BY THE COURT AGAINST THE DEFENDANT AND HIS/HER BOND. I further certify to the court that I have advised my client that he/she is responsible for obtaining the date his/her case is set for trial in this matter and that in the event he/she fails to appear on the date his/her case is set for trial all appropriate legal action will be taken by the court against the defendant and his/her bond, and I hereby certify that the defendant knows that he/she is personally responsible for obtaining the date his/her case is set for trial and for being present in court on that date.

___2/28/02___          ___M. Hampton Baxley___
Date                              Attorney for Defendant Signature

**FILED**                ___M. Hampton Baxley___
                                   Printed or Typed Attorney's Name

I certify that I served a copy of the foregoing plea and waiver of arraignment on the Prosecutor MAR -1 2002      ___P.O. Drawer 1486, Dothan, AL 36302___
by mailing/delivering a copy of the same to him/her on:                Address

___3/1/02___
Date        _Judy Byrd_
              JUDY BYRD, CLERK

This is to certify that my attorney has explained each and every matter and right set forth in this form and I have completely and fully read and do so understand each and every matter set forth in this form. I further state to the court that I do not wish to be personally present at an arraignment in this cause and that I do not want to have an attorney represent me at an arraignment and WITH FULL KNOWLEDGE OF EACH OF THESE RIGHTS, I HEREBY EXPRESSLY WAIVE SUCH RIGHTS. I further state to the court that I have been informed of the charge against me and have received a copy of the charge.

___2/28/02___          ___Ruben McNabb___
Date                              Defendant Signature

Filed in office this date _____    _____ By_____
                                                        Clerk

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                           *

    Plaintiff,                          *

V.                                          *        CRIMINAL DIVISION

REUBEN MCNABB,                              *        CASE NO. CC-02-225

    Defendant.                          *

## MOTION FOR PRELIMINARY HEARING AND DISCOVERY

Comes now, REUBEN MCNABB, the Defendant, by and through the undersigned attorney, and moves this Honorable Court to set this case for preliminary hearing on the next available calendar, at which time the Defendant demands that he be accorded a preliminary hearing as provided by law and that the State disclose the following:

1. The names and addresses of all witnesses against the Defendant;

2. The names and addresses of all witnesses known to the State having information exculpatory to the Defendant;

3. Copies of all written statements taken in the course of the investigation of said case by the State or any officer or agent acting in its behalf;

4. The substance of any and all oral statements made to the State, it's officers or agents in the course of investigation of said case which are either exculpatory of the Defendant or upon which the State intends to rely in the prosecution of this case;

5. The production of any and all other objects or things in the possession of the State or known or obtainable by it, its officers or agents, which would be exculpatory of the Defendant or upon which the State intends to rely in the prosecution of this case.

Respectfully submitted,

*FILED*

*FEB 13 2002*

M. Hampton Baxley (BAX009)
Attorney for Defendant
P. O. Drawer 1486
Dothan, Alabama 36302
(334)793-6550

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on the District Attorney of Houston County, Alabama, by placing same in his box in the Houston County Courthouse, Dothan, Alabama, on the 13th day of February, 2002.

Of Counsel

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                      *

     PLAINTIFF,                      *            CRIMINAL DIVISION

V.                                     *            CASE NO. CC-02-225

REUBEN MCNABB,                         *

     DEFENDANT.                      *

## MOTION TO SET BOND

COMES NOW, the Defendant, REUBEN MCNABB, by and through his appointed counsel of record, and moves this Honorable Court to set the bond in his case and as reason therefore, states the following:

1.     Defendant is not a flight risk.

2.     Defendant's father resides in Barbour County, Alabama, and is in a critical medical situation. Defendant wishes to spend time with his father while his father is still able to communicate.

WHEREFORE, Defendant prays this Honorable Court will set a reasonable bond in his case to an amount that would allow him to make bond and return to his family as soon as possible.

RAMSEY, BAXLEY & McDOUGLE

By: _____

     M. Hampton Baxley     (BAX009)
     Attorney for Defendant
     P. O. Drawer 1486
     Dothan, AL 36302
     (334) 793-6550

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all opposing counsel by depositing same in the United States Mail, with sufficient postage and properly addressed.

This the 13th day of February, 2002.

_____
Of Counsel

FILED

FEB 13 2002



28

2-27-02  Motion for Discovery granted. Motion to
Set Bond is set down for a Hearing on
the 11th day of March, 2002, at 9:00 a.m.
Notify.                              , Judge
(2-28-02 - _ HB, D d)

RECIPROCAL DISCOVERY ORDER

3-6 , 20 02

Within 14 days of this Order, the State and Defendant will make available for inspection and copying all materials discoverable under the Alabama Rules of Criminal Procedure. In addition, the State will make any exculpatory material available to the Defense. The State will make its materials available at the District Attorney's office and the Defense will do likewise at the Defense Counsel's office.

C. LAWSON LITTLE
CIRCUIT JUDGE

3. 1/-02 - Upon Heg. Bond Set At $500,000
3-1/02 Shaw

Hall - Fred

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,          *

     Plaintiff,          *

vs.          *          CASE NO.: CC-02-225

RUBEN McNABB          *

     Defendant.          *

## MOTION TO SUPPRESS EVIDENCE

COMES now the Defendant, RUBEN McNABB, by and through his undersigned attorney, and moves this Honorable Court to suppress all evidence seized as the basis for his arrest on the following grounds:

1.    The Defendant avers that the issuance of the search warrant in the instant case was illegal and served to violate the rights of the Defendant.

2.    The issuance of the search warrant was a result of an Affidavit based on hearsay evidence, in whole or in part, without existence of a substantial basis on believing that there was a factual basis for the information or a substantial basis for believing the source of the hearsay to be credible.

3.    The search of the premises which produced the evidence in question was wholly without any valid constitutional basis, thereby depriving the Defendant of his rights to due process as guaranteed under the 4th and 14th Amendments of the Constitution of the United States and Article I, Section 5 and Section 6 of the Constitution of the State of Alabama (1901).

4.    Defendant specifically avers that the search and seizure was illegal, in violation of his rights and unconstitutional for the following reasons:

a.    The Affidavit submitted to the issuing officer was improperly and illegally executed;

b.    The warrant was illegally issued because it does not show probable cause sufficient to justify the issuance of a search warrant;

c.    The seizure was illegal in that it was too broad and not in conformity with the directions of the issuing judge so far as the items subject to search and seizure;

d.    The information contained in the Affidavit constitutes false swearing;

e.    The search was a "general search";

f.    The Affiant, before the issuing judge, had no personal knowledge of any facts which would justify a determination by the judge of probable cause for the issuance of said warrant;

g.    The Affidavit on which the search warrant is based was insufficient as a matter of law.

5.    The search of the premises was illegal and all fruits of the search must be suppressed because of the foregoing reasons.

WHEREFORE, Defendant respectfully requests this Honorable Court for a hearing on this Motion to Suppress prior to the trial and outside the presence of the jury and for issuance of its Order suppressing all evidence seized as a result of the illegal search.

Respectfully submitted this 13th day of March, 2002.

RAMSEY, BAXLEY & McDOUGLE

By: _M. H. Baxley_
M. Hampton Baxley            (BAX009)
Attorney for Defendant
    Ruben McNabb
P. O. Drawer 1486
Dothan, AL 36302
(334) 793-6550

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney by depositing same in his mailbox located at the Houston County Courthouse Annex.

This the 13th day of March, 2002.

_M. H. Baxley_
Of Counsel

pc:

FILED

MAR 1 3 2002

Carol Roper, CIRCUIT CLERK
HOUSTON CO., AL

3-18-02    Motion to Suppress will be heard prior to trial.
Notify.
(3-19-02 — — H.B. D.A.)    Greg Holland, Judge

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

     PLAINTIFF,                           *

V.                                         *          CASE NO. CC-02-225

RUBEN MCNABB,                              *

     DEFENDANT.                           *

### MOTION TO RECONSIDER BOND

    Comes now the Defendant, RUBEN MCNABB, by and through his undersigned attorney, and moves this Honorable Court to reconsider the bond amount set in the instant case and for grounds therefore states as follows:

    1.    The Defendant is being held on a bond of $300,000.00 on a charge of Robbery, 1st Degree, and is presently incarcerated in the Houston County Jail;

    2.    The Defendant has immediate family in the area;

    3.    The Defendant's wife is currently expecting their child and will be unable to support herself and her other children without assistance;

    4.    The Defendant is financially unable to post bond in the amount set in this cause;

    5.    The Defendant's present incarceration makes it extremely difficult to consult with his attorney, locate witnesses on his behalf, and, in general, prepare a defense to the charges in this matter;

    6.    The Defendant is presumed innocent of the charges against him in this matter.

    WHEREFORE, Defendant respectfully requests that this Honorable Court enter an Order reducing said bond to an amount commensurate with the facts of this matter.

RAMSEY, BAXLEY & McDOUGLE

**FILED**

MAY 0 7 2002

*Judy Byrd*

JUDY BYRD, CLERK
HOUSTON CO., AL

By: _M. Hampton Baxley_   (BAX009)
    M. Hampton Baxley   (BAX009)
    Attorney for Defendant
    P. O. Drawer 1486
    Dothan, AL 36302
    (334) 793-6550

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney by depositing same in the District Attorney's box located at the Houston County Courthouse Annex.

This the 7th day of May, 2002.

_____
Of Counsel

7-31-02 Motion to Reconsider ~~Denied~~ Hollingford
set for hearing on the 14th day
of August 2002 at 9:00 a.m. Notify.
(C-18-02 ∋ - HB, LDa)

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *

    PLAINTIFF,                   *

V                                    *    CASE NO. CC-02-225

RUBEN McNABB,                        *

    DEFENDANT.                   *

### MOTION FOR SPEEDY TRIAL

    COMES NOW, the Defendant, RUBEN McNABB, by and through his undersigned attorney of record, and moves this Honorable Court for a speedy trial or disposition of the instant case.

    Submitted, this the 19th day of June, 2002.

                RAMSEY, BAXLEY & McDOUGLE

                By: _____

                M. Hampton Baxley          (BAX009)
                Attorney for Defendant
                P. O. Drawer 1486
                Dothan, AL 36302
                (334) 793-6550

### CERTIFICATE OF SERVICE

    I hereby certify that I have served a copy of the foregoing upon the District Attorney by depositing same in the District Attorney's box located at the Houston County Courthouse Annex.

    This the 19th day of June, 2002.

FILED

JUN 19 2002

_____
Of Counsel

CLERK
HOUSTON CO., AL

31

12-19-02    Motion for Speedy trial.
1-1-02     Motion for Speedy trial granted
           (7-3-02 — ) — H.B.
           el a + Judge  Denny  Holleng, Judge

on 6-20-02
J. Gui's office.
6-3-02

CASE # 02-225

Dear Judy Bird.

Please send me a copy of my
case action summary and a copy of
the motion filed in my behalf up to
this date. Also could you inform me
why my trial dates are not on my
case action summary since this is
the third time it has changed.
Thank you for your time and consideration.

Ruben McNabb

CASE # 02-225
Ruben McNabb. 52942
901 E. Main St.
Dothan Al 36302

rec'd
7-11-02

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

         PLAINTIFF,                 *        CASE NO. CC-2002-225

V.                                         *

RUBEN McNABB,                              *

         DEFENDANT.                 *

## DEFENDANT'S REQUEST FOR PRODUCTION BY THE STATE

The Defendant, pursuant to the Alabama Rules of Criminal Procedure 16 through 16.3 and other provisions of law respectfully requests the State to produce the following:

1.    To produce and permit the defendant to inspect and copy any written, or recorded statements made by the defendant to any law enforcement officer, official or employee which are in the possession, custody and control of the State of Alabama.

2.    To produce and permit the defendant to inspect and copy any written, or recorded statements by a co-defendant or accomplice, which is in the possession, custody or control of the State of Alabama.

3.    To disclose to the defendant the substance of any oral statement made by the defendant before and/or after arrest to any law enforcement officer, official or employee.

4.    To disclose to the defendant the substance of any oral statements made by a co-defendant or accomplice, before or after arrest to a law enforcement officer, official or employee.

5.   To produce and permit the defendant to inspect and copy any and all results of reports and police reports made in connection with this case, which are within the possession, custody and control of the State of Alabama.

6.   To produce and permit the defendant to analyze, inspect and copy or photograph any physical evidence within the possession, custody and control of the State of Alabama inclusive of any video and/or sound recordings.

7.   To disclose and make available to the defendant all evidence known to the State which is favorable to the defendant including but not limited to evidence which reasonably tends to negate the guilt of the defendant, reduce the degree of guilt of the defendant, or reduce the punishment of the defendant. Brady v. Maryland, 373 U.S. 83 (1963).

8.   To produce and permit the defendant to inspect and copy any recordings or any and all communications between law enforcement personnel concerning the offenses alleged.

9.   To produce the names, addresses and phone numbers of all witnesses to be called or likely to be called by the State.

10.   To produce the name and last known address of all confidential government informants who are eyewitnesses to the commission of the alleged crime or whose information the law enforcement personnel relied upon to procure a search or arrest warrant or search or arrest the defendant without said warrant.

11.   Any and all considerations or promises of consideration given to or made on behalf of State witnesses or agents, including payments or consideration to any State witness for non-prosecution.

12. Any and all records and information revealing felony convictions attributed to each State witness.

13. Any and all records and information showing prior misconduct or bad acts committed by the State witnesses.

14. Any information that any of the State witnesses had consumed alcohol or drugs prior to witnessing the event that gives rise to their respective testimony.

15. Any statement of witnesses which conflict either internally or with another statement of the same witness.

16. Any internal documents or other evidence of any law enforcement official's misfeasance, malfeasance or negligence whether by act or omission or commission in the performance of his or her duties concerning this specific case.

17. Any evidence of periodic destruction of any evidence such as a police department document retention policy.

18. Copies of all written or recorded polygraph tests taken in the course of the investigation of said case administered to any State witnesses by any officer or agent or investigator acting on the State's behalf.

19. In addition, the defendant requests notice of the following matters:

   a. Any grant of immunity or leniency offered or made to any witness or potential witness;

   b. Any item, of whatever sort, used or to be used to refresh the memory of any witness;

   c. Any fact, of which the state intends to ask the Court to take Judicial Notice;

d.    Any motions that the State intends to make.

20.    It is understood that this is a continuing request for production pursuant to Rule 16.3 of the Alabama Rules of Criminal Procedure, the Constitutions of the United States and the State of Alabama and other provisions of law.

RAMSEY, BAXLEY & McDOUGLE

By: _____
M. Hampton Baxley        (BAX009)
Attorney for Defendant
P. O. Drawer 1486
Dothan, AL 36302
(334) 793-6550

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney by depositing same in the District Attorney's box located at the Houston County Courthouse Annex.

This the 31st day of July, 2002.

_____
Of Counsel

FILED

JUL 3 1 2002

657

| 8-5-02 | Request for Production Granted Motion |
| 8-4-02 | re/fa Hamp Baxley + DA |

Glenn Holladay Judge

8-TA-02  Motion for Bond Reduction
Sent to Hutton Andy

639

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,           *

    PLAINTIFF,           *    CRIMINAL DIVISION

V.                          *    CASE NO. CC-2002-225

RUBEN McNABB,               *

    DEFENDANT.           *

## MOTION TO CONTINUE TRIAL

COMES NOW, the Defendant, RUBEN McNABB, by and through his undersigned attorney, and requests this Honorable Court to continue the trial in the above-styled cause and for grounds therefore states as follows:

1. Trial is set for August 27, 2002, for the charge of first degree robbery.

2. Several out-of-state witnesses for the defense have work-related conflicts and will not be able to attend the trial as it is currently scheduled.

3. The witnesses referred to in paragraph 2 are essential to the defense of the Defendant's case.

4. The District Attorney has been contacted and has no objection to a continuance at this time.

WHEREFORE, Defendant respectfully requests this Honorable Court to continue said trial which is presently scheduled to commence on August 27, 2002, and reschedule it for the next term.

RAMSEY, BAXLEY & McDOUGLE

By: _____

M. Hampton Baxley          (BAX009)
Attorney for Defendant
P. O. Drawer 1486
Dothan, AL 36302
(334) 793-6550
mhb@rbmlaw.org

**FILED**

AUG 2 1 2002

JUDY BYRD, CLERK
HOUSTON CO., AL

040

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney by depositing same in the District Attorney's box located at the Houston County Courthouse Annex.

This the 21st day of August, 2002.

_____
Of Counsel

041

| 8-21-02 | Motion to Continue Trial |
| 8-21-02 | Upon motion of defendant case continued. Motion |
| | (8-22-02 ? ) Denied. Holberg, Judge |
| | HB, D A) |

| STATE OF ALABAMA | * | IN THE CIRCUIT COURT OF |
| VS. | * | HOUSTON COUNTY, ALABAMA |
| RUBEN C MCNABB | * | CASE NO. CC2002 - 225-H |

## NOTICE TO DEFENDANT OF PREVIOUS CONVICTIONS AND
## NOTICE OF INTENT TO USE SUCH CONVICTIONS FOR IMPEACHMENT PURPOSES

You are hereby notified that the District Attorney's Office has evidence of the following convictions, which, in the event of your conviction in the above case, will be presented to the Court for consideration under the Habitual Offender Statute, §13A-5-9, Code of Alabama, 1975. Furthermore, it is the State's intent to use such convictions for impeachment purposes should the defendant testify at trial Rules 609(a)(b)& (c) of the Alabama Rules of Evidence.

| Date | Case No. | Charge | Disposition | Jurisdiction |
|------|----------|--------|-------------|--------------|
| 6-19-97 | | CARRYING CONCEALED WEAPON | 2 YRS 6 MOS | ORANGE COUNTY, FLA |
| 6-19-97 | | UPCS | 2 YRS 6 MOS | '' '' '' |
| 7-3-97 | | UPCS | 1 YR 6 MOS | ORLANDO, FLA |

You will be properly notified in the event the District Attorney receives evidence of any other additional convictions.

This the 19TH day of AUGUST 2002.

**FILED**

Assistant District Attorney AUG 20 2002

JUDY BYRD, CLERK
HOUSTON CO.

### CERTIFICATE OF SERVICE

I, William C. White, Assistant District Attorney, do hereby certify that on this date served a copy of the foregoing on _Hamp Baxley_, attorney of record for the defendant, by placing a copy of the same in his/her mailbox at the Houston County Courthouse on this 19TH day of AUGUST 2001.

Assistant District Attorney

| 8-21-02 | Motion to Continue Trial |
| 8-21-02 | Upon motion of defendant case continued. Motion |
| | (8-22-0-7)- |
| | STB, DA) |  Denny Holladay, Judge |

8-27-02    Continued for Appt. to next Available Term

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

     PLAINTIFF,                         *

V                                          *          CASE NO. CC-02-225

RUBEN McNABB,                              *

     DEFENDANT.                         *

## MOTION TO SCHEDULE TRIAL

COMES NOW, the Defendant, RUBEN McNABB, by and through his undersigned attorney of record, and moves this Honorable Court to schedule his trial for the next trial term.

Submitted, this the 30th day of August, 2002.

RAMSEY, BAXLEY & McDOUGLE

By: _____

M. Hampton Baxley          (BAX009)
Attorney for Defendant
P. O. Drawer 1486
Dothan, AL 36302
(334) 793-6550

FILED

SEP 9 2002

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney by depositing same in the District Attorney's box located at the Houston County Courthouse Annex.

This the 30th day of August, 2002.

_____
Of Counsel

| 9-10-02 | This Case is to be placed on the next available jury trial docket. Not by ___ _____ Judge |
| | (9-13-02-D-HB) (Judge & D.A.) |

1-16-03 | Continues unreached.

STATE OF ALABAMA               )      IN THE CIRCUIT COURT OF

V.                             )      HOUSTON COUNTY, ALABAMA

_Ruben Corey McWabb_           )      CASE NO. _CC02-225_ W
        DEFENDANT

## NOTICE OF STATE'S INTENT
## TO SEEK ADDITIONAL PENALTY

Comes now the State of Alabama, pursuant to §13A-5-6 of the Code of Alabama, and

notifies the defendant that the State intends to seek an additional penalty for the commission of a

felony in which a firearm or deadly weapon was used or attempted to be used.

Dated this _27_ day of _January_ 2002. _2003_

                         Assistant District Attorney

## CERTIFICATE OF SERVICE

I, Martin Adams, Assistant District Attorney, of the 20th Judicial Circuit, hereby certify
that I have served a copy of the foregoing on
_Hamp Baxley_ , attorney for defendant, by placing a copy
of the same in his/her box at the Houston County Courthouse this _27_ day of
_January_ 2002. _2003_

                         Assistant District Attorney

FILED

JAN 2 9 2003



JUDY BYRD, CLERK
HOUSTON CO., AL

```
JUR28                                          CIRCUIT CLERK JURY SYSTEM              PAGE:
OPER: TDB                                        HOUSTON COUNTY                       RUN DATE: 02/06/2003
                                             STRIKE LIST BY: N A M E                  RUN TIME: 15:36:03

TERM DATE: 02/06/2003   PANEL: ALL   STATUS: A
```

| STRIKE | JUROR'S NAME | STRIKE | JUROR'S NAME |
|--------|--------------|--------|--------------|
| 0001 | ADAMS JOHN MITCHELL | 0033 | FENIOR BEVERLY SCHOENEW |
| 0002 | ALFORD JEFFIE LEE | 0034 | FRIDELL JOSEPH FRANKLIN |
| 0003 | ARD ANNETTE FAILS | 0035 | GLASGOW FRANK L |
| 0004 | BARNWELL JAMES MARVIN J | 0036 | GLASNER GARY S |
| 0005 | BARRENTINE ROBERT E | 0037 | GODWIN CHARLES ERICK |
| 0006 | BLANCHARD FAYE OWENS | 0038 | GOOD CHARLES STEVEN |
| 0007 | BOWMAN STEPHANIE RAE | 0039 | GORDON RANDALL JOE |
| 0008 | BOYETT EDITH DIANNE HAL | 0040 | GOUGE FLOYD ALLEN |
| 0009 | BREWTON POWELL | 0041 | GRACE DANIEL LARRY |
| 0010 | BROOKS NANCY ANN | 0042 | GRIFFIN PHYLLIS C |
| 0011 | BROWN JAMES CURTIS | 0043 | GRIMMER JERELYN M |
| 0012 | BRYAN KATHY STARLING | ~~0044~~ | ~~GRIMSLEY JAMES EDWARD~~ |
| 0013 | CARROLL JUDITH CORN | 0045 | GROSS ROBERT ELMER |
| ~~0014~~ | ~~CHILDS JUNE MCKENZIE~~ | 0046 | HARRIS SYLVIA BAXLEY |
| 0015 | CHITTY SHIRLEY SPANN | 0047 | HART WILLIAM HENRY III |
| 0016 | CLARK ROBBY RIPPLE | 0048 | HOLLAND HAZEL MONDAY |
| 0017 | COKER KELLY JEAN | 0049 | HOOPER PATSY HOLMES |
| 0018 | COOK REGINALD EUGENE | 0050 | HOUSTON RENDA MYERS |
| 0019 | COPELAND TELLIS | 0051 | HUDGENS DANA LATRICE |
| 0020 | CRAIG JEFFREY SCOTT | 0052 | HUGHES LORI MARIE JACKS |
| 0021 | CROWE DORIS KENT | 0053 | HURST CLAYTON EDWIN |
| 0022 | CURRY BRIDGETTE GRIMSLE | 0054 | JACKSON RHONDA HENSLEY |
| 0023 | DANIELS SYLVESTER | 0055 | JACOBS SARAH SHIRLEY |
| 0024 | DAVIS LUTHER LEONARD | 0056 | JOHNSON JOHN WESLEY SR |
| 0025 | DAWSEY LATRECE V | 0057 | JOHNSON SUSAN MARIA BAR |
| 0026 | DEMKE PATRICIA HENRY | 0058 | JONES GREGORY ALLEN |
| 0027 | DEVANE LESTER B JR | 0059 | KIRKLAND JERRY J |
| 0028 | DILLARD KENNETH ED | 0060 | LEE JENNIFER DRINKARD |
| 0029 | DOUGLAS CHARLES WESLEY | ~~0061~~ | ~~LEGER MARVIN LEE~~ |
| 0030 | DOWNING DEBRA ANN | ~~0062~~ | ~~LEWIS NEO~~ |
| 0031 | EVANS CHARLES LOCIE | 0063 | MADISON LINDA WILLIAMS |
| 0032 | EVERETTE LINDA ANDREWS | 0064 | MANNING BRUCE ALLEN |

Handwritten annotations: CC02-a / state / of / Alabama / vs / Ruben / Corey / McNabb / (Hamp / Parker) / Judge / White / S Alt

JUR25A
OPER: TDB
HOUSTON COUNTY
STRIKE LIST BY: N A M E
PAGE: 2
RUN DATE: 02/06/2003
RUN TIME: 15:36:03

TERM DATE: 02/06/2003    PANEL: ALL    STATUS: A

| STRIKE | JUROR'S NAME | STRIKE | JUROR'S NAME |
|--------|--------------|--------|--------------|
| 0065 | MARTIN FARON PAUL | 0097 | TILLMAN BENNY JAMES |
| 0066 | MCCALLISTER CHARLES JER | 0098 | TURVIN DANNY CLARK |
| 0067 | MCCALLISTER SHERRY ANN | 0099 | TURVIN DONELL |
| 0068 | MCCAROLE TONYA PREVATT | 0100 | WARD COLEY D |
| 0069 | MCGRIFF SAUNDRA FREE | 0101 | WEATHERINGTON BARBARA A |
| 0070 | MCKEE DEBORAH DUNCAN | 0102 | WHATLEY ANSLEY E JR |
| 0071 | MCKINNON ROBERT DENNIS | 0103 | WILLIAMS AMY NICOLE SHU |
| 0072 | MCKISSACK JULIA TERRY W | 0104 | WILLIAMS BLONDELL H |
| 0073 | MCNEAL BETTY AMELIA | 0105 | WILLIAMS CARLOS |
| 0074 | MCNEAL WILLIAM RALPH JR | 0106 | WILLIAMS CYNTHIA D |
| 0075 | METCALF THEATA WOOD | 0107 | WILLIAMS JUDY MILTON |
| 0076 | NELSON ROBERT WAYNE | 0108 | WILLIS CHARLES MAX |
| 0077 | NORRIS LINDA BAXLEY | 0109 | WILSON FOREST CLAY |
| 0078 | PARKER JOAN N | 0110 | WILSON JUDY CAROL |
| 0079 | PICKETT MARY FARMER | 0111 | WREN VANESSA CHRISTIAN |
| 0080 | PIPKINS BEVERLY WEED | 0112 | WYMES SAM JR |
| 0081 | PITTMAN J C | 0113 | WYNN ALLEN RORY |
| 0082 | RICHARDSON MARY NIELSEN | 0114 | YOUMANS CLETUS N |
| 0083 | RILEY DOLORES H | 0115 | YOUNG TAMMIE |
| 0084 | RIVERS RICHARD JERREL | | |
| 0085 | ROBINSON WILLIE C | | |
| 0086 | RONEY CHARLENE BLANCHAR | | |
| 0087 | RUDD BARRY DALE | | |
| 0088 | SHIRAH MARY KATHRYN DOD | | |
| 0089 | SMITH JIMMIE LEE JR | | |
| 0090 | SMITH PATRICIA MOBLEY | | |
| 0091 | STILL LARONDA FAYE JONE | | |
| 0092 | STOVALL CARRIE F SPANN | | |
| 0093 | TAYLOR CHARLOTTE MCCULL | | |
| 0094 | THOMAS EDNA BRAY | | |
| 0095 | THOMAS KRYSTAL ANN | | |
| 0096 | TICE JAMES EARL | | |

CASE NO.

2-13-03

DATE

051

State of Alabama

v

Ruben Corey Mc Nabb

Robbery 1st Degree

CHARGE

Jerry White

JUDGE

Carla Woodall

COURT REPORTER

| S | ▷ | |
|---|---|---|
| 13 | 12 | 25 |
| 84 | 108 | 2 |
| 89 | 66 | 4 |
| 79 | 61 | 6 |
| 62 | 68 | 8 |
| 81 | 107 | 10 |
| 106 | 78 | 12 |
| 101 | 98 | 14 |
| 90 | 77 | 16 |
| 109 | 75 | 18 |
| 97 | 82 | 20 |
| 92 | 95 | 22 |
| 100 | 80 Alt | 24 |
| 63 Alt | | 26 |
| | | 28 |
| | | 30 |
| | | 32 |
| | | 34 |
| | | 36 |

3'
13
88

12
2
14
23
37

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
|     PLAINTIFF, | * | |
| V | * | CASE NO. CC-02-225 |
| RUBEN McNABB, | * | |
|     DEFENDANT. | * | |

## MOTION IN LIMINE

COMES NOW, Ruben McNabb, the Defendant in the above-styled cause, by and through his undersigned attorney, and respectfully moves that this court enter an Order prohibiting the prosecution in this cause from introducing or referring to any evidence indicating the defendant's previous conviction for carrying a concealed firearm. As grounds for this Motion, the Defendant states to the Court as follows:

1.      Defendant was previously convicted in Orange County, Florida, case number CR-92-11635, of carrying a concealed firearm on January 27, 1993, and pled guilty to that charge on the same date. Defendant's probation at that time was revoked and he served the remainder of a sentence in the Florida State Penitentiary.

2.      The Alabama Rules of Evidence, specifically Rule 609(a) and (b), state as follows:

> (a) **General Rule.** For the purpose of attacking the credibility of a witness,
> (1)(A) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law which the witness was convicted, and
> (1)(B) evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and
> (2) evidence that any witness has been convicted of a crime shall be

admitted if it involved dishonesty or false statement, regardless of the punishment.

(b) **Time Limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interest of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction, more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advanced written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

3.    Defendant's conviction for carrying a concealed firearm do not fall within the parameters of admissible evidence, as outlined in the Alabama Rules of Evidence, Rule 609(a) and (b), because the conviction is more than ten years old, the crimes do not involve dishonesty or false statement, and their prejudicial effect substantially outweighs any probative value. Further, defendant's conviction for carrying a concealed firearm is a misdemeanor offense.

4.    The introduction of evidence of defendant's conviction would tend to prejudice and inflame the jury and allow them to consider matters in the instant case that would infer that because defendant was convicted of crimes involving violence in the past, then defendant must be guilty of the current charge. This type of inference by a jury is in contrast to the general exclusionary rule of character evidence as stated in Rule 404(a) of the Alabama Rules of Evidence.

WHEREFORE, all premises considered, Defendant respectfully prays that this Court enter an Order prohibiting the State of Alabama from referring to, or introducing into evidence in this cause, any evidence of defendants prior conviction for carrying a concealed firearm.

RAMSEY, BAXLEY & McDOUGLE

By: _____
     M. Hampton Baxley    (BAX009)
     Attorney for Defendant
     P. O. Drawer 1486
     Dothan, AL 36302
     (334) 793-6550
     mhb@rbmlaw.org

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney by depositing same in the District Attorney's box located at the Houston County Courthouse Annex.

This the 13th day of February, ~~2002~~ 2003

_____
Of Counsel

February 13 2003. Motion in limine denied if deft take witness stand and state wishes to use conviction to impeach defendant, motion to suppress evidence denied.

Gary M White
Judge

February 13, 2003. At close of State's evidence, defendant moved for judgment of acquittal.

February 13 2003 - Attachments to issue
to Jimmy Bolin #1, 1571 Westgate Pkwy,
Dothan and Patsy Lynn Roach #4 Walmart
on Montgomery Hwy, Dothan (Ryan Childers)
2-13-03 Issued attachments)

February 14, 2003. [illegible handwriting] issue for May Bessie [illegible]
Dothan, Ala. and Telephone Receiver [illegible]
Baustve Agts & Highlands Boy [illegible]

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

     PLAINTIFF,                          *

V                                          *              CASE NO. CC-02-225

RUBEN McNABB,                              *

     DEFENDANT.                          *

## DEFENDANT'S REQUESTED JURY INSTRUCTIONS

COMES NOW the Defendant, RUBEN McNABB, and respectfully requests this Court to read the following Jury Charges to the Jury and to instruct the Jury that said charges are correct propositions of law and should be considered by the Jury in their deliberations as part of the law in this case.

I hereby certify that a true and correct copy of the attached Jury Charges have been served upon Counsel for the State in open court this _14th_ day of February, 2003.

RAMSEY, BAXLEY & McDOUGLE

By: _____
   M. Hampton Baxley              (BAX009)
   Attorney for Defendant
   P. O. Drawer 1486
   Dothan, AL 36302
   (334) 793-6550
   mhb@rbmlaw.org

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                              *

     PLAINTIFF,                               *

V                                              *              CASE NO. CC-02-225

RUBEN McNABB,                                  *

     DEFENDANT.                               *

## REQUESTED INSTRUCTION 1

I charge you, members of the jury, based on the evidence; you must find RUBEN McNABB not guilty.

_____ GIVEN
_____ GIVEN AS MODIFIED
  ✓  REFUSED
_____ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                        *

     PLAINTIFF,                          *

V                                        *          CASE NO. CC-02-225

RUBEN McNABB,                            *

     DEFENDANT.                          *

## REQUESTED INSTRUCTION 2

I further charge you that, if you believe the evidence, you must find RUBEN McNABB

not guilty.

\_\_\_\_\_ GIVEN
\_\_\_\_\_ GIVEN AS MODIFIED
\_\_\_\_\_ REFUSED
\_\_\_\_\_ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                                    *

     PLAINTIFF,                                     *

V                                                    *                    CASE NO. CC-02-225

RUBEN McNABB,                                        *

     DEFENDANT.                                     *

## REQUESTED INSTRUCTION 3

Circumstances, no matter how strong, which merely arouse a suspicion of guilt, cannot serve as a basis for convicting RUBEN McNABB.

   ✓ GIVEN
\_\_\_\_\_ GIVEN AS MODIFIED
\_\_\_\_\_ REFUSED
\_\_\_\_\_ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

      PLAINTIFF,                          *

V                                          *              CASE NO. CC-02-225

RUBEN McNABB,                              *

      DEFENDANT.                          *

## REQUESTED INSTRUCTION 4

Circumstances merely consistent with guilt or causing suspicion thereof are insufficient to justify conviction of RUBEN McNABB.

      __✓__ GIVEN
      _____ GIVEN AS MODIFIED
      _____ REFUSED
      _____ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
| PLAINTIFF, | * | |
| V | * | CASE NO. CC-02-225 |
| RUBEN McNABB, | * | |
| DEFENDANT. | * | |

## REQUESTED INSTRUCTION 5

Members of the jury, for circumstantial evidence to be sufficient to justify a conviction, the circumstances proved must not only be consistent with the hypothesis that the Defendant is guilty but inconsistent with the hypothesis that RUBEN McNABB is innocent, and inconsistent with every other rational hypothesis except that of guilt.

√ GIVEN
_____ GIVEN AS MODIFIED
_____ REFUSED
_____ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

      PLAINTIFF,                           *

V                                          *              CASE NO. CC-02-225

RUBEN McNABB,                              *

      DEFENDANT.                           *

## REQUESTED INSTRUCTION 6

You cannot convict RUBEN McNABB on mere possibilities, surmise, suspicion, or speculation, however strong they may be. A verdict of guilty based upon mere possibilities, surmise, suspicion or speculation, would violate the oath that you the members of this jury have taken. If, after carefully and fairly reviewing the facts, you are not satisfied of RUBEN McNABB'S guilt, then you have a reasonable doubt and RUBEN McNABB should be found not guilty.

      ✓   GIVEN
      _____   GIVEN AS MODIFIED
      _____   REFUSED
      _____   WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

     PLAINTIFF,                          *

V                                          *              CASE NO. CC-02-225

RUBEN McNABB,                              *

     DEFENDANT.                          *

## REQUESTED INSTRUCTION 7

Members of the jury, in a robbery prosecution for Robbery in the First Degree, the State must among prove, beyond a reasonable doubt that during the course of committing a theft RUBEN McNABB:

Used force against or threatened the use of force against the employees of the Winn Dixie located on Westgate Parkway with the intent to overcome their physical resistance or physical power of resistance; or

Threatened the imminent use of force against the employees of the Winn Dixie located on Westgate Parkway with intent to compel acquiescence to the taking of or escaping with property of the Winn Dixie located on Westgate Parkway; and

RUBEN McNABB was armed with a deadly weapon or dangerous instrument or caused serious physical injury to the employees of the Winn Dixie

If the State cannot prove that beyond a reasonable doubt, you must find the Defendant not guilty.

✓ GIVEN
_____ GIVEN AS MODIFIED
_____ REFUSED
_____ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

     PLAINTIFF,                         *

V                                          *           CASE NO. CC-02-225

RUBEN McNABB,                              *

     DEFENDANT.                         *

### REQUESTED INSTRUCTION 8

Members of the jury, in a Robbery in the First Degree prosecution, the State also must prove, beyond a reasonable doubt that it was the Defendant, RUBEN McNABB, to the exclusion of all others that committed the Robbery of Winn Dixie located on Westgate Parkway.

If the State does not prove this beyond a reasonable doubt, you must find the Defendant not guilty.

\_\_\_\_\_ GIVEN
\_\_\_\_\_ GIVEN AS MODIFIED
\_\_✓\_\_ REFUSED
\_\_\_\_\_ WITHDRAWN

*misleading and doesn't conform to evidence* Quy on White

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

      PLAINTIFF,                           *

V                                          *          CASE NO. CC-02-225

RUBEN McNABB,                              *

      DEFENDANT.                           *

## REQUESTED INSTRUCTION 9

In order to convict RUBEN McNABB of Robbery in the First Degree, each of you must be convinced, by the evidence, beyond a reasonable doubt, of each and every element of the crime of Robbery in the First Degree.

    √   GIVEN
    _____  GIVEN AS MODIFIED
    _____  REFUSED
    _____  WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                        *

    PLAINTIFF,                          *

V                                        *            CASE NO. CC-02-225

RUBEN McNABB,                            *

    DEFENDANT.                          *

## REQUESTED INSTRUCTION 10

Ladies and Gentlemen, if the State has left the slightest doubt as to any one of the individual elements of the crime of Robbery in the First Degree, then that is enough doubt to find the Defendant not guilty.

    ✓  GIVEN
    _____  GIVEN AS MODIFIED
    _____  REFUSED
    _____  WITHDRAWN

- 070

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *

     PLAINTIFF,                       *

V                                    *              CASE NO. CC-02-225

RUBEN McNABB,                        *

     DEFENDANT.                       *

## REQUESTED INSTRUCTION 11

    Ladies and Gentlemen, in considering the evidence and testimony given in the trial of this case, you should not attach any more credibility to the testimony of any law enforcement officer, simply because he or she is employed as a law enforcement officer, than you would to the testimony of anyone else.

_✓_ GIVEN
____ GIVEN AS MODIFIED
____ REFUSED
____ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

     PLAINTIFF,                           *

V                                          *            CASE NO. CC-02-225

RUBEN McNABB,                              *

     DEFENDANT.                           *

## REQUESTED INSTRUCTION 12

The State has the burden of providing the Defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely true than not true. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the Defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the Defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

    ✓   GIVEN
_____   GIVEN AS MODIFIED
_____   REFUSED
_____   WITHDRAWN

February 14, 2003 - Jury deadlocked,
Mistrial declared.

02-14-03

Jury in White
Judge

February 19 2003 — Let being made known
to the Court that the defendant was mistakenly
released by the Sheriff's office, an alias
writ of arrest is ordered to be issued. Bail
Set at $1,550,000

(2-19-03 alias issued)

ALIAS WARRANT

JID: JERRY M. WHITE                    CC 2002 000225.00

---

THE STATE OF ALABAMA         VS MCNABB RUBEN COREY

TO ANY LAW ENFORCEMENT OFFICER:

YOU ARE HEREBY COMMANDED TO ARREST: MCNABB RUBEN COREY
AND BRING HIM/HER BEFORE THIS COURT TO ANSWER THE STATE FOR THE CHARGE OF
FAILURE TO APPEAR ON THE CHARGE OF: ROBBERY 1ST          - FELONY

WITNESS MY HAND THIS FEBRUARY 19, 2003.

BOND SET AT:   $1,000,000.00 -

JUDGE/CLERK/MAGISTRATE

---

DEFENDANT'S ADDRESS:              DEFENDANT'S DESCRIPTION:

% HOUSTON COUNTY JAIL             HT: 600   WT: 197
                                  HAIR: BLK   EYE: BRO
DOTHAN          , AL 36302 0000   BIRTH DATE:
                                  RACE: B      SEX: M
                                  SID#: 000000000
                                  SSN#:

ALIAS:

EMPLOYER: _____    PHONE NO: _____

TICKET NUMBER:                       AGENCY/OFFICER: 0380100/SINGLETO

NOTE: ALIAS ORDERED DUE TO DEFT BEING RELEASED MISTAKENLY BY THE
      SHERIFF'S OFFICE.  BOND SET AT $1,000,000.00
      Criminal Jury Trial is to be set upon defendant's arrest.
THIS APPEARS TO BE A VALID ADDRESS

---

OFFICERS RETURN:
RECEIVED ON _____

EXECUTED ON _2-24-03_____    BY: Michael Spivey

( ) DEFENDANT ARRESTED, RELEASED ON BOND
( ) DEFENDANT ARRESTED, IN JAIL
( ) DEFENDANT ARRESTED, NOT BOOKED
( ) NOT FOUND
( ) OTHER _____

SHERIFF                              OFFICER

NCIC

OPERATOR:
PREPARED:02/19/2003

| State of Alabama<br>Unified Judicial System<br><br>Form C-10<br>Page 1 of 2    Rev. 2/95 | AFFIDAVIT OF SUBSTANTIAL<br>HARDSHIP AND ORDER | Case Number<br><br>0 /5 |
|---|---|---|

IN THE ___*District*___ COURT OF ___*Houston*___, ALABAMA
(Circuit, District, or Municipal)          (Name of County or Municipality)

STYLE OF CASE: _____ v. *Ruben Cory McNabb*
                    Plaintiff(s)                          Defendant(s)

TYPE OF PROCEEDING: _____ CHARGE(s) (if applicable): *Robbery 1st*

☐ CIVIL CASE-- I, because of substantial hardship, am unable to pay the docket fee and service fees in this case. I request that payment of these fees be waived initially and taxed as costs at the conclusion of the case.

☐ CIVIL CASE-- (such as paternity, support, termination of parental rights, dependency) - I am financially unable to hire an attorney and I request that the court appoint one for me.

☐ CRIMINAL CASE-- I am financially unable to hire an attorney and request that the court appoint one for me.

☐ DELINQUENCY/NEED OF SUPERVISION-- I am financially unable to hire an attorney and request that the court appoint one for my child/me.

## AFFIDAVIT

**SECTION I.**

1. IDENTIFICATION
Full name *Ruben Cory McNabb*                    Date of birth _____
Spouse's full name (if married)
Complete home address *1841 Ravenall Ave Orlando FL 3280*

Number of people living in household _____
Home telephone number _____
Occupation/Job _____ Length of employment _____
Driver's license number _____ *Social Security Number _____
Employer *Unemployed* _____ Employer's telephone number _____
Employer's address _____

2. ASSISTANCE BENEFITS

Do you or anyone residing in your household receive benefits from any of the following sources? (If so, please check those which apply.)

☐ AFDC    ☐ Food Stamps    ☐ SSI    ☐ Medicaid    ☐ Other _____

3. INCOME/EXPENSE STATEMENT *INMATE*
*Hamton Baxley is his atty*
Monthly Gross Income:
    Monthly Gross Income                                      $ _____
    Spouse's Monthly Gross Income (unless a marital offense) _____
    Other Earnings: Commissions, Bonuses, Interest Income, etc. _____
    Contributions from Other People Living in Household _____
    Unemployment/Workmen's Compensation,
        Social Security, Retirements, etc. _____
    Other Income (be specific) _____
        TOTAL MONTHLY GROSS INCOME              $ _____

Monthly Expenses:
    A. Living Expenses
        Rent/Mortgage                              $ _____
        Total Utilities: Gas, Electricity, Water, etc. _____
        Food _____
        Clothing _____
        Health Care/Medical _____
        Insurance _____
        Car Payment(s)/Transportation Expenses _____
        Loan Payment(s) _____

*OPTIONAL

Form C-10 Page 2 of 2   Rev. 2/95 | AFFIDAVIT OF SUBSTANTIAL HARDSHIP AND ORDER

Monthly Expenses: (cont'd page 1)
   Credit Card Payment(s)
   Educational/Employment Expenses
   Other Expenses (be specific) _____

   Sub-Total                                        A $ _____

B.   Child Support Payment(s)/Alimony          $ _____

   Sub-Total                                        B $ _____

C.   Exceptional Expenses                       $ _____

   TOTAL MONTHLY EXPENSES (add subtotals from A & B monthly only).  $ _____

Total Gross Monthly Income Less total monthly expenses:

DISPOSABLE MONTHLY INCOME                              $ _____

4.   LIQUID ASSETS:
   Cash on Hand/Bank (or otherwise available such as stocks,
      bonds, certificates of deposit)                 $ _____
   Equity in Real Estate (value of property less what you owe)
   Equity in Personal Property, etc. (such as the value of
      motor vehicles, stereo, VCR, furnishing, jewelry, tools,
      guns, less what you owe)
   Other (be specific)
   Do you own anything else of value? ☐ Yes  ☐ No
   (land, house, boat, TV, stereo, jewelry)
   If so, describe _____

   TOTAL LIQUID ASSETS                              $ _____

5.   Affidavit/Request
   I swear or affirm that the answers are true and reflect my current financial status.  I understand that a false statement or answer to any question in the affidavit may subject me to the penalties of perjury.  I authorize the court or its authorized representative to obtain records of information pertaining to my financial status from any source in order to verify information provided by me.  I further understand and acknowledge that, if the court appoints an attorney to represent me, the court may require me to pay all or part of the fees and expenses of my court-appointed counsel.

Sworn to and subscribed before me this

_____ day of _____, 19 _____

_____          Affiant's Signature
Judge/Clerk/Notary                       Print or Type Name

## ORDER OF COURT

SECTION II.
   IT IS THEREFORE, ORDERED, AND ADJUDGED BY THE COURT AS FOLLOWS:
   ☐ Affiant is not indigent and request is DENIED.
   ☐ Affiant is partially indigent and able to contribute monetarily toward his/her defense; therefore defendant is ordered to pay
      $ _____ toward the anticipated cost of appointed counsel. Said amount is to be paid to the clerk of court or as otherwise
      ordered and disbursed as follows: _____
   ☐ Affiant is indigent and request is GRANTED.
   ☐ The prepayment of docket fees is waived.

   IT IS FURTHER ORDERED AND ADJUDGED that _____, is hereby appointed as counsel to represent affiant.
   IT IS FURTHER ORDERED AND ADJUDGED that the court reserves the right and may order reimbursement of attorney's fees and expenses, approved by the court and paid to the appointed counsel, and costs of court.
   Done this _____ day of _____, 19 ____.

_____ Judge _____

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                     *

     PLAINTIFF,                           *

V.                                                    *     CASE NO. CC-2002-225 -W

RUBEN McNABB,                          *

     DEFENDANT.                         *

## MOTION TO REQUEST HEARING TO REDUCE BOND

COMES NOW, the Defendant, RUBEN COREY McNABB, by and through his appointed counsel of record, and moves this Honorable Court to reduce the bond amount set in his case and as reason therefore, states the following:

1.    Defendant claims he is not guilty of the charges and activities alleged in the State's Complaint.

2.    Defendant's trial was held on February 13 – 14, 2003, and the jury became deadlocked. Your Honor declared a mistrial in the case due to the deadlocked jury.

3.    After his mistrial, Defendant was erroneously released from the Houston County Jail. Defendant returned to the Houston County Jail after being made aware of this mistake. Defendant avers that he is not a flight risk and will return for the trial of his case if a reasonable bond is set in this case.

WHEREFORE, Defendant prays this Honorable Court will reduce the bond amount set in his case to an amount that would allow him to make bond and return to his family as soon as possible.

RAMSEY, BAXLEY & McDOUGLE

By: _____

M. Hampton Baxley          (BAX009)
Attorney for Defendant
P. O. Drawer 1486
Dothan, AL 36302
(334) 793-6550
mhb@rbmlaw.org

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all opposing counsel by depositing same in the United States Mail, with sufficient postage and properly addressed.

This the 24th day of February, 2003.

_____
Of Counsel

**FILED**

FEB 2 5 2003

*Judy Byrd*

JUDY BYRD, CLERK
HOUSTON CO., AL

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                      *

     PLAINTIFF,                        *

V                                      *                CASE NO. CC-02-225-W

RUBEN McNABB,                          *

     DEFENDANT.                        *

## MOTION FOR EXTRAORDINARY EXPENSES

COMES NOW the Defendant, RUBEN McNABB, by and through his undersigned appointed attorney, and respectfully moves this Honorable Court to grant this Motion for Extraordinary Expenses in the above-styled cause.  As grounds thereof, the Defendant states as follows:

1.     That on February 6, 2002, the Defendant, charged with Robbery First Degree, appeared before the District Court of Houston County, Alabama, where he filed an affidavit of substantial hardship prompting the appointment of the undersigned attorney.

2.     That the Defendant appeared before this Court for the trial of this case on February 13 and 14, 2003, and where, through no fault of his own, a mistrial was declared in Defendant's trial.

3.     That Defendant's counsel is in need of the trial transcript from the mistrial and the court reporter has estimated that such a transcript would cost $800.00. Defendant's counsel is in need of said transcript for cross examination and rebuttal purposes in the next trial of this case.

WHEREFORE, all premises considered, the Defendant, by and through counsel,

respectfully requests this Honorable Court to grant this Motion for Extraordinary

Expenses.

RAMSEY, BAXLEY & McDOUGLE


By: _____

M. Hampton Baxley        (BAX009)
Attorney for Defendant
P. O. Drawer 1486
Dothan, AL 36302
(334) 793-6550
mhb@rbmlaw.org

FILED

FEB 2 6 2003

JUDY BYRD, CLERK
HOUSTON CO., AL

2-26-03

Dave
2/26/03

Defendant before the Court and advised of
his/her rights, Hon. ___H. Baxley___
is appointed counsel for the Defendant.

B. Newlin
_____
DISTRICT JUDGE

(2-27-03 ☑ - HB, DA)

March 4, 2003 - motion to reduce bond
denied. ~~[illegible]~~
~~[illegible]~~ (Judge Colt, Judge)
(3-6-03 - __ - ___)

4/30/03   Cont. for △ w/5 director from State - Meeting

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,               *

    PLAINTIFF,              *

V.                              *      CASE NO. CC-2002-225

RUBEN McNABB,                   *

    DEFENDANT.              *

## MOTION TO REDUCE BOND

COMES NOW, the Defendant, RUBEN COREY McNABB, by and through his appointed counsel of record, and moves this Honorable Court to reduce the bond amount set in his case and as reason therefore, states the following:

1.    Defendant claims he is not guilty of the charges and activities alleged in the State's Complaint.

2.    Defendant's trial was held on February 13 – 14, 2003, and the jury became deadlocked. Your Honor declared a mistrial in the case due to the deadlocked jury.

3.    After his mistrial, Defendant was erroneously released from the Houston County Jail. Defendant returned to the Houston County Jail after being made aware of this mistake. Defendant avers that he is not a flight risk and will return for the trial of his case if a reasonable bond is set in this case.

4.    That the current bond set in this case of one million dollars ($1,000,000.00) is not reasonable.

WHEREFORE, Defendant prays this Honorable Court will reduce the bond amount set in his case to an amount that would allow him to make bond and return to his family as soon as possible.

RAMSEY, BAXLEY & McDOUGLE

By: _____
M. Hampton Baxley        (BAX009)
Attorney for Defendant
P. O. Drawer 1486
Dothan, AL 36302
(334) 793-6550
mhb@rbmlaw.org

### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all opposing counsel by depositing same in the United States Mail, with sufficient postage and properly addressed.

This the 1st day of May, 2003.

_____
Of Counsel

*Filed 5-7-03*
*Judy Byrd Clerk*

5-2-2003 | Motion to Reduce Bond is set down for a hearing
on the 15th day of May, 2003, at 9:00 a.m.
Notify. ~ Dew. m. White, Judge

(5-5-0-N - HB, D-A)

May 15, 2005 - Bail reduced to $700,000
& Bail to be approved by Court.    (Judy M. White
                                         Judge

(5-16-B-N - HB, D, A, O, O & Jail-Bail)

IN THE CIRCUIT COURT OF HOUSTON COUNTY ALABAMA

STATE OF ALABAMA
          PLAINTIFF

                              CASE NO. CC-2002-225-W

V
RUBEN McNABB
     DEFENDANT

          MOTION TO RECONSIDER BOND

COMES NOW, the Defendant, RUBEN COREY McNABB, PRO SE,
and moves this Honorable Court to reconsider reduction of
bond in the amount set in the CASE And reasons are
therefore, stated as following:

1. On February 6, 2002 the Honorable Courts of HOUSTON COUNTY
accepted Mr. McNABB's, Affidavit of Substantial Hardship.
Based upon his Level of income, he could not Afford to
retain And Attorney.

2. Mr. McNabb has been incarcerated in Houston County Jail
since February 5, 2002 without a reasonable bond, And several
bond reductions being requested. At no time has bond
been within a reasonable means for Mr. McNabb by the
fact that he filed a Affidavit of Substantial Hardship,
And has not been employed for over 16 months.

3. On May 15, 2003 bail was reduce from 1,000,000 to 100,000. To be approved by the courts.

4. On February 14, 2003 a jury became deadlocked and a mistrial was declared.

5. Houston County Prosecuters have had a entire year with Defendant bond outside of means for Defendant to meet bond. Defendant poses no threat to community.

6. After the mistrial Houston County jail released Defendant by error made in there paperwork. Defendant return from Orlando, Florida with out any coercement from law enforcement And a new charge of escape due to no fault of his own.

7. Defendant shows good virtue and respect for the law of Alabama, by showing he is no flight risk After returning with a frivolous charge of escape and bond being raised to a total of 1.5 million, And 1 year of incarceration before trial. The states proof of guilt by evidence presented at trial became evanescent due to a jury deadlock.

WHEREFORE, Defendant prays this Honorable Court will reconsider reducing the bond amount set in his case to 30,000 to 3,000 in order to return to his family until trial.

Pro'Se
Ruben Corey McNabb
901 E Main St.
Dothan, Al 36301

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all opposing counsel by depositing same in the United States Mail, with sufficient postage and properly addressed.

This the 2 day of July, 2003.

Ruben McNabb
Pro'Se

FILED

JUL 1 5 2003

JUDY BYRD, CLERK
HOUSTON CO., AL

August 5, 2003 - Above motion denied
+ Clerk is ordered not to submit any
further oral motions to Court.

8-11-03  copied Hamp Baxley, DA + deft
at jail.

1-20-05 Case) Cont'd.  (Issue) On Appeal)

IN THE SUPREME COURT OF ALABAMA
October 3, 2003

1021528

Ex parte Ruben Corey McNabb.  PETITION FOR WRIT OF MANDAMUS
(In re: State of Alabama v. Ruben Corey McNabb)   (Houston
Circuit Court: CC-02-225;  : CR-02-1305).

## CERTIFICATE OF JUDGMENT

The petition of Ruben Cory McNabb for a writ of
mandamus to be directed to the Court of Criminal Appeals of
Alabama, having been duly filed and submitted to the Court,

IT IS CONSIDERED AND ORDERED that the petition for writ
of mandamus be, and the same is hereby, returned to the
Court of Criminal Appeals.

IT IS FURTHER ORDERED that the petitioner pay the costs
of this proceeding, for which let execution issue.

PETITION RETURNED TO THE COURT OF CRIMINAL APPEALS.

OPINION BY LYONS, J. (9 pp)

Houston, See, Brown, Johnstone, Harwood, Woodall, and
Stuart, JJ., concur.

**FILED**

OCT 2 3 2003

*Judy Byrd*

JUDY BYRD, CLERK
HOUSTON CO., AL

I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appear(s) of record in said
Court.
Witness my hand this 21st day of October, 20 03

*Robert G Esdale, Sr* th

Clerk, Supreme Court of Alabama

COURT OF CRIMINAL APPEALS
STATE OF ALABAMA
JUDICIAL BUILDING, 300 DEXTER AVENUE
P.O. BOX 301555
MONTGOMERY, AL 36130-1555

H. W. "Bucky" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
FAX (334) 242-4689

ORDER

CR-02-1305

Ex parte Ruben Corey McNabb (In re: State of Alabama vs. Ruben Corey McNabb) (Houston Circuit Court: CC-02-225).

It is ORDERED that the respondent(s) shall be allowed 21 days from the date of this order to respond to the merits of this petition.

Done this the 18th day of November, 2003.

H.W. "Bucky" McMILLAN, PRESIDING JUDGE

CCA/wki

cc: Honorable Jerry White, Special Tc Judge
    Honorable Judy Byrd, Circuit Clerk
    Honorable William H. Pryor, Jr., Attorney General
    Honorable Douglas A. Valeska, District Attorney
    Honorable M. Hampton Baxley, Attorney, Petitioner
    Office of Attorney General

FILED

NOV 1 9 2003

JUDY BYRD, CLERK
HOUSTON CO., AL

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges



Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

CR-02-1305

*pending*

Ex parte Ruben Corey McNabb   (In re: State of Alabama vs. Ruben Corey McNabb)
(Houston Circuit Court: CC-02-225).

## ORDER

Upon consideration of the above referenced Petition for Writ of Mandamus, the Court of Criminal Appeals orders that said petition, be and the same is hereby, denied.

McMillan, P.J., and Cobb, Baschab, Shaw, and Wise, JJ., concur.

Done this the 9th day of January, 2004.

H. W. "Bucky" McMillan, Presiding Judge
Court of Criminal Appeals

cc: Hon. Jerry White, Special TC Judge
Hon. Judy Byrd, Circuit Clerk
Carla Woodall, Court Reporter
M. Hampton Baxley, Attorney
Hon. William H. Pryor, Jr., Attorney General
James B. Prude, Asst. Atty. Gen.
Hon. Douglas A. Valeska, District Attorney

FILED
JAN 12 ....
JUDY ... CLERK
HOUSTON CO., AL

*Circuit Court*
*State of Alabama, Houston County*
*I, Judy ........ Circuit Court, hereby*
*certify that this is a true and correct copy of*

*filed in this Cou___*
*This the ___*

*Circuit Clerk*

IN THE CIRCUIT COURT
OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

vs.                                        *     CASE NO. CC 2002 225

REUBEN COREY MCNABB.                       *

### MOTION TO RELEASE TRIAL EXHIBITS TO DISTRICT ATTORNEY

COMES NOW the State of Alabama by and through the undersigned counsel and moves

the court to order Court Reporter Carla Woodall to release trial exhibits in the above referenced

matter a for cause states that defendant's initial trial ended in mistrial.  The exhibits are needed for

trial set for February 10, 2004.

Respectfully submitted this the 2nd day of February 2004..

DOUGLAS ALBERT VALESKA
DISTRICT ATTORNEY

### CERTIFICATE OF SERVICE

I certify that I have served a copy of this motion on the Honorable Hamp Baxleyl,
Attorneys for the Defendant by placing a copy in their boxes at the Houston County Courthouse
on this the 2nd day of February 2004..

DOUGLAS ALBERT VALESKA

Feb. 02 2004

JUDY BYRD, CLERK
HOUSTON CO., AL

IN THE CIRCUIT COURT
OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *

vs.                                  *    CASE NO. CC 2002 225

REUBEN COREY MCNABB.                 *

## ORDER

I , Lawson Little, Judge of the Circuit Court, in and for Houston Countym, Alabama, a Court of

Record, do hereby order Court Reporter Carla Woodall  to release trial exhbits in the case of

State v. Reuben Corey McNabb to the District Attorney.

LAWSON LITTLE
CIRCUIT JUDGE

FEB 02 2004

JUD___ ___ ___ ___RK
HOUSTON CO., AL

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *

     Plaintiff,                          *

vs.                                  *     CASE NO.: CC-02-225

RUBEN McNABB                         *

     Defendant.                          *

## MOTION TO SUPPRESS EVIDENCE

COMES now the Defendant, RUBEN COREY McNABB, by and through his undersigned attorney, and moves this Honorable Court to suppress all evidence seized as the basis for his arrest on the following grounds:

1.     The Defendant avers that the issuance of the search warrant in the instant case was illegal and served in violation of the rights of the Defendant.

2.     The issuance of the search warrant was a result of an Affidavit based on hearsay evidence, in whole or in part, without existence of a substantial basis on believing that there was a factual basis for the information or a substantial basis for believing the source of the hearsay to be credible.

3.     The search of the premises which produced the evidence in question was wholly without any valid constitutional basis, thereby depriving the Defendant of his rights to due process as guaranteed under the 4th and 14th Amendments of the Constitution of the United States and Article I, Section 5 and Section 6 of the Constitution of the State of Alabama (1901).

4.     Defendant specifically avers that the search and seizure was illegal, in violation of his rights and unconstitutional for the following reasons:

     a.     The Affidavit submitted to the issuing officer was improperly and illegally executed;

b.    The warrant was illegally issued because it does not show probable cause sufficient to justify the issuance of a search warrant;

c.    The seizure was illegal in that it was too broad and not in conformity with the directions of the issuing judge so far as the items subject to search and seizure;

d.    The information contained in the Affidavit constitutes false swearing;

e.    The search was a "general search";

f.    The Affiant, before the issuing judge, had no personal knowledge of any facts which would justify a determination by the judge of probable cause for the issuance of said warrant;

g.    The Affidavit on which the search warrant is based was insufficient as a matter of law.

5.    The search of the premises was illegal and all fruits of the search must be suppressed because of the foregoing reasons.

WHEREFORE, Defendant respectfully requests this Honorable Court for a hearing on this Motion to Suppress prior to the trial and outside the presence of the jury and for issuance of its Order suppressing all evidence seized as a result of the illegal search.

Respectfully submitted this 4th day of February, 2004.

RAMSEY, BAXLEY & McDOUGLE

By: _____
M. Hampton Baxley    (BAX009)
Attorney for Defendant
P. O. Drawer 1486
Dothan, AL 36302
(334) 793-6550
mhb@rbmlaw.org

---

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing upon the District Attorney by depositing same in his mailbox located at the Houston County Courthouse.

This the 4th day of February, 2004.

_____
Of Counsel

---

**FILED**

FEB 5 2004


JUDY BYRD, CLERK
HOUSTON CO., AL

108

Ruben McNabb

CC-02-225

5-04 Motion to Suppress Evidence.
February 11, 2004- Defendant's motion ~~~~ Suppress
denied. ~~~~~~

TERM DATE: 02/09/2004   PANEL: ALL   STATUS: A

| STRIKE | JUROR'S NAME | STRIKE | JUROR'S NAME |
|--------|--------------|--------|--------------|
| ~~0127~~ | ~~MAY WAYMAN~~ | 0161 | PHILLIPS BARBARA FAYE |
| 0130 | MCCALL MARTHA JANE | 0162 | PHILLIPS TAMMY LYNN |
| ~~0131~~ | ~~MCCLOUD THOMAS FRANKLIN~~ | 0163 | FIGG JEAN S |
| 0132 | MCCOLLOUGH ALICE JOHNSO | ~~0164~~ | ~~PULLIN VERNELL S~~ |
| 0133 | MCCRAY NAOMI | ~~0165~~ | ~~RADFORD MARY LOUISE~~ |
| ~~0134~~ | ~~MCDONALD LEMUEL LEON~~ | 0166 | REYNER WEBSTER CLARK |
| 0135 | MCDONALD SANTONIO L | 0167 | RICHARDS FRANKLIN BRUCE |
| ~~0136~~ | ~~MCKENZIE ROBERT EARL~~ | ~~0168~~ | ~~RICHARDSON JAMES DALE~~ |
| 0137 | MCKENZIE WILMA BAXTER | ~~0169~~ | ~~RIVERS WALLACE SHARIF~~ |
| 0138 | MESSER HENRY MILFORD JR | ~~0170~~ | ~~ROBERTS CLARENCE BARRYL~~ |
| 0139 | MIDDLEBROOKS JOHN MARTI | 0171 | ROBISON DORIS ELLIS |
| 0140 | MILLS MARY D | ~~0172~~ | ~~ROSENTRATER GARY ERNEST~~ |
| 0141 | MITTA NANCY FERRELL | 0173 | RUSSELL LISA YORK |
| 0142 | MORGAN JOHNNY LEWIS | 0174 | SAULS EDWARD EARL |
| ~~0143~~ | ~~MORRIS RUSHIE BELL~~ | 0175 | SAWYER ROBERT JACK |
| ~~0144~~ | ~~MORRIS SANDRA JEAN~~ | 0176 | SEIBER HERB ROMAN |
| ~~0145~~ | ~~MOSS BUFORD C~~ | ~~0177~~ | ~~SHACKLEFORD MARKETA C~~ |
| 0146 | MOULTON CAROL ELAINE | ~~0178~~ | ~~SHAW JEFFREY LAMAR~~ |
| ~~0147~~ | ~~NEAL SHELBY L~~ | 0179 | SHEDDEN PATRICIA D |
| ~~0148~~ | ~~NELSON CRAIG WILLIAM~~ | 0180 | SHELLEY JOYCE HENDRIX |
| 0149 | NELSON TINA MARIE | 0181 | SHELLEY LARRY GAYLE |
| 0150 | NEWMAN ERIKA ARDEN | ~~0182~~ | ~~SIMS RONALD GLENN~~ S |
| 0151 | NEWSOME DOUGLAS A | 0183 | SIZEMORE SHARON JOY |
| 0152 | NEWTON OPTHELIA HODGES | ~~0184~~ | ~~SLOOP JOHN RATLIFF~~ |
| 0153 | NORMAN ELIZABETH HUNTER | ~~0185~~ | ~~SMITH EDDIE B~~ S |
| 0154 | OAKLEY KIM THOMPSON | 0186 | SMITH JOEY KEVIN |
| ~~0155~~ | ~~OLIVER JAMIE WAKEFIELD~~ | 0187 | SMITH KENNETH ALLEN |
| 0156 | PALMER MARVIN WAYNE | ~~0188~~ | ~~SNELLGROVE MARGARET ELI~~ S |
| ~~0157~~ | ~~PARTRIDGE DEAN THROPE~~ | ~~0189~~ | ~~SPARKS MARVIN CLIFFORD~~ S |
| ~~0158~~ | ~~PEEBLES PATRICIA PERRY~~ | ~~0190~~ | ~~SPEARS PHILLIP BEN~~ S |
| 0159 | PELHAM MADGE ELLEN | ~~0191~~ | ~~STARLING LORETTA LATRI~~ |
| 0160 | PELHAM PATRICIA SUE | ~~0192~~ | ~~STEVENS DARREN KEITH~~ S |

JUR250          ALABAMA JUDICIAL INFORMATION SYSTEM       PAGE:
OPER: Case 1:08-cv-00224-MEF-CSC  Document 17-3 COURT Filed 08/18/2008  Page 3 of 9 9 02/05/200
                   STRIKE LIST BY: N A M E        RUN TIME: 15:38:47

TERM DATE: 02/09/2004   PANEL: ALL   STATUS: A

STRIKE  JUROR'S NAME            STRIKE  JUROR'S NAME



0193  STOKES ANGELIA ASKIN

0194  SULLIVAN IDA S

ALT 0195  TAYLOR ROSE MCKINZIE

0196  TESH ELAINE B

0197  THOMAS MILDRED CREEL

0198  THOMPSON PAULA CLINE

0199  TINGLE PAMELA REGINA

0200  TO NCAE

0201  TRAN CHRYSTAL J

0202  TROKELL DIANE LANE

0203  TUCKER CHARLES DONALD

0204  TURNER SHIRLEY MATHIS

0205  WAID LAURIN SLINGLUFF

0206  WALKER COY GORDON

0207  WALKER SHERRY LYNN

0208  WALLACE WILLIAM C

0209  WARD MARCIA FAULKNER

0210  WARD ROGER ALLEN

0211  WARREN DIANNE  challenged

0212  WATFORD BOBBIE MANN

ALT 0213  WATFORD MARTHA PEACOCK

0214  WATFORD RISKEY WAYNE

0215  WATSON GIDGET DONYALE

0216  WATSON NANCY MCCALLISTE

0217  WELCH MARY FRANCES OXEN

0218  WESLEY IRA BERNARD

0219  WHALEY JAMES FLETCHER

0220  WHIGHAM THERISA EARNEST

0221  WHITEHEAD LINEA ANN

0222  WHITEHURST WILLARD L

0223  WYLER JAMES C

0224  WILKINSON SUSAN MICHELL

0225  WILLIAMS DEBORAH ANN

0226  WILLIAMS ERVIN S

0227  WILLIAMS GWENDOLYN V

0228  WILLIS ROBERT NEIL

0229  WILSON DEBRA ELAINE

0230  WOMACK BILLY MELVIN

0231  WOMACK JO ANN

0232  WOOD FORREST HESTER

0233  WOOD MILTON H

CC-2002-225

Feb. 10, 2009
DATE

*The State*

V

*Ruben Corey McNabb*

*Robbery, 1st*
CHARGE

*White*
JUDGE

*Carla Woodall*
COURT REPORTER

| S  11 | D  11 | T- 22 |
|-------|-------|-------|
| 188 | 231 | 2 |
| 227 | 204 | 4 |
| 189 | 210 | 6 |
| 185 | 203 | 8 |
| 232 | 216 | 10 |
| 221 | 193 | 12 |
| 190 | 230 | 14 |
| 215 | 208 | 16 |
| 182 | 198 | 18 |
| 192 | 214 | 20 |
| ALT-213 | ALT-195 | 22 |
| | | 24 |
| | | 26 |
| | | 28 |
| | | 30 |
| | | 32 |
| | | 34 |
| | | 35 |

```
  35
- 12
  23
-  1
  22
```

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                           *

     PLAINTIFF,                            *

V                                           *                    CASE NO. CC-02-225

RUBEN McNABB,                               *

     DEFENDANT.                            *

## DEFENDANT'S REQUESTED JURY INSTRUCTIONS

COMES NOW the Defendant, RUBEN McNABB, and respectfully requests this Court to read the following Jury Charges to the Jury and to instruct the Jury that said charges are correct propositions of law and should be considered by the Jury in their deliberations as part of the law in this case.

I hereby certify that a true and correct copy of the attached Jury Charges have been served upon Counsel for the State in open court this ____ day of February, 2004.

RAMSEY, BAXLEY & McDOUGLE

By: _____

M. Hampton Baxley          (BAX009)
Attorney for Defendant
P. O. Drawer 1486
Dothan, AL 36302
(334) 793-6550
mhb@rbmlaw.org

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

     PLAINTIFF,                          *

V                                          *              CASE NO. CC-02-225

RUBEN McNABB,                              *

     DEFENDANT.                          *

## REQUESTED INSTRUCTION 1

I charge you, members of the Jury, based on the evidence; you must find RUBEN McNABB not guilty.

\_\_\_\_\_ GIVEN
\_\_\_\_\_ GIVEN AS MODIFIED
\_\_✓\_ REFUSED
\_\_\_\_\_ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                              *

     PLAINTIFF,                              *

V                                              *          CASE NO. CC-02-225

RUBEN McNABB,                                  *

     DEFENDANT.                              :   *

## REQUESTED INSTRUCTION 2

I charge you, members of the Jury, if you believe the evidence, you must find RUBEN

McNABB not guilty.


    _____ GIVEN
    _____ GIVEN AS MODIFIED
    ___✓___ REFUSED
    _____ WITHDRAWN

157

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *

    PLAINTIFF,                    *

V                                    *              CASE NO. CC-02-225

RUBEN McNABB,                        *

    DEFENDANT.                    *

## REQUESTED INSTRUCTION 3

I charge you, members of the Jury, that the presumption of innocence with which the Defendant, RUBEN McNABB, enters into the trial is a fact in the case which must be considered with all the evidence and is not to be disregarded by you.

_____ ✓ GIVEN
_____ GIVEN AS MODIFIED
_____ REFUSED
_____ WITHDRAWN

_White, Judge_

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                        *

     PLAINTIFF,                        *

V                                        *                CASE NO. CC-02-225

RUBEN McNABB,                            *

     DEFENDANT.                        *

## REQUESTED INSTRUCTION 4

I charge you, members of the Jury, circumstances, no matter how strong, which merely arouse a suspicion of guilt, cannot serve as a basis for convicting RUBEN McNABB.

_____ ✓ GIVEN
_____ GIVEN AS MODIFIED
_____ REFUSED
_____ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                           *

     PLAINTIFF,                           *

V                                           *           CASE NO. CC-02-225

RUBEN McNABB,                               *

     DEFENDANT.                           *

### REQUESTED INSTRUCTION 5

I charge you, members of the Jury, circumstances merely consistent with guilt or causing suspicion thereof are insufficient to justify conviction of RUBEN McNABB.

_____ ✓ GIVEN
_____ GIVEN AS MODIFIED
_____ REFUSED
_____ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *

     PLAINTIFF,                    *

V                                    *          CASE NO. CC-02-225

RUBEN McNABB,                        *

     DEFENDANT.                    *

## REQUESTED INSTRUCTION 6

I charge you, members of the Jury, that the Defendant, RUBEN McNABB, should not be convicted of a crime on mere suspicion of or fear that he might have committed the act; the theory that the Defendant did so commit the act must be supported by the legal evidence before you.

    ___✓___ GIVEN
    _____ GIVEN AS MODIFIED
    _____ REFUSED
    _____ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                        *

    PLAINTIFF,                           *

V                                        *          CASE NO. CC-02-225

RUBEN McNABB,                            *

    DEFENDANT.                           *

## REQUESTED INSTRUCTION 7

I charge you, members of the Jury, that where circumstantial evidence is relied upon by the District Attorney, if those circumstances, based on the evidence presented, can be reconciled with the theory that some other person may have committed the crime, you must find RUBEN McNABB not guilty of the charges contained in the indictment.

_____ GIVEN
_____ GIVEN AS MODIFIED
___✓___ REFUSED        *because the State did not totally*
_____ WITHDRAWN      *depend upon circumstantial evidence*
                       *—therefore the charge would be*
                       *inapplicable and confusing.*
                                          *White, Judge*

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *

     PLAINTIFF,                      *

V                                    *          CASE NO. CC-02-225

RUBEN McNABB,                        *

     DEFENDANT.                      *

## REQUESTED INSTRUCTION 8

I charge you, members of the Jury, you cannot convict RUBEN McNABB on mere possibilities, surmise, suspicion, or speculation, however strong they may be. A verdict of guilty based upon mere possibilities, surmise, suspicion or speculation, would violate the oath that you the members of this jury have taken. If, after carefully and fairly reviewing the facts, you are not satisfied of RUBEN McNABB'S guilt, then you have a reasonable doubt and RUBEN McNABB should be found not guilty.

√   GIVEN
_____ GIVEN AS MODIFIED
_____ REFUSED
_____ WITHDRAWN

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                         *

      PLAINTIFF,                          *

V                                         *           CASE NO. CC-02-225

RUBEN McNABB,                             *

      DEFENDANT.                          *

## REQUESTED INSTRUCTION 9

I charge you, members of the Jury, in a robbery prosecution for Robbery in the First Degree, the State must among prove, beyond a reasonable doubt that during the course of committing a theft RUBEN McNABB:

Used force against or threatened the use of force against the employees of the Winn Dixie located on Westgate Parkway with the intent to overcome their physical resistance or physical power of resistance; or

Threatened the imminent use of force against the employees of the Winn Dixie located on Westgate Parkway with intent to compel acquiescence to the taking of or escaping with property of the Winn Dixie located on Westgate Parkway; and

RUBEN McNABB was armed with a deadly weapon or dangerous instrument or caused serious physical injury to the employees of the Winn Dixie

If the State cannot prove that beyond a reasonable doubt, you must find the Defendant not guilty.

\_\_\_\_✓\_ GIVEN
\_\_\_\_\_ GIVEN AS MODIFIED
\_\_\_\_\_ REFUSED
\_\_\_\_\_ WITHDRAWN

_White, Judge_

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *

     PLAINTIFF,                           *

V                                          *          CASE NO. CC-02-225

RUBEN McNABB,                              *

     DEFENDANT.                           *

### REQUESTED INSTRUCTION 10

I charge you, members of the Jury, in a Robbery in the First Degree prosecution, the State also must prove, beyond a reasonable doubt that ~~it was~~ the Defendant, RUBEN McNABB, to the exclusion of all others, ~~that~~ *was one of the two alleged to have* committed the robbery of Winn Dixie located on Westgate Parkway.

If the State does not prove this beyond a reasonable doubt, you must find the Defendant not guilty.

\_\_\_\_\_ GIVEN
\_\_✓\_\_ GIVEN AS MODIFIED
\_\_\_\_\_ REFUSED
\_\_\_\_\_ WITHDRAWN

*Authentic, Judge*

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
| PLAINTIFF, | * | |
| V | * | CASE NO. CC-02-225 |
| RUBEN McNABB, | * | |
| DEFENDANT. | * | |

### REQUESTED INSTRUCTION 11

I charge you, members of the Jury, in order to convict RUBEN McNABB of Robbery in the First Degree, each of you must be convinced, by the evidence, beyond a reasonable doubt, of each and every element of the crime of Robbery in the First Degree.

\_\_✓\_\_ GIVEN
\_\_\_\_\_ GIVEN AS MODIFIED
\_\_\_\_\_ REFUSED
\_\_\_\_\_ WITHDRAWN

116

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                           *

     PLAINTIFF,                             *

V                                           *          CASE NO. CC-02-225

RUBEN McNABB,                               *

     DEFENDANT.                             *

## REQUESTED INSTRUCTION 12

I charge you, members of the Jury, if the State has left a reasonable doubt as to any one of the individual elements of the crime of Robbery in the First Degree, then that is enough doubt to find the Defendant not guilty.

\_\_\_\_\_ ✓ GIVEN
\_\_\_\_\_ GIVEN AS MODIFIED
\_\_\_\_\_ REFUSED
\_\_\_\_\_ WITHDRAWN

1:7
1

## IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *

     PLAINTIFF,                    *

V                                    *           CASE NO. CC-02-225

RUBEN McNABB,                        *

     DEFENDANT.                    *

### REQUESTED INSTRUCTION 13

I charge you, members of the Jury,, in considering the evidence and testimony given in the trial of this case, you should not attach any more credibility to the testimony of any law enforcement officer, simply because he or she is employed as a law enforcement officer, than you would to the testimony of anyone else.

    ✓ GIVEN
    _____ GIVEN AS MODIFIED
    _____ REFUSED
    _____ WITHDRAWN

*White, Judge*

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *

    PLAINTIFF,                       *

V                                    *          CASE NO. CC-02-225

RUBEN McNABB,                        *

    DEFENDANT.                       *

### REQUESTED INSTRUCTION 14

I charge you, members of the Jury, the prosecution has the burden of providing the Defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely true than not true. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the Defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the Defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

_✓_ GIVEN
_____ GIVEN AS MODIFIED
_____ REFUSED
_____ WITHDRAWN

1.

# IN THE CIRCUIT COURT FOR THE
## COUNTY OF HOUSTON
## STATE OF ALABAMA

### CRIMINAL DIVISION

STATE OF ALABAMA            *

    PLAINTIFF           *

VS                          *      CASE NO. CC-2002-225

RUBEN COREY McNABB          *

    DEFENDANT.          *

## V E R D I C T

WE, THE JURY, FIND THE DEFENDANT, RUBEN COREY McNABB GUILTY OF ROBBERY, FIRST DEGREE, AS CHARGED IN THE INDICTMENT.


_Milton H. Wood_
NAME OF FOREMAN(please print)

_Milton H. Wood_
FOREMAN SIGNATURE

_Andy Byrd_
CLERK OF COURT

_February 11, 2004_
DATE

JURY CONVICTION

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA

CRIMINAL DIVISION

VS.

_Ruben Corey Mc Nabb_                    CASE NO. _CC 2002 - 225_

    The Defendant having been indicted and arraigned upon the Indictment on a charge of _Robbery 1st Degree_, and heretofore having plead not guilty thereto the case was tried Before a jury composed of _Milton H. Wood_ as foreperson and eleven others. The Jury having been duly empanelled, sworn and charged by the Court according to law, with the Defendant being present in open court with his attorney at each and every stage of proceedings, said jury has now on this date pursuant to their oath found the Defendant guilty of _Robbery 1st Degree_ as charged in the Indictment (a lesser included offense of that charge in the Indictment).

    In accordance with the verdict of the Jury, Defendant is hereby adjudged guilty of _Robbery 1st Degree_ Defendant being asked if he/she had anything to say why sentence of law should not be pronounced upon him/her, and Defendant says nothing.

    **IT IS THEREFORE ORDERED AND ADJUDGED BY THE COURT** that the Defendant is guilty of said charge.

    (✓) A Sentence hearing is set for the _18th_ day of _March_, 20_04_ at _9:00_ o'clock _A_ M. _No bail._

    **DONE,** this the _11th_ day of _February_, ~~2002.~~ _2004._

_[signature]_
CIRCUIT JUDGE

## SENTENCING ORDER

AS PUNISHMENT, DEFENDANT IS HEREBY FORMALLY SENTENCED:

( ) to hard labor for Houston County for a term of _____.

(✗) to the penitentiary of the State of Alabama for a term of _____ ~~years.~~ ( ) ~~FHOA~~ _natural life without parole._

On the 30th day after the Clerk transmits to the Department of Corrections a copy of this judgment entry and sentence, if the Department has not directed the Sheriff where the Defendant shall be taken for confinement, the Sheriff is hereby ordered to transport Defendant forthwith to the Department's receiving center at Kilby/Tutweiler (circle) and effectuate the transfer of the Defendant to the custody of the Department. In the event the Department refuses to accept the Defendant in compliance with state law, the Sheriff is ordered to secure the Defendant to the property at the Department's receiving center.

Said sentence shall run ( ) consecutive or ( ) concurrent with case number (s) _____.

_____

( ) said sentence is suspended for _____ years on the condition of good behavior and payment of all fines, costs, and restitution.

( ) The Defendant is hereby given credit for the days spent incarcerated pending trial.

Defendant is also ordered to pay:

( ) A fine of $_____
( ) A Victim Compensation Assessment of $_____.
(X) All Court Costs.
( ) Restitution of $ _____ to _____
( ) Drug Demand Reduction Act Assessment of $1,000.00.
( ) Alabama Forensics Sciences Trust Fund $100.00.
( ) Pay direct to Alabama Dept. of Forensic Sciences-Dothan Division
    $_____.
( ) Investigation restitution direct to ( )DPD ( ) HCSO $_____.

ADDITIONAL SENTENCE PROVISION ORDERED ARE:

( ) Completion of a substance abuse program CRO
( ) The Department of Public Safety is ordered to comply with Alabama Code 13A-12-290 by suspending Defendant's drivers license for six months.
( ) Continued on same bond.
( ) Appeal bond is set at $_____.
( ) Indigency status granted and free transcript is ordered.

PROBATION:

( ) Defendant applies for probation.
( ) Defendant waives application for probation.
( ) Probation hearing is set for the _____ day of _____ 20___ at _____
( ) Defendant to remain on same bond pending probation hearing

DONE this the 24th day of March, 2004.

February 11, 2004 - At close of State's evidence, defendant moved for judgment of acquittal, motion denied.

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *

      PLAINTIFF,                   *

VS.                                  *    CASE NO. CC 2002 0002755

RUBEN COREY MCNABB,                  *

DEFENDANT.                           *

## NOTICE TO DEFENDANT OF PREVIOUS CONVICTIONS AND NOTICE OF INTENT TO USE SUCH CONVICTIONS FOR IMPEACHMENT PURPOSES

     You are hereby notified that the District Attorney's Office has evidence of the following convictions, which, in the event of your conviction in the above case, will be presented to the court for consideration under the Alabama Habitual Offender Statute, Sec. 13A-5-9, Code of Alabama, 1975. Furthermore, it is the State's intent to use such convictions for impeachment purposes should the defendant testify at trial, Rules 609 (a), (b), (c)of the Alabama Rules of Evidence.

| Date | Case No. | Charge | Disposition | Jurisdiction |
|------|----------|--------|-------------|--------------|
| 3/28/1995 | CR 94 5433 | Possession of Cocaine with Intent to Sell | 14 months | Orange Co, FL |
| 7/3/1997 | CR 0-97-3658 | Possession of Cocaine with Intent to Sell | 20 months | Orange Co, FL |
| 8/4/93 | CR 92-11635 | Carrying Concealed Firearm | 30 months | Orange Co, FL |
| 7/3/1997 | CR-0-97-13987 | Possession of Cocaine with Intent to Sell | 20 months | Orange Co, FL |

     You will be properly notified in the event the District Attorney receives evidence of any other or additional convictions.

     This the 17th day of November, 2004.

                                         _Douglas Albert Valeska_
                                       DOUGLAS ALBERT VALESKA
                                       DISTRICT ATTORNEY

### CERTIFICATE OF SERVICE
     I certify that I have served a copy of this motion on the Honorable Hamp Baxley, Attorney for the Defendant by placing a copy in his box at the Houston County Courthouse on March 17, 2004.

                 _Douglas Albert Valeska_
                 DOUGLAS ALBERT VALESKA

**FILED**

MAR 1 7 2004

_Judy Byrd_
JUDY BYRD, CLERK
HOUSTON CO., AL

March 18, 2004 – On motion of defendant ~~the~~
sentencing hearing continued to March 24, 2004,
at 11:00 AM.

3-18-04   Notfd. Hamp Baxley, DA & P.O.

STATE OF ALABAMA

V.

Ruben McNabb

\*
\*
\*
\*
\*

IN THE CIRCUIT COURT OF

HOUSTON COUNTY, ALABAMA

CASE NO. CC _02_-225_

<u>NOTICE TO DEFENDANT OF PREVIOUS CONVICTIONS AND NOTICE OF INTENT TO
USE SUCH CONVICTIONS FOR IMPEACHMENT PRUPOSES</u>

You are hereby notified that the District Attorney's Office has evidence of the following
convictions, which, in the event of your conviction in the above case, will be presented to the
Court for consideration under the Alabama Habitual Offender Statute, §13A-5-9, Code of
Alabama, 1975. Furthermore, it is the State's intent to use such convictions for impeachment
purposes should the defendant testify at trial, Rules 609(a), (b), and (c) of the Alabama Rules of
Evidence.

| Date | Charge | Disposition | | Jurisdiction |
|------|--------|-------------|---|--------------|
| 8-4-93 | Carrying Concealed Weapon | 38 months | CR 92-11635 | Orange Co. FL |
| 3-28-95 | Poss. Cocaine w/ Intent to Sell | 14 months | CR 94-5433 | Orange Co. FL |
| 7-3-97 | Poss. Cocaine w/ Intent to Sell | 20 months | CR 97-2935 | Orange Co. FL |
| 7-3-97 | Poss. Cocaine w/ Intent to Sell | 20 months | CR 97-3458 + run cc w/ 97-2935 | Orange Co. FL |

You will be properly notified in the event the District Attorney receives evidence of any
other additional convictions.

This the _18th_ day of _March_, 2004.

Amy Mendheim
Assistant District Attorney

<u>Certificate of Service</u>

I, Amy Mendheim, do hereby certify that I have this date served a copy of the foregoing on
_Thomp Baxley_, attorney of record for the defendant, by placing a copy of the same in
his/her mailbox at the Houston County Courthouse on this the _18th_ day of _March_,
2004.

**FILED**

MAR 18 2004

Judy Byrd
JUDY BYRD, CLERK
HOUSTON CO., AL

Amy Mendheim

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA                    136

STATE OF ALABAMA,                            *

    Plaintiff,                              *

vs.                                          *        CASE NO.: CC-02-225-W

RUBEN McNABB                                 *

    Defendant.                             *

## MOTION TO WITHDRAW AND APPOINT NEW COUNSEL
## TO REPRESENT DEFENDANT ON APPEAL

COMES NOW, M. Hampton Baxley currently noted as attorney of record for the Defendant, RUBEN McNABB, in this matter, and respectfully moves this Court for leave to withdraw as attorney for Defendant and appoint new counsel to represent Defendant on appeal; and, as grounds therefore, says as follows:

1.    Counsel represented Defendant through two (2) trials of his case.

2.    Counsel believes Defendant has a valid case for appeal to the Alabama Court of Criminal Appeals.

3.    Counsel believes new counsel would be more effective on the appeal of this case.

WHEREFORE, premises considered, the undersigned attorney requests this Honorable Court to allow him to withdraw from representation of Defendant and appoint new counsel to represent Defendant on appeal.

RAMSEY, BAXLEY & McDOUGLE

By: _____
M. Hampton Baxley          (BAX009)
Attorney for Defendant
P. O. Drawer 1486
Dothan, AL 36302
(334) 793-6550
mhb@rbmiaw.org

**FILED**

MAR 2 4 2004

JUDY BYRD, CLERK
HOUSTON CO., AL

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney by depositing same in their respective boxes located at the Houston County Courthouse.

This the 23rd day of March, 2004.

_____
Of Counsel

March 30, 2004 - Hampton Baxley Allowed to
withdraw as attorney for defendant. Cliff
Mendheim appointed to represent defendant
on appeal.
Defendant gives oral notice of Appeal to
Alabama Court of Criminal Appeals.
Defendant allowed free transcript on Appeal.
Clerk to notify Mendheim & Al. Crim. Appeals. Denny M. White
Judge

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                              *

      PLAINTIFF,                           *

V                                              *          CASE NO. CC-02-225-W

RUBEN McNABB,                                  *

      DEFENDANT.                           *

<u>MOTION FOR NEW TRIAL</u>

COMES NOW the Defendant, RUBEN McNABB, and respectfully moves this Honorable Court to set aside the verdict rendered in this case and grant him a new trial and as reason therefore, says as follows:

1.     The verdict of the jury is contrary to the evidence in the case;

2.     The verdict of the jury is contrary to the law in the case;

3.     The verdict of the jury is contrary to the evidence and the law in the case;

4.     The verdict of the jury is contrary to the great preponderance of the evidence in the case;

5.     The verdict of the jury is contrary to the weight of the evidence in the case;

6.     The Court erred in allowing the admission of items seized from the Defendant's home by virtue of an illegal search warrant which was obtained through the use of an impermissibly and unduly suggestive photographic line-up

7.     The Court erred in other substantial and materials matters as reflected in the record.

RAMSEY, BAXLEY & McDOUGLE

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the foregoing upon the District Attorney by depositing same in their respective boxes located at the Houston County Courthouse.

This the _____ day of March, 2004.

_____
Of Counsel

By: _____
    M. Hampton Baxley        (BAX009)
    Attorney for Defendant
    P. O. Drawer 1486
    Dothan, AL 36302
    (334) 793-6550
    mhb@rbmiaw.org

FILED

MAR 2 5 2004

JUDY BYRD, CLERK
HOUSTON CO., AL

137

## CERTIFICATE OF SERVICE

I hereby certify that I have, on this 8th day of April, 2004, served an exact copy of the foregoing on Doug Valeska, District Attorney of Houston County, Alabama, by placing said copy in his box at the Houston County Courthouse.

_____
Of Counsel

| STATE OF ALABAMA, | * | IN THE CIRCUIT COURT OF |
|---|---|---|
| V. | * | HOUSTON COUNTY, ALABAMA |
| RUBEN C. MCNABB, | * | CRIMINAL DIVISION |
| DEFENDANT. | * | CC-2002-225-W |

## MOTION TO WITHDRAW

COMES NOW, R. Cliff Mendheim, appointed attorney for the Defendant, Ruben C. McNabb, and respectfully moves this Court for leave to withdraw as attorney for Defendant and as grounds thereof, states as follows:

1. That the undersigned attorney was appointed on or about March 23, 2004, to represent Defendant during his appeal.

2. That the undersigned attorney believes it will be in Defendant's best interests to allow another attorney handle the appeal of this matter.

WHEREFORE, all premises considered, the undersigned attorney requests this Honorable Court to allow him to withdraw from representation of Defendant and appoint another attorney to represent the Defendant during the appeal of this matter.

Respectfully Submitted.

BUNTIN, ETHEREDGE & DOWLING

R. Cliff Mendheim (MEN008)
Attorney for Defendant
PO Box 1193
Dothan, Alabama 36303
(334) 793-3377

**FILED**

APR 0 8 2004

JUDY BYRD, CLERK
HOUSTON CO., AL

3-25-04 MOTION FOR NEW TRIAL

April 7, 2004 - Def's Motion for new trial is denied
Cliff Mendhim moves that he be allowed to withdraw
Motion granted. David Hogg appointed to
represent defendant on appeal. Clerk to notify
deft, Cliff Mendhim, David Hogg, Ct. of Criminal Appeals
Judge White, Judy

132

ACR371                        ALABAMA JUDICIAL DATA CENTER
                NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                              BY THE TRIAL COURT CLERK
                    IN THE CIRCUIT COURT  OF   HOUSTON COUNTY
STATE OF ALABAMA VS MCNABB RUBEN COREY          JUDGE: JERRY M. WHITE
------------------------------------------------------------------------
| APPEAL DATE: 03/30/2004
|-----------------------------------------------------------------------
| INDIGENCY STATUS:
|   GRANTED INDIGENCY STATUS AT TRIAL COURT:      __X__ YES    _____ NO
|   APP, TRIAL COUNSEL PERMITTED TO W/D ON APPEAL: __X__ YES    _____ NO
|   INDIGENT STATUS REVOKED ON APPEAL:            _____ YES    __X__ NO
|   INDIGENT STATUS GRANTED ON APPEAL:            __X__ YES    _____ NO
|
| DEATH PENALTY: NO
|                              Hog 007
| APPEAL TYPE: STATE CONVICTION   David Hogg is appointed as Counsel on Appeal
|-----------------------------------------------------------------------
| THIS IS AN APPEAL FROM A CONVICTION.
|                                                      03/ 24/ 04
| DATE OF CONVICTION: 02/11/2004        DATE OF SENTENCE: 00/00/0000
|
| YOUTHFUL OFFENDER STATUS: DENIED
|
| CO/CASE NUMBER: 38/CC 2002 000225.00
| CODE: ROB1   CONVICTION: ROBBERY 1ST       ACTION: CONVICTED
|                L I F E  w/o Parole         STATUTE: 13A-008-041
| SENTENCE:   CONF: 00 YRS 00 MOS 000 DAYS
| SENTENCE:   PROB: 00 YRS 00 MOS 000 DAYS              LIFEWO: YES
|-----------------------------------------------------------------------
| POST-JUDGMENT MOTIONS FILED:  DT FILED      DT DENIED    CON BY AGREE
| _X_ MOTION FOR NEW TRIAL     03/25/2004    04/07/2004    ------------
| ___ MOTION FOR JUDG, OF ACQUIT _____    _____     ------------
| ___ MOTION TO W/D GUILTY PLEA  _____    _____     ------------
| ___ MOTION FOR ATTY TO W/DRAW  _____    _____     ------------
| ___ OTHER
|-----------------------------------------------------------------------
| COURT REPORTER(S):                    WOODALL, CARLA H.
| ADDRESS:                              C/O HON. LARRY ANDERSON
|                                       DOTHAN        ,  AL  36302
|
| APPELLATE COUNSEL #1:                 HOGG DAVID KENNETH
| ADDRESS:                              188 N FOSTER STREET
|                                       SUITE 200
|                                       DOTHAN        ,  AL  36303
| PHONE NUMBER:                         334-794-8559
|
| APPELLATE COUNSEL #2:                 _____
| ADDRESS:                              _____
|                                       _____
|                                       _____
| PHONE NUMBER:                         _____
|
| APPELLANT (PRO SE):                   MCNABB RUBEN COREY
| ADDRESS:                              % HOUSTON COUNTY JAIL
|                                       DOTHAN        ,  AL  363020000
| AIS #:
|
| APPELLEE (IF CITY APPEAL):            _____
| ADDRESS:                              _____
|                                       _____
------------------------------------------------------------------------
| I CERTIFY THAT THE INFORMATION PROVIDED                OPERATOR: STW
ABOVE IS ACCURATE TO THE BEST OF MY            PREPARED: 04/14/2004
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO    _____
THIS ACTION ON THIS 15th DAY OF _April__, 2004    CIRCUIT COURT CLERK

| State of Alabama<br>Unified Judicial System<br>Form ARAP-1C        8/91 | **REPORTER'S TRANSCRIPT ORDER -- CRIMINAL**<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br><br>_____ - _____ |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☐ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF ___Houston_____ COUNTY

_____, Appellant

V.  ☒ STATE OF ALABAMA  ☐ MUNICIPALITY OF _____

| Case Number<br>CC 02-225 | Date of Judgment/Sentence/Order<br>3-24-04 |
| Date of Notice of Appeal<br>Oral: 3-30-04     Written: | Indigent Status Granted:<br>☒ Yes    ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT.**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

_____    _____    _____
Signature                              Date                                  Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                                    **COURT REPORTER(S)**

A. ☒ **TRIAL PROCEEDINGS** - Although this designation will include the judgment and sentence         ___Carla Woodall_____
proceedings, a transcript of the organization of the jury and arguments of counsel must         ___c/o Hon. Larry Anderson___
be designated separately                                                                          ___Dothan, AL_____

B. ☐ **ORGANIZATION OF THE JURY** - This designation will include voir dire examination and         _____
challenges for cause. Note that in noncapital cases the voir dire of the jury will not be         _____
recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)                                _____

C. ☐ **ARGUMENTS OF COUNSEL** - Note that in noncapital cases the arguments of counsel will         _____
not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)                         _____

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
| D. _____ | _____ | **FILED** |
| E. _____ | _____ | APR 23 2004 |
| F. _____ | _____ | *Judy Byrd* |
| G. _____ | _____ | JUDY BYRD, CLERK |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS

_____    4-23-04    David K. Hogg
Signature                              Date                                  Print or Type Name

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to:  (1) Clerk of the Court of Criminal Appeals,  (2) the District Attorney,
(3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

State of Alabama
Unified Judicial System
Form ARAP- 26 (front)    8/91

## COURT OF CRIMINAL APPEALS
## DOCKETING STATEMENT

Criminal Appeal Number

_____  _____

## A. GENERAL INFORMATION:

☐CIRCUIT COURT  ☐DISTRICT COURT  ☐JUVENILE COURT OF    Houston                    COUNTY

Ruben Corey McNabb                                          , Appellant

.V.  ☐STATE OF ALABAMA    ☐MUNICIPALITY OF _____

| Case Number    CC 02-225 | Date of Complaint or Indictment | Date of Judgment/Sentence/Order    3-24-04 |
|---|---|---|
| Number of Days of Trial/Hearing    Days | Date of Notice of Appeal    Oral: 3-30-04 | Written: |

Indigent Status Requested: ☒Yes ☐No              Indigent Status Granted: ☒Yes ☐No

## B. REPRESENTATION:

Is Attorney Appointed or Retained? ☒Appointed ☐Retained.    If no attorney, will appellant represent self? ☐Yes ☐No

Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)

David K. Hogg

Telephone Number
334-794-8659

| Address    188 N. Foster St., Ste 20 | City    Dothan | State    AL | Zip Code    36303 |
|---|---|---|---|

## C. CODEFENDANTS: List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
|---|---|
| Codefendant | Case Number |
| Codefendant | Case Number |

## D. TYPE OF APPEAL: Please check the applicable block.

1 ☒State Conviction    4 ☐Pretrial Order    7 ☐Juvenile Transfer Order    10 ☐Other (Specify)
2 ☐Post-Conviction Remedy    5 ☐Contempt Adjudication    8 ☐Juvenile Delinquency    _____
3 ☐Probation Revocation    6 ☐Municipal Conviction    9 ☐Habeas Corpus Petition    _____

## E. UNDERLYING CONVICTION/CHARGE: Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐Capital Offense · § _____    6 ☐Trafficking in Drugs · § _____    11 ☐Fraudulent Practices · § _____
2 ☐Homicide · § _____    7 ☒Theft · § 13A-8-41    12 ☐Offense Against Family · § _____
3 ☐Assault · § ___ d ___    8 ☐Damage or Intrusion    13 ☐Traffic · DUI · § _____
4 ☐Kidnapping/Unlawful    to Property · § _____    14 ☐Traffic · Other · § _____
Imprisonment · § _____    9 ☐Escape · § _____    15 ☐Miscellaneous (Specify).
5 ☐Drug Possession · § _____    10 ☐Weapons/Firearms · § _____    · § _____

## F. DEATH PENALTY:

Does this appeal involve a case where the death penalty has been imposed?  ☐Yes ☒No

## G. TRANSCRIPT:

1. Will the record on appeal have a reporter's transcript? ☒Yes ☐No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. **4-23-04**
   (Date)
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk? ☐Yes ☐No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions? ☐Yes ☐No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

REQUEST FOR LOCAL EXTENSION OF TIME
TO COMPLETE THE REPORTER'S TRANSCRIPT

155

Ruben Corey McNabb          v.   State of Alabama
Appellant's Name                      Appellee

Trial Court Case No. CC-02-275     Notice of Appeal Date 3-30-04

On appeal from the:  [✓] Circuit Court of
                     [ ] District Court of  } Houston        County
                     [ ] Juvenile Court of

I, Carla H. Woodall , a court reporter in the above referenced case,
hereby request a 28 day extension to complete the transcript in said cause for the reasons
I have set out below. Currently this transcript is due on 6-2-04 , and with this extension
the transcript will be due on 6-30-04 .

REASONS: Due to working on previously appealed
transcripts as well as time spent in court

Carla H. Woodall                    6-1-2004
Court Reporter                       Date

========================================================================
## TRIAL COURT ACTION

[✓] Upon consideration of the above request, I hereby grant a 28 day extension to complete said transcript, thus extending
the transcript's due date to 6-30-2004 . Upon granting this request, I direct the court reporter to file this order
with the Clerk of this Court and to mail or fax a copy hereof to the Clerk of the Court of Criminal Appeals at the address
noted below by no later than the transcript due date in effect immediately preceding this order.

[ ] The above referenced request for a local extension is denied.

Judge's Signature                   6/1/04
                                     Date

Note:   Pursuant to Rule 11(c) of the Alabama Rules of Appellate Procedure, local extensions cannot total more than 28
days and cannot be to a date more than 84 days from the date of the notice of appeal.

========================================================================
The Clerk of the Court of Criminal Appeals     Fax (334) 242-4689
P. O. Box 301555
Montgomery, Alabama 36130-1555

| MOTION TO COURT OF CRIMINAL APPEALS FOR EXTENSION OF TIME TO FILE TRANSCRIPT | 156 |
| --- | --- |

TO:   The Clerk of the Court of Criminal Appeals      Fax: (334) 242-4689
P. O. Box 301555
Montgomery, Alabama 36130-1555

Criminal Appeals Case Number      CR 03-1141

Ruben Corey McNabb _____ v. _State of Alabama_
Appellant's Name                              Appellee

Trial Court Case No. CC-02-225   Notice of Appeal Date 3-30-2004   **FILED**

JUN 25 2004

On appeal from the:  [✓] Circuit Court of
[ ] District Court of  _Houston_ County
[ ] Juvenile Court of

JUDY BYRD, CLERK
HOUSTON CO., AL

I, _Carla H. Woodall_, a court reporter in the above referenced case, hereby request a _28_ day extension to complete the transcript in said cause for the reasons I have set out below. Currently this transcript is due on _6-30-2004_, and with this extension the transcript will be due on _7-28-2004_.

REASONS: Due to working on several transcripts that have appealed an due prior to this one. I am currently working on this appeal and no other requests for extensions are anticipated

_Carla H. Woodall_                    6-25-2004
Court Reporter                         Date

Note:   Rule 11(c) of the Alabama Rules of Appellate Procedure prohibits an appellate court from granting an extension if the request is not received by the clerk of the appellate court within the time originally prescribed or before the expiration of an extension previously granted. Based on internal policy of the Court of Criminal Appeals, no more than two 28-day extensions will be granted.

ACR359    *Court COPY*    ALABAMA JUDICIAL DATA CENTER    137
HOUSTON COUNTY
TRANSCRIPT OF RECORD
CONVICTION REPORT

CC 2002 000225.00 01
JERRY M. WHITE

```
| CIRCUIT COURT OF HOUSTON COUNTY              COURT ORI: 038015 J |

| STATE OF ALABAMA       VS.          DC NO:    0000 000000.00 |
| MCNABB RUBEN COREY        ALIAS:    G J:    0000000275 |
| % HOUSTON COUNTY JAIL     ALIAS:    SSN:    ████████ |
| DOTHAN AL  36302                    SID:    000000000 |
|                                     AIS: |

| DOB: ████████    SEX: M  HT: 6 00    WT: 197  HAIR: BLK    EYE: BRO |
| RACE: ( )W (X)B ( )O   COMPLEXION:          AGE:       FEATURES: |

| DATE OFFENSE: 06/07/2001  ARREST DATE: 02/05/2002  ARREST ORI: 0380100 |

| CHARGES @ CONV      CITES          CT CL COURT ACTION        CA DATE |
| ROBBERY 1ST         13A-008-041    01 A  CONVICTED           02/11/2004 |
|                                    00                        00/00/0000 |
|                                    00                        00/00/0000 |

| JUDGE: JERRY M. WHITE              PROSECUTOR: VALESKA DOUGLAS A |

| PROBATION APPLIED   GRANTED  DATE    REARRESTED DATE  REVOKED  DATE |
| ( )Y(X)N            ( )Y( )N         ( )Y( )N         ( )Y( )N |

| 15-18-8, CODE OF ALA 1975  IMPOSED   SUSPENDED    TOTAL   JAIL CREDIT |
| ( )Y (X)N   CONFINEMENT: Life W/O Parole00 00 000 Life W/O Parole02 00 037 |
|             PROBATION : 00 00 000              00 00 000 |
| DATE SENTENCED: 03/24/2004   SENTENCE BEGINS: 03/24/2004 |

| PROVISIONS              COSTS/RESTITUTION            DUE        ORDERED |

| PENITENTIARY           RESTITUTION              $0.00        $0.00 |
| LIFE WO PAROL          ATTORNEY FEE          $7677.30     $7677.30 |
|                        CRIME VICTIMS           $50.00       $50.00 |
|                        COST                  $1488.07     $1488.07 |
|                        FINE                     $0.00        $0.00 |
|                        MUNICIPAL FEES           $0.00        $0.00 |
|                        DRUG FEES                $0.00        $0.00 |
|                        ADDTL DEFENDANT          $0.00        $0.00 |
|                        DA FEES                  $0.00        $0.00 |
|                        COLLECTION ACCT          $0.00        $0.00 |
|                        JAIL FEES                $0.00        $0.00 |

|                        TOTAL                 $9215.37     $9215.37 |

| APPEAL DATE       SUSPENDED        AFFIRMED             REARREST |

| (X)Y( )N 03/30/2004 ( )Y( )N       ( )Y( )N             ( )Y( )N |

| REMARKS:                           THIS IS TO CERTIFY THAT THE |
|                                    ABOVE INFORMATION WAS EXTRACTED |
|                                    FROM OFFICIAL COURT RECORDS |
|                                    AND IS TRUE AND CORRECT. |
| DEFENDANT TO SERVE NATURAL LIFE WITHOUT PAROLE IN THE STATE OF |
| ALABAMA PENITENTIARY. |
```

JODY BYRD    *(signature)*
07/23/2004

07-23-04
OPERATOR: AML
PREPARED: 07/23/2004

State's printed name (Clerk's Initials)                          ~138
                                                                (CIVIL / CRIMINAL)

COURT REPORTER'S INDEX OF TRIAL EXHIBITS — ARAP RULE 11(a)

IN THE CIRCUIT COURT OF __Houston__ COUNTY

APPELLANT: Ruben Corey McNabb    Dothan / ALABAMA - COUNTY SEAT

VS.                                                    ACTION (Case)
STATE OF ALABAMA - or -                    appellant    No. CC-02-275

                                                        [✓] State Criminal
                                                        [ ] Civil (Law)
                                                        [ ] City Appeal (Crim.)
TO:  (name)  Judy Burd                     appellee     [ ] Civil (Equity)

FROM: (name) Carla H. Woodall  ___ of CIRCUIT COURT of __Houston__ COUNTY.
                          COURT REPORTER of  20TH  JUDICIAL CIRCUIT OF ALABAMA

REPORTER'S INDEX TO EXHIBITS

The following EXHIBITS were received by the Court Reporter in above Action and same have been properly marked and identified. Where capable said exhibit(s) have been assembled herein (in flat file); where incapable of being assembled herein such exhibit(s) placed in suitable separate container. This index includes all exhibits (herein assembled or separately housed - or - other, as indicated) and further indicates the offered, admitted or not admitted into evidence, etc.

[NOTE: (✓) check appropriate]

| Party | Exhibit No. | BRIEF DESCRIPTION OF EXHIBIT | [✓] Examined For | Offered [✓] | With- drawn [✓] | Admitted In Court In Evid. [✓] | Refused In Court or Evid. [✓] | In Flat File [✓] | REMARKS, etc. |
|---|---|---|---|---|---|---|---|---|---|
| | | State's Exhibits | | | | | | | |
| SX | 1 | photo lineup | | | ✓ | | | | |
| SX | 2 | robinson | ✓ | | | | | | |
| SX | 3 | box of pennies | ✓ | | | | | | |
| SX | 4 | speaker wire | ✓ | | | | | | |
| SX | 5 | food stamps | ✓ | | | | | | |
| SX | 6 | stamps | ✓ | | | | | | |
| SX | 7 | bullets | | | | | | | |
| SX | 8 | stamps | | | | | | | |
| SX | 9 | money wrapper | | | | | | | |
| SX | 10 | driver's license | ✓ | | | | | | |
| SX | 11 | food coupon | | | ✓ | | | | |
| SX | 12 | search warrant | ✓ | | | | | | |
| SX | 13 | | | | | | | | |
| SX | 14 | | | | | | | | marked by state never identified |
| SX | 15 | photo | | | | | | | marked by state never identified |
| SX | 16 | photo | | | ✓ | | | | |
| SX | 17 | photo | | | ✓ | | | | |
| SX | 18 | photo | | | ✓ | | | | |
| SX | 19 | photo | | | ✓ | | | | |
| SX | 20 | photo | | | ✓ | | | | |
| SX | 21 | photo | | | ✓ | | | | |
| SX | 22 | photo | | | ✓ | | | | |
| SX | 23 | photo | | | ✓ | | | | |
| SX | 24 | photo | | | ✓ | | | | |

NOTE: ARAP RULE 11(e)... Reporter shall file all exhibits with trial Court Clerk within 14 days (2 weeks) of date of the Notice of Appeal in Criminal and Civil Actions, assembled in a flat file (not stinck) and if incapable then assembled in a suitable container ...with index.

1) ABOVE INDEX RECEIVED & FILED  20th  July  2004
2) EXHIBITS IN FILE &/OR CONTAINER VERIFIED (except as noted)

/s/ ___Judia Burd___
     CLERK - REGISTER - or - AUTHORIZED ASSIST.
     CLERK'S OFC. [ ] - REGISTER'S OFC. [ ]

DATED THIS 20 DAY OF  July  2004

/s/ ___Carla H. Woodall___
                COURT REPORTER
        20TH  JUDICIAL CIRCUIT

Page 1 of 2

Def't's printed name (Clerk's Jaw)

.... - 153
RCVR / CRIMINAL

COURT REPORTER'S INDEX OF TRIAL EXHIBITS — ARAP RULE 11(c)

IN THE CIRCUIT COURT OF Houston COUNTY

Dothan / ALABAMA — COUNTY SEAT

APPELLANT- Ruben Corey McNabb

VS.                                                                    appellant

STATE OF ALABAMA · or ·

ACTION (Case)
No. CC-02-225
( ) State Criminal
( ) Civil (Law)
( ) City Appeal (Crim.)
( ) Civil (Equity)

TO:    (name) Judy Byrd                           · OF CIRCUIT COURT OF Houston COUNTY.

FROM: (name) Carla H. Woodall    COURT REPORTER OF 20TH · JUDICIAL CIRCUIT OF ALABAMA

REPORTER'S INDEX TO EXHIBITS

The following EXHIBITS were received by the Court Reporter in above Action and same have been properly marked and identified. Where capable said exhibit(s) have been assembled herein (in flat file); where incapable of being assembled herein such exhibit(s) placed in suitable separate container. This Index includes all exhibits (herein assembled or separately housed · or · other, as indicated) and further indicates these offered, admitted or not admitted into evidence, etc..:·

[NOTE: (√) check appropriate]

| Party | Exhibit no. | BRIEF DESCRIPTION OF EXHIBIT | (√) Admitted Yes or | Iden. only (√) | With-drawn (√) | Admitted By Court To Party (√) | Ordered Retained By Court By Order (√) | In File (√) | In Cont. (√) | REMARKS, etc. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Defendant's Exhibits | | | | | | | | |
| DX | 1 | receipt | √ | | | | | | | |
| | | | | | | | | | | |
| | | Sentencing | | | | | | | | |
| SX | 1 | prires | √ | | | | | | | |

NOTE: ARAP RULE 11(c)... Reporter shall file all exhibits with trial Court Clerk within 14 days (2 weeks) of date of the Notice of Appeal in Criminal and Civil Actions, assembled in a flat file (not stuck) and if incapable then assembled in a suitable container . . . with index.

1) ABOVE INDEX RECEIVED & FILED, 28th day of July 2004
2) EXHIBITS IN FILE &/OR CONTAINER VERIFIED (except as noted)       DATED THIS 28 DAY OF July 2004

/s/ Judy Byrd
CLERK · REGISTER · or · AUTHORIZED ASS'T
CLERK'S OFC. ( ) — REGISTER'S OFC. ( )

/s/ Carla H. Woodall
COURT REPORTER
20TH JUDICIAL CIRCUIT

Page 2 of 2

STATE'S EXHIBIT NUMBER 2

148

CERTIFICATION OF EVIDENCE

    I, Judy Byrd, Clerk of the Circuit Court of Houston County, Alabama, do hereby certify that State's Exhibit Number 2 is of such size and bulk (bag and contents) that it is incapable of being included in the transcript, but will be forwarded to the Court of Criminal Appeals, if requested by the Court. (toboggon)

*Judy Byrd*

Judy Byrd, Clerk

STATE'S EXHIBIT NUMBER 3

CERTIFICATION OF EVIDENCE

1 2 1

    I, Judy Byrd, Clerk of the Circuit Court of Houston County, Alabama, do hereby certify that State's Exhibit Number 3 is of such size and bulk (bag and contents) that it is incapable of being included in the transcript, but will be forwarded to the Court of Criminal Appeals if requested by the Court. (box of pennies)

                                             Judy Byrd, Clerk

STATE'S EXHIBIT 4

CERTIFICATION OF EVIDENCE

I, Judy Byrd, Clerk of the Circuit Court of Houston County, Alabama, do hereby certify that State's Exhibit Number 4 is of such size and bulk (speaker wire) that it is incapable of being included in the transcript, but will be forwarded to the Court of Criminal Appeals if requested by the court.

Judy Byrd, Clerk

STATE'S EXHIBIT NUMBER 5





1 + 6

STATE'S EXHIBIT NUMBER  6

CERTIFICATION OF EVIDENCE

    I, Judy Byrd, Clerk of the Circuit Court of Houston County, Alabama, do hereby certify that State's Exhibit Number 6  is of such size and bulk (stamps) that it is incapable of being included in the transcript, but will be forwarded to the Court of Criminal Appeals  if requested  by the court.

Judy Byrd
Judy Byrd,  Clerk

153

STATE'S EXHIBIT NUMBER 9







STATE'S EXHIBIT NUMBER 10



STATE'S EXHIBIT NUMBER 15



STATE'S EXHIBIT NUMBER 16



STATE'S EXHIBIT NUMBER  17



STATE'S EXHIBIT NUMBER 18



STATE'S EXHIBIT NUMBER  19



STATE"S EXHIBIT NUMBER 20



153

STATE'S EXHIBIT NUMBER 21



STATE'S EXHIBIT NUMBER 22



STATE'S EXHIBIT NUMBER :23

155



STATE'S EXHIBIT NUMBER 24



DEFENDANT'S EXHIBIT NUMBER 1

Greg's Complete Auto
Repair
523-5917

# AUTO REPAIR ORDER

NAME Ruben McNabb
ADDRESS 927 Honeysuckle Rd J141
CITY, STATE Dothan AL 36301

| QUAN. | PART NO. | NAME OF PART | PRICE | | | CUSTOMER'S INFORMATION | | |
|---|---|---|---|---|---|---|---|---|
| 1 | | transmission used | 200 — | | DATE 6/6/01 | CUSTOMER'S ORDER NO. | WHEN PROMISED 6/10/01 | PHONE 3347186001 |
| | | installation | 175 — | | YEAR • MAKE • MODEL 84 Buick lesabre | | SERIAL NO. MOTOR NO. | |
| | | | | | LICENSE NO. 7117519 | ODOMETER | | WRITTEN BY |

☐ LUBE  ☐ OIL CHANGE  ☐ FLUSH TRANS.  ☐ FLUSH DIFF.  ☐ WASH  ☐ POLISH

DEFENDANT'S EXHIBIT 1

| GAS, OIL & GREASE | | ACCESSORIES | | | | |
|---|---|---|---|---|---|---|
| GALS. GAS | | | | LABOR ONLY | 175 — |
| QTS. OIL | | | | PARTS | 200 — |
| **TOTAL PARTS** | | LBS. GREASE | | ACCESSORIES | |
| **MECHANICS RECOMMENDATIONS** | | TOTAL GAS OIL & GREASE | | GAS, OIL, & GREASE | |
| | | ☐ RETAIN PARTS | | MISC. MERCHANDISE | |
| | | ☐ DESTROY PARTS | | SUBLET REPAIRS | |
| ESTIMATE AMOUNT • PARTS & LABOR ▶ | | AUTHORIZED BY | TOTAL ACCESSORIES | | TAX | 22 00 |
| | | | | | **TOTAL** | 397 00 |

I HEREBY AUTHORIZE THE ABOVE REPAIR WORK TO BE DONE ALONG WITH THE NECESSARY MATERIAL, AND HEREBY GRANT YOU AND/OR YOUR EMPLOYEES PERMISSION TO OPERATE THE CAR, TRUCK OR VEHICLE HEREIN DESCRIBED ON STREETS, HIGHWAYS OR ELSEWHERE FOR THE PURPOSE OF TESTING AND/OR INSPECTION. AN EXPRESS MECHANICS LIEN IS HEREBY ACKNOWLEDGED ON ABOVE CAR, TRUCK OR VEHICLE TO SECURE THE AMOUNT OF REPAIRS THERETO.

YOU ARE ENTITLED TO A PRICE ESTIMATE FOR THE REPAIRS YOU HAVE AUTHORIZED  THE REPAIR PRICE MAY BE LESS THAN THE ESTIMATE, BUT WILL NOT EXCEED THE ESTIMATE WITHOUT YOUR PERMISSION. YOUR SIGNATURE WILL INDICATE YOUR ESTIMATE SELECTION.

TEARDOWN ESTIMATE - I UNDERSTAND THAT MY CAR WILL BE REASSEMBLED WITHIN _____ DAYS OF THE DATE SHOWN IF I CHOOSE NOT TO AUTHORIZE THE SERVICES RECOMMENDED.

1. I request an estimate in writing before you begin repairs _____
2. Please proceed with repairs, but call me before continuing if the price will exceed $ _____
3. I do not want an estimate.

Adams GT3870

AUTO REPAIR ORDER

STATE'S EXHIBIT NUMBER 1   SENTENCING

158

# EXEMPLIFICATION CERTIFICATE

STATE OF FLORIDA

         SS.

COUNTY OF ORANGE

I, *Chris Zeiser* Deputy Clerk of the Circuit Court in and for the County of Orange, State of Florida, and Custodian of the Records and of the Seal of said Court, DO HEREBY CERTIFY that the attached and foregoing is a true and correct copy of:

**Ruben Corey McNabb**      **Case # CRO92-11635, CRO97-3658, CRO94-2935, CRO94-5433**

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this the *4th* day of *September* A.D., 2002.

         LYDIA GARDNER, Clerk of the Court

By: _____, Deputy Clerk

STATE OF FLORIDA

         SS.

COUNTY OF ORANGE

I, *Jay Cohen* , one of the Judges of the Ninth Judicial Circuit of the State of Florida, and of the Circuit Court of Orange County, Florida, DO HEREBY CERTIFY that the foregoing attestation is in due form and made by the proper officer.

WITNESS my hand and seal of said Court this *6* day of *September* A.D., 2002.

_____

CIRCUIT JUDGE

STATE OF FLORIDA

         SS:

COUNTY OF ORANGE

I, *Chris Zeiser* Deputy Clerk of the Circuit Court in and for the County of Orange, State of Florida, DO HEREBY CERTIFY that the Honorable *Jay Cohen* who signed the foregoing attestation is a duly commissioned and qualified Judge of the Ninth Judicial Circuit of the State of Florida for Orange County.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this the *10th* day of *September* A.D. 2002.

         LYDIA GARDNER, Clerk of the Court

By: _____, Deputy Clerk

COURT MINUTES    ORDER (PLEA/SENTENCING/RELEASE)

AKA: *Rodney Little*

TE OF FLORIDA

VS

*Ruben Corey McNabb*

IN THE CIRCUIT COURT IN AND FOR ORANGE
COUNTY, FLORIDA

CASE CR93-11635

DIVISION 14

CHARGED WITH:

1) *Carrying Con F/A*

COURT OPENED AT 8/4/93 10:40AM HONORABLE *G. Adams* JUDGE

ASSISTANT PUBLIC DEFENDER _____ ASSISTANT STATE ATTORNEY *M. Graham*

COURT REPORTER *M Pasak* COURT DEPUTY *G Davisson*

This case came on this date for ____ Plea __X__ Sentencing ____ Trial ____ Pre-Trial.

The Defendant was ____ present, ____ not present, __✓__ present with Counsel *B Blessing*

____ Plea of not guilty withdrawn. ____ Defendant tried and found guilty of: ____ Defendant sworn and pled __✓__ Guilty to:

____ Nolo Contendere to:

____ Defendant reserves right to appeal ____ Adjudication of Guilt withheld, finding of guilt entered.

____ Defendant adjudged guilty. ____ $5.00 C.C. ____ $50.00 C.C.F. ____ $200.00 C.J.T.F. or ____ $50.00 C.J.T.F.(27.3455)

____ **P.S.I. ORDERED.** It is hereby Ordered that the Department of Corrections submit P.S.I. or a scoresheet of Defendant and deliver a written report of same to the undersigned Judge within two working days before sentencing. STATUS _____.

____ Sentencing set for_____, 19____, at_____.M., Courtroom_____

____ P.S.I. Bond set at_____. ____ P.D.R. ORDERED. ____ P.S.I. waived.

**SENTENCING:**

____ Adjudication of guilt was withheld, a finding of guilt entered. *CC waived*

__✓__ Defendant adjudged guilty. ____ $5.00 C.C. ____ $50.00 C.C.F. __✓__ $200.00 C.J.T.F. (27.3455)or ____ $50.00 C.J.T.F.

SENTENCE: *5 years Prob w/ cond:*
*① not own possess firearm*
*② PD lien waived*
*③ concur w/ any other prob*

____ RELEASE - Defendant is Ordered released from custody as to this case only.

DONE AND ORDERED this __4__ day of ____*august*____, 19__93__.

_____
CIRCUIT JUDGE

FILED IN OPEN COURT THIS __4__ DAY OF ____*Aug*____, 19__93__

FRAN CARLTON, Clerk of the CIRCUIT/COUNTY Court

Distribution:    Surety/Cash Bond
                 Defendant
                 Probation/Parole
                 Court Deputy

_____
DEPUTY CLERK in attendance.

COURT RECESSED at __8/4/93__

STATE OF FLORIDA, COUNTY OF ORANGE
that the above and foregoing is a true copy of the original filed in this office
I HEREBY CERTIFY
LYDIA GARDNER, Clerk Circuit Court

Dated 9-4-02 By _____ D.C.

32-60(B)  (7-92)

OFFICER: RIOLAND-09/0
DOC#: 370109

# JUDGEMENT OF GUILT
# AND PLACING DEFENDANT ON PROBATION

STATE OF FLORIDA
    VS       Plaintiff

In the Circuit Court of the
9th Judicial Circuit in
and for Orange County, Florida

RODNEY LITTLE
    Defendant

Case No. CR92-11635

This cause coming on this day to be heard before me, and you, the defendant RODNEY LITTLE, being now present before me, and you having:
ENTERED A PLEA OF GUITY TO:
the offense of CT. I CARRYING A CONCEALED FIREARM the Court here adjudges you to be guilty of said offense; and

It appearing to the satisfaction of the Court that you are not likely again to engage in a criminal course of conduct, and that the ends of justice and the welfare of society do not require that you should suffer the penalty authorized by law:

Now, therefore, it is ordered and adjudged that the imposition of sentence are hereby withheld, and that you are hereby placed on probation for a period of FIVE (5) YEARS CONCURRENT WITH ANY OTHER PROBATION under the supervision of the Department of Corrections and its Officers, such supervision to be subject to the provisions of the laws of this State.

It is further ordered that you shall comply with the following conditions of probation:

(1)    Not later than the fifth day of each month, you will make a full and truthful report to your Probation Officer on the form provided for that purpose.

(2)    You will pay to the State of Florida the amount of Fifty Dollars ($50.00) or lesser amount as determined by the Department of Corrections, plus a 4% surcharge per month by the fifth day of each month toward the cost of your supervision unless otherwise waived in compliance with Florida Statutes.

(3)    You will not change your residence or employment or leave the county of your residence without first procuring the consent of your Probation Officer.

(4)    You will neither possess, carry or own any weapons or firearm without first securing the consent of your Probation Officer.

(5)    You will live and remain at liberty without violating any law. A conviction in a court of law shall not be necessary in order for such a violation to constitute a violation of your probation.

(6)    You will not use intoxicants to excess; nor will you visit places where intoxicants, drugs or other dangerous substances are unlawfully sold, dispensed or used.

(7)    You will work diligently at a lawful occupation and support any dependents to the best of your ability as directed by your Probation Officer.

(8)    You will promptly and truthfully answer all inquiries directed to you by the Court or the Probation Officer, and allow the Officer to visit in your home, at your employment site or elsewhere, and you will comply with all instructions he may give you.

(9)    You will not possess or use any marijuana or other controlled substance except upon prescription of a duly licensed medical or osteopathic doctor and then only in accordance with the prescribed dosage. You will not possess any controlled substance paraphernalia or forged or blank prescription forms.

(10)    Unless prohibited from consuming alcoholic beverages by a special condition elsewhere in this order, you will not consume alcoholic beverages to the extent that your normal faculties are impaired.

_____ Probation Violator

_____ Community Control Violator

_____ Retrial

_____ Resentence

State of Florida
v.    AKA Rodney Little

Ruben Corey McNabb
Defendant

In the Circuit Court, Ninth Judicial Circuit,

in and for _____ Orange _____ County, Florida

Division _____ 14

Case Number _____ CR92-11635

FILED IN OPEN COURT
THIS 6 DAY OF August 19 93

Fran Carlton Clerk

BY _____ D.C.

# J U D G M E N T

The defendant, Ruben Corey McNabb AKA Rodney Little , being personally before this court,

represented by _____ D Blessing _____ , the attorney of record, and the state

represented by _____ M Graham _____ , and having

_____ been tried and found guilty by jury/ by court of the following crime(s)

☑ entered a plea of guilty to the following crime(s)

_____ entered a plea of nolo contendere to the following crime(s)

Orange Co FL 4561496
08/13/93  03:54:15pm
OR Bk 4605 Pg 423

| Count | Crime | Offense Statute Number(s) | Degree of Crime | OBTS Number |
|-------|-------|---------------------------|-----------------|-------------|
| 1 | Carrying A Concealed Firearm | 79001 | F3 | 5017351 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

☑ and no cause being shown why the defendant should not be adjudicated guilty, IT IS ORDERED that the
defendant is hereby ADJUDICATED GUILTY of the above crime(s).

_____ and pursuant to section 943.325, Florida Statutes, having been convicted of attempts or offenses relating
to sexual battery (ch.794) or lewd and lascivious conduct (ch.800) the defendant shall be required to sub-
mit blood specimens.

_____ and good cause being shown;  IT IS ORDERED THAT ADJUDICATION OF GUILT BE WITHHELD.

32-34 (8/92)

State of Florida

v.

Ruben C. McNabb

Defendant

Case Number CR92-11635

## FINGERPRINTS OF DEFENDANT

| 1. Right Thumb | 2. Right Index | 3. Right Middle | 4. Right Ring | 5. Right Little |
|---|---|---|---|---|
| | | | | |

| 6. Left Thumb | 7. Left Index | 8. Left Middle | 9. Left Ring | 10. Left Little |
|---|---|---|---|---|
| | | | | |

Fingerprints taken by: _Dawsson LD_         _D/S OCSO_

Name                                    Title

I HEREBY CERTIFY that the above and foregoing are the fingerprints of the
defendant, _Ruben C. McNabb_ , and that they were placed thereon by the defendant
in my presence in open court this date.

DONE AND ORDERED in open court in _____ORANGE_____ County, Florida,
this __6__ day of ____august____, 19_93_

Judge

STATE OF FLORIDA, COUNTY OF ORANGE    I HEREBY CERTIFY
that the above and foregoing is a true copy of the original filed in this office
LYDIA GARDNER, Clerk Circuit Court

Dated _9-4-02_ By _____ D.C.

OR Bk 4605 Pg 424
Orange Co FL 4561496

32-37 (7/92)

RECORDED & RECORD VERIFIED
_Martha O Haynie_
County Comptroller, Orange Co, FL

_X_COURT MINUTES _X_ORDER    PROBATION VIOLATION/ COMMUNITY CONTROL/ RELEASE ORDER

STATE OF FLORIDA    *AKA Rodney Little*

-vs-    IN THE CIRCUIT/ COUNTY COURT FOR
ORANGE COUNTY, FLORIDA

Robin Corey McNabb    CASE NO. CR92-11635 DIVISION 14

CHARGED WITH:    1) 79001

COURT OPENED AT___3/28/95___    HONORABLE __M. Cymanick__ JUDGE
ASSISTANT STATE ATTORNEY __G Wood__ Cogden    ASSISTANT PUBLIC DEFENDER ___
COURT REPORTER __G Wood__    COURT DEPUTY __D Moore__
    This case came on this date for Violation of _Probation_ Community Control    Hearing _X_ Sentencing.
The Defendant was___Not Present___Present with Counsel __Edward C Jewett__
Defendant _X_ADMITTED___DENIED Violation of condition(s) _5_
A hearing was conducted. ___All witnesses were placed under the Rule of Exclusion.

STATE WITNESSES SWORN AND TESTIFIED :    STATE EXHIBITS ADMITTED INTO EVIDENCE:

DEFENSE WITNESSES SWORN AND TESTIFIED:    DEFENSE EXHIBITS ADMITTED INTO EVIDENCE:

COURT WITNESSES SWORN AND TESTIFIED:    COURT EXHIBITS ADMITTED INTO EVIDENCE:

Court found___NO VIOLATION _X_VIOLATION OF _PROBATION_ COMMUNITY CONTROL condition(s)___
_Probation_/Community Control was___RESTORED _X_REVOKED___TERMINATED.    WARRANT RESCINDED.
Court modified _Probation_/Community Control as follows:    STATE OF FLORIDA, COUNTY OF ORANGE
I HEREBY CERTIFY,
that the above and foregoing is a true copy of the original filed in this office
FRAN GARDNER, Clerk Circuit Court

Adjudication of guilt was _X_ENTERED PREVIOUSLY___ENTERED___WITHHELD.    Dated 9-4-0_    DEPUTY    D.C.
Sentence deferred to___    19___    M.
Defendant___REMANDED to custody___PERMITTED TO REMAIN ON___
SENTENCE/OTHER    38 mos DOC w/c 285 days TS

___All previously owed monies will be reduced to Civil Judgment.
FINES AND COSTS MUST BE PAID BY CASH, MONEY ORDER, OR CASHIER'S CHECK.  NO PERSONAL CHECKS WILL BE ACCEPTED.
Said sentence to run___CONCURRENT WITH___CONSECUTIVE TO___
___DEFENDANT RELEASED FROM CUSTODY AS TO THIS CASE ONLY.
DONE AND ORDERED THIS _28_ DAY OF __March__, 19_95_

__Michael F. Cymanick__
CIRCUIT/COUNTY JUDGE

FILED IN OPEN COURT __March 95__
This _28_ DAY OF __March__, 19_95_.
DAN CARLTON, CLERK OF THE CIRCUIT/COUNTY COURTS

BY _____, Deputy Clerk in attendance.

COURT RECESSED at___
CC: _X_DEFENDANT _X_COURT DEPUTY _X_PROBATION AND PAROLE OR COMMUNITY CONTROL

32-GO (D)    (5/93)

Defendant __Ruben C.__   Case Number __CR 95__   OBTS Number __501735__
__mc Nabb__                          __11635__                              1.

## SENTENCE

(As to Count __one__)

The defendant, being personally before this court, accompanied by the defendant's attorney of record,_____
__E. Jewett__ , and having been adjudicated guilty herein, and the court having given the defendant
an opportunity to be heard and to offer matters in mitigation of sentence, and to show cause why the defendant should
not be sentenced as provided by law, and no cause being shown,

    (Check one if applicable.)

    _____ and the Court having on _____ deferred imposition of sentence until this date.
                                    (date)

    _____ and the Court having previously entered a judgment in this case on _____ now resentences
    the defendant.                                                              (date)

    _____ and the Court having placed the defendant on probation/community control and having subsequently revoked
    the defendant's probation/community control.

IT IS THE SENTENCE OF THE COURT THAT:

    _____ The defendant pay a fine of $_____, pursuant to section 775.083, Florida Statutes, plus $_____
    as the 5% surcharge required by section 960.25, Florida Statutes.

    _____ The defendant is hereby committed to the custody of the Department of Corrections.

    _ The defendant is hereby committed to the custody of the Sheriff of _____**Orange**_____ County, Florida.

    _____ The defendant is sentenced as a youthful offender in accordance with section 958.04, Florida Statutes.

TO BE IMPRISONED (CHECK ONE; UNMARKED SECTIONS ARE INAPPLICABLE.):

    _____ For a term of natural life.    38 mos

    _____ For a term of _____.

    _____ Said SENTENCE SUSPENDED for a period of _____ subject to conditions set forth in
    this order.

FILED IN OPEN COURT
THIS ___ DAY OF __March__, 19 95
__Fran Carlton__, Clerk
BY _____ D.C.

If "split" sentence, complete the appropriate paragraph.

    _____ Followed by a period of _____ on probation/community control under the supervision of the
    Department of Corrections according to the terms and conditions of supervision set forth in a separate order
    entered herein.

    _____ However, after serving a period of _____ imprisonment in _____, the
    balance of the sentence shall be suspended and the defendant shall be placed on probation/community

    control for a period of _____ under supervision of the Department of Corrections
    according to the terms and conditions of probation/community control set forth in a separate order entered
    herein.

    the event the defendant is ordered to serve additional split sentences, all incarceration portions shall be
    satisfied before the defendant begins service of the supervision terms.

CONSECUTIVE/         It is further ordered that the sentence imposed for this count shall run _____ Consecutive to
   CONCURRENT        _____ Concurrent with (check one) the sentence set forth in count _____ above.

Defendant _Ruben L_                    Case Number _CR-93-11635_
_McNabb_

## SPECIAL PROVISIONS                                    _156_

(As to Count _One_)

By appropriate notation, the following provisions apply to the sentence imposed:

## Mandatory/Minimum Provisions:

Firearm
___ It is further ordered that the 3-year minimum imprisonment provisions of section 775.087(2), Florida Statutes, is hereby imposed for the sentence specified in this count.

Firearm
(Police Officer Weapon)
___ It is further ordered that the 3-year minimum imprisonment provisions of section 775.0875, Florida Statutes, is hereby imposed for the sentence specified in this count.

Drug Trafficking
___ It is further ordered that the _____ mandatory minimum imprisonment provisions of section 893.135(1), Florida Statutes, is hereby imposed for the sentence specified in this count.

Controlled Substance
Within 1,000 Feet of School
___ It is further ordered that the 3-year minimum imprisonment provisions of section 893.13(1)(e)1, Florida Statutes, is hereby imposed for the sentence specified in this count.

Habitual Felony Offender
___ The defendant is adjudicated a habitual felony offender and has been sentenced to an extended term in accordance with the provisions of section 775.084(4)(a), Florida Statutes. The requisite findings by the court are set forth in a separate order or stated on the record in open court.

Habitual Violent
Felony Offender
___ The defendant is adjudicated a habitual violent felony offender and has been sentenced to an extended term in accordance with the provisions of section 775.084(4)(b), Florida Statutes. A minimum term of _____ year(s) must be served prior to release. The requisite findings of the court are set forth in a separate order or stated on the record in open court.

Law Enforcement
Protection Act
___ It is further ordered that the defendant shall serve a minimum of _____ years before release in accordance with section 775.0823, Florida Statutes.

Capital Offense
___ It is further ordered that the defendant shall serve no less than 25 years in accordance with the provisions of section 775.082(1), Florida Statutes.

Short-Barreled Rifle,
Shotgun, Machine Gun
___ It is further ordered that the 5-year minimum provisions of section 790.221(2), Florida Statutes, are hereby imposed for the sentence specified in this count.

Continuing
Criminal Enterprise
___ It is further ordered that the 25-year minimum sentence provisions of section 893.20, Florida Statutes, are hereby imposed for the sentence specified in this count.

## Other Provisions:

Retention of Jurisdiction
___ The court retains jurisdiction over the defendant pursuant to section 947.16(3), Florida Statutes (1983).

Jail Credit
___ It is further ordered that the defendant shall be allowed a total of _285_ days as credit for time incarcerated before imposition of this sentence.

Prison Credit
___ It is further ordered that the defendant be allowed credit for all time previously served on this count in the Department of Corrections prior to resentencing.

32-30 (7-92)

Defendant _Ruben M NaBb_   Case Number _CR92-11635_

Other Provisions, continued:                                                        167

**Consecutive/Concurrent**       _____It is further ordered that the sentence imposed for this count shall run
**As To Other Counts**           (check one) _____consecutive to _____concurrent
                                 with the sentence set forth in count _____of this case.

**Consecutive/Concurrent**       _____It is further ordered that the composite term of all sentences imposed for
**As To Other Convictions**      the counts specified in this order shall run
                                 (check one) _____consecutive to _____concurrent
                                 with the following:
                                 (check one)

                                 _____any active sentence being served.

                                 _____specific sentences: _____

                                 _____

                                 _____

                                 _____

    In the event the above sentence is to the Department of Corrections, the Sheriff of __ORANGE__
County, Florida, is hereby ordered and directed to deliver the defendant to the Department of Corrections at
the facility designated by the department together with a copy of this judgment and sentence and any other
documents specified by Florida Statute.

    The defendant in open court was advised of the right to appeal from this sentence by filing notice of
appeal within 30 days from this date with the clerk of this court and the defendant's right to the assistance
of counsel in taking the appeal at the expense of the State on showing of indigency.

    In imposing the above sentence, the court further recommends _Work Release_

_____

_____

_____

    DONE AND ORDERED in open court at _____ __ORANGE__ _____ County, Florida,
this_____ day of ____March____ 19_95_.

_Michael F. Cycmanick_
                                                                         Judge

STATE OF FLORIDA, COUNTY OF ORANGE, I HEREBY CERTIFY
that the above and foregoing is a true copy of the original filed in this office
LYDIA GARDNER, Clerk Circuit Court
Dated _9-4-02_ By_____ D.C.

Page _3_ of _____

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NUMBER: CR-O-92- 11635 /-A

STATE OF FLORIDA,
    Plaintiff,

DIVISION NO: 14

vs.

RUBEN COREY MCNABB,
    AKA: LITTLE, RODNEY
    Defendant.

_____/

## Court Minutes / Order (Hearing Violation of Probation)

Court opened on 06/19/97, with the following officers present:
Honorable Frank N. Kaney, Judge Presiding.
Asst. State Atty.:   Division 14
Court Deputy:    R. Drummond

Court Reporter:   Bobby Timms

This case came on this day for Hearing for Violation of Probation. The Defendant was present with counsel. Counsel's Name: M. Solomon.

## Count(s): Ct. 01) 79001

The Defendant admitted violating the condition(s) of the Affidavit and Warrant of Violation of Probation: as charged
The Court found the Defendant violated condition(s) of Probation: as charged.

## Sentence

The Defendant's Probation is revoked.

**Jail**
    The defendant is ordered to serve 30 Month(s) in the Department of Corrections with credit for 1 Year(s), 238 Day(s) time served.   All counts on this case to run concurrent with CR93-2899.

**Probation**

Filed in Open Court this 19th day of June, 1997.

**Fran Carlton**
Clerk of the Circuit and County Courts

By: M. Foster/H. Young,
Deputy Clerk in Attendance

STATE OF FLORIDA COUNTY OF ORANGE I HEREBY CERTIFY
that the above and foregoing is a true copy of the original filed in this office
LYDIA GARDNER, Clerk Circuit Court
Dated _____ By _____ D.C.

Done and Ordered at Orange County, Florida this 19th day of June, 1997.

_____
Honorable Frank N. Kaney, Judge Presiding

| | | | | |
|---|---|---|---|---|
| ____ ACS | ____ Dockets | ____ Defendant | ____ Booking | ____ Court Security |
| ____ CFSC | ____ Court Deputy | ____ P&P/Com Cont | ____ Surety | ____ S.O. on ____ |

____ Other: _____

RUBEN COREY MCNABB    06/19/97 03:45 PM   Page 1 of 1    CR-O-92- 11635 / A

ndant: RUBEN COREY MCNABB    Case Number: CR-O-92- 11635    OBTS Number: 0005017351
A: LITTLE, RODNEY)

## SENTENCE
### (as to Count 01)

The defendant being personally before this court, accompanied by the defendant's attorney of record, M. Solomon, and having been adjudicated guilty herein, and the court having given the defendant an opportunity to be heard and to offer matters in mitigation of sentence, and to show cause why the defendant should not be sentenced as provided by law, and no cause being shown, and the Court having placed the defendant on probation and having subsequently revoked the defendant's probation.

### IT IS THE SENTENCE OF THE COURT THAT:

The Defendant is hereby committed to the custody of the Department of Corrections.

### TO BE IMPRISONED:

For a term of 30 Month(s).

## SPECIAL PROVISIONS
### (As to Count 01)

The following provision(s) apply to the sentence imposed:

**Other Provisions:**

Jail Credit

It is further ordered that the defendant shall be allowed a total of 1 Year(s), 238 Day(s) as credit for time incarcerated before imposition of this sentence.

RUBEN COREY MCNABB    06/19/97 03:45 PM    Page 1 of 2    CR-O-92- 11635 / A

Defendant: RUBEN COREY MCNABB (AKA: LITTLE, RODNEY)

Case Number: CR-O-92- 11635

Consecutive / Concurrent as to Other Convictions

It is further ordered that the composite term of all sentences imposed for the counts specified in this order shall run concurrent with CR93-2899.

In the event the above sentence is to the Department of Corrections, the Sheriff of Orange County, Florida, is hereby ordered and directed to deliver the defendant to the Department of Corrections at the facility designated by the department together with a copy of this judgment and sentence and any other documents specified by Florida Statute.

The defendant in open court was advised of the right to appeal from this sentence by filing notice of appeal within 30 days from this date with the clerk of this court and the defendant's right to assistance of counsel in taking the appeal at the expense of the State on showing of indigence.

Filed in Open Court this 19th day of June, 1997.

**Fran Carlton**
Clerk of the Circuit and County Courts

By: M. Foster/H. Young,
Deputy Clerk in Attendance

Done and Ordered at Orange County, Florida this 19th day of June, 1997.

Honorable Frank N. Kaney, Judge Presiding

STATE OF FLORIDA, COUNTY OF ORANGE, I HEREBY CERTIFY,
that the above and foregoing is a true copy of the original filed in this office
LYDIA GARDNER, Clerk Circuit Court

Dated 9-4-02 By _____ D.C.

RUBEN COREY MCNABB                06/19/97 03:45 PM    Page 2 of 2                CR-O-92- 11635 / A

*Carla*

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C    8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br><br>____ - ____ |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

[X] CIRCUIT COURT  [ ] DISTRICT COURT  [ ] JUVENILE COURT OF    Houston _____ COUNTY

Ruben McNabb , Appellant

v.  [X] STATE OF ALABAMA  [ ] MUNICIPALITY OF _____

| Case Number<br>CC 02-225 | Date of Judgment/Sentence/Order<br>3-24-04 | |
| Date of Notice of Appeal<br>Oral:  3-30-04    Written: | | Indigent Status Granted:<br>[X] Yes    [ ] No |

PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

| Signature | Date | Print or Type Name |

PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED. Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:

COURT REPORTER(S)

A. [X] TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately

Carla Woodall
c/o Hon. Larry Anderson
Dothan, AL

B. [ ] ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. [ ] ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
| D. _____ | _____ | |
| E. _____ | _____ | **FILED** |
| F. _____ | _____ | APR 23 2004 |
| G. _____ | _____ | *Jislyn Byrd*<br>JUDY BYRD, CLERK |

IMPORTANT NOTICE: The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS

| Signature | Date  4-23-04 | David K. Hogg<br>Print or Type Name |

DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to:  (1) Clerk of the Court of Criminal Appeals.  (2) the District Attorney. (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript

```
 1              IN THE CIRCUIT COURT OF HOUSTON COUNTY

 2                        STATE OF ALABAMA

 3    STATE OF ALABAMA,            *
                                   *
 4    v.                           *      Case No. CC-02-225
                                   *
 5    RUBEN COREY MCNABB,          *
                                   *
 6         Defendant.              *

 7


 8


 9
           REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL
10


11


12
      Before:
13
                 The Honorable Jerry M. White
14
                      February 13, 2003
15


16


17
      APPEARANCES:
18
                 For the State
19
                      Martin Adams, Esquire
20                    Assistant District Attorney

21               For the Defendant

22                    M. Hampton Baxley, Esquire
                      Dothan, Alabama
23


24
      Carla H. Woodall
25    Court Reporter
```

1                              I N D E X

2              State of Alabama   v.   Ruben Corey McNabb
                          Case No. CC-02-225
3

4                                                              PAGE

5      REPORTER'S TRANSCRIPT ORDER                                1

6      TITLE PAGE                                                 2

7      INDEX                                                      3

8      COLLOQUY                                                   4

9                    STATE'S TESTAMENTARY EVIDENCE

10     WITNESSES:

11          WILLIE WILLIAMSON

12               Direct Examination by Mr. Adams               4
                 Cross Examination by Mr. Baxley              12
13
       STATE RESTS                                            18
14
                     DEFENDANT'S TESTAMENTARY EVIDENCE
15
       WITNESSES:
16
            RONALD REEVES
17
                 Direct Examination by Mr. Baxley            18
18
       DEFENSE RESTS                                          22
19
       ARGUMENT BY MR. BAXLEY                                 22
20
       RULING BY THE COURT                                   25
21
       REPORTER'S CERTIFICATE                                 26
22

23

24

25

4

<u>PROCEEDINGS</u>

<u>MOTION TO SUPPRESS</u>

1

2

3    THE COURT:  Now, what about our motion to

4    suppress evidence?  Do we need to take testimony

5    on that?

6    MR. BAXLEY:  Yes, sir.  That's very pertinent

7    in this case, Your Honor.

8    THE COURT:  Okay.

9    MR. BAXLEY:  Are you ready to hear that?

10    THE COURT:  Yes, sir.

11    MR. ADAMS:  Let me get my witness, Judge.

12    THE COURT:  Do you want to call the police

13    officer?  Is that who you want to call?

14    MR. BAXLEY:  Yes, sir.

15    MR. ADAMS:  Who do you want?  I'm going to

16    put Willie on.  Generally I go first and then you

17    get to rebut it.

18    THE COURT: Okay.

19    MR. ADAMS:  Judge, the State calls Willie

20    Williamson to the stand.

21    WILLIE WILLIAMSON

22    having first been duly sworn, was examined and

23    testified as follows:

24    <u>DIRECT EXAMINATION</u>

25  <u>BY MR. ADAMS:</u>

| | | |
|---|---|---|
| 1 | Q | State your name, please. |
| 2 | A | Sergeant Willie Williamson. |
| 3 | Q | How are you employed? |
| 4 | A | City of Dothan Police Department. |
| 5 | Q | In what capacity? |
| 6 | A | I'm an investigator, criminal investigations |
| 7 | | division. |
| 8 | Q | Employed in that capacity back on June 7, 2001? |
| 9 | A | Yes, sir. |
| 10 | Q | Back on that date did you have an opportunity to |
| 11 | | investigate an armed robbery at the Winn Dixie? |
| 12 | A | Yes. |
| 13 | Q | Where is that located? |
| 14 | A | It's on 1571 Westgate Parkway. |
| 15 | Q | Is that in Houston County? |
| 16 | A | Yes. |
| 17 | Q | Dothan, Alabama? |
| 18 | A | Yes, sir. |
| 19 | Q | And you were dispatched over there.  Did your |
| 20 | | office get a call on something? |
| 21 | A | Investigator Singleton actually responded to that |
| 22 | | call as the investigator. |
| 23 | Q | And did he collect some evidence? |
| 24 | A | Yes, he did. |
| 25 | Q | All right.  And then you responded at a later |

| 1 | | date? |
| 2 | A | Yes.  He and I later went out later at about five |
| 3 | | p.m. and did a further investigation. |
| 4 | Q | Did you speak to some witnesses? |
| 5 | A | Yes. |
| 6 | Q | Did you speak to a Betty Jean Prescott? |
| 7 | A | Yes. |
| 8 | Q | What did she tell you when you interviewed her? |
| 9 | A | Ms. Prescott told us that she was -- had just come |
| 10 | | to work -- let me refresh my notes here.  She's a |
| 11 | | cashier there.  She's employed there.  And she |
| 12 | | reports to work about 0400 hours, which is four |
| 13 | | a.m.  And she said she was coming to work.  And |
| 14 | | she said that she had always noticed -- tries to |
| 15 | | be observant because it's real dark out and she |
| 16 | | doesn't want anything to happen to her.  And she |
| 17 | | also said she had been robbed before which had |
| 18 | | made her a little more observant in her words. |
| 19 | | Ms. Prescott said there was a mini van coming from |
| 20 | | around the north side of the store at a very high |
| 21 | | rate of speed and she had to actually swerve to |
| 22 | | keep from hitting the curb.  So she was on her |
| 23 | | vehicle and she had to -- she barely missed it. |
| 24 | | And she stated that the only thing she could tell |
| 25 | | us about the van was that it was possibly a 1989 |

```
 1        through 1992 model and that it had wood panels on
 2        the side of it.  She stated that she had got out
 3        of her car and went in and she clocked in and it
 4        was about three-fifty-three a.m. then.  And then
 5        she walked to the back of the store.  Ms. Prescott
 6        stated that almost immediately the store was
 7        robbed.  And she stated that Reeves, which was the
 8        manager at that time, walked to the back of the
 9        store, and he was talking to Reginald Hill, who I
10        believe was assistant manager although I'm not
11        quite sure.
12   Q    Let me ask you.  You spoke to her and she told you
13        about a van?
14   A    Yes.
15   Q    And described it?
16   A    Yes.
17   Q    And did you and Officer Singleton try to locate
18        this particular vehicle or a vehicle that would
19        match it?
20   A    Yes.
21   Q    And where did you go?
22   A    We went to Barstone Apartments located on
23        Honeysuckle Road.
24   Q    Was that the only place you went?  First place?
25        Only place?
```

| 1 | A | That's the first place.  That's the first |
| 2 | | apartment complex. |
| 3 | Q | What made you go there? |
| 4 | A | Barstone Apartments has a history of having |
| 5 | | several police calls there. |
| 6 | Q | Now, you mentioned one of the managers.  There was |
| 7 | | a night manager, Mr. Reeves? |
| 8 | A | Yes. |
| 9 | Q | Who else was there?  Any other managers? |
| 10 | A | Mr. Hill would have been there. |
| 11 | Q | Did you find out where Mr. Hill lived? |
| 12 | A | Yes. |
| 13 | Q | Where did he live? |
| 14 | A | Barstone Apartments. |
| 15 | Q | Based on your preliminary investigation, were you |
| 16 | | concerned with a possible inside job with regard |
| 17 | | to this armed robbery? |
| 18 | A | Investigator Singleton had mentioned that to me, |
| 19 | | yes. |
| 20 | Q | And you-all discussed that? |
| 21 | A | Yes, sir. |
| 22 | Q | You went to Barstone Apartments.  What did you |
| 23 | | see -- when did you go to Barstone Apartments? |
| 24 | A | Would have been after five p.m., and if memory |
| 25 | | serves me, it was still daylight.  It was during |

1      the summer hours.

2  Q   And --

3  A   We pulled in the driveway and essentially we were

4      looking for a van with wood panels.  A mini van.

5      Such as Ms. Prescott had described.

6  Q   And did you find one?

7  A   Yes.

8  Q   And what type of car was that, or vehicle, that

9      you saw there?

10  A   It was a Dodge -- I'm sorry, a 1989 white Dodge

11      mini van with wood panel siding on the sides of

12      the vehicle.

13  Q   Run the tag on it?

14  A   Yes, sir.

15  Q   What did it come back as?

16  A   It was registered to Ruben or Yvette McNabb, 927

17      Honeysuckle Road, which is Barstone Apartments,

18      apartment number J.  I believe there's going to be

19      a number to that, too.

20  Q   Were you able to -- so it came back to a Ruben or

21      Yvette?

22  A   McNabb.

23  Q   Did you run a rap sheet on Mr. McNabb?

24  A   Yes.

25  Q   And what did it show?

1    A    It showed that he had some -- possible some

2         convictions for drug activity and having weapons

3         in his possession.

4    Q    Had he previously been arrested for armed robbery?

5    A    It showed there was some type of robbery charge.

6         I don't know the outcome of it.

7    Q    But he was arrested?

8    A    Yes, sir.

9    Q    And through your investigation did you -- were you

10        able to determine whether or not Mr. McNabb knew

11        Mr. Hill?

12   A    Yes.

13   Q    And did they live in the same basic area?

14   A    In the same complex.

15   Q    They both lived in Barstone?

16   A    Correct.

17   Q    You determined through your investigation that

18        they were acquaintances?

19   A    Yes.

20   Q    And did you return and speak to Ms. Prescott?

21   A    Yes, sir.

22   Q    And did you bring her to Barstone?

23   A    Yes, sir.  Investigator Singleton and I went to

24        Ms. Prescott's residence.  We called her, and she

25        knew we were coming.  We went and got her.  We

```
 1        drove her over to Barstone to look at the mini

 2        van.

 3   Q    What did she say when you got there?

 4   A    She stated that the van looked like the one in the

 5        parking lot that night, the night of the robbery,

 6        but she could not be sure about the color, but

 7        that the wood grain on the side of the mini van

 8        was the right color and the van looked like the

 9        right year model.

10   Q    What did you do after that?

11   A    I sent off to Alabama Department Public Safety

12        driver's license division to have a picture of Mr.

13        McNabb e-mailed to me.  There was not one in our

14        computer system.  And when we got the photograph,

15        we put together a black and white photo lineup to

16        include Mr. McNabb's picture in it.  And then we

17        called Mr. ████████ the manager on duty during the

18        robbery, and asked him if he would come to the

19        police department and look at the photos.  He did

20        so and gave us a statement about what happened

21        during the robbery, and he stated -- I'm sorry.

22        Essentially he picked him from the lineup.  Picked

23        Mr. McNabb as the --

24   Q    Essentially or he did pick him out?

25   A    He did pick him out of the lineup as one of the
```

1       ~~men who had robbed him~~.

2    Q    And then what did you do after that?

3    A    We typed a search warrant at that point.

4    Q    Based on the information that you had gathered

5         that you've recovered?

6    A    Correct.

7    Q    Those particular items, you got the search warrant?

8    A    Yes, sir.

9              MR. ADAMS:  That's all I have, Judge.

10             THE COURT:  Mr. Baxley?

11             MR. BAXLEY:  Is she going to be able to

12        testify to the search warrant herself?

13             MR. ADAMS:  I believe she typed it up.

14                      CROSS EXAMINATION

15   BY MR. BAXLEY:

16   Q    You typed it up?

17   A    Yes, I typed it up.

18   Q    So you're going to be able to do that.  Okay.

19             And you have a copy of that warrant?

20   A    I'm sorry?

21   Q    Do you have a copy of the warrant?

22   A    The warrant?

23   Q    Yes.

24   A    I should have the original.

25   Q    In the affidavit signed -- even though Jimmy

| | | |
|---|---|---|
| 1 | | Singleton signed this, you would still verify the |
| 2 | | contents of this affidavit? |
| 3 | A | Yes, sir.  Even though Jimmy signed it, I typed it |
| 4 | | and put the words together. |
| 5 | Q | In this you stated that Mr. McNabb has a history |
| 6 | | of robbery.  Where do you obtain that history of |
| 7 | | robbery? |
| 8 | A | NCIC.  I run a criminal history of Mr. McNabb. |
| 9 | Q | I've got the history, too.  It doesn't show |
| 10 | | anything about it.  Where is that history of |
| 11 | | robbery in his report? |
| 12 | A | Hold on.  Let me find it. |
| 13 | | THE WITNESS:  You found it?  I have the same |
| 14 | | copy. |
| 15 | | MR. ADAMS:  It's right towards the end. |
| 16 | | Unless you want to take this one. |
| 17 | | THE WITNESS:  I'll take this one.  They're |
| 18 | | identical. |
| 19 | A | It shows that he was -- it shows these are the |
| 20 | | drug convictions. |
| 21 | Q | We know about the drugs.  I want to know about the |
| 22 | | robbery. |
| 23 | A | Right.  I understand.  I just saw it.  I'm sorry. |
| 24 | | Here it is.  It shows that December 18, 1996, |
| 25 | | Orlando Police Department he was charged with |

```
 1         robbery, which is a first degree felony in that
 2         state with a firearm.
 3    Q    He was convicted of that charge?
 4    A    It says the charges were reduced to larceny,
 5         misdemeanor first degree.  Florida.
 6    Q    So he doesn't have a history of robbery, does he?
 7         Anyone can make an allegation, but there's no
 8         conviction for robbery, is there?
 9    A    There's no conviction for robbery, no, sir.
10    Q    Exactly.  But you list in your affidavit he has a
11         history of robbery?
12    A    Yes, I did.
13    Q    Even though you knew that was false?
14    A    I knew he wasn't convicted of it, right.
15    Q    But you knew it was false and presented to a judge
16         where a judge might assume --
17              MR. ADAMS:  Objection.  Asked and answered.
18              THE COURT:  I understand what's happened.  Go
19         ahead.  You're not arguing to a jury.  It's just
20         me.
21    Q    You said you sent off for the digital photograph
22         of Mr. McNabb, correct?
23    A    Correct.
24    Q    Do you have a copy of that photo lineup here with
25         you today?
```

```
 1    A    Yes.
 2    Q    And this is the exact photo lineup you showed to
 3         Mr. Reeves?
 4    A    Yes.
 5    Q    I notice that the photographs are different.  Was
 6         there a reason for the photographs being different
 7         in this photo lineup?
 8    A    In speaking about Mr. McNabb's photograph?
 9    Q    Correct.  It's a different kind of photograph than
10         all five of the other photographs.
11    A    The ones -- the only photograph I could obtain was
12         from the driver's license division of Mr. McNabb.
13    Q    Okay.  Well, tell me this.  Could you have
14         obtained driver's licenses for these other people
15         or anyone else to obtain the same character or
16         nature of photographs?
17    A    If they had driver's license in Alabama.
18    Q    I'm saying -- you could have gotten other driver's
19         license photos that match the grainyness and I
20         guess disparity shown by Mr. McNabb's photo, could
21         you not?
22    A    They vary by state.  If these gentlemen have
23         driver's license --
24    Q    That's not my question, Ms. Williamson.  I asked
25         you if --
```

| | | |
|---|---|---|
| 1 | A | I don't know, Mr. Baxley, because I don't know |
| 2 | | what other photographs other states have if these |
| 3 | | people -- |
| 4 | Q | I'm not asking about other states.  I'm asking |
| 5 | | anything.  You say you need photographs of five |
| 6 | | black males, six foot tall, roughly balding, |
| 7 | | whatever.  You give a general characteristic.  To |
| 8 | | get the exact -- or near about the same as Mr. |
| 9 | | McNabb's description or whatever the description |
| 10 | | may have been that you were looking for.  You |
| 11 | | could have done that? |
| 12 | A | From the driver's license division, yes, sir. |
| 13 | Q | So you could have easily gotten other photographs |
| 14 | | from the driver's license division rather than |
| 15 | | using the glossy photos that were obviously used |
| 16 | | in this one? |
| 17 | A | If I -- |
| 18 | Q | Yes or no? |
| 19 | A | No.  If I used the pictures of these gentlemen and |
| 20 | | they had a driver's license, I can get the |
| 21 | | photographs, yes.  But to find these gentlemen |
| 22 | | just based on whether they had a driver's license |
| 23 | | or not -- |
| 24 | Q | That's not what I asked, once again.  You don't |
| 25 | | have to have the exact same people.  I'm just |

1      saying other people that would match the

2      photographs.  The problem we have got here is that

3      photograph is different than from all the other

4      five photographs in this lineup.

5   A  I understand.

6   Q  Is that true?

7   A  By resolution, yes.

8   Q  Yes.  By resolution or whatever.  It's a different

9      photograph?

10  A  It appears to be more -- a little more distorted

11     than the others, yes.

12  Q  Okay.  Thank you.

13        But you could have gotten other digital

14     photographs rather than using those other five?

15     Possibly, you could have.  If you wanted to, you

16     could have?

17  A  No, sir, I don't -- I don't think you understand

18     what I'm trying to say.  I had to find these

19     gentlemen to match Mr. McNabb.  They had to be

20     similar in description.  I couldn't just go and

21     pick out a driver's license and say, I need that

22     photograph because I wouldn't know their

23     descriptions.  I wouldn't know they were balding.

24     So if these gentlemen had pictures with the State

25     of Alabama, they would look exactly like that.

1    Q    But you could have -- say that's Joe Blow.  You
2         could have called and said Joe Blow, I need his
3         driver's license photograph.  You could have
4         gotten that, could you?  It might have taken a
5         little bit longer, but you could have gotten it,
6         right?
7    A    It depends on the state.
8    Q    I'm saying if they were in Alabama, Ms.
9         Williamson.
10   A    Yes.  If they were in Alabama, Mr. Baxley.
11   Q    Okay.  That's what I'm asking.  That's exactly
12        what I'm asking.  Thank you.
13             MR. BAXLEY:  That's all I have for her at
14        this time, Your Honor.
15             THE COURT:  Anything further?
16             MR. ADAMS:  No, sir.
17             THE COURT:  Please, ma'am, you may step
18        down.
19             MR. ADAMS:  The State would rest at this
20        time.
21             MR. BAXLEY:  I would like to call Mr. Reeves,
22        Your Honor.
23                       RONALD REEVES
24        having first been duly sworn, was examined and
25        testified as follows:

```
1              DIRECT EXAMINATION

2    BY MR. BAXLEY:

3    Q    Mr. Reeves, my name is Hamp Baxley.  I'm a lawyer

4         for Mr. McNabb in this case.  Thank you for coming

5         here today.  You were shown -- you were obviously

6         robbed -- on duty the night the Winn Dixie was

7         robbed.  Over a year ago, correct?

8    A    Yes.

9    Q    And at some point you called 911, didn't you?

10   A    Yes, sir.

11   Q    Do you remember the substance of your conversation

12        with 911?

13   A    No, I couldn't recall.  Obviously I was -- I just

14        been robbed.  That's what I told them.

15   Q    Could you give a description of who robbed the

16        store that night?

17   A    Yes, sir.  One guy.

18   Q    You could give a description of one guy?

19   A    Yes.

20   Q    What was that description?

21   A    What was the description?

22   Q    Uh-huh.

23   A    Well, he's a black male, and he had a cap on.

24        Like a toboggan cap.  And then, you know, I was --

25        and I said he was about -- about around six foot
```

| | | |
|---|---|---|
| 1 | | tall. |
| 2 | Q | Six foot tall, black male.  That's about all you |
| 3 | | knew about the guy.  Just one of them.  And how |
| 4 | | many were there? |
| 5 | A | There was two. |
| 6 | Q | Two of them? |
| 7 | A | Yes, sir. |
| 8 | Q | Six foot tall, black male.  And do you recall |
| 9 | | calling 911 and not being able to give them a |
| 10 | | description? |
| 11 | A | I couldn't -- I don't remember.  I don't remember. |
| 12 | Q | Okay.  Tell me this.  Did you -- could you |
| 13 | | remember any of the facial characteristics of the |
| 14 | | person you remember? |
| 15 | A | Yes. |
| 16 | Q | You remember the facial characteristics.  I'm |
| 17 | | going to play for you -- this is a 911 tape that |
| 18 | | was called in on that night.  I would like for you |
| 19 | | to listen to it to make sure this is correct. |
| 20 | | (At which time the 911 tape was played.) |
| 21 | Q | You just heard that.  They said, could you tell |
| 22 | | what race they were.  And you said, no, I |
| 23 | | couldn't, ma'am.  Is that what you said that |
| 24 | | night? |
| 25 | A | Race they was, yeah, I said that. |

| | | |
|---|---|---|
| 1 | Q | You said, I could not tell what race they were? |
| 2 | A | Uh-huh. |
| 3 | Q | So you didn't know what race they were that night, |
| 4 | | did you? |
| 5 | A | Well, a black male.  I know that.  I was upset at |
| 6 | | the time, sir. |
| 7 | Q | But on the tape you -- |
| 8 | A | That's right. |
| 9 | Q | She simply asked you black or white, and you |
| 10 | | couldn't name black or white, could you? |
| 11 | A | Yeah. |
| 12 | Q | Okay.  Now, five days later you go down to the |
| 13 | | police department and you look at that thing and |
| 14 | | you pick somebody out of that.  What did you pick |
| 15 | | out of that lineup? |
| 16 | A | Pick five out. |
| 17 | Q | Any reason you picked five out?  I mean, the |
| 18 | | reason I ask that is does number five stand out to |
| 19 | | you for any reason? |
| 20 | A | Yes.  Yes, it do. |
| 21 | Q | How did it stand out? |
| 22 | A | He had -- he held me at gun point. |
| 23 | Q | You said that's the individual that held you at |
| 24 | | gun point right there?  You're a hundred percent |
| 25 | | sure even though the 911 tape -- the 911 tape you |

1    said that you did not know the race of the person?

2    A    I'm a hundred percent sure.

3    Q    Hundred percent sure?

4    A    Hundred percent sure.

5         MR. BAXLEY:  Thank you.

6         THE COURT:  You may step down.

7         MR. ADAMS:  Mr. Reeves, if you'll just go

8    down the hall, there's a room right there, or you

9    can just wait outside.  Thank you.

10        THE COURT:  Anything further?

11        MR. BAXLEY:  No, sir.  Other than just a

12   summary.

13        THE COURT:  Go ahead.

14        MR. BAXLEY:  Your Honor, the search warrant

15   here, it was issued based on pretty much

16   impermissibly and unduly suggested photo lineup.

17   And the officer who filled out --

18        THE COURT:  Tell me what it is -- I'm not

19   sure I understand what it is that you are saying

20   is suggestive and impermissible.

21        MR. BAXLEY:  Your Honor, that photograph of

22   number five being a driver's license photograph is

23   a digital photograph.  It's grainy.  It was

24   enlarged from its original stance.  And it's

25   distorted compared to the rest of the photographs.

1   A neutral person or I would naturally fall to

2   that photograph on that lineup.  And it's our

3   contention that that is unduly suggestive.  We

4   believe that Mr. Reeves as you heard the 911 tape

5   does not recall who robbed the store.  He didn't

6   know the race of the individual.  He could not

7   tell.  And I know he said something different just

8   then.  It's been a year after the fact.  Maybe

9   he's got his memory refreshed.  We can't really

10  tell.

11          THE COURT:  And also he might have been

12  scared to death when he made that 911 call.

13          MR. ADAMS:  He sure sounded like it, Judge.

14          MR. BAXLEY:  May very well have, Your Honor.

15          The sworn testimony of Officer Singleton in

16  an application for that search warrant was

17  knowingly and intentionally false.  There was no

18  history of robbery.  Yet, they presented that to

19  Judge Mendheim to sign and receive that search

20  warrant.  That's just completely false.  The

21  Alabama Court of Criminal Appeals states that a

22  search warrant may be invalidated if the affidavit

23  that supported that warrant contains materials and

24  false statements made knowingly and intentionally

25  or in wreckless disregard for the truth.  Sergeant

1    Williamson stated up there, they knew he hadn't

2    been convicted of a robbery, yet, they still

3    include that in that search warrant.  That was

4    wreckless on their behalf.  They should have never

5    included that in that search warrant.  That

6.   totally invalidates that search warrant.  Officer

7    Singleton had Mr. McNabb's entire criminal history

8    and knowingly and intentionally just made up this

9    thing about robbery to enhance his chances of

10   obtaining this search warrant.  If you're looking

11   at the warrant, if you strike the identification

12   of Mr. McNabb by Mr. Reeves because of that as I

13   said intentionally and unduly suggestive photo

14   lineup and strike the part about him having

15   history of robbery, the only connection between

16   the robbery and Mr. McNabb is the fact that he

17   owned a white Dodge mini-van.  And if Your Honor

18   allows that warrant to stand based only on those

19   facts, if you strike the highlighted portions I've

20   given to you there, then basically that search

21   warrant would be good to search the house of any

22   person who happened to own a white mini-van or a

23   mini-van with wood-grain siding on that night as

24   we know that that such a warrant is totally

25   invalid and against the constitution of the United

1    States.  And anything retrieved from that that

2    search based on that illegal warrant must be

3    suppressed just like the fruits from the poisonous

4    tree.

5        THE COURT:  Where's the rest of this warrant

6    where it shows what they are searching for and

7    what they wanted to search?  All I have is the

8    affidavit.  I guess they probably -- okay.  The

9    apartment at Barstone Apartments, any vehicle.

10   Okay.  I see.  Looking for any firearms, cash,

11   food stamps, clothing, or other evidence involved

12   in the robbery.

13       Okay.  The motion to suppress is

14   denied.

15           (End of motion to suppress.)

16           (Off the Record.)

17

18

19

20

21

22

23

24

25

```
 1                    *  *  *  *  *  *  *  *  *  *  *

 2                     REPORTER'S CERTIFICATE

 3                    *  *  *  *  *  *  *  *  *  *  *

 4      STATE OF ALABAMA

 5      COUNTY OF HOUSTON

 6

 7              I, Carla H. Woodall, Court Reporter and

 8      Notary Public in and for the State of Alabama at Large,

 9      do hereby certify that the above-styled and numbered

10      cause was reported stenographically by me and is a true

11      and correct transcript of the testimony, objections,

12      motions, rulings of the Court, and was transcribed by

13      or under my direction and control.

14              I further certify that I have filed all

15      exhibits offered in the trial of this cause, if any,

16      with the Circuit Clerk of Houston County, Dothan,

17      Alabama, for incorporation into the Record on Appeal.

18              I further certify that I have on this day,

19      filed with the Clerk of the Court of Criminal Appeals,

20      the Attorney General, and the parties here involved, a

21      copy of the Reporter's Index to the Testimony and a

22      Certificate of Completion of Reporter's Transcript of

23      the said cause.

24              I further certify that I have filed the

25      original and three copies of this transcript in the
```

1    office of the Circuit Clerk of the Circuit Court of

2    Houston County, Dothan, Alabama.

3

4         Done this the 28th  day of July, 2004.

5

6                          _____

7                          Carla H. Woodall
                           Court Reporter and Notary Public
8                          State of Alabama at Large

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COURT OF CRIMINAL APPEALS No. CR-03-1141

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF ___Houston___ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC2002-225 Volume II__

CIRCUIT JUDGE __Jerry M. White__

Type of Conviction / Order Appealed From: __ROBBERY I__

Sentence Imposed: __LIfe w/o Parole, and costs__

Defendant Indigent: ☒ YES  ☐ NO

__Ruben McNabb__

| | |
|---|---|
| Hon. David Hogg | 334-794-8559 |
| (Appellant's Attorney) | (Telephone No.) |
| 188 N. Foster St. Ste 200 | |
| (Address) | |
| Dothan, Al.  36303 | |
| (City) | (State) | (Zip Code) |

NAME OF APPELLANT

V.

## STATE OF ALABAMA

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

NAME OF APPELLEE

(For Court of Criminal Appeals Use Only)

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP-1C        8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br><br>_____ - _____ |
|---|---|---|

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☑ CIRCUIT COURT   ☐ DISTRICT COURT   ☐ JUVENILE COURT OF   Houston _____ COUNTY

_Ruben McNabb_ , Appellant

V.   ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF _____

| Case Number<br>CC 02-225 | Date of Judgment/Sentence/Order<br>3-24-04 |
|---|---|
| Date of Notice of Appeal<br>Oral:  3-30-04        Written: | Indigent Status Granted:<br>☑ Yes      ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

_____            _____
Signature                            Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                    COURT REPORTER(S)

A. ☑ **TRIAL PROCEEDINGS** - Although this designation will include the judgment and sentence    Carla Woodall
proceedings, a transcript of the organization of the jury and arguments of counsel must    c/o Hon. Larry Anderson
be designated separately                                       Dothan, AL

B. ☐ **ORGANIZATION OF THE JURY** - This designation will include voir dire examination and    _____
challenges for cause. Note that in noncapital cases the voir dire of the jury will not be    _____
recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ **ARGUMENTS OF COUNSEL** - Note that in noncapital cases the arguments of counsel will    _____
not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D. _____ | _____ | **FILED** |
| E. _____ | _____ | **APR 23 2004** |
| F. _____ | _____ | _Judy Byrd_ |
| G. _____ | _____ | JUDY BYRD, CLERK |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

_signature_                    4-23-04                    _David K. Hogg_
Signature                      Date                       Print or Type Name

DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to:  (1) Clerk of the Court of Criminal Appeals,  (2) the District Attorney,  (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

```
1              IN THE CIRCUIT COURT OF HOUSTON COUNTY

2                        STATE OF ALABAMA

3    STATE OF ALABAMA,           *
                                 *
4    v.                          *      Case No. CC-02-225
                                 *
5    RUBEN COREY MCNABB,         *
                                 *
6         Defendant.             *

7

8

9         REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

10

11

12   Before:

13              The Honorable Jerry M. White and jury

14                     February 10, 2004

15

16   APPEARANCES:

17           For the State

18                   Douglas Albert Valeska, Esquire
                     District Attorney
19
                     Denise Bates, Esquire
20                   Assistant District Attorney

21           For the Defendant

22                   M. Hampton Baxley, Esquire
                     Dothan, Alabama
23

24
     Carla H. Woodall
25   Court Reporter
```

I N D E X

State of Alabama  v.  Ruben Corey McNabb
Case No. CC-02-225

|  | PAGE |
|---|---|
| REPORTER'S TRANSCRIPT ORDER | 1 |
| TITLE PAGE | 2 |
| INDEX | 3 |
| INDEX OF STATE'S TRIAL EXHIBITS | 9 |
| INDEX OF DEFENDANT'S TRIAL EXHIBITS | 11 |
| INDEX OF STATE'S SENTENCING EXHIBITS | 12 |
| COLLOQUY | 13 |
| ROLL OF JURY VENIRE CALLED | 13 |
| VOIR DIRE BY THE COURT | 14 |
| VOIR DIRE BY MR. VALESKA | 16 |
| VOIR DIRE BY MR. BAXLEY | 16 |
| COLLOQUY | 16 |
| JURY STRUCK | 18 |
| JURY IMPANELED | 18 |
| ROLL OF JURY CALLED | 19 |
| JURY SWORN | 19 |
| COLLOQUY | 19 |
| JURY VENIRE EXCUSED | 20 |
| COLLOQUY | 20 |
| OPENING STATEMENTS BY MR. VALESKA | 21 |
| OPENING STATEMENTS BY MR. BAXLEY | 21 |

1              I N D E X   (Continued)

2

3    OBJECTION BY MR. VALESKA                        21

4    OPENING STATEMENTS CONTINUED BY MR. BAXLEY      22

5                STATE'S TESTAMENTARY EVIDENCE

6    WITNESSES:

7        RONALD REEVES

8            Direct Examination by Mr. Valeska        22
             Cross Examination by Mr. Baxley          75
9            Redirect Examination by Mr. Valeska      95
             Recross Examination by Mr. Baxley        98
10           Further Redirect Examination
                by Mr. Valeska                        99
11

12       PATSY ROACH

13           Direct Examination by Mr. Valeska       100
             Cross Examination by Mr. Baxley         122
14

15       BETTY PRESCOTT

16           Direct Examination by Mr. Valeska       129
             Cross Examination by Mr. Baxley         134
17           Redirect Examination by Mr. Valeska     140
             Recross Examination by Mr. Baxley       141
18

19       REGGIE HILL

20           Direct Examination by Mr. Valeska       141
             Cross Examination by Mr. Baxley         155
21

22   COLLOQUY                                        170

23   PROCEEDINGS FOR FEBRUARY 10, 2004 ENDED         172

24   TITLE PAGE                                      173

25   PROCEEDINGS FOR FEBRUARY 11, 2004, BEGAN        174

1                    I N D E X   (Continued)

2


3    ADOPTION OF SUPPRESSION HEARING OF FEB. 13, 2003    174

4
            STATE'S TESTAMENTARY EVIDENCE CONTINUED
5
WITNESSES:
6
        JIMMY SINGLETON
7
            Direct Examination by Mr. Valeska        174
8            Cross Examination by Mr. Baxley          206

9
STATE RESTS                                          221
10
MOTION FOR JUDGEMENT OF ACQUITTAL                    221
11
RULING BY THE COURT                                 222
12
13              DEFENDANT'S TESTAMENTARY EVIDENCE

14   WITNESSES:

15        RUBEN COREY MCNABB

16            Direct Examination by Mr. Baxley        222
             Voir Dire Examination by Mr. Valeska    228
17            Direct Examination Continued
                by Mr. Baxley                         229
18            Cross Examination by Mr. Valeska        235
             Redirect Examination by Mr. Baxley      266
19

20        YVETTE MCNABB

21            Direct Examination by Mr. Baxley        271
             Cross Examination by Mr. Valeska        278
22

23        RUBEN COREY MCNABB (Recalled)

24            Direct Examination by Mr. Baxley        302
             Cross Examination by Mr. Valeska        303
25

1                    I N D E X    (Continued)

2


3       RONALD REEVES (Recalled)

4            Direct Examination by Mr. Baxley          304
             Cross Examination by Mr. Valeska          304
5
    DEFENSE RESTS                                      306
6

7           STATE'S REBUTTAL TESTAMENTARY EVIDENCE

8   WITNESSES:

9       SHERRY WISDOM

10           Direct Examination by Mr. Valeska         307
             Cross Examination by Mr. Baxley           310
11

12      STEPHANIE REEVES

13           Direct Examination by Mr. Valeska         311
             Cross Examination by Mr. Baxley           314
14           Redirect Examination by Mr. Valeska       314

15

16      MARY BESSIE

17           Direct Examination by Mr. Valeska         315
             Cross Examination by Mr. Baxley           321
18           Redirect Examination by Mr. Valeska       322

19      GREG BRYSON

20           Direct Examination by Mr. Valeska         323
             Cross Examination by Mr. Baxley           327
21           Redirect Examination by Mr. Valeska       329
             Recross Examination by Mr. Baxley         332
22

23      WILLIE WILLIAMSON

24           Direct Examination by Mr. Valeska         333
             Cross Examination by Mr. Baxley           335
25           Redirect Examination by Mr. Valeska       335

I N D E X  (Continued)

STATE RESTS                                          336

CLOSING ARGUMENTS BY MR. VALESKA                    337

OBJECTION BY MR. BAXLEY                              337

CLOSING ARGUMENTS CONTINUED BY MR. VALESKA          338

CLOSING ARGUMENTS BY MR. BAXLEY                     338

OBJECTION BY MR. VALESKA                            338

CLOSING ARGUMENTS CONTINUED BY MR. BAXLEY           338

REBUTTAL ARGUMENTS BY MR. VALESKA                   338

OBJECTION BY MR. BAXLEY                              338

REBUTTAL ARGUMENTS CONTINUED BY MR. VALESKA         339

JURY CHARGE                                         339

ALTERNATE JURORS EXCUSED                            356

JURY DELIBERATIONS                                  356

VERDICT                                             356

JURY POLLED                                         356

JURY EXCUSED                                        357

ADJUDICATION                                        357

SENTENCING DATE SET                                 357

BOND                                                358

PROCEEDINGS FOR FEBRUARY 11, 2004 ENDED             358

TITLE PAGE                                          359

PROCEEDINGS FOR MARCH 18, 2004 BEGAN                360

COLLOQUY                                            360

8

I N D E X   (Continued)

| | |
|---|---|
| 3  PROCEEDINGS FOR MARCH 18, 2004 ENDED | 363 |
| 4  TITLE PAGE | 364 |
| 5  PROCEEDINGS FOR MARCH 24, 2004 BEGAN | 365 |
| 6  COLLOQUY | 365 |
| 7  SENTENCING | 373 |
| 8  PROCEEDINGS FOR MARCH 24, 2004 ENDED | 373 |
| 9  REPORTER'S CERTIFICATE | 374 |
| 10 CERTIFICATE OF COMPLETION | 376 |

1

2

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

INDEX OF STATE'S TRIAL EXHIBITS

| EXHIBIT NO. | PAGE MARKED | PAGE ADMITTED | PAGE DENIED | PAGE WITHDRAWN |
|---|---|---|---|---|
| State's 1 | 24 | | | |
| State's 2 | 24 | 193 | | |
| State's 3 | 24 | 199 | | |
| State's 4 | 24 | 191 | | |
| State's 5 | 24 | 194 | | |
| State's 6 | 24 | 197 | | |
| State's 7 | 24 | | | |
| State's 8 | 24 | | | |
| State's 9 | 24 | 195 | | |
| State's 10 | 24 | 204 | | |
| State's 11 | 24 | | | |
| State's 12 | 24 | | | |
| State's 13 | 24 | | | |
| State's 14 | 24 | | | |
| State's 15 | 53 | 64 | | |
| State's 16 | 53 | 66 | | |
| State's 17 | 53 | 67 | | |
| State's 18 | 53 | 73 | | |
| State's 19 | 53 | 73 | | |
| State's 20 | 53 | 73 | | |
| State's 21 | 53 | 70 | | |
| State's 22 | 53 | 69 | | |

1                    INDEX OF STATE'S TRIAL EXHIBITS CONTINUED

2

3        State's 23          53              72

4        State's 24          53              71

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          INDEX OF DEFENDANT'S TRIAL EXHIBITS

2

|          | PAGE | PAGE | PAGE | PAGE |
|-------------|--------|----------|--------|-----------|
| EXHIBIT NO. | MARKED | ADMITTED | DENIED | WITHDRAWN |
| Defendant's 1 | 228 | 303 | | |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | | | |
|---|---|---|---|---|

INDEX OF STATE'S SENTENCING EXHIBITS

| EXHIBIT NO. | PAGE MARKED | PAGE ADMITTED | PAGE DENIED | PAGE WITHDRAWN |
|---|---|---|---|---|
| State's 1 | 365 | 373 | | |

```
 1                    PROCEEDINGS
 2              (Jury venire present.)
 3         THE COURT:  Ladies and gentlemen of the jury
 4    panel, I'm going to ask the clerk to call the roll
 5    of those of you who are serving on this particular
 6    panel at this time.  And I'm going to ask a favor
 7    of you right here at the beginning.  And, that is,
 8    that this one time when she calls your name, if
 9    you would stand there where you are and answer so
10    that the attorneys can see you.  And then once
11    you've stood and answered, you can have your seat
12    back.
13              (At which time the roll of the jury
14               venire was called by the clerk.)
15         THE COURT:  Thank you very much, ladies and
16    gentlemen.
17              Now, at this time I'm going to qualify
18    you as to the case of the State of Alabama versus
19    Ruben Corey McNabb.  This is Mr. McNabb sitting
20    here in the suit.  If you'll stand up.
21         THE DEFENDANT:  (Complied.)
22         THE COURT:  And Ruben Corey -- you can take
23    your seat back.
24         THE DEFENDANT:  (Complied.)
25         THE COURT:  Ruben Corey McNabb is charged by
```

1      an indictment returned by the grand jury of

2      Houston County, Alabama, back on August 16, 2001,

3      and he's charged by that indictment with robbery

4      in the first degree.  Mr. McNabb is represented by

5      Mr. Hamp Baxley.  This is Mr. Baxley right here.

6      And the State is being represented by Mr. Valeska,

7      the district attorney, and his assistant, Ms.

8      Denise Bates.

9              Now, I have certain questions that I

10     need to ask you in qualifying you on this

11     particular case.

12             Now, is either of you related by blood

13     or by marriage to this Defendant here, Ruben Corey

14     McNabb?

15             (No response.)

16         THE COURT:  Or is either of you related by

17     blood or by marriage to Ron Reeves?  Mr. Reeves

18     works at the Winn Dixie on Westgate Parkway.

19             (No response.)

20         THE COURT:  Or is either of you related by

21     blood or by marriage to Patsy Lynn Roach, who also

22     works at the Winn Dixie on Westgate Parkway?

23             (No response.)

24         THE COURT:  Or is either of you an agent,

25     stockholder, director, or an employee of the Winn

1        Dixie Company?

2                (No response.)

3            THE COURT:  Is either of you a witness in

4        this case either for the State of Alabama or for

5        this Defendant here, Ruben Corey McNabb?

6                (No response.)

7            THE COURT:  Or is either of you on the

8        appearance bond of this Defendant, Ruben Corey

9        McNabb?

10                (No response.)

11            THE COURT:  Was either of you on the grand

12        jury of Houston County, Alabama, which returned

13        this indictment against Mr. McNabb charging him

14        with robbery in the first degree, that being the

15        August 16, 2001, grand jury where Mr. Emmanuel --

16        if I can read Mr. -- it looks like Mr. Emmanuel

17        Williams was the foreperson?

18                (No response.)

19            THE COURT:  Has either of you ladies and

20        gentlemen read anything about the facts in this

21        case or have you heard or seen anything about the

22        facts in this case that would bias your minds and

23        prejudice your verdict and prevent you from giving

24        a fair and impartial trial, both to the State and

25        to the Defendant, if you were selected as a juror

1    to try this case?

2         (No response.)

3       THE COURT:  Does either of you have a fixed

4    opinion as to the guilt or the innocence of this

5    Defendant that would prevent you from giving a

6    fair and impartial trial to both the State and to

7    the Defendant if you were selected as a juror to

8    try this case?

9         (No response.)

10       THE COURT:  Or does either of you have any

11    interest in either the conviction or the acquittal

12    of this Defendant?

13         (No response.)

14       THE COURT:  Or has either of you made any

15    promise or given any assurance that you would

16    either convict or acquit this Defendant if you

17    were selected as a juror to try this case?

18         (No response.)

19       THE COURT:  Questions for the State, Mr.

20    Valeska?

21         (At which time Mr. Valeska further

22           qualified the jury venire.)

23       THE COURT:  Mr. Baxley.

24         (At which time Mr. Baxley further

25           qualified the jury venire.)

1           THE COURT:  Does anybody need to tell me

2     anything in answer to any of the questions that

3     were asked?  Let's take the first row first here.

4     Anybody on the first row need to come up and tell

5     me anything?

6               (No response.)

7           THE COURT:  What about the second row?

8               (No response.)

9           THE COURT:  The third?  Anybody on the third

10    row?

11              (No response.)

12          THE COURT:  What about the fourth?  Anybody?

13              (No response.)

14          THE COURT:  Or the fifth?

15              (No response.)

16          THE COURT:  With that, then, I hereby declare

17    these jurors to be qualified.  And it's a quarter

18    till eleven.

19               Approach the bench, gentlemen, if you

20    will.

21               (At which time a bench conference was

22               held off the Record.)

23               (Off the Record.)

24               (At which time the following proceedings

25               were held in open court:)

```
 1          THE COURT:  Ladies and gentlemen, it's going

 2     to take some time for the attorneys to get their

 3     notes together and strike this jury, and there's

 4     no reason on earth why you ought to have to sit

 5     here and be bored to death while that's being

 6     done.  So I'm going to let you go at this time.

 7     If you will, just be back here at one o'clock.  At

 8     one o'clock we'll seat the jury and get started on

 9     the testimony.  Just be sure everybody is back

10     here at one o'clock.  And thank you very much.

11              (Jury venire not present.)

12          THE COURT:  Yes, ma'am?

13          A JUROR:  I just have a question.  It dawned

14     on me when Mr. Valeska was saying something.  If

15     we're held every day and it gets close to dark, is

16     there a way to provide --

17          THE COURT:  We're not going to go until after

18     dark.  If we have to, the sheriff will help you

19     out.

20                  (At which time the attorneys and the

21                   clerk struck the jury off the Record.)

22                  (Off the Record.)

23                  (Jury venire present.)

24          THE CLERK:  As I call your name, if you will,

25     please go and have a seat in the jury box.
```

```
 1              Sharon Sizemore.  Joey Smith.  Kenneth
 2     Smith.  Ida Sullivan.  Rose Taylor.  Mildred
 3     Thomas.  Chrystal Tran.  Martha Watford.  Mary
 4     Frances Welch.  Ira Wesley.  Susan Wilkinson.
 5     Deborah Williams.  Robert Willis.  Milton Wood.
 6                    (At which time the roll of the jury was
 7                    called by the clerk.)
 8                    (At which time the jury sworn by the
 9                    clerk.)
10          THE COURT:  Ladies and gentlemen, you're the
11     trial jury in this case of the State of Alabama
12     versus Ruben Corey McNabb.  And during the course
13     of this trial and until all of the evidence is in
14     and the case has been submitted to you for your
15     verdict, you should not discuss the case among
16     yourselves, nor should you discuss it with anyone
17     else, nor should you allow anyone to discuss it
18     with you or even to discuss it in your presence.
19     If anyone approaches you at any time and attempts
20     to discuss this case with you or even to discuss
21     it in your presence, then you should let the Court
22     know immediately.
23                    Now, are you gentlemen ready to get
24     started?
25          MR. VALESKA:  Yes, sir.
```

```
1              THE COURT:  Mr. Baxley?

2              MR. BAXLEY:  Yes, sir.

3              THE COURT:  The remainder of you are

4       discharged, and you may go.  And just come back at

5       nine o'clock in the morning to the jury assembly

6       room.

7                       (At which time the jury venire was

8                        excused.)

9              MR. BAXLEY:  I have a suppression motion.

10             THE COURT:  I usually hear those when that

11      part of the trial comes.

12             MR. VALESKA:  Could we approach the bench

13      before you rule?

14             THE COURT:  I haven't ruled --

15             MR. VALESKA:  I think we could solve it if I

16      could come up to the bench, Judge White.

17                      (At which time the following proceedings

18                       were held at the bench outside of the

19                       hearing of the jury:)

20             MR. VALESKA:  Judge, if I could remind the

21      Court, you tried this case.  It would be the same

22      evidence.  You've already made a ruling so I don't

23      know why you couldn't adopt your previous ruling

24      because nothing has changed.

25             MR. BAXLEY:  If you want to do it that way,
```

1      that's fine.  It's just for the appeal.

2           THE COURT:  Let's just wait until that part

3      of the time comes when it's introduced, and then

4      we'll do it then.

5           MR. BAXLEY:  That's fine.  Just to get it

6      over with.

7           THE COURT:  I just assume not do it -- I

8      mean, that is not the way I generally do it.

9           MR. VALESKA:  That's fine.

10               (At which time the following proceedings

11                were held in open court:)

12          THE COURT:  You gentlemen may state your case

13     to the jury.

14               (At which time opening statements were

15                made by Mr. Valeska.)

16          THE COURT:  Mr. Baxley?

17               (At which time opening statements were

18                made by Mr. Baxley.)

19          MR. VALESKA:  Objection.  Objection.  If I

20     could approach the bench if I could.

21          THE COURT:  Okay.

22               (At which time the following proceedings

23                were held at the bench outside of the

24                hearing of the jury:)

25          MR. VALESKA:  Mr. Baxley wants to tell the

1    jury he's been waiting in jail for this trial.

2    That's not relevant.  It has nothing to do with

3    this.  I object.

4         MR. BAXLEY:  That's fine, Your Honor.

5         THE COURT:  I sustain the objection.

6              (At which time the following proceedings

7              were held in open court:)

8              (At which time opening statements were

9              continued by Mr. Baxley.)

10        THE COURT:  Who will the State's first

11   witness be?

12        MR. VALESKA:  Ronald Reeves, Your Honor.

13                    RONALD REEVES

14   having first been duly sworn, was examined and

15   testified as follows:

16                  DIRECT EXAMINATION

17   BY MR. VALESKA:

18   Q    Tell me your name, please, sir.

19   A    Ronald Reeves.

20   Q    Mr. Reeves, how old are you?

21   A    I'm thirty-five.

22   Q    Tell the jury where you are employed today.  Which

23        business?

24   A    Winn Dixie.

25   Q    Now, if I could, let's go back to on or about June

| | | |
|---|---|---|
| 1 | | 7, 2001, ~~I ask them~~ for you to tell the jury |
| 2 | | where you're ~~employed~~ then. |
| 3 | A | Winn Dixie. |
| 4 | Q | What position did you have with them, please, sir? |
| 5 | A | Manage ~~assistant~~ manager. |
| 6 | Q | This is a big courtroom, and I don't hear real |
| 7 | | good.  Make sure everybody else can hear. |
| 8 | | How long had you been an assistant manager |
| 9 | | working at the Westgate Winn Dixie there? |
| 10 | A | Four years. |
| 11 | Q | Now, let me ask you something.  In cashing food |
| 12 | | stamps or if large amounts of money were counted |
| 13 | | being a manager, what happens to the money when it |
| 14 | | went from the cash registers into the office? |
| 15 | A | It was in a safe, got put in a safe. |
| 16 | Q | Does it just go in there in bulk?  Ones, fives, |
| 17 | | and ten all together?  How does it go? |
| 18 | A | No, sir.  It was separated. |
| 19 | Q | When it was separated, what was it separated with? |
| 20 | A | Wraps of a thousands, five hundred dollars, and a |
| 21 | | hundred dollar wrap. |
| 22 | Q | Any type of identification marks put on a food |
| 23 | | stamp that is canceled to be turned in for money |
| 24 | | to be exchanged or those wraps you're talking |
| 25 | | about to identify your store? |

```
 1    A    Yes, sir.
 2    Q    What stamp would have been placed on the food
 3         stamp number from your store or the currency
 4         wrappers?
 5    A    Four twenty-six.  Store number four twenty-six.
 6    Q    Now, would any other Winn Dixie have your four
 7         twenty-six store?
 8    A    No, sir.
 9    Q    Now, tell the ladies and gentlemen of the jury, in
10         an average week would your Winn Dixie do a large
11         amount of business in cash?
12    A    Yes, sir.
13    Q    Now, when cashiers needed change working out there
14         on the teller lines, how would they get it?
15    A    They would get it in wraps, and they would get the
16         coins in a roll.
17                   (State's Exhibits No. 1 through 14 were
18                    premarked for identification.)
19    Q    Would you tell the ladies and gentlemen of the
20         jury how often there would be a pick up for money
21         to be taken to the bank; in other words, the cash
22         collected day or night?  Who would make a bank
23         deposit, or who came by to pick up the cash?
24    A    The manager would take it to the bank.
25    Q    Let's go to June 7 of 2001.  I ask you, what was
```

```
 1              kept in the safe in the inner office that night?
 2    A    Well, we had stamps -- postage stamps.  And we had
 3         large amount of bills, and also we had food stamps
 4         there, and we had coins there kept in a box and
 5         some was outside the box -- some outside the box.
 6    Q    Could you tell the ladies and gentlemen of the
 7         jury if a teller needed let's just say fifty
 8         dollars in quarters, would she have gotten that in
 9         a huge box taken out there?
10    A    No, sir.
11    Q    How would it have been taken out?
12    A    It would have been taken out in a roll.  Like
13         fifty dollars we would have had -- we would have
14         had -- if it's ten dollars in quarters, or dimes,
15         either one is five dollars, so if you would have
16         said ten dollars, it would be -- you said fifty
17         dollars, it would be five rolls of the quarters
18         there.
19    Q    Now, I noticed you're wearing a jacket today, and
20         I'm not going to ask you to take off your jacket.
21         Could you tell the ladies and gentlemen of the
22         jury your biceps, your arms, are they thin like
23         mine?
24    A    No, sir.
25    Q    Are they muscular?
```

1    A    Yes, sir.

2    Q    How tall are you?

3    A    Six six.

4    Q    And how much do you weigh?

5    A    Probably around about two twenty or two thirty.

6    Q    Would you consider yourself a very strong man or

7          medium or weak?

8    A    Very strong man.

9    Q    Tell the ladies and gentlemen of the jury,

10         nighttime at the Winn Dixie, would there have been

11         more employees and managers versus the daytime or

12         less?

13    A    It will be less.

14    Q    Go to June 7, 2001.  Tell the ladies and gentlemen

15         of the jury, the employees that you recall were

16         working that shift that night after ten o'clock or

17         after midnight, who were the ones actually

18         working?

19    A    Patsy Roach, Reggie Hill, and there was a guy

20         named John Stack, and there was a guy named Steven

21         Woodham.  They were stocking the aisles, and

22         Patsy was on the front.

23    Q    What position did she have?  Was she a manager?

24    A    She's a cashier.

25    Q    Anybody else working the store?

| | | |
|---|---|---|
| 1 | A | Reggie Hill. |
| 2 | Q | Reggie Hill, what was his position?  Tell the jury. |
| 3 | A | Same as mine was.  Assistant manager. |
| 4 | Q | And would Mr. Hill have access to the safe? |
| 5 | A | Yes, sir. |
| 6 | Q | Who else had access that was working that night? |
| 7 | A | I would. |
| 8 | Q | Now, would you tell the ladies and gentlemen of |
| 9 | | the jury, when you come in the front doors of the |
| 10 | | Winn Dixie on June 7 that night after midnight, |
| 11 | | what kind of doors were they?  Are they push doors? |
| 12 | A | No, sir.  They was automatic doors. |
| 13 | Q | Did they make any kind of sound, in other words, |
| 14 | | when you come in and out when they open or close? |
| 15 | A | Yes, sir. |
| 16 | Q | Now, when you actually came inside the store and |
| 17 | | walked in the store from the doors off whatever it |
| 18 | | is the rubber on the thing when you step on the |
| 19 | | door, what kind of floor did you immediately step |
| 20 | | on? |
| 21 | A | Tile floor. |
| 22 | Q | Had you walked on that tile floor before? |
| 23 | A | Yes, sir. |
| 24 | Q | Did you ever wear hard-type shoes? |
| 25 | A | No, sir. |

| | | |
|---|---|---|
| 1 | Q | Did you wear soft shoes? |
| 2 | A | Yes, sir. |
| 3 | Q | Would it make any sound? |
| 4 | A | No, sir.  Not the soft. |
| 5 | Q | Now, tell the ladies and gentlemen of the jury, |
| 6 | | Ms. Prescott, do you know where she was working |
| 7 | | just prior to you leaving and going up to the |
| 8 | | front where Ms. Roach was when you got robbed? |
| 9 | A | She was in the back. |
| 10 | Q | Do you know where Reggie Hill was? |
| 11 | A | He was in the back. |
| 12 | Q | Now, tell the ladies and gentlemen of the jury, |
| 13 | | was the Winn Dixie, did it have currency in the |
| 14 | | safe, correct? |
| 15 | A | Yes, sir. |
| 16 | Q | Anything else?  What else would have been in the |
| 17 | | safe? |
| 18 | A | Postage stamps. |
| 19 | Q | And how would the postage stamps, would they have |
| 20 | | been the kind you lick?  Or little rolls?  How |
| 21 | | were they? |
| 22 | A | They were straight in a bundle like. |
| 23 | Q | Let me show you a couple of exhibits, if I could. |
| 24 | | Showing you State's Exhibit No. 9, State's Exhibit |
| 25 | | No. 5 for identification purposes.  I refer to |

```
 1            them as State's Exhibit 9 and State's Exhibit 5.

 2            Do you recognize those items, please?

 3      A     Yes, sir.

 4      Q     How do you recognize them?

 5      A     Our store number.

 6      Q     How do you know those belong to your store or they

 7            were ever in your store?

 8      A     The store stamp on it.

 9      Q     What number?

10      A     Four twenty-six.

11      Q     Is that on 5 or 9?

12      A     That's on 5 here.

13      Q     What is on 9?

14      A     9 is the same thing.

15      Q     5 is what?  Tell us what that is.

16      A     That's a food stamp.

17      Q     And 9 is what?

18      A     Wrap -- money wrap.

19      Q     Once again, help me with money wrap.  What do you

20            mean money wrap?  Tell the jury.  They didn't work

21            in the store.  What was it?

22      A     It's a thousand dollar money wrap.  This wraps the

23            dollar bills -- not the dollar bills, but the

24            twenty or the fifty dollar bills -- hundred dollar

25            bills.  It wraps the paper money.
```

| | | |
|---|---|---|
| 1 | Q | And where when it was wrapped and put stamps |
| 2 | | around it, in other words, the wrapper and stamp |
| 3 | | with the store, tell the jury where it or the food |
| 4 | | stamps would have been kept when business was |
| 5 | | conducted at that day.  In other words, where was |
| 6 | | that kept? |
| 7 | A | In the safe. |
| 8 | Q | How many safes did you have in that Winn Dixie? |
| 9 | A | Two. |
| 10 | Q | Who had combinations or access to the safe? |
| 11 | A | The managers.  Reggie and myself. |
| 12 | Q | Would Ms. Roach have had access to that safe? |
| 13 | A | No, sir. |
| 14 | Q | Can you tell the ladies and gentlemen of the jury, |
| 15 | | did you know Ms. Roach's voice?  Had you heard it |
| 16 | | before June 7th? |
| 17 | A | Yes, sir. |
| 18 | Q | Now, the store that you worked in that night, was |
| 19 | | it in Dothan, Alabama, Houston County? |
| 20 | A | Dothan. |
| 21 | Q | Was it located in Dothan, Alabama, Houston County? |
| 22 | A | Yes, sir. |
| 23 | Q | The Winn Dixie itself, did Ruben Corey McNabb, the |
| 24 | | man right over here at the table with the tie on, |
| 25 | | did he work for you? |

| | | |
|---|---|---|
| 1 | A | No, sir. |
| 2 | Q | Had you ever seen him in the store yourself? |
| 3 | A | No, sir. |
| 4 | Q | Now, can you tell the ladies and gentlemen of the |
| 5 | | jury, sometime around four o'clock a.m. on June 7 |
| 6 | | of 2001, can you tell the ladies and gentlemen of |
| 7 | | the jury, did someone call you to go to any |
| 8 | | particular part of the store? |
| 9 | A | Yes, sir. |
| 10 | Q | Whose voice? |
| 11 | A | Patsy Roach. |
| 12 | Q | Any doubt in your mind it was Patsy's? |
| 13 | A | It was Patsy Roach. |
| 14 | Q | And where were you in the store?  Tell the jury. |
| 15 | A | I was stocking aisle one. |
| 16 | Q | Now, help me.  If I walk in the doors the first |
| 17 | | aisle, cash register aisle, all the way down, |
| 18 | | there's many of them, correct? |
| 19 | A | Yes, sir. |
| 20 | Q | The aisle, would they be to the extreme left is |
| 21 | | one or extreme right where the produce was? |
| 22 | A | Extreme right where the produce was. |
| 23 | Q | Aisle one, do they come across like two, three, |
| 24 | | four, five, all the way down?  Many aisles? |
| 25 | A | Yes. |

32

| | | |
|---|---|---|
| 1 | Q | Has the store changed since then today?  Has it |
| 2 | | been re-arranged and things changed? |
| 3 | A | A little bit. |
| 4 | Q | What I want to ask you, when you came around the |
| 5 | | aisle or at some point in time, could you see |
| 6 | | where Ms. Roach was? |
| 7 | A | Yes, sir. |
| 8 | Q | What part of the store was she in? |
| 9 | A | She was where the cigarettes was behind the |
| 10 | | counter, service desk. |
| 11 | Q | As you walked towards the service desk and where |
| 12 | | the cigarettes were, could you observe and see |
| 13 | | what she was actually doing while she was walking |
| 14 | | towards you? |
| 15 | A | She was stocking cigarettes. |
| 16 | Q | As you walked towards her, was her back to you? |
| 17 | A | Yes, sir. |
| 18 | Q | Could you see any other people up there at the |
| 19 | | service desk or the counter? |
| 20 | A | Yes, sir. |
| 21 | Q | Man or woman? |
| 22 | A | Man. |
| 23 | Q. | How many? |
| 24 | A | One. |
| 25 | Q | White male or black male? |

```
 1    A    Black male.

 2    Q    See him in the courtroom?

 3    A    Yes, sir.

 4    Q    Point him out.

 5    A    (Witness complied.)

 6              MR. VALESKA:    Let the Record reflect he

 7         pointed out McNabb.

 8    Q    Would you tell the ladies and gentlemen of the

 9         jury, is that how he had his hair that day?

10    A    No, sir.

11    Q    Now, was he wearing a tie and coat today like he

12         was then?

13    A    No, sir.

14    Q    Now, when you got up there as you approached him,

15         did he say something to you?

16    A    Yes, sir.

17    Q    Tell the ladies and gentlemen of the jury what

18         McNabb said to you as you got close to the service

19         desk with Ms. Roach's back to you-all.

20    A    I asked him could I help him first.  And then he

21         said -- he didn't say anything.  And he said,

22         guess what, today is your lucky day.

23    Q    Now, tell the ladies and gentlemen of the jury,

24         was it daytime or nighttime?

25    A    Nighttime.
```

| | | |
|---|---|---|
| 1 | Q | Did that get your attention? |
| 2 | A | Yes, sir. |
| 3 | Q | What did he say or do next? |
| 4 | A | He said, he ordered Patsy out from around the |
| 5 | | counter and said, don't do anything crazy. |
| 6 | Q | What did he -- |
| 7 | A | He said, let's go to the office. |
| 8 | Q | Did he show you anything in his hands? |
| 9 | A | Yes, sir. |
| 10 | Q | What was it? |
| 11 | A | It was like a silver nine millimeter.  As a |
| 12 | | matter of fact, it was automatic. |
| 13 | Q | Is there a difference between automatic and |
| 14 | | revolver?  Can you help me? |
| 15 | A | Yes, sir, it's different.  Revolver is around -- |
| 16 | | it's got a round thing, and automatic you load |
| 17 | | from the butt end up there. |
| 18 | Q | Tell the ladies and gentlemen of the jury, you |
| 19 | | were six feet what? |
| 20 | A | Six. |
| 21 | Q | How many pounds again? |
| 22 | A | About two thirty or two forty. |
| 23 | Q | Ms. Roach, her size, was she bigger or smaller |
| 24 | | than you? |
| 25 | A | Smaller. |

```
 1    Q    Now, McNabb, do you have an opinion approximately
 2         how tall he was your best judgment?
 3    A    Probably about six foot.
 4    Q    What about his weight?  Skinny?  Medium?  Heavy?
 5         I don't want to stay fat, but use that
 6         distinction.
 7    A    Medium.
 8    Q    His skin complexion?  Light?  Medium?  Dark?
 9    A    Dark.
10    Q    Would you tell the ladies and gentlemen of the
11         jury, do you remember what type of clothing he was
12         wearing?
13    A    Yes, sir.  He had on like a toboggan-type cap with
14         a bib on it.
15    Q    What color?
16    A    Black.
17    Q    Show you if I could -- showing you State's Exhibit
18         2 for identification purposes.  Do you recognize
19         that?
20    A    Yes, sir.
21    Q    Who was wearing this cap, this toboggan?
22    A    The robber, Corey McNabb.
23    Q    Now, can you tell the ladies and gentlemen of the
24         jury, being six foot five, six six, six seven, two
25         hundred and something pounds, why didn't you grab
```

| | | |
|---|---|---|
| 1 | | the gun and fight him? |
| 2 | A | Sir, I was frightened. |
| 3 | Q | Had you ever been robbed before? |
| 4 | A | No, sir. |
| 5 | Q | Were any other employees you concerned about their |
| 6 | | safety besides yourself? |
| 7 | A | Patsy Roach. |
| 8 | Q | . Would you tell the ladies and gentlemen of the |
| 9 | | jury, did you yell out for help?  Did you scream? |
| 10 | A | No, sir. |
| 11 | Q | Tell the jury why you didn't scream. |
| 12 | A | Because I was scared that he would shoot me. |
| 13 | Q | Now, the location from where you were with McNabb |
| 14 | | and the gun and Ms. Roach, and I ask about the |
| 15 | | entrance or exit doors customers going in and out |
| 16 | | of the Winn Dixie, let's just say it was eight |
| 17 | | o'clock in the morning or later, who would |
| 18 | | normally come in and out that door? |
| 19 | A | Customers. |
| 20 | Q | Did you ever have any customers that you can |
| 21 | | recall around four o'clock generally in the |
| 22 | | morning?  Was that normal? |
| 23 | A | No, sir.  We didn't have any customers. |
| 24 | Q | Were you concerned about any customers also coming |
| 25 | | through that door with McNabb with an armed gun |

| | | |
|---|---|---|
| 1 | | and someone could walk in? |
| 2 | A | Yes, sir. |
| 3 | Q | Where did McNabb tell you to go? |
| 4 | A | He told me to go to the office. |
| 5 | Q | Now, tell the ladies and gentlemen of the jury, if |
| 6 | | you're standing there, you first walk in the |
| 7 | | store, you go to the right by the glass windows or |
| 8 | | you go to the counters, do you immediately know |
| 9 | | where the office is?  Can you immediately see the |
| 10 | | office real easily? |
| 11 | A | Where the counter is? |
| 12 | Q | Yes, sir. |
| 13 | A | No, sir, you can't see it. |
| 14 | Q | When you went to the office, would you tell the |
| 15 | | ladies and gentlemen of the jury, how many doors |
| 16 | | are in that hallway? |
| 17 | A | Two doors. |
| 18 | Q | Who went first?  In other words, why don't you |
| 19 | | tell the jury, as you got to the office door, who |
| 20 | | was first in line to the door in relationship to |
| 21 | | McNabb and the pistol?  What was the order of |
| 22 | | people? |
| 23 | A | Well, I was first and Patsy behind me and he was |
| 24 | | behind Patsy. |
| 25 | Q | Was there any way you could go out that hallway or |

| | | |
|---|---|---|
| 1 | | get assistance in any way or escape? |
| 2 | A | No, sir. |
| 3 | Q | Was there a phone inside the office? |
| 4 | A | Yes, sir. |
| 5 | Q | Tell the jury why you didn't pick up the phone and |
| 6 | | call 911 right away. |
| 7 | A | Because he had a gun to me. |
| 8 | Q | The office door itself, what was the door made of |
| 9 | | when you opened it?  What's it made of, that door? |
| 10 | A | It's a wood door. |
| 11 | Q | Solid wood? |
| 12 | A | Solid wood. |
| 13 | Q | Glass on it? |
| 14 | A | Yes, sir, there's glass on it. |
| 15 | Q | Who had the key to lock or unlock it? |
| 16 | A | I did. |
| 17 | Q | Did you unlock it to gain admittance? |
| 18 | A | Yes, sir. |
| 19 | Q | Who came into the office with you at that point in |
| 20 | | time? |
| 21 | A | After me it was Patsy, and after Patsy then |
| 22 | | McNabb. |
| 23 | Q | Did he continue to have the gun? |
| 24 | A | Yes, sir. |
| 25 | Q | Can you tell the ladies and gentlemen of the jury |

```
 1              when you first got inside the office why you

 2              didn't pull the door shut and it would have locked

 3              and you could have called the police?  Why didn't

 4              you do that then?

 5    A    I was frightened, and I was looking for Patsy's

 6              safety, too.

 7    Q    The office, describe and tell the ladies and

 8              gentlemen of the jury, is the office as big as

 9              where you're sitting?  And I'm going to stand over

10              here and we go over to where -- is it that big or

11              smaller than that area?

12    A    Where --

13    Q    The jury box?

14    A    Yeah, it's about that size there.

15    Q    Now, there are other windows besides the door in

16              the office?

17    A    Yes, sir.

18    Q    If you go in the door right here, in other words,

19              this is the door and you step into the door and

20              you're looking this way, where is the safe?  To my

21              right or left?  Right or left?

22    A    To your right.

23    Q    And where are the windows inside the office

24              besides the door?  Right or left?

25    A    They be to your right.
```

```
 1    Q    This way, correct?

 2    A    Yes, sir.

 3    Q    Now, you're inside with Ms. Roach.  McNabb, what

 4         did he say about the safe?

 5    A    He said -- he ordered me to open the safe up.

 6         And --

 7    Q    Did he describe or tell you as he told you to open

 8         up -- the manner or the way that you were doing

 9         it, faster, or quicker?

10    A    He said, do it quicker.  He said, hurry up and

11         open the safe.  And he didn't tell me once, he

12         told me twice.  He said if I don't open the safe,

13         he would bust me.

14    Q    Help me if you can.  The terminology, what is bust

15         me if you know?

16    A    He going to pop me, cap me, or shoot me.  Either

17         one.

18    Q    Would you tell the ladies and gentlemen of the

19         jury, were you looking at his face the whole

20         time?  In other words, look him straight in the

21         face?  Is that what you were doing?

22    A    No, sir.  I was trying to open the safe.

23    Q    Help me a little bit, Mr. Reeves.  You're six foot

24         seven -- six six, two hundred and something

25         pounds, tell me why you're not looking at Corey
```

```
 1            McNabb straight in the face while he's got a gun
 2            while this is going on?
 3       A    Because I was frightened.  I was scared I would
 4            get shot or Patsy get shot.
 5       Q    His tone and his voice inflection, his demeanor,
 6            was he talking like I'm talking or was he loud,
 7            threatening?
 8       A    He was loud and threatening.
 9       Q    Did you get the safe open real easy real quickly
10            the first time?
11       A    No, sir.  It took me a while to open it.
12       Q    Tell the jury, you had opened that safe how many
13            times before, correct?
14       A    Yes, sir.
15       Q    You knew the combination?
16       A    Correct.
17       Q    Why was it difficult this time to get it open?
18       A    Because I had a gun to me and I was scared.
19       Q    Could you hear Patsy making any sounds or shortly
20            after that?
21       A    Yes, sir.  She was crying.
22       Q    Now, would you tell the ladies and gentlemen of
23            the jury, at that point in time, did you see any
24            other black males right then?
25       A    When I was opening the safe?
```

| | | |
|---|---|---|
| 1 | Q | Yes, sir.  Right then did you see anybody? |
| 2 | A | No, sir. |
| 3 | Q | Did you hear the door close when you went in?  In |
| 4 | | other words, you went in and Patsy went in and |
| 5 | | McNabb went in. |
| 6 | A | Yes. |
| 7 | Q | Now, I want to ask you, did you have a watch on? |
| 8 | A | No, sir. |
| 9 | Q | Well, did you take out a pencil and paper and |
| 10 | | write down his description?  Did you do that? |
| 11 | A | No, sir. |
| 12 | Q | Did you try to count to determine how many seconds |
| 13 | | he was in there?  Did you do that? |
| 14 | A | No, sir. |
| 15 | Q | What was your mind focused on, tell this jury, |
| 16 | | during this time? |
| 17 | A | I was afraid I would be shot. |
| 18 | Q | Would you tell the ladies and gentlemen of the |
| 19 | | jury, the safe, after you opened the first safe, |
| 20 | | what was inside the first safe? |
| 21 | A | It was coins.  Mostly coins and box coins and the |
| 22 | | other one was -- it's in a tray. |
| 23 | Q | How many safes are there total? |
| 24 | A | Two. |
| 25 | Q | I want to ask you about after you opened the first |

```
 1        safe.  Did McNabb say anything to you about

 2        opening up the second safe?

 3   A    Yes, sir.  He told me to open up the second one.

 4   Q    Tell the jury, where was most of the currency and

 5        the cash?  In the second safe or first safe?

 6   A    Second safe.

 7   Q    I asked you about the wrappers.  I believe it's

 8        State's Exhibit No. 9.  9 itself with the money

 9        wrapper and the stamps, was that where the

10        currency was with those kind of stamps?

11   A    Yes, sir.

12   Q    Could you tell the ladies and gentlemen of the

13        jury, any sounds being made as you were standing

14        there and after you opened the safe?  Both safes,

15        what sounds were you hearing?

16   A    Well, he ordered me to -- first of all, he ordered

17        me to get on my knees --

18   Q    Hold on.  Get on your knees?

19   A    Yes.

20   Q    Is the safe a real big area?  The room itself?

21   A    No, it's not that big.

22   Q    Why did you get down on your knees?  Tell the jury.

23   A    Because he ordered me to get on my knees.

24   Q    What did he have in his hand?

25   A    He had a gun pointed at me.
```

```
 1    Q    Did you believe the gun was loaded?

 2    A    Yes, sir.

 3    Q    I don't mean to be personal, but I want to ask

 4         you, your size, you being a man, why didn't you

 5         try to take the gun away from him then?

 6    A    Sir, I was frightened.  I was scared I would get

 7         shot.  I was looking out for Patsy, too.

 8    Q    In the area of the office if the gun went off if

 9         it would have been fired, would there have been

10         anything it could have struck or hurt anybody else

11         if it went through and reflected or hit something?

12    A    It would of hit Patsy.

13    Q    Tell the ladies and gentlemen of the jury, did you

14         get down on your knees?

15    A    Yes, sir.

16    Q    Tell the jury what was going through your mind

17         right then when he told you to get down on your

18         knees.

19    A    What was going through my mind, I was afraid he

20         was going to shoot me in my head.

21    Q    Did he instruct Patsy to do anything at that time?

22    A    He told her to tie me up.

23    Q    I don't mean to be personal, have you ever been

24         tied up before when somebody had a gun on you?

25    A    No, sir.
```

| | | |
|---|---|---|
| 1 | Q | Did that cause you concern for your safety? |
| 2 | A | Yes, sir. |
| 3 | Q | And how were you tied up by Patsy with his |
| 4 | | instructions? |
| 5 | A | I was on my knees, and I was tied with my hands |
| 6 | | tied behind my back. |
| 7 | Q | So if I got up here on this table and I put my |
| 8 | | knees down and feet behind me and put my hand |
| 9 | | behind me, that's how it occurred, correct? |
| 10 | A | Yes, sir. |
| 11 | Q | During this time could you see McNabb's face the |
| 12 | | whole time while she was tying you up?  Were you |
| 13 | | watching his face. |
| 14 | A | No, sir. |
| 15 | Q | What were you tied up with?  Can you tell -- |
| 16 | A | Speaker wire. |
| 17 | Q | If it was behind you, how can you see or know what |
| 18 | | you were being tied up with? |
| 19 | A | It was speaker wire. |
| 20 | Q | Did the office of Winn Dixie have speaker wire in |
| 21 | | it? |
| 22 | A | No, sir. |
| 23 | Q | Did you have a tie on that night? |
| 24 | A | Yes, sir. |
| 25 | Q | Any other ties inside the office itself that night |

```
 1           when you went in with McNabb with the gun on you
 2           and Ms. Roach?
 3     A     Yes, sir.
 4     Q     Where was the other tie located?
 5     A     It was hanging on the wall.
 6     Q     Now, when you were down, if I could use the jury
 7           box, use this corner you see where it's indented
 8           over there, is that about the width in that
 9           corner?
10     A     Yes, sir.
11     Q     And if I could just kind of use this wall, if this
12           was the extreme wall and you're in this corner and
13           I walk away, it much wider or longer than this?
14     A     That's about --
15     Q     About this area?
16     A     Yes, sir.
17     Q     Is it fair to say if I use as one wall, you tell
18           me when to stop as I slide this way so the jury
19           will know how wide this little indention is.
20     A     About right there.
21     Q     Somewhere in here?
22     A     Yes, sir.
23     Q     Anything against the wall here on the sides as
24           you're put up in that area, what items of
25           furniture or files --
```

| 1  | A | It's a desk and a filing cabinet there. |
|----|---|------------------------------------------|
| 2  | Q | So you're in this location in the corner up like |
| 3  |   | this down on your knees? |
| 4  | A | Yes. |
| 5  | Q | What happened to Patsy? |
| 6  | A | Patsy was then -- after I was tied up, he take the |
| 7  |   | neck tie down from the thing -- |
| 8  | Q | The neck tie, when it was jerked down, how were |
| 9  |   | you in a position to see that if he was behind |
| 10 |   | you?  Tell us where the neck tie was. |
| 11 | A | It was on the wall. |
| 12 | Q | And my example was if this was the end of the wall |
| 13 |   | and you're facing this way down, where was the |
| 14 |   | neck tie? |
| 15 | A | It was on the wall right there (indicating). |
| 16 | Q | Now, so what happened to Patsy and the neck tie, |
| 17 |   | if you know? |
| 18 | A | He jerked it down and tied her up with it. |
| 19 | Q | And what position did she get in if you know |
| 20 |   | because you were facing straight ahead? |
| 21 | A | She was right behind me in the same position I was |
| 22 |   | in. |
| 23 | Q | If you rocked or moved and I know you're kind of |
| 24 |   | tall but leaned way back, do you think in that |
| 25 |   | location you could have touched Patsy? |

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Or bumped her? |
| 3 | A | Yes, sir. |
| 4 | Q | What sounds was she making? |
| 5 | A | She was crying.  She was really scared. |
| 6 | Q | Do you remember what language they were saying to |
| 7 | | her or how they described her or what words of |
| 8 | | profanity or slang terms they used towards her? |
| 9 | A | Yes, sir. |
| 10 | Q | What did they say? |
| 11 | A | That's right, bitch, I'm still here, at the door |
| 12 | | here. |
| 13 | Q | You were first, Patsy was second, and the |
| 14 | | demonstration you've shown us.  Did you yourself |
| 15 | | ever see another black male? |
| 16 | A | Yes, sir. |
| 17 | Q | Tell the ladies and gentlemen of the jury when you |
| 18 | | saw or knew there was another black male besides |
| 19 | | McNabb there. |
| 20 | A | When -- like I said, after I had opened the safe |
| 21 | | and they was ordering me to come in, he then |
| 22 | | opened the door. |
| 23 | Q | Who opened the door? |
| 24 | A | Mr. McNabb opened the door. |
| 25 | Q | And then who came in? |

| | | |
|---|---|---|
| 1 | A | Let the other guy come in. |
| 2 | Q | White male or black male? |
| 3 | A | Black male. |
| 4 | Q | Was he hearing anything that you recall? |
| 5 | A | Yes, sir. |
| 6 | Q | He have a hat on? |
| 7 | A | He had a toboggan. |
| 8 | Q | This is June 7th.  Did you wear a hat or cap or |
| 9 | | toboggan to work that day? |
| 10 | A | No, sir. |
| 11 | Q | Now, the other black male, could you tell if he |
| 12 | | was taller or shorter if you could? |
| 13 | A | He was shorter. |
| 14 | Q | And his skin complexion, light, medium, or dark |
| 15 | | compared to McNabb?  Can you tell us? |
| 16 | A | A little lighter than McNabb. |
| 17 | Q | Tell us about his physical size.  I'm asking about |
| 18 | | height, in other words, six feet.  Was he tall? |
| 19 | | About the same?  Smaller?  What you could tell. |
| 20 | A | About the same height. |
| 21 | Q | What about his body weight?  In other words, I use |
| 22 | | light, medium, heavy. |
| 23 | A | He was a little bit heavier than McNabb. |
| 24 | Q | And you heard his voice? |
| 25 | A | Yes, sir. |

| | | |
|---|---|---|
| 1 | Q | And you heard McNabb's voice? |
| 2 | A | Yes, sir. |
| 3 | Q | Now, could you tell the ladies and gentlemen of |
| 4 | | the jury, when the door shuts to the office, does |
| 5 | | it make a sound when it catches? |
| 6 | A | Yes, sir. |
| 7 | Q | Now, let me show you these exhibits.  I wanted to |
| 8 | | ask you if I could -- first of all, the boxes with |
| 9 | | the money, the coin money, would you stamp them |
| 10 | | Winn Dixie or put your store stamp on those? |
| 11 | A | No, sir. |
| 12 | Q | Why not? |
| 13 | A | Because they just come straight from the bank.  We |
| 14 | | wouldn't stamp them. |
| 15 | Q | Let me show you these two exhibits if I could. |
| 16 | | State's Exhibit No. 3.  Just let you hold it. |
| 17 | | What was it? |
| 18 | A | It's pennies. |
| 19 | Q | You can set it right there. |
| 20 | A | (Witness complied.) |
| 21 | Q | Do you know how many pennies? |
| 22 | A | Twenty-five dollars. |
| 23 | Q | Let me ask you, State's Exhibit 3, is that the |
| 24 | | kind of box or pennies you kept in the safe that |
| 25 | | night on June 7th? |

1          MR. BAXLEY:  Your Honor, I object.  There's

2     no distinctive characteristics on that box.

3          THE COURT:  He said was the kind.

4          MR. VALESKA:  The kind or similar.

5          THE COURT:  I overrule you.

6   Q    Now, if I could, let me show you State's Exhibit

7     No. 6 for identification purposes.  I realize it's

8     in a plastic bag now with State's 6.  But I asked

9     you about books of stamps or how stamps were kept

10    in the Winn Dixie that night for customers.  Were

11    they kept in that plastic bag in the -- is that

12    how they were kept?

13  A    No, sir.

14  Q    How were they kept?

15  A    They were kept without -- in a bag.  They were

16    just -- they were kept in a book like.  It was

17    stacked up in the safe.

18  Q    Loose?  Is that a fair term?

19  A    Yes, sir.

20  Q    I asked you about the stamps whether it was a

21    roll, lick-on kind, and then you said they were

22    stick-em type, correct?

23  A    Stick-em.

24  Q    Looking at those stamps, which is State's Exhibit

25    No. 9, is that the size or the approximate type of

```
 1              stamps, the self-address stamps?  State's Exhibit
 2              6.  I'm sorry.  I said 9.  6.  Would you tell the
 3              ladies and gentlemen of the jury, is that the type
 4              of stamps, in other words, flower stamps you kept
 5              on June 7th?
 6      A       Yes, sir.
 7      Q       In the safe that you know and seen them earlier
 8              that night?
 9      A       Yes.
10      Q       Now, did you give McNabb permission to take any
11              metal money, boxes, pennies, coins, currency,
12              stamps, or checks in any manner or fashion out of
13              the Winn Dixie?
14      A       No, sir.
15      Q       Now, tell the ladies and gentlemen of the jury,
16              the other man, did he have a gun?  Do you recall?
17      A       Yes, sir.
18      Q       Do you remember what it looked like, if you can?
19      A       It was about like a -- it was three eighty.  It
20              was black.
21      Q       Darker?
22      A       Darker, yes, sir.
23      Q       Do you know much about three eighties or nine
24              millimeters?
25      A       Yes.
```

| | | |
|---|---|---|
| 1 | Q | Ever fired them? |
| 2 | A | Yes. |
| 3 | Q | Ever put bullets in them? |
| 4 | A | Yes. |
| 5 | Q | Can you put three eighty bullets in a nine |
| 6 | | millimeter? |
| 7 | A | Yes, sir. |
| 8 | Q | Can you put nine millimeter bullets in a three |
| 9 | | eighty pistol? |
| 10 | A | Yes, sir. |
| 11 | Q | Can you tell the ladies and gentlemen of the jury, |
| 12 | | the office itself, what was being dropped on the |
| 13 | | floor? |
| 14 | A | It was tills that was already made up for the next |
| 15 | | morning and for them to open up and it was -- |
| 16 | | still already made up.  Tills, or registers. |
| 17 | Q | What color are the tills? |
| 18 | A | Black. |
| 19 | Q | What are they made of?  Are they made of wood? |
| 20 | A | Steel. |
| 21 | | (State's Exhibits No. 15 through 24 were |
| 22 | | marked for identification.) |
| 23 | Q | Can you tell the ladies and gentlemen of the jury |
| 24 | | how many times you heard that door open or close |
| 25 | | from the first time you went in -- the office door |

```
 1              is what I'm talking about -- while McNabb was

 2              there and the other gun man?   Your best

 3              recollection how many times the door opened or

 4              closed.

 5      A       That time and other time.

 6      Q       You went in the first time?

 7      A       Yes, sir.

 8      Q       Closed?

 9      A       Yes, sir.

10      Q       Then it opened?

11      A       Yes, sir.

12      Q       Who came in?

13      A       The other.

14      Q       That's the second time?

15      A       Yes, sir.

16      Q       And did they leave the office with you and Ms.

17              Roach inside?

18      A       Yes, sir.

19      Q       So that's how many times?

20      A       That's three times.

21      Q       Now, after the third time, the minute the door

22              shut the third time or just before it shut, did

23              you hear any conversation from the second black

24              male that you described that had the black gun

25              make any comments towards Ms. Roach?
```

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | What did he say? |
| 3 | A | That's right, and then I'm still here. |
| 4 | Q | Could you see the position of the door if anybody |
| 5 | | was standing in the door because of the location |
| 6 | | you were in? |
| 7 | A | No, sir. |
| 8 | Q | Ms. Roach being behind you, once again, you got up |
| 9 | | and moved where she was still in that position a |
| 10 | | little bit later? |
| 11 | A | Yes, sir. |
| 12 | Q | And when you got up and moved while she was still |
| 13 | | in the position kneeled down from that location |
| 14 | | stepping over here, could you see the door that |
| 15 | | you go in and out with the glass door? |
| 16 | A | No, sir. |
| 17 | Q | You got around the little edge, could you see it? |
| 18 | A | Yes. |
| 19 | Q | Now, tell the ladies and gentlemen of the jury, |
| 20 | | you were tied up, Ms. Roach was tied up, how long |
| 21 | | can you tell the panel from the time you first saw |
| 22 | | McNabb until you left the office yourself with Ms. |
| 23 | | Roach still inside, how many seconds, minutes did |
| 24 | | it last? |
| 25 | A | It seemed like a long time, sir.  About -- I say |

```
1              at least --

2    Q    Short time or long time?

3    A    Long time.

4    Q    Now, would you tell the ladies and gentlemen of

5         the jury, during that time from the time you first

6         walked up and saw McNabb, had the conversation

7         with him, until you left, he left, and you go out

8         the door, approximately how much of that time can

9         you tell the jury did you see his face?  Some?

10        Part?  None?  Or all?

11   A    I didn't see it at all after he tied me up.

12   Q    After you were tied up, then, at that point in

13        time, you couldn't really see his face?

14   A    No, sir.

15   Q    Now, if I could, when Ms. Roach was behind you and

16        the comment was made to her -- and I won't ask it

17        again, you told us what was said -- did you

18        immediately try to jump up and get away then?

19   A    No, sir.

20   Q    Why not?

21   A    I was afraid.

22   Q    What were you afraid of?

23   A    I was afraid he would hurt both of us.

24   Q    When you were kneeling down in that position

25        looking straight ahead, did you know for sure they
```

57

|     |   |                                                         |
|-----|---|---------------------------------------------------------|
| 1   |   | were inside the store, outside the store, still         |
| 2   |   | looking in the window, or outside?                      |
| 3   | A | I never -- no, sir.                                     |
| 4   | Q | Could you hear any cars when you were inside the        |
| 5   |   | office coming or going outside?                         |
| 6   | A | No, sir.                                                |
| 7   | Q | At some point in time did you get up?                   |
| 8   | A | Yes, sir, I did.                                        |
| 9   | Q | Where was Ms. Roach?                                    |
| 10  | A | She was still on her knees.                             |
| 11  | Q | And how did you get by her?                             |
| 12  | A | I just sort of, like, crossed over her.                |
| 13  | Q | And when you got up and crossed over her, you           |
| 14  |   | could see the door to the office with the glass,        |
| 15  |   | correct?                                                |
| 16  | A | Yes, sir.                                               |
| 17  | Q | Did you see McNabb or the other robber?                 |
| 18  | A | No, sir.                                                |
| 19  | Q | Did you call 911 right then?                            |
| 20  | A | No, sir, I didn't.                                      |
| 21  | Q | There's a phone in there, right?                        |
| 22  | A | Yes, sir.                                               |
| 23  | Q | Tell the jury why you didn't call right away.           |
| 24  | A | Because I was afraid, and, like I said, I didn't        |
| 25  |   | know if they were still in the store or not.  So I      |

| | | |
|---|---|---|
| 1 | | just told her to stay right there until I go check |
| 2 | | the store out. |
| 3 | Q | Were there other employees that you knew still |
| 4 | | working out there? |
| 5 | A | Yes, sir. |
| 6 | Q | Other men? |
| 7 | A | Yes, sir. |
| 8 | Q | Other women? |
| 9 | A | Yes, sir. |
| 10 | Q | Now, as you came out the office door, immediately |
| 11 | | come out the door and take a left -- |
| 12 | A | Yes, sir. |
| 13 | Q | -- go towards the end, what's immediately to the |
| 14 | | right? |
| 15 | A | The door you enter. |
| 16 | Q | Did you peek around the corner to see if anybody |
| 17 | | was there then? |
| 18 | A | Yes, sir. |
| 19 | Q | Did you see anybody there then? |
| 20 | A | No, sir. |
| 21 | Q | Could you see completely around all the corners to |
| 22 | | see if there was nobody out in the parking lot or |
| 23 | | standing there? |
| 24 | A | No, sir, I couldn't see. |
| 25 | Q | The comment had already been made by the other |

```
 1           black male, not McNabb, about still being there

 2           with Ms. Roach, correct?

 3      A    Yes, sir.

 4      Q    Where did you go?  Tell us.

 5      A    I kept looking around.  Then I went down the aisle

 6           and I -- I eventually made myself to the back and

 7           I told Reggie, I said, guess what, man, we been

 8           robbed.

 9      Q    And you were tied up you told us.  What happened

10           to the wire?

11      A    I showed -- after I was taking off, I showed him

12           the speaker wire right there.

13      Q    Where did you and Reggie go next?

14      A    He said, come on -- let's go check on Patsy.

15      Q    Now, Ms. Prescott, the other female that was

16           working, did she go up front when you-all went

17           right then?  Did she go with you?

18      A    I don't think she did.

19      Q    Why didn't you take her up there; in other words,

20           so there would be three of you to look to see if

21           you could see anybody?  Why did you leave her

22           there?

23      A    I was taking Reggie because he's the other

24           manager.

25      Q    Now, and as you walked and went back up to the
```

| | | |
|---|---|---|
| 1 | | front, describe how you did that. I mean, did you |
| 2 | | just walk like this or did you -- you look for |
| 3 | | somebody? |
| 4 | A | I was still looking. |
| 5 | Q | Looking for who? |
| 6 | A | Mr. McNabb and the robber and the other guy. |
| 7 | Q | How as you got to the front of the aisles and then |
| 8 | | went to the front of the store -- did you get back |
| 9 | | to the office? |
| 10 | A | Yes, sir. |
| 11 | Q | Did you go to where Patsy was? |
| 12 | A | Yes, sir. |
| 13 | Q | Did you untie her? |
| 14 | A | Yes, sir, I sure did. |
| 15 | Q | Did you then call 911? |
| 16 | A | Yes, sir. |
| 17 | Q | Tell the ladies and gentlemen of the jury, you |
| 18 | | heard before, I'll phrase it this way, the |
| 19 | | deposition under oath where the tape was played, |
| 20 | | correct? |
| 21 | A | Yes, sir. |
| 22 | Q | My question to you is you heard the 911 operator, |
| 23 | | is this a long conversation, two or three minutes, |
| 24 | | or was it real short? The conversation you heard |
| 25 | | with her. |

```
 1    A    Real short.

 2    Q    Now, did you -- did she ask you about the

 3         robbery --

 4    A    Yes, sir.

 5    Q    White males or black males?  Or if you could

 6         identify what race they were?

 7    A    I told them I didn't know.

 8    Q    Look at the jury and tell them, you got robbed by

 9         white males or black males?

10    A    Black male.

11    Q    Why couldn't you tell the 911 operator shortly

12         after the robbery within a minute or two they were

13         white or black?

14    A    Because I was afraid.

15    Q    Now, let me -- let me go forward since then today,

16         this is now 2004, February 9 -- 10, have you still

17         had thoughts or concerns for your safety since the

18         robbery?

19    A    Yes, sir.

20    Q    Has it effected you in any way having a gun put on

21         you?

22    A    Yes, sir.

23    Q    Are you still concerned about it today?

24    A    Yes, sir.

25    Q    Now, did you see the police officers when they
```

| | | |
|---|---|---|
| 1 | | came to the Winn Dixie? |
| 2 | A | Yes, sir. |
| 3 | Q | Did you talk to them as to what had occurred and |
| 4 | | what happened? |
| 5 | A | Yes, sir. |
| 6 | Q | So you described for the police officers the best |
| 7 | | you could recall what happened, correct? |
| 8 | A | Yes. |
| 9 | Q | Tell the jury, robbed that night and the police |
| 10 | | officers talking to you, did you go down and talk |
| 11 | | to the police at a later point in time? |
| 12 | A | Yes, sir. |
| 13 | Q | Was your memory better today or back then? |
| 14 | A | When I got robbed? |
| 15 | Q | Huh? |
| 16 | A | Today. |
| 17 | Q | Could you tell the ladies and gentlemen of the |
| 18 | | jury, do you remember everything that happened |
| 19 | | during the robbery a hundred percent? |
| 20 | A | Yes, sir. |
| 21 | Q | During the robbery do you know what kind of shoes |
| 22 | | the robbers were wearing?  Do you remember? |
| 23 | A | Yes, sir. |
| 24 | Q | What were they? |
| 25 | A | They were sneaker-type shoes. |

```
 1    Q    Sneaker.  If I use the term tennis, is that the
 2         same type thing?
 3    A    Yes, sir.
 4    Q    Soft shoe versus a hard shoe?
 5    A    Yes, sir.
 6    Q    Now, could anybody, anybody come off the street
 7         and go into your safe and get the food stamps or
 8         get those money rolls from the general public walk
 9         in and get those?
10    A    No, sir.
11    Q    How much money in your best estimation, cash, was
12         taken -- United States currency from McNabb and
13         the other man?  Your best judgment?
14    A    Probably around about twenty -- about twenty
15         thousand I say.
16    Q    Checks also taken?
17    A    Yes, sir.
18    Q    Working as a manager, did you ever get or any
19         checks ever brought back and produced from
20         customers who had bought food items, did they ever
21         turn up in any way or cashed or returned to your
22         store?  They weren't, were they?
23    A    No, sir.
24    Q    State's Exhibit 15, do you recognize 15?
25    A    Yes, sir.
```

| | | |
|---|---|---|
| 1 | Q | What is 15? |
| 2 | A | Out in front of our store. |
| 3 | Q | Is that the way it looked shortly after the |
| 4 | | robbery? |
| 5 | A | Yes, sir. |
| 6 | Q | Same substantial condition? |
| 7 | A | Yes, sir. |
| 8 | Q | Not marked in any way? |
| 9 | A | No. |
| 10 | | MR. VALESKA:  Offer 15. |
| 11 | | MR. BAXLEY:  No objection. |
| 12 | | THE COURT:  Let it be admitted. |
| 13 | | (State's Exhibit No. 15 was admitted |
| 14 | | into evidence.) |
| 15 | Q | Show you State's 16 for identification purposes. |
| 16 | | What is 16?  What part of the store? |
| 17 | A | The office. |
| 18 | Q | I asked you about what items thrown on the floor |
| 19 | | by McNabb or the other robber.  Do you recognize |
| 20 | | those? |
| 21 | A | Yes, sir. |
| 22 | Q | What are they? |
| 23 | A | Registers. |
| 24 | Q | If I use the terms tills, what's a till? |
| 25 | A | It's a till that we get ready for the cashier -- |

1            morning cashier.

2    Q     I ask about what you put money in, not box money

3          -- not loose quarters or rolled quarters, do you

4          recognize anything in those?

5    A     Yes, sir.  The trays.

6    Q     The trays I'm pointing to?

7    A     Yes, sir.

8    Q     Is that the position of the items when you first

9          went in the store with McNabb?  Is that how it

10         looked?

11   A     No, sir.

12   Q     After you got up from the corner and went out with

13         Ms. Patsy still there, you went out, is that the

14         position you saw those items?

15   A     Yes, sir.

16   Q     What about the items to the left I'm pointing to?

17         What are those?

18   A     You put -- cash money in the envelopes there.

19   Q     Is that the way when you got up from the corner it

20         looked before the police came?

21   A     Yes.

22   Q     Does it appear to be marked, altered, or changed

23         in any way from the time you left until the police

24         got there?

25   A     No, sir.

| | | |
|---|---|---|
| 1 | Q | Exactly the way it looked? |
| 2 | A | Yes, sir. |
| 3 | | MR. VALESKA:  Offer State's 16. |
| 4 | | THE COURT:  Let it be admitted. |
| 5 | | (State's Exhibit No. 16 was admitted |
| 6 | | into evidence.) |
| 7 | Q | Let me show you State's 17 for identification |
| 8 | | purposes.  What is 17? |
| 9 | A | That's the front of the safe. |
| 10 | Q | I apologize.  I should step back so you can speak |
| 11 | | loud.  Which safe?  There were two safes. |
| 12 | A | That was the first safe right there. |
| 13 | Q | Is that the way it looked after the robbery?  Is |
| 14 | | that how it looked? |
| 15 | A | No, sir. |
| 16 | Q | Is that how it looked before the robbery? |
| 17 | A | Before the robbery. |
| 18 | Q | Does it truly and accurately depict the safe, the |
| 19 | | location, the telephone, you come in to the right, |
| 20 | | in other words, from the outside in the office |
| 21 | | door, the position it was in? |
| 22 | A | Yes, sir. |
| 23 | Q | Is the safe open or closed in that picture? |
| 24 | A | It's closed. |
| 25 | Q | Besides that, in other words, it was not closed |

1    after McNabb and the other robber got the items

2    out, correct?

3    A    Yes, sir.

4    Q    So it is different, but it's just shut, correct?

5    A    Yes, sir.

6    Q    Besides that, same condition?

7    A    Yes, sir.

8    Q    Same location?

9    A    Yes, sir.

10    Q    Same position that night?

11    A    Yes, sir.

12         MR. VALESKA:  Offer 17, Judge White.

13         MR. BAXLEY:  No objection.

14         THE COURT:  Let it be admitted.

15              (State's Exhibit No. 17 was admitted

16              into evidence.)

17    Q    Let me show you State's Exhibit 22.  What is 22?

18    A    Front of the safe.

19    Q    Does it show a different position than 17?

20         Different size or view of it?

21    A    Yes, sir.

22    Q    On 22, what does it show to open it?

23    A    It shows a handle.

24    Q    And the combination?

25    A    Yes, sir.

| | | |
|---|---|---|
| 1 | Q | Is that the way it looked on that location? |
| 2 | A | Yes, sir. |
| 3 | Q | Appear to be marked, altered, changed in any way |
| 4 | | that you can tell? |
| 5 | A | No, sir. |
| 6 | Q | I want to ask you, in the office itself, you been |
| 7 | | in that office many times, right? |
| 8 | A | Yes, sir. |
| 9 | Q | Is there a clock in the office? |
| 10 | A | Yes, sir. |
| 11 | Q | Now, do you remember when the robbery your best |
| 12 | | recollection started -- happened?  Your best |
| 13 | | opinion?  Around what time? |
| 14 | A | About around four o'clock. |
| 15 | Q | I'm not going to go through the whole robbery |
| 16 | | again, but I want to go through all that, the time |
| 17 | | period, the police coming and them talking to you |
| 18 | | and the police coming in and talking to other |
| 19 | | witnesses, and I asked you about the condition of |
| 20 | | the store -- the office itself, the trays, the |
| 21 | | condition of the safe, the pictures, was it open |
| 22 | | or closed? |
| 23 | A | It was closed. |
| 24 | Q | So the entire time I want to ask you about, the |
| 25 | | picture itself, looking at picture No. 22, was the |

1        safe open or closed?

2  A   Closed.

3  Q   Did you close it for any reason after the police

4        were there?

5  A   No, sir.

6  Q   Was it closed?  It was closed in the picture?

7  A   Yes, sir.

8  Q   Does it show the clock on the wall as to what time

9        this picture was made?

10  A   Yes, sir.

11  Q   Four-thirty?

12  A   Yes, sir.

13         MR. VALESKA:  Offer State's 22.

14         MR. BAXLEY:  No objection, Your Honor.

15         THE COURT:  Let that be admitted.

16            (State's Exhibit No. 22 was admitted

17            into evidence.)

18  Q   Showing you State's 21 and 24 together.  What's 21?

19  A   21 is the front of the store.  Well, it's the

20        doors you go to enter the store.

21  Q   I asked about the doors.  Is that the way it look,

22        the automatic doors?

23  A   Yes, sir.

24  Q   After the robbery?

25  A   Yes, sir.

| | | |
|---|---|---|
| 1 | Q | Are they closed or open? |
| 2 | A | Closed. |
| 3 | Q | Same substantial condition, though, correct? |
| 4 | A | Yes, sir. |
| 5 | | MR. VALESKA:  Offer 21 into evidence, Judge |
| 6 | | White. |
| 7 | | MR. BAXLEY:  No objection. |
| 8 | | THE COURT:  Let that be admitted. |
| 9 | | (State's Exhibit No. 21 was admitted |
| 10 | | into evidence.) |
| 11 | Q | Showing you State's 22 as you started down the |
| 12 | | hallway, how many doors were down there? |
| 13 | A | There's three. |
| 14 | Q | Which was the first door to what part of the |
| 15 | | store? |
| 16 | A | Office. |
| 17 | Q | What's next? |
| 18 | A | That's the door to the till room. |
| 19 | Q | Till room, who uses the till room? |
| 20 | A | Cashiers. |
| 21 | Q | What's the next door at the end of the hallway? |
| 22 | A | A storage room there -- storage area. |
| 23 | Q | In that picture, any other doors in that hallway? |
| 24 | A | That's it. |
| 25 | Q | Does it show the approximate length even though |

| | | |
|---|---|---|
| 1 | | it's not the best view the size of that from the |
| 2 | | corner where the service counter and cigarettes |
| 3 | | are -- I'll withdraw that. |
| 4 | | Does it show the length of the hallway? |
| 5 | A | Yes, sir. |
| 6 | Q | Does it show the glass and the wood on the office |
| 7 | | door? |
| 8 | A | Yes, sir. |
| 9 | Q | Is that the way it looked after the robbery? |
| 10 | A | Yes, sir. |
| 11 | | MR. VALESKA:  Offer 24. |
| 12 | | MR. BAXLEY:  No objection, Your Honor. |
| 13 | | THE COURT:  Let it be admitted. |
| 14 | | (State's Exhibit No. 24 was admitted |
| 15 | | into evidence.) |
| 16 | Q | State's 23 -- 16 is already admitted -- but 23, |
| 17 | | does it show a different view in relationship to |
| 18 | | the width or the depth of the office, in other |
| 19 | | words, from the picture at the end of the office |
| 20 | | as you walk in to the left or right?  Does it show |
| 21 | | how wide or short it is on 23? |
| 22 | A | Yes, sir. |
| 23 | Q | Does it show the safe? |
| 24 | A | Yes. |
| 25 | Q | Any chairs? |

```
 1   A    Yes, sir.

 2   Q    The chairs, which part of the store were the

 3        chairs in the picture in relationship to where you

 4        or Ms. Roach was put down and tied up with your

 5        hands by you?  By the chair or to the right or to

 6        the left?

 7   A    To the right of the chair.

 8             MR. VALESKA:  Offer State's 23.

 9             MR. BAXLEY:  No objection, Your Honor.

10             THE COURT:  Let it be admitted.

11                 (State's Exhibit No. 23 was admitted

12                 into evidence.)

13   Q    18, 19, and 20, do you yourself know what those

14        are?

15   A    Yes, sir.

16   Q    I ask you on 16 and 23 about some tills or metal

17        trays.  You described them.  You said that they

18        were metal, correct?

19   A    Yes.

20   Q    Did you say steel or metal?

21   A    Steel.

22   Q    What I want to ask you about, 18, 19, 20, do you

23        recognize what part of the store they were in?

24   A    Yes, sir.

25   Q    What are they in?
```

| | | |
|---|---|---|
| 1 | A | Office. |
| 2 | Q | What items are those in 18, 19, and 20? |
| 3 | A | The top of the till. |
| 4 | Q | The tills that were pulled to the floor when you |
| 5 | | stepped over them -- excuse me, before that night, |
| 6 | | before the robbery that night, had you seen any |
| 7 | | tills that you checked when you opened the safe |
| 8 | | that had any type of impressions like those did? |
| 9 | A | No, sir. |
| 10 | Q | Had you ever seen tills with impressions on them |
| 11 | | and some kind of foot prints all during the time |
| 12 | | you worked there? |
| 13 | A | No, sir. |
| 14 | | MR. VALESKA:  Offer 18, 19, and 20. |
| 15 | | MR. BAXLEY:  No objection. |
| 16 | | THE COURT:  Let those be admitted. |
| 17 | | (State's Exhibits No. 18, 19, and 20 |
| 18 | | were admitted into evidence.) |
| 19 | Q | I showed you the clock and it showed four-thirty, |
| 20 | | right? |
| 21 | A | Yes, sir. |
| 22 | Q | And the robbery happened at four, correct? |
| 23 | A | Yes, sir. |
| 24 | Q | So you did talk with officers, they did interview |
| 25 | | other people after they arrived on the scene, |

| | | |
|---|---|---|
| 1 | | correct? |
| 2 | A | Yes. |
| 3 | Q | When you called the 911 until the police officers |
| 4 | | arrived, were they there in five or ten seconds or |
| 5 | | was it longer than that? |
| 6 | A | Probably about five or ten seconds. |
| 7 | Q | Five or ten seconds they got there, or minutes? |
| 8 | A | It was minutes.  About five or ten minutes. |
| 9 | Q | What I want to ask you about, do you know, if you |
| 10 | | remember, the best you can, had you talked to the |
| 11 | | police after you talked to the 911 operator, that |
| 12 | | 911 operator that night?  Did you talk to the |
| 13 | | police that night? |
| 14 | A | Yes, sir. |
| 15 | Q | Would it have been around four-thirty or after |
| 16 | | four-thirty, if you recall? |
| 17 | A | Probably around about -- a little bit after |
| 18 | | four-thirty. |
| 19 | Q | Any doubt in your mind -- this is my last question |
| 20 | | -- the man at the table with Mr. Baxley, McNabb, |
| 21 | | the man you identified, it is the man that had the |
| 22 | | gun on you that made the threats that you've |
| 23 | | identified? |
| 24 | A | No doubt about it. |
| 25 | | MR. VALESKA:  Pass the witness.  That's all I |

```
 1        have.
 2                 THE COURT:  Mr. Baxley.
 3                         CROSS EXAMINATION
 4    BY MR. BAXLEY:
 5    Q    Mr. Reeves, where were you or what were you doing
 6         when Ms. Roach contacted you or paged you at the
 7         store?
 8    A    I was stocking shelves.
 9    Q    Shocking shelves?
10    A    Yes.
11    Q    Approximately where in the store were you located?
12    A    I was probably in the -- probably, like, in the
13         back part.  It was -- it's a side view of the
14         store there.
15    Q    Hold on one second.  I'm going to show you
16         something here.  This is a big schematic of the
17         Winn Dixie.  Does that accurately depict what the
18         Winn Dixie looks like for the most part?
19    A    Talking about the inside --
20    Q    No.  Just itself.  I'm going to show you something
21         on the inside in a moment.
22    A    Yes.
23    Q    Where would you say -- we'll show the jury in a
24         moment.  Where would you say the entrance is
25         located and the office is located?
```

| 1 | A | It's kind of hard for me to tell you what that is |
| 2 | | there.  Probably be -- |
| 3 | Q | You said there's, like, a Subway here or something |
| 4 | | else? |
| 5 | A | Yes. |
| 6 | Q | Where about would your store start in relationship |
| 7 | | to everything else? |
| 8 | A | Start right there.  In that area there. |
| 9 | Q | Where would your entryway be? |
| 10 | A | Probably right -- |
| 11 | Q | You mark it for me on there. |
| 12 | A | (Witness complied.) |
| 13 | | Right here. |
| 14 | Q | That is the entryway? |
| 15 | A | Yes. |
| 16 | Q | Where is the office in relation to that, now? |
| 17 | A | It would be -- as you go in the store, it would be |
| 18 | | right in this area (indicating).  It's turning |
| 19 | | there. |
| 20 | Q | The entryway is here and office is about here. |
| 21 | | MR. VALESKA:  Judge, I guess for purposes -- |
| 22 | | I have an objection.  If we're publicizing to the |
| 23 | | jury, I would like with an agreement that's not to |
| 24 | | scale before he publishes it. |
| 25 | | MR. BAXLEY:  I'm not arguing it's scale. |

```
 1              Just trying to get an approximation here.
 2                   THE COURT:  Maybe let him write entry and
 3              office.  Or either you write it for him.
 4      Q   E is entry and O is office.  Where were you in the
 5              store in relation to everything when you were
 6              paged stocking shelves?
 7      A   This is the entrance right here.  You go about
 8              right here, and it was about -- close to the back
 9              about this area here.  Well, you might say side
10              rather.  Because the back would be back that way.
11      Q   Put a mark, more or less, where you were in there
12              stocking shelves.
13      A   (Witness complied.)
14                   Probably about right here.
15      Q   Put an S in the middle of that.
16      A   (Witness complied.)
17      Q   About how long did it take you to get up front?
18      A   Sir, probably about four -- about four seconds I
19              would say.
20      Q   Four seconds.
21                   Was anyone with you stocking at that time?
22      A   No, sir.  Nobody stocking.
23      Q   Just by yourself?
24      A   Yes, sir.  When they called me to the front.
25      Q   Where was Reggie Hill at that time?
```

```
 1   A    Reggie?  When I was called to the front, Reggie
 2        was in the back.
 3   Q    Do you know where in the back he was?
 4   A    He was back there with Ms. Prescott.
 5   Q    With Ms. Prescott.
 6             Had you seen Ms. Prescott before she got
 7        there?  I mean, at the time she arrived at the
 8        store.
 9   A    No, sir.  I sure hadn't.
10   Q    Had you seen Ms. Prescott at all that night prior
11        to the robbery?
12   A    No, sir.
13   Q    You had not seen Ms. Prescott at all?
14   A    No, sir.
15   Q    How did you know she was there?
16   A    I hear her voice when she paged Reggie to the
17        back.  On the intercom.
18   Q    I'm going to play a tape for you and give you a
19        transcript of the 911 tape.
20             MR. BAXLEY:  You got this, don't you, Doug?
21             MR. VALESKA:  Yes, sir.
22   Q    I want you to tell me if this is the 911 tape you
23        made on the night of the --
24             MR. BAXLEY:  Your Honor, can I put this up to
25        the microphone?
```

```
 1              THE COURT:  Sure.
 2                   (At which time the 911 tape was
 3                   played.)
 4     Q    And that's the 911 tape that you made; is that
 5          correct?
 6     A    Yes, sir.
 7     Q    And does that transcript you have in front of you
 8          accurately depict the words that were said in that
 9          911 conversation?
10              MR. VALESKA:  I'll stipulate that's his voice
11          on the tape, Judge White.
12              THE COURT:  I think he's --
13     A    Yes, sir.
14     Q    On that 911 tape you did claim that you could not
15          tell the race of the individuals who robbed the
16          store; is that correct?
17     A    Yes, sir.
18     Q    And you claimed earlier it was because you were
19          upset?
20     A    Yes, sir.
21     Q    But also on that tape you say you think it was the
22          same guy that did it last time?
23     A    Uh-huh.
24     Q    So you're telling this jury that you didn't know
25          the race, but you did know it was the same guy
```

```
1          that did it the last time?
2               MR. VALESKA:  I object.  I object to the form
3          of the question.
4               MR. BAXLEY:  Your Honor, this is cross.
5               THE COURT:  You did say that it's -- you
6          thought it was the same guy that did it the last
7          time?
8               THE WITNESS:  Yes, sir.
9               THE COURT:  Go ahead.  If you want to restate
10         your question.  I overrule the objection.
11    Q    In your 911 conversation, did you tell the 911
12         operator that you thought the robber who had just
13         robbed the store was the same guy that robbed the
14         store the last time?
15    A    Yes, sir.
16    Q    And what do you mean by the last time?
17    A    What I mean by the last time that -- the reason I
18         said that because he know too much about the
19         office.
20    Q    He knew too much about the office?
21    A    He knew too much about the office.
22    Q    And were you robbed the last time the Winn Dixie
23         robbed?
24    A    Yes, I was robbed the last time it was robbed.
25    Q    So you were actually present for that robbery?
```

| | | |
|---|---|---|
| 1 | A | The last time it was robbed? |
| 2 | Q | Yes. |
| 3 | A | On June 7th. |
| 4 | Q | This is the second robbery you been involved with? |
| 5 | A | No, this is the first -- you said the last time it |
| 6 | | was robbed, I was there. |
| 7 | Q | I'm talking about the last time in relation to |
| 8 | | your testimony the last time. |
| 9 | A | I don't understand what you're saying. |
| 10 | Q | Maybe I'm confusing you.  I apologize for that. |
| 11 | | You stated this was the same guy that robbed the |
| 12 | | Winn Dixie the last time? |
| 13 | A | Yes. |
| 14 | Q | And the last time, when did the last time occur? |
| 15 | A | Well -- before I got robbed? |
| 16 | Q | Yes, sir. |
| 17 | A | That's what I'm talking about.  Before I got |
| 18 | | robbed. |
| 19 | Q | When did that last robbery occur? |
| 20 | A | When I got robbed? |
| 21 | | THE COURT:  No, the one before -- |
| 22 | Q | The one before -- |
| 23 | A | I don't remember the last time when it was.  It |
| 24 | | was probably -- just probably six months apart. |
| 25 | Q | Six months apart? |

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | But you weren't a party to that other robbery that |
| 3 | | happened six months earlier? |
| 4 | A | No, sir. |
| 5 | Q | You claim the robbery took place in February of |
| 6 | | 2001? |
| 7 | A | Sir, I -- I -- I really don't know. |
| 8 | Q | When did you start working for Winn Dixie? |
| 9 | A | When did I start working for Winn Dixie? |
| 10 | Q | Yes, sir. |
| 11 | A | I started working for Winn Dixie in '96. |
| 12 | Q | In '96. |
| 13 | | At that same store? |
| 14 | A | Yes, sir. |
| 15 | Q | You been -- do you still work there? |
| 16 | A | I don't work at that exact store anymore.  I work |
| 17 | | at Winn Dixie.  I work at another store now. |
| 18 | Q | When did you leave the Westgate Parkway Winn Dixie? |
| 19 | A | I think it was in April. |
| 20 | Q | April? |
| 21 | A | April of last year. |
| 22 | Q | 1996 -- when in 1996 did you begin working for |
| 23 | | them? |
| 24 | A | October. |
| 25 | Q | October of 1996 through -- and you say |

```
 1           approximately April of 2003?
 2   A       Yes, sir.
 3   Q       You work there consistently that entire -- seven
 4           year period?
 5   A       Yes, sir.
 6   Q       During that time period how many times had the
 7           Winn Dixie been robbed?
 8   A       During that time period?
 9   Q       Yes, sir.
10   A       Once.
11   Q       Once?
12   A       Yes, sir.  Twice in that time period.  From April
13           to October, twice.
14   Q       October of 1996 to April 2003, the Winn Dixx been
15           robbed twice?
16   A       Yes, sir.
17   Q       You claim five -- you were taken to the police
18           station how long after the robbery took place?
19           When did you go to the police station to look at a
20           photo lineup?
21   A       It was on a Tuesday is when I went.  It was
22           probably -- got robbed on a Thursday.  It was
23           Tuesday of that next week.
24   Q       Robbed on Thursday and you went on Tuesday.
25           Roughly five days?
```

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Is that your testimony?  Five days after the fact? |
| 3 | A | Yes, sir. |
| 4 | Q | You claim five days after the fact you had a |
| 5 | | better recollection of -- |
| 6 | A | Yes, sir.  Yes, sir. |
| 7 | Q | -- the robbers than you did on the day of the |
| 8 | | incident? |
| 9 | A | Yes, sir. |
| 10 | Q | What according -- what stands out in Mr. McNabb's |
| 11 | | facial features that makes you claim he was the |
| 12 | | one that robbed you that night? |
| 13 | A | What stands out? |
| 14 | Q | Yes, sir. |
| 15 | A | Well, he was -- he didn't have -- he didn't have |
| 16 | | those -- sort of like a thin mustache then.  But |
| 17 | | he don't have that now.  And like I said, still |
| 18 | | see his face now.  That's the one. |
| 19 | Q | On the night that it was robbery, what |
| 20 | | denominations of coins, cash, stamps, and food |
| 21 | | stamps were kept in that safe? |
| 22 | A | What denominations? |
| 23 | Q | What denominations -- fives, tens, twenties, |
| 24 | | hundred dollars, fifties? |
| 25 | A | Sir, I can't -- I can't really tell.  It was a |

```
 1          bunch.  I don't know really definitely how much
 2          really --
 3     Q    No, you said twenty thousand dollars earlier.  You
 4          couldn't give us a round about figure how much of
 5          each kind --
 6     A    No, sir.  Because you got to realize.  It was in a
 7          -- like a bag, a bank bag.  So we kept that in a
 8          bank bag.  So it just wasn't scattered all over
 9          the safe.  Just go in there and look at it, but it
10          was in a bank bag.
11     Q    What's a bank bag?
12     A    A deposit bag.
13     Q    Explain -- describe to the jury --
14     A    It's a plastic bag.  The money is kept in.  Seal
15          it and keep it there, and then you make a deposit
16          the next day.  It wasn't just out loose.  It was
17          in a bag.  Some was in a bag and some wasn't in a
18          bag.  You know what I'm saying?  We got some in a
19          deposit bag, and then we had some just in the safe
20          like.  You understand what I'm saying?
21     Q    Yes.
22              How about coins?  Obviously we got coins in
23          front of you.  How many boxes or cases or however
24          you describe that coin?
25     A    We had coins.  Pennies, dimes, nickels, and
```

```
 1              quarters in the box.
 2     Q        Is that a pretty heavy coin box there?
 3     A        Yes, sir.
 4     Q        How many of those boxes were there?
 5     A        How many boxes there?
 6     Q        Yes, sir.  Typically.  You worked there several
 7              years --
 8     A        Like I said, we kept dimes, pennies --
 9     Q        You just kept one box of each, two boxes of each?
10     A        Sometimes one and sometimes two.  It just depends.
11     Q        Did you ever keep more than that?  Ten boxes?
12     A        No, sir.
13     Q        What would be the maximum number of coins you kept
14              there?
15     A        Probably like I said, one of each.
16     Q        You're saying one box of quarters, one box of
17              dimes, one box of pennies?
18     A        Yes.
19     Q        One box of nickels.
20                  You're a big fella.  Could you carry one box
21              of each of those out on your own?  You claim
22              you're a big strong fella here.
23     A        Yes.
24     Q        You obviously are.  Could you carry one box of
25              each of those out with ease?
```

```
1    A   Yes, sir.  If I had a bag I could.

2    Q   If you had a bag?

3    A   Yes, sir.

4    Q   One of those -- how much do you say that weighs?

5    A   Probably a good five -- about five or ten pounds.

6        About five pounds at the most.

7    Q   When you were in the office, you say you were tied

8        up on your knees facing the wall?

9    A   Yes, sir.

10   Q   Ms. Roach is behind you?

11   A   Yes, sir.

12   Q   You also claim you saw the other person come in?

13   A   Yes, sir.  I said -- yes, sir, I did.

14   Q   Now, how can you see the person when you said you

15       never looked at them?

16   A   I never looked at them.  Well, I had a glimpse of

17       the guy when he come in the office.  As a matter

18       of fact, I probably misunderstood your question.

19       But I heard the door open.  I'll say that.  I

20       heard the door open.  The door -- Mr. McNabb

21       opened the door.

22   Q   And that's what I'm curious about.  Explain to me

23       -- when you first walked up to the counter, you

24       say you confronted Mr. McNabb?

25   A   Yes.
```

```
1    Q    Was he standing face-to-face like me to you here,
2         or were you -- he was obviously outside the
3         counter as you walked up to him face-to-face?
4    A    I walked up to him.  And he was standing sideways.
5         He was standing up -- like standing like this
6         here when I came up.  He was standing like this
7         here (indicating).
8    Q    So I would be you.  I would be walking.  And
9         you're Mr. McNabb.  And all you see is a side
10        profile?
11   A    Yes, sir.
12   Q    From that point, did you see a full facial profile?
13   A    Yes, sir.  Because he turned.  And when I was
14        saying, yes, sir, could I help you, he said, guess
15        what, today is your lucky day.  And he pointed the
16        gun at me.
17   Q    Did he make any -- this robber do anything to
18        obscure their face at all?
19   A    Did they coat their face?
20   Q    Did either one of the robbers do anything to
21        obscure their face?  Panty hose?  Sock?  Mask?
22   A    No, sir.
23   Q    Nothing like that.
24        And is it possible that Mr. Hill could have
25        been up front during that time period?
```

```
 1    A    It wasn't no way he was.

 2    Q    I'm not saying for him being the robber.  Excuse

 3         me, that's not what I'm indicating there.  Just

 4         because he was working there -- was that Mr.

 5         Hill's regular night work?  Was it a surprise

 6         night to work?

 7    A    No, sir, it was his regular night to work.

 8    Q    It was his regular night to work?

 9    A    Yes, sir.

10    Q    So it's possible that Mr. Hill could have been

11         anywhere in that store at any time?

12              MR. VALESKA:  Objection.  Possible is a

13         mental conclusion for Mr. Hill, not of this

14         witness.

15              MR. BAXLEY:  Your Honor, I'm speaking about

16         this man was a night manager.  He's the one that

17         was in control of where employees were.  He can

18         certainly testify where other employees were that

19         night --

20              THE COURT:  I think he said he didn't know

21         where he was.

22                   Didn't you?

23              THE WITNESS:  Mr. Hill was in the back part.

24              THE COURT:  When the public address came off

25         for you to come to come to the front, he was in
```

1          the back?

2              THE WITNESS:  Well, I'll say this right

3          here.  Mr. Hill was called to the back.  And like

4          I said, when I was -- when I was called to the

5          front, Mr. Hill was somewhere in the back.  I say

6          that because that's where I found him at when I

7          got out -- got out of the office there.

8     Q    What I'm saying, though, Mr. Hill wasn't assigned

9          to a particular location that night, was he?

10    A    No, sir, he wasn't.

11    Q    So he could have been roaming anywhere in that

12         store on that particular night?  Just doing his

13         regular duties?

14    A    Yes.  Yes.

15    Q    Stocking, cleaning, supervising, whatever he does?

16    A    Yes.

17    Q    So he could have been anywhere in that store?

18    A    Yes.

19    Q    Could he have been in the office at some point?

20    A    No, sir, not in the office.  Couldn't have been in

21         the office.

22    Q    Forget the robbery even happened.  This is a

23         regular working night with Mr. Hill.  He had

24         access to that office, correct?

25    A    Yes, sir, he sure did.

```
1    Q    And it's possible at some point during a regular

2         working night at the Winn Dixie, Mr. Hill could be

3         in that office?

4    A    No, not really.  Because he would have been either

5         stocking or something.  We hardly very seldom went

6         in the office.

7    Q    If someone needed change, he would go in that

8         office and get change; if someone needed anything,

9         it's possible he could have gone in that office;

10        is that correct?

11   A    Yes, it's possible.

12   Q    When you left the office itself, you say you

13        walked out the door, you walked down the hallway,

14        you didn't see anybody; is that correct?

15   A    Yes, sir.

16   Q    Did you look outside for a car for the alleged

17        robbers?

18   A    Yes, sir.  I glimpsed to the -- I looked to the

19        right of me.  Because the outside doors, when you

20        walk out the office door, it's to your right when

21        you go outside the thing there.  So I looked to

22        the -- after I walked out the doors there, out of

23        the office, I come up and I looked to the right

24        where the --

25   Q    And that's the big glass windows looking out in
```

| | | |
|---|---|---|
| 1 | | the parking lot? |
| 2 | A | No, sir.  The doors is first.  I looked out that |
| 3 | | door first.  The double doors.  And then I looked |
| 4 | | out the big glass windows there. |
| 5 | Q | And you did not see an automobile of any type? |
| 6 | A | No, sir. |
| 7 | Q | No cars speeding away? |
| 8 | A | No, sir. |
| 9 | Q | And no sign of the alleged robbers? |
| 10 | A | No, sir. |
| 11 | Q | No sign of the robbers. |
| 12 | | You also claim that you and Mr. Hill were |
| 13 | | equal rank so to speak at the Winn Dixie? |
| 14 | A | Yes. |
| 15 | Q | So he wasn't your supervisor, you weren't his |
| 16 | | supervisor? |
| 17 | A | No, sir. |
| 18 | Q | Both had co-equal responsibilities? |
| 19 | A | Yes.  Yes. |
| 20 | Q | Did you know about Mr. Hill's criminal history? |
| 21 | | MR. VALESKA:  Objection. |
| 22 | | THE COURT:  Sustained. |
| 23 | Q | In his job would Mr. Hill have access to those |
| 24 | | cash register drawers? |
| 25 | A | Yes, sir. |

| | | |
|---|---|---|
| 1 | Q | In his job would Mr. Hill have access to cashed |
| 2 | | food stamps or discarded thousand dollar money |
| 3 | | wrappers? |
| 4 | A | Access to it? |
| 5 | Q | Would he have access to it? |
| 6 | A | Well, it just stays in the office.  Yes, he can go |
| 7 | | in and out of the office. |
| 8 | Q | Would he have access to the infamous Winn Dixie |
| 9 | | four twenty-six stamp? |
| 10 | A | No, sir, it stays in the office there. |
| 11 | Q | But he has access to the office? |
| 12 | A | Yes. |
| 13 | Q | So he could stamp something?  If he wanted to |
| 14 | | stamp a piece of paper with that stamp, he could |
| 15 | | do that, couldn't he? |
| 16 | A | Yes. |
| 17 | Q | Now, the money wrapper we've discussed earlier, |
| 18 | | you had stated that -- I'll withdraw that. |
| 19 | | Did you ever make a statement to the Dothan |
| 20 | | Police Department? |
| 21 | A | Talking about a statement in -- explain a |
| 22 | | statement. |
| 23 | Q | Yes.  A statement.  Did they take a recorded |
| 24 | | statement of you at any point during their |
| 25 | | investigation? |

| | | |
|---|---|---|
| 1 | A | I don't think so.  I don't know.  I really don't |
| 2 | | know. |
| 3 | Q | Did you ever write -- did they ever get you to |
| 4 | | write anything down and you sign it on the bottom |
| 5 | | and say this is what happened and sign it Ron |
| 6 | | Reeves? |
| 7 | A | Sir, I can't recall. |
| 8 | Q | What were your regular working hours at the time |
| 9 | | of the robbery? |
| 10 | A | I would basically come in at about ten-thirty at |
| 11 | | night. |
| 12 | Q | Ten-thirty at night? |
| 13 | A | Yes, sir. |
| 14 | Q | And what time did you usually get off? |
| 15 | A | Approximately around about seven. |
| 16 | Q | Seven o'clock a.m? |
| 17 | A | Yes, sir. |
| 18 | Q | So this robbery would have occurred about half way |
| 19 | | through your shift? |
| 20 | A | Probably, yeah. |
| 21 | Q | One more thing about Mr. Hill.  You say -- after |
| 22 | | leaving the office, you went down one of the |
| 23 | | aisles and met Mr. Hill coming back up an aisle? |
| 24 | A | I don't think I said that. |
| 25 | Q | Where did you see Mr. Hill after -- |

| | | |
|---|---|---|
| 1 | A | I went from -- I went to look for him, and as I |
| 2 | | was going -- I was going through like a produce |
| 3 | | section, I met him in the back -- back room. |
| 4 | | That's where I met him at. |
| 5 | Q | So he was in the back room? |
| 6 | A | Yes. |
| 7 | Q | How many stamps were taken from the store?  What |
| 8 | | dollar amount?  Do you have any idea? |
| 9 | A | No, sir. |
| 10 | Q | Would the police report have an accurate amount of |
| 11 | | stamps? |
| 12 | A | That was taken? |
| 13 | Q | Yes, sir. |
| 14 | A | What they got from the house there.  That's the |
| 15 | | only thing they would have. |
| 16 | | MR. BAXLEY:  Nothing further of this witness |
| 17 | | right now. |
| 18 | | MR. VALESKA:  Just a couple of quick |
| 19 | | questions if I could, Judge White. |
| 20 | | REDIRECT EXAMINATION |
| 21 | BY MR. BAXLEY: | |
| 22 | Q | The question was how many stamps would have been |
| 23 | | kept in the safe.  Two, three, five strips, or a |
| 24 | | lot of stamps? |
| 25 | A | There was a lot of stamps. |

```
 1    Q    What I want to ask you, Mr. Baxley was asking you
 2         about Reggie Hill working there.  How long had
 3         Reggie worked there at the time you worked there
 4         approximately?  It was more than a month or two,
 5         right?
 6    A    Yes, sir.
 7    Q    Now, did you have any internal threats or money go
 8         missing while Reggie worked there?  You didn't,
 9         did you?
10    A    No.
11    Q    Did you have any -- in other words, inventory to
12         make sure you had the food, the cans; nothing ever
13         went missing while Reggie was working there,
14         right?
15    A    No, sir.
16    Q    Let me ask you something if I could about Reggie,
17         in other words, let's talk about Mr. Baxley asked
18         you about the first robbery and make sure we have
19         this correct.  Tell the ladies and gentlemen of
20         the jury how many men you have picked out that
21         have robbed you.
22    A    One.
23    Q    Point him out.
24    A    (Witness complied.)
25    Q    McNabb, correct?
```

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | The question is, the Winn Dixie was robbed one |
| 3 | | time before this robbery, right? |
| 4 | A | Yes, sir. |
| 5 | Q | Look at this jury.  Were you there?  Were you |
| 6 | | robbed personally?  You weren't, were you? |
| 7 | A | No, sir. |
| 8 | Q | So when you used the terminology on the 911 tape, |
| 9 | | you think it was the same man that did it before, |
| 10 | | telling the 911 person that, you weren't there |
| 11 | | when the robbery happened, right? |
| 12 | A | No, sir. |
| 13 | Q | So somebody else had to tell you, in other words, |
| 14 | | the manager like Mr. Bolin or the police, what |
| 15 | | happened on that robbery, correct? |
| 16 | A | Yes, sir. |
| 17 | Q | And you're not telling the jury that you can |
| 18 | | identify McNabb as doing the first robbery because |
| 19 | | you weren't there, right? |
| 20 | A | That's right. |
| 21 | Q | Now, if I could, look at the jury and tell them to |
| 22 | | your knowledge between the four and four-thirty |
| 23 | | and the picture when the clock was made with the |
| 24 | | safe, did you yourself actually see while you were |
| 25 | | there Reggie Hill talking to the police, being |

1    interviewed?  You did, didn't you?

2  A Yes, sir.

3     MR. VALESKA:  That's all.  Pass the witness.

4     THE COURT:  Anything else?

5     MR. BAXLEY:  Just one small question.

6        RECROSS EXAMINATION

7  BY MR. BAXLEY:

8  Q Why didn't you untie Ms. Roach as soon as you got

9   up and saw everybody was gone?

10     MR. VALESKA:  Object.  That was outside the

11   scope of what I went back into.

12     THE COURT:  I overrule.  I overrule.  He can

13   ask.

14  Q Why didn't you untie Ms. Roach after you got up

15   and saw everyone else was gone?

16  A Why didn't I untie her?

17  Q Yes, sir.

18  A For her protection.  Because I didn't even know if

19   they were still in there or not.  That's the

20   reason I didn't untie her.

21  Q You left her tied up?

22  A Yes, sir.

23     MR. BAXLEY:  No further questions.

24     MR. VALESKA:  The question about the wire,

25   Judge White, what he said I want to ask about.

1                    FURTHER REDIRECT EXAMINATION

2      BY MR. VALESKA:

3      Q    Who produced the wire to tie you up or Ms. Roach?

4      A    Mr. McNabb.

5                    MR. VALESKA:  That's all.

6                    THE COURT:  You may step down.

7                         And I think this is probably a good

8           opportunity to take a recess.  We've been here

9           about two hours, and I suspect you need to make a

10          trip to the rest room.  So let's take about

11          fifteen minutes.  You can go to the jury room.

12          But feel free to go and get a soft drink if you

13          want to or go to the rest room.  But while you're

14          out of the jury box, do not discuss the case among

15          yourselves.  Do not discuss it with anyone else.

16          Do not allow anyone to discuss it with you or even

17          in your presence.  And we'll take about fifteen

18          minutes.

19                        (Jury not present.)

20               THE COURT:  We'll take about fifteen

21          minutes.

22                        (Off the Record.)

23               THE COURT:  Bring the jury.

24                        (Jury present.)

25               THE COURT:  Mr. D.A., who will you have?

|    |   |                                                      |
|----|---|------------------------------------------------------|
| 1  |   | MR. VALESKA:  Patsy Roach.                            |
| 2  |   | PATSY ROACH                                           |
| 3  |   | having first been duly sworn, was examined and        |
| 4  |   | testified as follows:                                 |
| 5  |   | DIRECT EXAMINATION                                    |
| 6  |   | BY MR. VALESKA:                                       |
| 7  | Q | Tell us your name, please, ma'am.                    |
| 8  | A | Patsy Roach.                                          |
| 9  | Q | Let's go back to June 7, 2001.  Tell the jury        |
| 10 |   | where you were.                                       |
| 11 | A | Winn Dixie.                                           |
| 12 | Q | Did you know Mr. Reeves?                              |
| 13 | A | Yes, sir.                                             |
| 14 | Q | Did you know Reggie Hill?                             |
| 15 | A | Yes, sir.                                             |
| 16 | Q | How did you know those two men?                      |
| 17 | A | They were assistant managers.                        |
| 18 | Q | Could you tell the ladies and gentlemen of the       |
| 19 |   | jury, did you ever work any other shift besides      |
| 20 |   | the night shift back in June before that?            |
| 21 | A | No, sir.                                              |
| 22 | Q | Had you ever been in the store during daylight; in   |
| 23 |   | other words, during eight to five when you weren't   |
| 24 |   | working when you had a day off?  Had you been in     |
| 25 |   | there to see how many employees were working at      |

|     |     |                                                        |
|-----|-----|--------------------------------------------------------|
| 1   |     | that time?                                             |
| 2   | A   | No, sir.                                               |
| 3   | Q   | Would there be more employees in the nighttime or      |
| 4   |     | daytime?                                               |
| 5   | A   | More.                                                  |
| 6   | Q   | In the daytime, correct?                               |
| 7   | A   | Yes, sir.                                              |
| 8   | Q   | Before June 7, 2001, were you ever robbed before?      |
| 9   | A   | No, sir.                                               |
| 10  | Q   | That night -- you were married, correct?               |
| 11  | A   | Yes, sir.                                              |
| 12  | Q   | And you were working?                                  |
| 13  | A   | Yes, sir.                                              |
| 14  | Q   | Now, I want to go particularly sometime did you        |
| 15  |     | know Betty Prescott?                                   |
| 16  | A   | Yes, sir.                                              |
| 17  | Q   | How did you know Ms. Prescott?                         |
| 18  | A   | They worked in the back checking in vendors.           |
| 19  | Q   | Could you tell the ladies and gentlemen of the         |
| 20  |     | jury, sometime that night around four o'clock, do      |
| 21  |     | you remember where you were positioned in the          |
| 22  |     | store just before the robbery?                         |
| 23  | A   | Yes, sir.  I was behind the cigarette counter.         |
| 24  | Q   | What were you doing at that time in the morning?       |
| 25  | A   | Stocking cigarettes and doing inventory.               |

| 1 | Q | Did you have a lot of customers come in at that |
| 2 | | time? |
| 3 | A | No, sir, I did not. |
| 4 | Q | Were there any other cashiers on the front part |
| 5 | | down the line to wait on customers if they came in |
| 6 | | at that time? |
| 7 | A | Yes, sir. |
| 8 | Q | What other cashiers were working the cash -- |
| 9 | A | No, sir.  I'm sorry. |
| 10 | Q | Who was responsible if a customer came in, please, |
| 11 | | ma'am? |
| 12 | A | I was. |
| 13 | Q | How tall are you? |
| 14 | A | About five four or five five. |
| 15 | Q | And I don't want to be personal, let's go back to |
| 16 | | June 7 of 2001, and ask how much did you weigh |
| 17 | | then? |
| 18 | A | Gosh, I guess around one thirty maybe. |
| 19 | Q | Your physical strength, were you super strong, |
| 20 | | medium, kind of weak?  Could you describe your |
| 21 | | physical strength? |
| 22 | A | Kind of weak. |
| 23 | Q | How long had you worked at the Winn Dixie? |
| 24 | A | About three years. |
| 25 | Q | Let's go to around four o'clock and ask, did you |

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | ever have the occasion to see anybody at the                 |
| 2  |   | counter that you were working at when you were               |
| 3  |   | stocking at the service desk or I refer to it                |
| 4  |   | where the cigarettes are?  Did you see somebody?             |
| 5  | A | Yes, sir.                                                    |
| 6  | Q | White male or black male?                                    |
| 7  | A | Black male.                                                  |
| 8  | Q | Did he say anything to you?                                  |
| 9  | A | Yes, sir.                                                    |
| 10 | Q | Tell the jury what he said to you specifically.             |
| 11 | A | He came in and asked to speak to Ron Reeves.                |
| 12 | Q | Kind of go back, and if you could tell this jury            |
| 13 |   | before June 7th of 2001, working nighttime at four          |
| 14 |   | o'clock, how many customers had you had at that             |
| 15 |   | point that had come in at four o'clock and asked            |
| 16 |   | to speak to Mr. Ron Reeves, knew his name right             |
| 17 |   | out of the blocks?                                           |
| 18 | A | None.                                                        |
| 19 | Q | Now, at that time did he give you any kind of               |
| 20 |   | facial expressions; other words, gee, I don't               |
| 21 |   | know, a smile or any kind of expression on his              |
| 22 |   | face when he talked with you?                                |
| 23 | A | No, sir.                                                     |
| 24 | Q | Did that get your attention?                                 |
| 25 | A | Yes, sir.                                                    |

| | | |
|---|---|---|
| 1 | Q | Tell the jury why. |
| 2 | A | I just thought that it was kind of rude. |
| 3 | Q | Tell the ladies and gentlemen of the jury, did you |
| 4 | | call for Mr. Reeves? |
| 5 | A | Yes, sir. |
| 6 | Q | How did you do that? |
| 7 | A | There was a phone behind the counter.  I picked it |
| 8 | | up and paged him. |
| 9 | Q | And did you hear the voice yourself over the page |
| 10 | | through the speaker system? |
| 11 | A | Yes, sir. |
| 12 | Q | And did you continue to look at this man in the |
| 13 | | face then? |
| 14 | A | No, sir, I did not. |
| 15 | Q | What did you do next?  Tell the jury. |
| 16 | A | I turned my back and continued counting and doing |
| 17 | | inventory on cigarettes. |
| 18 | Q | There were some picture introduced I want to show |
| 19 | | you real quick.  Showing you real quickly State's |
| 20 | | Exhibit 15, what is 15?  You recognize that? |
| 21 | A | That's the front of the store. |
| 22 | Q | I want to show you particularly State's 21.  You |
| 23 | | said 15 was the front of the store.  What about |
| 24 | | 21?  What's that? |
| 25 | A | It's a picture of the doors. |

| | | |
|---|---|---|
| 1 | Q | Those doors, what I want to ask you about, you |
| 2 | | been in the store working at four o'clock before |
| 3 | | this occasion and somebody came in and out of |
| 4 | | those doors, at four o'clock when you didn't have |
| 5 | | any customers, could you hear the doors? |
| 6 | A | Yes, sir. |
| 7 | Q | Now, before you turned around and someone said |
| 8 | | something to you and you turned around and saw the |
| 9 | | man, who asked for Mr. Reeves, white male or black |
| 10 | | male? |
| 11 | A | Black male. |
| 12 | Q | Did you hear him walk in any manner or fashion |
| 13 | | after you heard the doors open? |
| 14 | A | No, sir. |
| 15 | Q | What is the floor made of? |
| 16 | A | Concrete. |
| 17 | Q | Would you tell the ladies and gentlemen of the |
| 18 | | jury, did you ever get to look at his shoes later |
| 19 | | on that night? |
| 20 | A | Yes, sir. |
| 21 | Q | What kind of shoes did he have? |
| 22 | A | They were wearing tennis shoes. |
| 23 | Q | And you used the term they.  Help me.  I'm asking |
| 24 | | when you first standing there.  As we go through |
| 25 | | what occurred there, the robbery, did you see |

| | | |
|---|---|---|
| 1 | | another person? |
| 2 | A | Yes, sir. |
| 3 | Q | Male or female? |
| 4 | A | It was a male. |
| 5 | Q | White male or black male? |
| 6 | A | Black male. |
| 7 | Q | Now, tell the ladies and gentlemen of the jury, as |
| 8 | | Mr. Reeves approached, could you hear him coming? |
| 9 | A | No, sir. |
| 10 | Q | As he got closer, did you hear his voice? |
| 11 | A | Yes, sir. |
| 12 | Q | Did you still have your back towards him and the |
| 13 | | black male? |
| 14 | A | Yes, sir. |
| 15 | Q | What did you hear Mr. Reeves say to him? |
| 16 | A | I heard Mr. Reeves ask McNabb could he help him. |
| 17 | Q | And what did -- you used the term McNabb, the |
| 18 | | black male, what did he say to Mr. Reeves that you |
| 19 | | heard? |
| 20 | A | He said, guess what, this is your lucky day.  And |
| 21 | | he pulled out the gun out of his jacket and told |
| 22 | | us to come on. |
| 23 | Q | Did that get your attention when you saw the gun? |
| 24 | A | Yes, sir, it did. |
| 25 | Q | Were you afraid? |

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Had you ever been robbed before? |
| 3 | A | No, sir. |
| 4 | Q | Tell the jury why you were afraid. |
| 5 | A | Because I have two small children that I was -- I |
| 6 | | was afraid that they were going to grow up without |
| 7 | | a mama. |
| 8 | Q | Would you tell the ladies and gentlemen of the |
| 9 | | jury that the man that you saw that you used the |
| 10 | | term McNabb, was he taller or smaller or heavier |
| 11 | | than you? |
| 12 | A | He was taller. |
| 13 | Q | Do you know approximately what his height was, |
| 14 | | your best judgment? |
| 15 | A | Around six feet. |
| 16 | Q | His weight?  Could I ask you, could you tell the |
| 17 | | ladies and gentlemen of the jury back on June 7, |
| 18 | | 2001, was it light, medium, or heavy if I could |
| 19 | | refer to it that way? |
| 20 | A | Medium. |
| 21 | Q | His skin complexion, light, medium or dark? |
| 22 | A | Dark. |
| 23 | Q | Did you see what kind of clothing he was wearing? |
| 24 | A | Yes, sir. |
| 25 | Q | What kind of clothing? |

| | | |
|---|---|---|
| 1 | A | I want to say it was a blue-jean-type material. |
| 2 | | It was heavy. |
| 3 | Q | Would you tell the ladies and gentlemen of the |
| 4 | | jury, June 7th, was it forty or thirty degrees or |
| 5 | | cold at that time? |
| 6 | A | No, sir. |
| 7 | Q | Who went first in the office at McNabb's |
| 8 | | instructions with the gun? |
| 9 | A | Mr. Reeves. |
| 10 | Q | Who went second? |
| 11 | A | I did. |
| 12 | Q | Would you tell the ladies and gentlemen of the |
| 13 | | jury, did the gun ever touch your body? |
| 14 | A | Yes, sir, it did. |
| 15 | Q | What part of your body did McNabb touch you with |
| 16 | | the gun? |
| 17 | A | The middle of my back. |
| 18 | Q | What did he say to you? |
| 19 | A | I was all crying and upset, and he called me baby |
| 20 | | girl and said that I was going to be all right as |
| 21 | | long as I done what I was told. |
| 22 | Q | Now, would you tell the ladies and gentlemen of |
| 23 | | the jury, when you got into the office with Mr. |
| 24 | | Reeves and McNabb you said, did you see any other |
| 25 | | men right then, any other black males? |

```
 1    A    No, sir, not at that time.

 2    Q    You get in the office.  Reeves, yourselves, and

 3         McNabb, what was said or done?  Tell the jury.

 4    A    Excuse me?

 5    Q    What happened in the office?  What was said when

 6         you got in the office with you, Mr. Reeves, and

 7         McNabb?

 8    A    They -- Mr. Reeves was opening up the safe.

 9         McNabb told him --

10              MR. BAXLEY:  Your Honor, I object.  Using the

11         term McNabb.  She has not identified my client in

12         any way.

13              THE COURT:  I sustain the objection unless

14         you do that.

15    Q    Ma'am, do you see the man in the courtroom that

16         put a gun in your back?

17    A    Yes, sir, I do.

18    Q    Do you see the man in the courtroom that called

19         you baby doll?

20    A    Yes, I do.

21    Q    Do you see the man at the counter that came up to

22         you?

23    A    Yes, sir.

24    Q    Point him out and tell the jury.

25    A    (Witness complied.)
```

1           He's sitting right there.

2           MR. VALESKA:  Let the Record reflect she

3      pointed out the Defendant McNabb.

4  Q    Tell the ladies and gentlemen of the jury when

5      you used the terminology earlier you described as

6      McNabb, is that the man you're referring to at the

7      table you've identified?

8  A    Yes.

9  Q    Tell us what McNabb said in your presence with

10     yourself and Reeves, Mr. Reeves, in the office.

11 A    What he said to me?

12 Q    And/or Mr. Reeves about the money or safe.  What

13     was said?

14 A    Told us to hurry up.

15 Q    Could you observe whether Mr. Reeves if he was

16     real calm?

17 A    He was nervous.

18 Q    What did you tell the ladies and gentlemen, was

19     the safe opened in your presence?

20 A    Yes.

21 Q    What was taken out of the safe?

22 A    Money.

23 Q    When I say money, if I use the term paper money,

24     United States currency, paper bills, any other

25     kind of money taken?

```
1    A    Yes, sir.

2    Q    What other kind of money taken?

3    A    Coins.  Bills.

4    Q    Did you see what McNabb put the paper money or the

5         coins in, please, ma'am, or the box?  Whatever?

6    A    I saw a glimpse.  It was, like, a backpack or some

7         type of heavy sack.

8    Q    Would you tell the ladies and gentlemen of the

9         jury, please, ma'am, were you ever tied up?

10   A    Yes, sir.

11   Q    Who tied you up?

12   A    McNabb.

13   Q    Was anybody else tied up before you were?

14   A    Yes, sir.

15   Q    Who was that?

16   A    Mr. Reeves.

17   Q    And how did Mr. Reeves get tied up?  At whose

18        instruction?

19   A    He was tied up with a, like, a speaker-type wire,

20        and McNabb told me to pull the wire out of this

21        little black mesh bag that he had.  Told me to tie

22        Mr. Reeves up.

23   Q    Would you tell the ladies and gentlemen of the

24        jury, who had that black bag that had the wire?

25   A    McNabb.
```

```
 1    Q    Would you tell the ladies and gentlemen of the
 2         jury, you mentioned there was another black male
 3         that you saw.  Was he in the office at that time
 4         or shortly after that?
 5    A    Yes, sir.
 6    Q    Was he -- how did he look?  Describe his
 7         appearance, in other words.  What was on his head?
 8    A    He had a toboggan on.
 9    Q    Did McNabb have anything on his head?
10    A    Yes, sir, he did.
11    Q    What kind of clothing was the other black male
12         wearing, if you recall?
13    A    About the same type of clothing.  They were
14         dressed warm.
15    Q    Help me with their heights and weights.  In other
16         words, who was taller, McNabb or the other black
17         male?
18    A    McNabb was taller.
19    Q    Who was heavier weight-wise?
20    A    The second guy.
21    Q    Skin complexion, was McNabb's skin that you
22         referred to, was it lighter or darker or the same
23         as the other black male?
24    A    It was lighter.
25    Q    Would you tell the ladies and gentlemen of the
```

```
 1              jury, there was a clock in the office, correct?
 2     A    Yes, sir.
 3     Q    Were you watching the clock?
 4     A    No, sir.
 5     Q    Did you have a watch on?
 6     A    Yes, sir.
 7     Q    What kind of watch did you have on?
 8     A    Just a little small watch.
 9     Q    Why didn't you watch the watch to see how long
10          this took place?
11     A    Because I was scared.
12     Q    And how did you get tied up?  What manner or
13          fashion?  Show me or tell me as you're standing
14          there.
15     A    He -- McNabb, there was a neck tie hanging on the
16          wall.  And he got the neck tie down off the wall
17          and tied my hands up behind my back.
18     Q    And Mr. Reeves, how was he tied?  Hands in front
19          or back?
20     A    In the back.
21     Q    Would you tell the ladies and gentlemen of the
22          jury, was there any speaker wire inside the office
23          itself when you first went in with McNabb and Mr.
24          Reeves that you saw lying around anywhere that
25          belonged to the store?
```

1    A    No, sir.

2    Q    Any sounds being made after Mr. Reeves was put

3         down on the floor on his knees?  Any sounds inside

4         the office itself that were occurring?

5    A    Yes, sir.

6    Q    What sounds?

7    A    The sounds of the tills hitting the floor.

8    Q    Every time the till hit the floor, were you afraid?

9    A    Yes, sir.

10   Q    Would you tell the ladies and gentlemen of the

11        jury, did the other man have a gun if you know,

12        the other black male?

13   A    Yes, sir.

14   Q    What did the gun look like?  Could you tell us?

15   A    It was a dark color.

16   Q    What about McNabb's gun?

17   A    It was a silver -- looked like a nine millimeter.

18   Q    Would you tell the ladies and gentlemen of the

19        jury, when Mr. Reeves was tied up, was he put in a

20        certain part of the office?

21   A    Yes, sir.

22   Q    Use the door that you go in and out with the safe

23        to the right, which part of the office was he put

24        in?

25   A    The left side.

| | | |
|---|---|---|
| 1 | Q | And up in the left upper side? |
| 2 | A | Yes, sir. |
| 3 | Q | And I use reference to the jury kind of over there |
| 4 | | in the corner when you see the pillar in the |
| 5 | | corner of the wall, was it about that width? |
| 6 | A | Yes, sir. |
| 7 | Q | What about the length?  If I could, let me just |
| 8 | | kind of say this is the actual wall that Mr. |
| 9 | | Reeves was put against with furniture or whatever |
| 10 | | in there, if I turn this way and go back, tell me |
| 11 | | when to stop. |
| 12 | A | About right there. |
| 13 | Q | Somewhere in here? |
| 14 | A | Yes, sir. |
| 15 | Q | Was there enough for two human beings to get up in |
| 16 | | that area? |
| 17 | A | Yes, sir. |
| 18 | Q | Who was the second human being that was put up |
| 19 | | there? |
| 20 | A | Me. |
| 21 | Q | And how were you instructed to get in that |
| 22 | | position?  Who told you to do that? |
| 23 | A | McNabb. |
| 24 | Q | And what did he tell you to do? |
| 25 | A | He told me to kneel down behind Mr. Reeves. |

| | | |
|---|---|---|
| 1 | Q | Did he still have the gun? |
| 2 | A | Yes, sir. |
| 3 | Q | Were you afraid at that time? |
| 4 | A | Yes, sir, I was. |
| 5 | Q | In your mind what you felt what was going to |
| 6 | | happen to you then? |
| 7 | A | I didn't know if they were going to shoot me in |
| 8 | | the back of the head. |
| 9 | Q | Or something else? |
| 10 | A | Yes, sir. |
| 11 | Q | Now, was Mr. Reeves making any sounds as he was in |
| 12 | | front of you or say anything or try to help in any |
| 13 | | way at that time that he could do anything? |
| 14 | A | No, sir. |
| 15 | Q | Can you tell the ladies and gentlemen of the jury, |
| 16 | | in that position you were in then kneeling down, |
| 17 | | did you ever hear the door open a second or third |
| 18 | | time? |
| 19 | A | Yes, sir. |
| 20 | Q | Did you ever look when you heard the door open on |
| 21 | | one of those second or third times? |
| 22 | A | Yes, sir. |
| 23 | Q | Tell this jury, McNabb had a gun on you, threats |
| 24 | | made to you, correct? |
| 25 | A | Yes, sir. |

```
 1    Q    Mr. Reeves?

 2    A    Yes, sir.

 3    Q    Why would you look if there had been threats made

 4         to you unless people had guns?  Tell the jury.

 5    A    When I heard the door open and close, I thought

 6         that they had gone.  And when I turned back

 7         around, that second man was standing there.

 8    Q    That was not McNabb, correct?

 9    A    It was not McNabb.

10    Q    And what did that second man that had the gun say

11         to you?  Words to the effect what you remember.

12    A    He said, yeah, I'm still here, bitch, and I'm not

13         afraid to pop you, don't do anything stupid.

14    Q    Did you continue to look at him?

15    A    No, sir, I did not.

16    Q    Tell the jury why you didn't keep looking at him

17         to get a better description of how he looked.

18    A    I was scared he was going to shoot me.

19    Q    Did you hear anything that happened to the door

20         after that?

21    A    Yes, sir.

22    Q    It shut?

23    A    Yes, sir.

24    Q    And this time it shut immediately, did you look

25         right away?
```

| | | |
|---|---|---|
| 1 | A | No, sir, I did not. |
| 2 | Q | Why didn't you look if you had already looked? |
| 3 | A | Because I was afraid he was still there. |
| 4 | Q | Now, you're inside the store with Mr. Reeves.  Can |
| 5 | | you tell the ladies and gentlemen of the jury how |
| 6 | | long you were inside with Mr. Reeves until |
| 7 | | somebody moved inside the office? |
| 8 | A | I don't know. |
| 9 | Q | Short time?  Long time? |
| 10 | A | It seemed like a long time. |
| 11 | Q | Who first moved inside the office then? |
| 12 | A | Mr. Reeves. |
| 13 | Q | And how did he move? |
| 14 | A | He kind of stepped over me. |
| 15 | Q | Were you still tied up? |
| 16 | A | Yes, sir. |
| 17 | Q | Was he still tied up? |
| 18 | A | Yes, sir. |
| 19 | Q | Were you crying? |
| 20 | A | Yes, sir. |
| 21 | Q | Did he leave you in the office? |
| 22 | A | Yes, sir. |
| 23 | Q | Did you hear the door? |
| 24 | A | Yes, sir. |
| 25 | Q | Now, Ms. Roach, please tell the jury, in other |

| | | |
|---|---|---|
| 1 | | words, you were still tied up on your knees, |
| 2 | | correct? |
| 3 | A | Yes, sir. |
| 4 | Q | Did you get up and ~~use the ph~~one to call 911? |
| 5 | A | No, sir. |
| 6 | Q | Why not? |
| 7 | A | Because I was scared. |
| 8 | Q | Now, at some point in time did someone come back |
| 9 | | to the office where you were left in the office? |
| 10 | A | Yes, sir. |
| 11 | Q | Did you even move out of the position until |
| 12 | | someone came back? |
| 13 | A | No, sir. |
| 14 | Q | Tell the jury again why you didn't move. |
| 15 | A | Because I was afraid to move because I was scared |
| 16 | | that they were still around. |
| 17 | Q | Now, who came back to the office next? |
| 18 | A | Mr. ~~Reeves~~ and Reggie Hill. |
| 19 | Q | Now, you had worked there with Reggie Hill for a |
| 20 | | period of time also, correct? |
| 21 | A | Yes, sir. |
| 22 | Q | And Mr. Reeves? |
| 23 | A | Yes, sir. |
| 24 | Q | And when they came back this time, Mr. Reeves and |
| 25 | | Mr. Hill, had someone used the phone?  Do you |

```
 1          know?  Or called 911 while you were present?
 2     A    No, sir.
 3     Q    Did you leave the office?
 4     A    No, sir.
 5     Q    Did the police come shortly after that?
 6     A    Yes, sir.
 7     Q    Now, could you tell the ladies and gentlemen of
 8          the ▓▓▓▓▓ who untied you?
 9     A    ▓▓▓▓▓▓
10     Q    And what were you tied up with?
11     A    A neck tie.
12     Q    Now, pictures I would like to show you if I could,
13          I've showed you 15 and 21.  23, what's 23?
14     A    It's pictures of tills.
15     Q    That the position in 16 where the tills were empty
16          with the metal trays and the money envelopes on
17          the floor when you finally got up?
18     A    Yes, sir.
19     Q    24 show you the doorways and the hall?
20     A    Yes, sir.
21     Q    Which one is the office?  First, second, or third
22          as you're looking at it?
23     A    The first one.
24     Q    Were you wearing tennis shoes that night?  Do you
25          recall?
```

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Did you step on the tills? |
| 3 | A | No, sir. |
| 4 | Q | The safe, did you have access to the safe |
| 5 | | yourself, the combination? |
| 6 | A | No, sir. |
| 7 | Q | Now, customers -- the store was still open shortly |
| 8 | | after that.  The store was still open, correct? |
| 9 | A | Yes, sir. |
| 10 | Q | Did you even have money to open up for the |
| 11 | | customers? |
| 12 | A | No, sir. |
| 13 | Q | You yourself know how much money was taken? |
| 14 | A | No, sir. |
| 15 | Q | Now, I want to ask you, would you tell the ladies |
| 16 | | and gentlemen of the jury your best judgment, can |
| 17 | | you tell us from the time you first saw McNabb |
| 18 | | that you've identified that was in the store until |
| 19 | | the time he went out the door and you lost sight |
| 20 | | of him, do you have an opinion as how long that |
| 21 | | lasted? |
| 22 | A | No -- |
| 23 | Q | I'm talking about minutes. |
| 24 | A | Not long. |
| 25 | Q | Why did you look at McNabb's face after, if |

1   anytime, that you were at the counter after that?

2   Why did you look at his face again?  You saw the

3   face, correct?

4 A Yes, sir.

5 Q You saw the face of the other black male, correct?

6 A Yes, sir.

7 Q Tell the ladies and gentlemen of the jury --

8   MR. VALESKA:  That's all I have.  Pass the

9   witness.  Thank you very much.

10   THE COURT:  Mr. Baxley.

11       CROSS EXAMINATION

12 BY MR. BAXLEY:

13 Q Ms. Roach, what was the amount of the time between

14   the time you heard him walk up and when you first

15   laid eyes on the robber?

16 A Not long.  Just a couple of minutes maybe.  I

17   don't know.

18 Q Couple of minutes?  Be a couple of seconds?

19 A I don't know.

20 Q Don't know.

21   And what kind of look did you get at this

22   person who robbed you?

23 A A pretty good look.

24 Q Would your recollection of the robber be better

25   now or at that time?

```
 1    A    Now.

 2    Q    So your memory improves over time?

 3    A    Uh-huh.

 4    Q    Have you seen a picture of Mr. McNabb shown to you

 5         by the D.A. or anybody else during the course of

 6         preparing for this trial?

 7    A    No, sir.

 8    Q    No, you haven't seen a picture at all of anybody?

 9    A    (Witness nodded.)

10    Q    Were you ever taken to the police station and

11         shown a photo lineup?

12    A    No, sir.

13    Q    You were never taken to the police station?

14    A    I was.

15    Q    Were you ever shown a photo lineup at any point?

16    A    They went through the computer and showed me

17         different pictures.

18    Q    So if an officer testifies that they took you down

19         and showed you a lineup, that officer would be

20         lying?

21             THE COURT:  Do you know what a lineup is?

22             MR. BAXLEY:  Sir?

23             THE COURT:  She said she saw some pictures on

24         a computer.  And then you said if an officer said

25         he showed you a lineup, would he be lying.  I'm
```

```
 1          not sure she's got it together as to -- I mean, a
 2          group of pictures together is what a lineup is.
 3     Q    Do you recall Investigator Singleton?
 4     A    Yes, sir.
 5     Q    Do you remember that man?
 6     A    Yes, sir.
 7     Q    Did you ever go to the police station with him?
 8     A    Yes, sir.
 9     Q    And you looked at different pictures, and was it
10          done on a sheet or was it done otherwise?  Did
11          they show you things like this, or was it some
12          other format?
13     A    It was on a computer, but Singleton and another
14          officer came to my house not long after that and
15          they had a picture like that.
16     Q    Did they show you something that looked like this?
17     A    Yes, sir.
18     Q    Is this the one they showed you?
19     A    I don't know.
20     Q    You don't recall.
21              If Singleton says this is the one that was
22          shown to you, would he be correct?
23     A    I don't know.
24     Q    You say you don't recall seeing this before?
25     A    I remember them showing me something, but I don't
```

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | know if it was that one.  I don't remember.                 |
| 2  | Q | But you don't remember looking at this one and              |
| 3  |   | selecting someone out of this one?                          |
| 4  | A | I remember selecting somebody out.                          |
| 5  | Q | If it was this one, do you remember which one you           |
| 6  |   | selected?                                                    |
| 7  | A | No, sir.                                                     |
| 8  | Q | What facial features or other discernible features          |
| 9  |   | made this robber stand out to you?                          |
| 10 | A | Both of them had a light mustache.                          |
| 11 | Q | Both had light mustaches?                                    |
| 12 | A | Uh-huh.                                                       |
| 13 | Q | Anything else?                                               |
| 14 | A | No, sir.                                                     |
| 15 | Q | Nothing else.                                                |
| 16 |   | When you say someone was heavy, what do you                  |
| 17 |   | call heavy?  What do you call light, medium, all             |
| 18 |   | the words Mr. Valeska used?  What are you using to           |
| 19 |   | come up with those terminologies?                           |
| 20 | A | Talking about weight?                                        |
| 21 | Q | Yes, ma'am.                                                  |
| 22 | A | I don't know.  I guess around maybe one eighty --           |
| 23 |   | two hundred.                                                  |
| 24 | Q | What would you call one eighty?  Is that light,             |
| 25 |   | medium, or heavy?                                            |

| | | |
|---|---|---|
| 1 | A | That would be medium. |
| 2 | Q | What would you describe the robbers as being? |
| 3 | | Light, heavy, or medium based on that recollection? |
| 4 | A | Medium. |
| 5 | Q | A hundred and eighty pounds. |
| 6 | | Now, you also claim that one of the robbers |
| 7 | | was wearing a blue-jean-type coat? |
| 8 | A | Yes, sir. |
| 9 | Q | Did you recognize anything else about the clothing |
| 10 | | on either individual? |
| 11 | A | Yes, sir. |
| 12 | Q | What else did you notice? |
| 13 | A | They were wearing toboggans. |
| 14 | Q | Other than toboggan -- we got toboggans and a jean |
| 15 | | coat.  Anything else? |
| 16 | A | They were wearing tennis shoes. |
| 17 | Q | Tennis shoes.  Do you recall what type of tennis |
| 18 | | shoes? |
| 19 | A | No, sir.  Just tennis shoes. |
| 20 | Q | Just tennis shoes. |
| 21 | | How long did it take for Mr. Reeves to get |
| 22 | | up front after you paged him? |
| 23 | A | Not long.  Just a few seconds. |
| 24 | Q | Just a few seconds. |
| 25 | | And how long would you say the entire robbery |

```
 1          took place?

 2    A     I don't know.  I wasn't timing it.

 3    Q     Weren't timing it?

 4    A     No, sir.

 5    Q     What time did you arrive at work that night?

 6    A     I guess around ten p.m.

 7    Q     Ten o'clock.

 8          Did you work the exact same hours as Mr.

 9          Reeves?

10    A     No, sir.

11    Q     What time would you have gotten off the next

12          morning?

13    A     Around six.

14    Q     Around six.

15          So he testified he came in at ten and left at

16          seven.  So you came in at ten and left at six?

17    A     Yes, sir.

18    Q     Was that your -- did you always work that shift?

19    A     Had I always?

20    Q     Yes, ma'am.

21    A     No.  I used to work the evening -- like, second

22          shift.  But then I got moved to third shift.

23    Q     And how long had you been working at the Winn

24          Dixie?

25    A     About three years.
```

```
 1   Q   Three years?

 2   A   Yes, sir.

 3   Q   What was your entire time period of working at

 4       Winn Dixie?  When did you first start?

 5   A   Well, I used to work at south side.  Counting that

 6       all off and on, I worked with the company about

 7       eight years.

 8   Q   How about the Westgate Parkway location, how long

 9       had you worked there?

10   A   About three.

11   Q   So how many years before the accident -- the

12       incident?  I'm sorry.

13   A   About five, I guess.

14   Q   Westgate Parkway, when did you first start working

15       at that particular store?

16   A   I don't remember the exact date.

17   Q   When did you quit working for that store?  Or are

18       you still working for them?

19   A   No, sir.

20   Q   When did you quit working for them?

21   A   Probably I guess about a month after the robbery.

22   Q   After the robbery you quit.

23           When you left the office, did you see any

24       cars or anything out in the parking lot that

25       belonged to these robbers, or did you see the
```

```
 1        robbers again?

 2   A    No, sir.

 3   Q    You saw nothing else about them?

 4   A    No, sir.

 5   Q    And the speaker wire, are you familiar with what

 6        that speaker wire looked like?

 7   A    Yes, sir.

 8   Q    So you would be able to identify speaker wire or

 9        identify the speaker wire that was used?

10   A    Yes, sir.

11            MR. BAXLEY:  Nothing further at this time.

12        Reserve the right to recall.

13            THE COURT:  Anything else, Mr. Valeska?

14            MR. VALESKA:  No.  Ask that she could step

15        down.

16            THE COURT:  You may step down.

17                Who will you have next?

18            MR. VALESKA:  Reggie Hill.  No.  Betty

19        Prescott.  I'm sorry.

20                        BETTY PRESCOTT

21        having first been duly sworn, was examined and

22        testified as follows:

23                      DIRECT EXAMINATION

24   BY MR. VALESKA:

25   Q    Tell us your name, please, ma'am.
```

```
 1    A    Betty Jean Prescott.

 2    Q    Ms. Prescott, do you still work for Winn Dixie?

 3    A    Yes, I do.

 4    Q    How many years have you worked for them?

 5    A    Around nine.

 6    Q    Let's go back on or about June 7th of 2001 and ask

 7         were you working at Winn Dixie that morning a.m.

 8         hours?

 9    A    Yes, I was.

10    Q    What time do you recall approximately getting to

11         work?

12    A    Approximately about -- probably three-twenty

13         because I usually clocked in about three-thirty.

14    Q    On June 7, 2001, did you in fact come off the

15         Montgomery Highway, or did you come off Westgate

16         to turn into Winn Dixie?  Which way did you turn

17         into?

18    A    I came across Westgate, across 231, down on

19         Westgate again and then turned into Winn Dixie

20         parking lot.

21    Q    When you pulled in, the general conditions, was

22         the sun up or was it dark?

23    A    It was dark.

24    Q    As you pulled in, did you see immediately the

25         first time you made the turn any immediate
```

```
 1            vehicles or did you pull up into the lot before
 2            you then saw some vehicles that were moving?
 3    A       I was probably about midway in the lot.
 4    Q       And did some vehicle get your attention?
 5    A       Yes, it did.
 6    Q       Why did one vehicle at this time in the morning
 7            get your attention?  Tell us.
 8    A       It was coming from the back of the store at a
 9            pretty good rate of speed.
10    Q       Was it a car?
11    A       No.  It was a van.
12    Q       Would you tell the ladies and gentlemen of the
13            jury, did it come close to you?
14    A       Yes, he did.
15    Q       How close did he come?
16    A       Oh, about like that (indicating).
17    Q       And would you tell the ladies and gentlemen of the
18            jury the description of the van, did you notice
19            any type of distinctive marks on the van as it was
20            in that distance close to you?
21    A       It had a wood grain paneling down the sides.
22    Q       I'm not a car expert, did you have an opinion the
23            model, the year it was in your opinion?
24    A       I'm not good at models, but I would say '89 to a
25            '92.
```

132

```
 1    Q    As it went by, did you get a tag at that time?
 2    A    No, sir.
 3    Q    Now, what did you do next, Ms. Prescott, then,
 4         after that?
 5    A    I pulled on down to my parking space I normally
 6         parked in every morning parked, got out, went in
 7         the front door, went to the produce room, and
 8         clocked in.
 9    Q    And who were the managers working that night --
10         the two if you know?
11    A    Ron Reeves and Reggie Hill.
12    Q    Now, and then after you clocked in, did you start
13         working that morning in the store?
14    A    Yes, I did.
15    Q    At some point in time later that morning, some
16         time after four o'clock a.m., did you come to see
17         Mr. Reeves or hear Mr. Reeves?
18    A    Mr. Reeves came -- yeah, to the back room where we
19         were.
20    Q    Did he tell you what happened?
21    A    He said he had been held up.
22    Q    Would you tell the ladies and gentlemen of the
23         jury, did you go to the front with him right then
24         immediately?
25    A    No, I did not.
```

| | | |
|---|---|---|
| 1 | Q | Tell the jury why you didn't go to the front. |
| 2 | A | Well, I didn't much want to. |
| 3 | Q | Why? |
| 4 | A | I was afraid to go. |
| 5 | Q | Would you tell the ladies and gentlemen of the |
| 6 | | jury, did any other store personnel go with Mr. |
| 7 | | Reeves back up to the front? |
| 8 | A | Mr. Hill did. |
| 9 | Q | And at a later point in time, did you go back up |
| 10 | | to the front? |
| 11 | A | Yes, I did. |
| 12 | Q | Was it a short time or a good while later? |
| 13 | A | Five to -- about five to ten minutes probably. |
| 14 | Q | Were you satisfied in your own mind or safety |
| 15 | | that the police were up there at that time? |
| 16 | A | Well, I thought so.  I thought they had had time. |
| 17 | Q | All right.  Now, did you yourself after the police |
| 18 | | arrived talk to them? |
| 19 | A | Yes, I did. |
| 20 | Q | Before you talked to the police, were you present |
| 21 | | when Reggie Hill was present and either you or |
| 22 | | someone was asking you what had happened that |
| 23 | | night? |
| 24 | A | Yes. |
| 25 | Q | Up by the front cash registers? |

1    A    Yes.

2    Q    In Reggie Hill's presence --

3    A    Yes, sir --

4    Q    -- I'm asking what you said, did you make any

5         statements to Reggie Hill about what had happened

6         to you in the parking lot?

7    A    I made the statement that that might have been

8         them on the van that run over me, in a jokingly

9         way.

10   Q    And would you tell the ladies and gentlemen of the

11        jury, what did Reggie Hill do or say then that you

12        saw?

13   A    He went outside and got the policeman to talk to

14        me.

15   Q    Did he bring the police, and did they come back

16        and talk to you about what happened?

17   A    Yes, they did.

18   Q    And then did you tell the police?

19   A    Yes, I did.

20        MR. VALESKA:    That's all.    Pass the witness.

21        Thank you very much.

22                        CROSS EXAMINATION

23   BY MR. BAXLEY:

24   Q    Ms. Prescott, you claim you got to work at about

25        three-forty-five a.m. or is that three-thirty a.m?

```
 1    A    I usually clocked in about three-thirty.  I

 2         usually get to work about three-twenty at that

 3         time.

 4    Q    And you say this speeding van came from around the

 5         side of the building --

 6    A    The back.

 7    Q    -- when you were arriving at three-thirty?

 8    A    There about.

 9    Q    There about.

10             I'm going to show you a picture.  You've

11         seen this before, haven't you?

12    A    Yes.

13    Q    I want to show you -- if you'll come down here for

14         a moment.  I'm sorry.  If you'll show --

15    A    (Witness complied.)

16    Q    -- the jury where you're talking about the van

17         speeding around.

18    A    I come in this driveway right here.  Right here.

19         I go around this way, all the way.  I saw the van

20         coming from around here about the time I got

21         here.  We met.  There was a light post right in

22         here.  And we met right in there about like that

23         (indicating).  And he came over.

24    Q    Came by right there.  But this was before the

25         robbery occurred, right?
```

```
 1   A   Right.

 2   Q   So this van -- you see where the van went?

 3   A   No, I did not.

 4   Q   So it was -- you can get back up.  I'm sorry.

 5   A   (Witness complied.)

 6   Q   So this van after you -- it came near you right

 7       there, and you parked; is that correct?

 8   A   Uh-huh.

 9   Q   Where did the van go after it passed right by you?

10   A   I don't know.

11   Q   Don't know.

12           Did it stop in the front --

13   A   It wasn't in the front parking lot when I got out

14       and went around because I looked to see if I could

15       see it.

16   Q   So did you see if it exited the parking lot

17       anywhere?

18   A   No.

19   Q   But it obviously wasn't in the parking lot?

20   A   I don't think so.

21   Q   And this was over half an hour before the robbery

22       took place, at least to the best of your knowledge?

23   A   Close.  It wouldn't have been that long.

24   Q   Do you recall about when the robbery took place

25       that night?
```

```
 1    A    Not for sure.
 2    Q    But if someone else testified it happened around
 3         four o'clock --
 4    A    That would be close.
 5    Q    So using those times we can say this van was
 6         speeding around the side of the building a half
 7         hour before the robbery, then?  And, once again,
 8         what was the color of that van?
 9    A    I don't know.
10    Q    No idea what the color was?
11    A    I don't know anything except I recognized that
12         wood grain going down the side.
13    Q    Was this a common-type van?
14    A    It was -- it wasn't the biggest van.  It wasn't
15         the smallest van.  It was about a middle size van.
16    Q    Is it one --
17    A    I don't know what model.
18    Q    Is it a type of van you would see on the road all
19         the time?
20    A    No.
21    Q    So there could be hundreds or thousands of them
22         possibly?
23    A    No.
24    Q    What was distinctive about it?
25    A    That wood grain paneling going down the side.
```

| | | |
|---|---|---|
| 1 | Q | Was it a specialized wood grain paneling? |
| 2 | A | I don't know.  All I know it was wood grain |
| 3 | | paneling. |
| 4 | Q | What was the demeanor of Mr. Hill and Mr. Reeves |
| 5 | | after the robbery?  What were they acting like? |
| 6 | A | Ron was scared.  Mr. Hill, I wasn't around him |
| 7 | | enough to really notice that much.  The only thing |
| 8 | | I mentioned the van almost hit me out front. |
| 9 | Q | What was Mr. Hill doing at the time of the robbery? |
| 10 | A | He was back in the receiving room with me.  We |
| 11 | | were pushing out buggies to the dumpster. |
| 12 | Q | Pushing buggies to the dumpster. |
| 13 | | Isn't it also true that Sergeant Williamson, |
| 14 | | one of the police officers in this case, took you |
| 15 | | over to Barstone Apartments to look at automobiles? |
| 16 | A | Yes. |
| 17 | Q | And did you identify an automobile? |
| 18 | A | No, I did not identify it. |
| 19 | Q | You didn't? |
| 20 | A | Not specifically.  I said it looked familiar. |
| 21 | Q | Looked familiar, but you couldn't say if it was |
| 22 | | exact thing -- |
| 23 | A | No, I cannot.  Cannot. |
| 24 | Q | The wood grain didn't look the exact, it was |
| 25 | | possible but not all the way? |

```
 1    A    It was right size, wood grain was in the right
 2         place, but I cannot tell you if that was the van.
 3    Q    So you weren't sure that was the van or not there?
 4    A    No, I cannot.
 5    Q    And that parking lot outside the Winn Dixie, is
 6         that a very well lighted place or kind of a dark
 7         place?
 8    A    It's medium lit.
 9    Q    And when that van came real close to you, did you
10         see any of the occupants inside of it?
11    A    I couldn't -- I couldn't see or tell.  I looked,
12         but I couldn't tell.
13    Q    Could you tell if they were black or white?
14    A    No.
15    Q    Couldn't tell if they were male or female?
16    A    No.
17    Q    Could you tell if there were one or two?
18    A    No.
19    Q    Did it have tinted windows or anything?
20    A    I don't know.  All I know I couldn't see who was
21         in the van.
22    Q    Once again, this van was thirty minutes before the
23         robbery took place?
24              MR. VALESKA:  Judge, asked and answered.  He
25         said it wasn't about thirty minutes.  It was
```

```
 1        shorter.  He's asked her about three times.
 2               THE COURT:  I sustain.
 3               MR. BAXLEY:  Nothing further at this time.
 4               MR. VALESKA:  If I could, Judge.
 5                    REDIRECT EXAMINATION
 6   BY MR. VALESKA:
 7   Q    Ms. Prescott, would you tell -- do you recall -- I
 8        know it's been a while -- when Sergeant Williamson
 9        and Sergeant Singleton picked you up and took you
10        to look at Barstone where a vehicle was, was that
11        a week or two after the robbery or the same day,
12        ma'am?
13   A    It was that very night after it happened that
14        night before.
15   Q    And I want you to tell the ladies and gentlemen of
16        the jury, I would like to ask you, did you tell
17        the detective, is this correct, the van looked
18        like the one you saw in the parking lot that
19        night, but you could not be sure about the color,
20        but that that wood grain was the right color and
21        the van looked like the right year model in
22        reference to the '89 to '92?  Is that true?
23   A    That's exactly what I told them.
24   Q    Could you tell the ladies and gentlemen of the
25        jury, since then, since that day of the robbery,
```

```
 1              when you looked that night, did you see any other

 2              vans just like that one the entire time since you

 3              lived in Dothan?

 4     A    No, I haven't.

 5              MR. VALESKA:  That's all.

 6                         RECROSS EXAMINATION

 7    BY MR. BAXLEY:

 8     Q    But once again, as you sit there, you can't

 9              testify one way or the other whether or not that

10              van at Barstone was the exact van?

11     A    No, I can't.

12              MR. BAXLEY:  Thank you.

13              THE COURT:  Ms. Prescott, you may step down.

14              MR. VALESKA:  Could she be excused?  She

15              needs to go back to work.

16              THE COURT:  Do you have any objection?

17              MR. BAXLEY:  No, Your Honor.

18              THE COURT:  You're excused, Ms. Prescott.

19              You may leave.

20                         REGGIE FILLER

21              having first been duly sworn, was examined and

22              testified as follows:

23                         DIRECT EXAMINATION

24    BY MR. VALESKA:

25     Q    Tell us your name.
```

```
1    A    Reginald Marcus Hill.

2    Q    Mr. Hill, let's go back to around June 7th of

3         2001. Tell the jury where you worked.

4    A    I was at work at Winn Dixie.

5    Q    What store?

6    A    Winn Dixie on Westgate Parkway.

7    Q    How long had you worked for Winn Dixie from that

8         point of June 7, 2001, going backwards?  How many

9         months or years?

10   A    I been working for Winn Dixie for approximately

11        five years.

12   Q    Now, tell the ladies and gentlemen of the jury, do

13        you know Ronald Reeves?

14   A    Yes, sir, I did.

15   Q    Did you know the lady just coming out, Ms.

16        Prescott, as you were coming in?

17   A    Sir?

18   Q    As you were coming in, did you see the lady

19        getting off the stand, or did you see her?

20   A    I didn't see her.

21   Q    Did you know Ms. Prescott?

22   A    Yes.

23   Q    How did you know her?

24   A    She worked receiving at the grocery store.

25   Q    Do you know Ms. Roach?
```

```
 1    A    Yes, sir.

 2    Q    How did you know her?

 3    A    She was the night cashier.

 4    Q    Would you tell the ladies and gentlemen of the

 5         jury, as one of the managers on or about June 7,

 6         2001, what was the currency kept, the paper money,

 7         the coin money that was collected that day before

 8         the manager would go to the bank and make a

 9         deposit the next morning?  Where was it kept?

10    A    In a safe in the front office.

11    Q    Did you have access to the safe?

12    A    Yes, sir, I did.

13    Q    Did you know the combination?

14    A    Yes, sir, I did.

15    Q    Did Mr. Reeves know the combination?

16    A    Yes, sir, he did.

17    Q    Would you tell the ladies and gentlemen of the

18         jury, please, do you know a man by the name of

19         Ruben Corey McNabb?

20    A    Yes, sir, I did.

21    Q    Before June 7th of 2001, tell the ladies and

22         gentlemen of the jury how you knew McNabb.

23    A    He stayed in my apartment complex.

24    Q    And what apartment complex was that?

25    A    Bayscene Apartments.
```

```
 1    Q    Can you tell the ladies and gentlemen of the jury,

 2         had you ever talked with him before June 7th of

 3         2001?

 4    A    Yes, sir.

 5    Q    Had you ever played any type of sports activities

 6         with him?

 7    A    Basketball.

 8    Q    Had you ever been to his apartment?

 9    A    Yes, sir.

10    Q    Had you ever been into the bedrooms of his

11         apartment?

12    A    No, sir.

13    Q    The time you were in his apartment, who was

14         present?

15    A    He was, if I'm not mistaken.  Maybe his wife was

16         home.

17    Q    Were you ever in his apartment by yourself at any

18         time ever?

19    A    No, sir.

20    Q    Can you tell the ladies and gentlemen of the jury,

21         before June 7, 2001, you were working at Winn

22         Dixie, correct?

23    A    Yes, sir.

24    Q    Did McNabb ever have any conversations with you in

25         the month of April, May, up until June in
```

```
 1           reference to where you worked?
 2     A     He knew where I worked, yes, sir.
 3     Q     Did he ask you about where you worked?
 4     A     Yes, sir.
 5     Q     Tell the jury over a period of time what he asked
 6           about you working at Winn Dixie.  What questions
 7           did he ask you?
 8     A     We talked about how many people at -- worked the
 9           night shift because he knew I worked the night
10           shift.
11     Q     Did you tell him?
12     A     Yes, sir.
13     Q     Were more people working the night shift or day
14           shift?
15     A     Night shift.
16     Q     And did he ask you any questions about the money,
17           the currency, how much money you made a week?
18     A     Yes, sir.
19     Q     What did you tell him?
20     A     I told him probably about two fifty -- three
21           hundred thousand if I'm not mistaken.
22     Q     And would you tell the ladies and gentlemen of the
23           jury, did he ever ask you at any time specifically
24           about any of the night managers, their names or
25           description of those managers excluding yourself?
```

| 1  | A | Big black guy with the big arms.  I told him Ron. |
|----|---|---|
| 2  | Q | Ron who? |
| 3  | A | Ron Reeves. |
| 4  | Q | And do you see Mr. Reeves in the courtroom today? |
| 5  | A | Yes, sir. |
| 6  | Q | Is that who you're referring to? |
| 7  | A | Yes, sir. |
| 8  | Q | And he has big muscular arms, correct? |
| 9  | A | Yes, sir. |
| 10 | Q | Now, did you play basketball with other people in |
| 11 |   | the complex with Mr. McNabb and yourself and |
| 12 |   | others? |
| 13 | A | Not all the time -- |
| 14 | Q | But some of the time? |
| 15 | A | Yes, sir. |
| 16 | Q | Any other person, man or woman, ever ask you the |
| 17 |   | questions that Mr. McNabb asked you about the |
| 18 |   | money, the employees, how many people there at |
| 19 |   | nighttime, or what the managers were named? |
| 20 |   | Nobody did, did they? |
| 21 | A | No, sir. |
| 22 | Q | He was the only one, correct? |
| 23 | A | Yes, sir. |
| 24 | Q | Now, would you tell the ladies and gentlemen of |
| 25 |   | the jury, on June 7, 2001, were you working that |

```
 1        night?
 2    A   Yes, sir, I was.
 3    Q   Did you come to learn if the store was robbed?
 4    A   Yes, sir.
 5    Q   Who -- how was the first way you knew the store
 6        was robbed that night?  Who did you see?
 7    A   Ron was walking to the back untying his arms.
 8    Q   Would you tell the ladies and gentlemen of the
 9        jury, was he calm or was he excited?  Was he
10        nervous?  How did he act that you saw?
11    A   He was pretty excited.
12    Q   Would you tell the ladies and gentlemen of the
13        jury, did you inquire about any other employees in
14        reference that worked in the store at that time to
15        him or did he say anything about any other
16        employees?
17    A   I asked where was Patsy.
18    Q   And Patsy was who in this courtroom?
19    A   The night cashier.
20    Q   Ms. Roach refer to, correct?
21    A   Yes, sir.
22    Q   And did he tell you where she was?
23    A   Yes, sir.
24    Q   And where did you go next?
25    A   To the front office.
```

| | | |
|---|---|---|
| 1 | Q | And who did you go to check on? |
| 2 | A | Patsy. |
| 3 | Q | And when you got to the front office, did you see |
| 4 | | Ms. Roach? |
| 5 | A | Yes, sir. |
| 6 | Q | Was she calm? |
| 7 | A | She was -- no, sir, she wasn't calm. |
| 8 | Q | And where was she? |
| 9 | A | In the corner tied up. |
| 10 | Q | Who untied her? |
| 11 | A | If I'm not mistaken, I did. |
| 12 | Q | Would you tell the ladies and gentlemen of the |
| 13 | | jury, were there any phones in the back part of |
| 14 | | the office of Winn Dixie -- not the office, but |
| 15 | | the back part where the back door loading -- |
| 16 | | intercom systems, correct, to call? |
| 17 | A | (Witness nodded.) |
| 18 | Q | When you got to the office and untied Ms. Roach |
| 19 | | and assisted her, was 911 then called in your |
| 20 | | presence? |
| 21 | A | Yes, sir, I believe so. |
| 22 | Q | Who called them? |
| 23 | A | Ron. |
| 24 | Q | Would you tell the ladies and gentlemen of the |
| 25 | | jury, did the police arrive shortly after that? |

```
 1    A    Yes, sir.
 2    Q    Now, would you tell them at a later point in time
 3         that morning, did you come to see Ms. Betty
 4         Prescott up front?
 5    A    Yes, sir.
 6    Q    When I say up front, I'm referring by the cash
 7         registers the aisles you go through down from the
 8         produce closer towards the front where the office
 9         is and the entrance or exit door, correct?  Did
10         you see her in that general area?
11    A    Yes, sir.
12    Q    And talk to her?
13    A    Yes, sir.
14    Q    Here's what I want to ask you.  If you could tell
15         the ladies and gentlemen of the jury, did she tell
16         you in your presence anything about seeing a van
17         outside just before she came in to work?
18    A    She said a brown -- a brown and white station
19         wagon.
20    Q    Station wagon or van?
21    A    At the time she said a station wagon.
22    Q    Did she ever tell you it was a van?
23    A    It came to my -- later on I found that out, yes,
24         sir.
25    Q    She described what was on the vehicle, what it
```

| 1 |   | looked like, any kind of paneling? |
|---|---|---|
| 2 | A | Not to me.  I told it to the officer. |
| 3 | Q | That's what I want to ask you about.  Did she give |
| 4 |   | you a description, though, of what she saw? |
| 5 | A | Yes, sir. |
| 6 | Q | And then when she did that, did you go get a |
| 7 |   | police officer and bring them back so she could |
| 8 |   | tell the police officers what she saw? |
| 9 | A | Yes, sir. |
| 10 | Q | Now, if I could, can I ask you, let me show you |
| 11 |   | some exhibits if I could.  First of all, tell me, |
| 12 |   | currency in the safe itself, the two safes, metal |
| 13 |   | money, how would you get metal money to give to |
| 14 |   | the cashiers?  How would it come in from the bank? |
| 15 | A | It comes in boxes. |
| 16 | Q | Let me show you an exhibit if I could.  State's |
| 17 |   | Exhibit No. 3.  Do you recognize State's 3? |
| 18 | A | Yes, sir.  That's the box. |
| 19 | Q | The type box, did you stamp the boxes and put Winn |
| 20 |   | Dixie on them or if they were opened up stamp the |
| 21 |   | individual penny rolls?  Did you-all do that? |
| 22 |   | Those weren't stamped, were they? |
| 23 | A | No, sir. |
| 24 | Q | What was stamped inside the office of any kind of |
| 25 |   | identification store number on there? |

1   A   Money straps, food stamps, checks if I'm not

2       mistaken.

3   Q   You see this box of pennies over here?  You see it

4       on the floor?  See any kind of stamps you can

5       notice from that side about identification marks

6       on there that you can see from that far away?

7   A   No, sir.

8   Q   Now, if I could, please tell the ladies and

9       gentlemen of the jury, you worked there for how

10      many years before the robbery?

11  A   About five years.

12  Q   At any time was there ever a shortage of any cash

13      or currency or money or produce or when I say

14      produce, I mean, you know, boxes of stuff gone

15      missing when they had inventory while you were

16      working there?

17  A   No, sir.

18  Q   Now, can you tell the ladies and gentlemen of the

19      jury, before the robbery happened, did you see any

20      of the robbers at the time the robbery was taking

21      place?

22  A   No, sir.

23  Q   Did you yourself know whether they were black or

24      white when the robbery was actually happening?

25  A   No, sir.

| 1 | Q | Did you know if they were men or women? |
|---|---|---|
| 2 | A | No, sir. |
| 3 | Q | Did you know if they had weapons or not? |
| 4 | A | No, sir. |
| 5 | Q | Now, can you tell the ladies and gentlemen of the |
| 6 | | jury, after June 7th of 2001, did you ever see |
| 7 | | McNabb -- excuse me, Ruben Corey McNabb, the man |
| 8 | | you identified at the table, ask you those |
| 9 | | questions, did you see those vehicles at the |
| 10 | | apartment complex that you recall? |
| 11 | A | I believe I saw his Cadillac that was there. |
| 12 | Q | What about the van? |
| 13 | A | The van?  I don't remember seeing the van. |
| 14 | Q | From where you live in the apartment complex to |
| 15 | | where McNabb lived, the defendant at the table, |
| 16 | | could you see his apartment from your apartment? |
| 17 | A | No, sir. |
| 18 | Q | Driving in the front of Barstone and go right or |
| 19 | | left, correct? |
| 20 | A | Yes, sir. |
| 21 | Q | If you go left and go all the way down to the end |
| 22 | | and dead end and turn right, would it be down by |
| 23 | | your apartment? |
| 24 | A | Yes, sir. |
| 25 | Q | If you came in the front of Barstone and took a |

1      right and went around the first building and went

2      down to the second or third section right in

3      there, would his apartment have been in that

4      general area right there?

5  A   Yes, sir.

6  Q   Now, had you ever had any problems with McNabb

7      before June 7th of 2001 in any way?

8  A   No, sir.

9  Q   No fights --

10       MR. BAXLEY:  Objection, Your Honor.  He never

11    said he had any problem with Mr. McNabb on June

12      7th.

13       THE COURT:  Pardon me?

14       MR. BAXLEY:  He never said he had any problem

15    with McNabb and --

16       MR. VALESKA:  I asked him before that date of

17    June 7th.

18       THE COURT:  He asked if he had had any

19    problem with him before that date.

20  Q   Before the date, did you have any fights or words

21      with him in my manner or fashion before June 7th

22      of 2001?

23  A   No, sir.

24  Q   Would you tell the ladies and gentlemen of the

25      jury, when I asked you about Ruben Corey McNabb

| | | |
|---|---|---|
| 1 | | asked you about the things at the Winn Dixie, who |
| 2 | | did you tell that to that he had asked you |
| 3 | | about -- |
| 4 | A | Police. |
| 5 | Q | Police; is that fair to say? |
| 6 | A | (Witness nodded.) |
| 7 | Q | Did you know McNabb's wife? |
| 8 | A | Yes, sir. |
| 9 | Q | Back in May, periods of May and up until June, do |
| 10 | | you know if his wife was getting ready or had a |
| 11 | | baby sometime in May, if you knew? |
| 12 | A | Yes, sir.  She had a baby. |
| 13 | Q | Did you know where she worked? |
| 14 | A | Yes, sir. |
| 15 | Q | Where did she work? |
| 16 | A | Chick-fil-a. |
| 17 | Q | Do you know where McNabb worked at some point in |
| 18 | | time?  If you do. |
| 19 | A | Yes, sir. |
| 20 | Q | Where had he been working, if you know? |
| 21 | A | I don't know the name of the place.  He built I |
| 22 | | believe church furniture. |
| 23 | | MR. VALESKA:  That's all.  Pass the witness. |
| 24 | | Thank you very much. |
| 25 | | THE COURT:  Mr. Baxley. |

```
 1                    CROSS EXAMINATION

 2    BY MR. BAXLEY:

 3    Q    Mr. Hill, when was the first time you ever had

 4         contact with Corey McNabb?

 5    A    I guess it was about around September of 2001, I

 6         guess.

 7    Q    September of 2001?

 8    A    2000 or 2001.  I'm not exactly sure of the year.

 9         Whenever I moved to Alabama.

10    Q    So you don't recall --

11    A    2000, I believe.

12    Q    September of 2000?

13    A    Yes, sir.

14    Q    Where did you move from?

15    A    Panama City, Florida.

16    Q    Panama City.

17              And how would you describe your relationship

18         with Mr. McNabb?

19    A    We hang out.  Like I say, we might have shot some

20         at the basketball court here and there.

21    Q    Would you consider yourself friends?

22    A    Yes, sir.

23    Q    What would be the frequency of your contact with

24         Mr. McNabb?

25    A    A couple of times a week I guess.
```

| | | |
|---|---|---|
| 1 | Q | So you saw him quite often, then? |
| 2 | A | Not very often because our work schedules.  I |
| 3 | | guess so, yes, sir. |
| 4 | Q | Did he know when you worked? |
| 5 | A | Yes, sir. |
| 6 | Q | He knew when you worked? |
| 7 | A | Yes, sir. |
| 8 | Q | And you say you saw him possibly a couple of times |
| 9 | | a week from September of 2000 until when? |
| 10 | A | Until -- well, I don't know the last time I saw |
| 11 | | him if that's what you're asking. |
| 12 | Q | You have no idea the last time you saw Mr. McNabb? |
| 13 | A | No, sir. |
| 14 | Q | Do you recall the last time you saw Mr. McNabb |
| 15 | | prior to June 7, 2001? |
| 16 | A | I hadn't saw him in a while. |
| 17 | Q | Had not seen him in a while. |
| 18 | | Had you seen his cars in the apartment |
| 19 | | complex during that time period? |
| 20 | A | I only saw his Cadillac. |
| 21 | Q | But he had another car; is that correct? |
| 22 | A | Yes, sir. |
| 23 | Q | What kind of other car did he have? |
| 24 | A | LaSabre. |
| 25 | Q | LaSabre. |

```
 1              And he also had a white van?
 2    A    Yes, sir.
 3    Q    When you entered the complex, did you drive by Mr.
 4         McNabb's apartment, or did you enter the other way?
 5    A    I drove -- I swap up ways.
 6    Q    So you go both ways?
 7    A    Yes, sir.
 8    Q    Would you ever glance at his apartment to see if
 9         Corey was home?
10    A    Sometimes I probably looked through the parking
11         lot and see, yes, sir.
12    Q    So -- but you are testifying right now you did not
13         see his Buick or his van at that apartment complex
14         for some time?
15    A    Not to my knowledge.  I mean, what is some time?
16    Q    You tell me.  What do you consider some time?
17         Unless you use June 7, 2001, as the point date.
18         Before June 7, 2001, obviously June 7th sticks out
19         in your mind; is that correct?  Is that fair to
20         say?
21    A    Yes, sir.
22    Q    About how long before that is the last time you
23         had seen somebody at Corey's apartment or had seen
24         his car there?
25    A    Honestly I don't know.  I hadn't seen Corey in a
```

```
 1        while.

 2   Q    You had not seen him around?

 3   A    No, I hadn't seen Corey in a while.

 4   Q    Is it possible that he had -- was gone at that

 5        time?

 6   A    It's possible.

 7   Q    With your job at the Winn Dixie, would you have

 8        access to the money and the stamp that you stamped

 9        things with there we keep talking about?

10   A    Yes, sir.

11   Q    And by the way, do you still work for Winn Dixie?

12   A    No, sir.

13   Q    When did you leave Winn Dixie, or were you

14        terminated from Winn Dixie?

15             MR. VALESKA:  Object.

16             THE COURT:  Overruled.

17   A    About July 2001 if I'm not mistaken.

18   Q    Were you terminated, or did you quit?

19   A    I was asked to resign.

20   Q    You were asked to resign?

21   A    Yes, sir.

22   Q    What was the reason you were asked to resign?

23             MR. VALESKA:  Object.

24             MR. BAXLEY:  Your Honor, this is pertinent.

25             THE COURT:  Approach the bench.
```

```
 1                    (At which time the following proceedings
 2                    were held at the bench outside of the
 3                    hearing of the jury:)
 4          THE COURT:  What are you trying to prove?
 5          MR. BAXLEY:  The jury has a right to know.
 6          THE COURT:  Well, I don't think they do.  If
 7     it has something to do with this trial, they do.
 8     But it it's irrelevant, they don't.
 9          MR. BAXLEY:  I don't know if it's irrelevant
10     until I ask him.  The potential exist --
11          MR. VALESKA:  I object.
12          MR. BAXLEY:  If he was terminated for some
13     sort of theft or anything of that nature --
14          THE COURT:  That's what I call possibly
15     digging up a snake if you don't know what the
16     answer is going to be.
17                    (At which time the following
18                    proceedings were held in open court:)
19          THE COURT:  I overrule.  Go ahead.
20   Q   Did you ever drive one of Mr. McNabb's cars?
21   A   Once.
22   Q   Once.
23          So you had access to his keys at some point
24     during your interaction with him?
25   A   I guess when I drove the car, yes, sir, his car
```

```
 1       keys.
 2   Q   Was it just a car key, or did he hand you his set
 3       of keys?  Everyone has --
 4   A   The car key.  I helped him go pick his car up from
 5       the shop.
 6   Q   Any other car keys from the key chain?
 7   A   No, sir.  I was following him.
 8   Q   You were following him.
 9           Have you ever gone on a trip with Mr. McNabb?
10   A   Yes, sir.  Once.
11   Q   Where did you go?
12   A   Went to Orlando.
13   Q   Went to Orlando with him.
14           So if you're going on trips with him and help
15       him with his car and stuff, the two of you must
16       have been pretty close?
17   A   Yes, sir.  We were friends.
18   Q   You still consider Mr. McNabb a friend?
19   A   Yes, sir.  As far as I know.
20   Q   You also claim that Mr. McNabb asked you specific
21       questions about how many people worked at the Winn
22       Dixie, what kind of cash was kept there, how much
23       cash was kept there; is that correct?
24   A   Yes, sir.
25   Q   Did he ever ask you anything about the layout of
```

```
 1           the office?

 2      A    No, sir.

 3      Q    He didn't ask you where the safe was?

 4      A    No, sir.

 5      Q    Did he ever ask you if there was a security system?

 6      A    No, sir.

 7      Q    Did he ever ask you if there was cameras in the

 8           place?

 9      A    No, sir.

10      Q    Did he ever ask you if there were guards there?

11      A    No, sir.

12      Q    Assuming he did ask you those things, would those

13           things be -- would you be suspicious of him

14           otherwise?

15      A    If he asked me those things?

16      Q    Yes, sir.

17      A    Yes, sir.

18      Q    So is it suspicious for someone to ask you how

19           much business your store does in a week?

20      A    No, sir.

21      Q    But you're saying -- you thought it was

22           significant enough to tell the police about it?

23      A    I was asked.

24      Q    So you were asked.  This is something they

25           solicited from you that you didn't offer to them?
```

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | You say it was some words the police put in your |
| 3 | | mouth? |
| 4 | A | No, sir. |
| 5 | Q | But he never asked you anything else about |
| 6 | | specifics? |
| 7 | A | The officer -- who you talking about? |
| 8 | Q | I'm talking about Mr. McNabb.  You're claiming he |
| 9 | | asked you all these things -- |
| 10 | A | Right. |
| 11 | Q | -- about the inner working of your store, and |
| 12 | | you're saying he didn't ask you about other things |
| 13 | | that in my opinion would be important to a |
| 14 | | robber.  But you're saying he didn't ask you |
| 15 | | things about security measures.  Did he ask you |
| 16 | | you about bait money? |
| 17 | A | No, sir. |
| 18 | Q | Did you have bait money there? |
| 19 | A | Yes, sir. |
| 20 | Q | I'm assuming you know what bait money is? |
| 21 | A | Yes, sir. |
| 22 | Q | Could you explain to the Judge and jury what bait |
| 23 | | money is? |
| 24 | A | Bait money is set up in the register where |
| 25 | | somebody robs it, you intentionally give them that |

```
 1          money and it will either leave an ink spot on you

 2          or it depends on the bait money or it could have a

 3          honing device to locate them or whatever.

 4     Q    And it's also my understanding that this is --

 5          this wasn't the first robbery that occurred there?

 6     A    That's right.

 7     Q    And you were present for the robbery that occurred

 8          several months prior to that?

 9     A    Yes, sir.

10     Q    About what -- when did that robbery occur?

11     A    It was around October.  October the -- I don't

12          remember the date.

13     Q    That's October of perhaps --

14     A    2000.

15     Q    -- 2000?

16     A    Yes, sir.

17     Q    And did you see the robber at that time?

18     A    No, sir, not -- well, yes, sir.

19     Q    You did see the robber in 2000?

20     A    Yes, sir.

21     Q    Did you ever recognize that robber?

22     A    No, sir.

23     Q    Do you recall what the robber looked like?

24     A    No, sir.

25     Q    Was the robber -- did the robber have any
```

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | obscurity on the face or have his face hidden in             |
| 2  |   | any way?                                                     |
| 3  | A | He had a toboggan-type cap pulled down over his              |
| 4  |   | face kind of like with his head down.                        |
| 5  | Q | And you made a statement to the police; is that              |
| 6  |   | correct?  And that was on June 25th of 2001?                 |
| 7  | A | Yes, sir.                                                    |
| 8  | Q | Is that correct?                                             |
| 9  | A | Yes, sir, I believe so.                                      |
| 10 | Q | Now, as you sit here today, are you claiming that            |
| 11 |   | Corey McNabb was also the man who robbed the store           |
| 12 |   | in October of 2000?                                          |
| 13 | A | I'm not claiming anything, no, sir.                          |
| 14 | Q | You're not saying that?                                      |
| 15 | A | No, sir.                                                     |
| 16 | Q | In your statement you seem to say that.  Let me              |
| 17 |   | read your statement here.  Do you recall giving              |
| 18 |   | that statement?                                              |
| 19 | A | I have to know what the statement says.                      |
| 20 | Q | This is the statement you gave in -- on June 27,             |
| 21 |   | 2001.  Obviously that's roughly twenty days after            |
| 22 |   | the robbery.                                                 |
| 23 | A | Okay.  Yes, sir.                                             |
| 24 | Q | And do you recall going there with an officer                |
| 25 |   | named Dennis Owens?                                          |

```
 1   A    I believe so, yes, sir.

 2   Q    That's right.

 3             And this is a person -- this is an officer

 4        who asked you about all these things that Corey

 5        had -- you allege Corey asked you about in the

 6        robbery -- well, about the store, all those things

 7        about the money and such and the employees.  And

 8        at one point this Officer Owens says, okay,

 9        during the course of that robbery -- and correct

10        me if I'm wrong -- the robber came up to one of

11        the cashiers and apparently requested that she

12        call a manager.  She called you, and you went to

13        the front, stood by the cashier.  The black male

14        then showed the gun and took you and her back to

15        the office at gun point and committed the robbery.

16        You said, yes, sir.  All right.  Did you recognize

17        the robber at that time.  No, sir.  Did you

18        suspect who the robber was at that time.  At that

19        time, no, sir.  Very soon after that robbery, did

20        you have a suspicion of who that robber was.  You

21        answered, yes, sir.

22             Who was your suspicion of who that robber

23        was?

24   A    Ruben McNabb, Corey.

25   Q    You thought it was him?
```

```
 1    A    (Witness nodded.)

 2    Q    But this is someone you say you met and had

 3         played basketball with and was around several

 4         times a week from September of 2000.  This robbery

 5         happened in October of 2000.  And you're going to

 6         sit here and tell this Judge and jury that you

 7         couldn't -- you didn't recognize a man who you had

 8         done things with who lived near you whose

 9         apartment you had been to and gone on trips with

10         when he came to your store?  Is that what you're

11         telling us?

12    A    Yes, sir.  I never said I was a hundred percent

13         sure.

14    Q    But I'm saying this is someone you're around a

15         good bit.  I'm curious how you can be sure.

16    A    At the time of the first robbery, I didn't know

17         him that well.

18    Q    But you told me you had seen him after the fact,

19         though.

20    A    Yes, sir.

21    Q    But you still didn't know?

22    A    No, sir.  There was nothing that led to -- to lead

23         me to believe that.

24    Q    Nothing led there.

25              And that robbery -- let's go back to that
```

```
 1              robbery then.  Did that robbery and the October
 2              robbery specifically tell you any instructions
 3              about not -- don't give me the bait money?
 4    A         No, sir.
 5    Q         Never said anything like that?  You're absolutely
 6              sure?
 7    A         Yeah.  He took the money and threw it down and
 8              said -- I can't remember exactly what he said.
 9    Q         So you tried to put the bait money on him, and he
10              knew bait money was there, didn't he?
11    A         Yes, sir.
12    Q         And threw that bait money down?
13    A         Yes, sir.
14    Q         And this other robbery as far as everyone knows,
15              that wasn't done, correct?
16                   MR. VALESKA:  I object.  I object.
17                   THE COURT:  Wait a minute.  I don't
18              understand the question.  What was the question?
19                        And before you answer, give me a chance
20              to rule.
21                        What was the question?
22                   MR. BAXLEY:  I'm sorry, Your Honor.  I was
23              asking him if he knew that bait money had anything
24              to do with this last robbery.
25                   MR. VALESKA:  The question was as far as
```

```
 1        anyone else knows, did bait money.  And he can't
 2        testify what other people know, Judge.  He wasn't
 3        the one that was robbed --
 4             THE COURT:  Yeah.  I sustain the objection.
 5        Because that would have to be hearsay.  It would
 6        have to be something somebody else told him.
 7   Q.   But to the best of your knowledge, you're saying
 8        right here right now you think Corey McNabb also
 9        robbed the Winn Dixie in October of 2000; is that
10        correct?
11   A    What am I basing it on?
12   Q    I'm basing it on your testimony here.  You claimed
13        back on this statement you made in June of 2001 --
14   A    Because of what the officer showed me, yes, sir.
15   Q    -- that you weren't sure, and then all of a
16        sudden you came up with this -- you know, a couple
17        of weeks after that robbery you decided it was
18        Corey.
19   A    I never fully decided it was Corey.
20   Q    Never fully decided about it.
21             But the same things happened during those
22        two robberies?
23             MR. VALESKA:  Objection.  He can't --
24             MR. BAXLEY:  Withdrawn, Your Honor.
25             THE COURT:  He can tell what happened the one
```

1    that he was involved in.

2         MR. BAXLEY:  Yes, sir.

3  Q    What type of person would you consider Corey to be?

4  A    He was a fairly nice person.

5  Q    Would you think he's capable of robbery?

6  A    Yes, sir.

7  Q    You think he's capable of robbery?

8  A    Yes, sir.

9  Q    And what leads you to that conclusion?

10 A    We talk about each other's backgrounds before.

11 Q    And what was in your background?

12 A    What was in my background?

13 Q    You talking about you talked about each other's

14      backgrounds.  What was in each other's

15      backgrounds?

16 A    Just things that we done.

17 Q    Even though this was your friend, you think he was

18      capable of robbing someone?

19         MR. VALESKA:  Objection.  Asked and

20      answered.  He said he was capable of robbing in

21      his opinion.

22         THE COURT:  He said he thought he was.

23 Q    Would you still consider Corey your friend?

24 A    Yeah.  I hadn't talked to him in a long time.  I

25      hadn't had any dealings with him.

```
 1    Q    Did you ever have any contact with his wife after
 2         this robbery took place?
 3    A    No, sir.
 4    Q    You didn't.
 5         Did you ever make any phone calls to her?
 6    A    No, sir.
 7    Q    Did you ever go to their apartment after that
 8         robbery?
 9    A    No, sir.
10         MR. BAXLEY:  I have got no further questions
11    right now, Your Honor.  Reserve the right to
12    recall.
13         THE COURT:  Anything on redirect?
14         MR. VALESKA:  No, sir.  That's it.
15         THE COURT:  You may step down.
16         Have you got a short witness?
17         MR. VALESKA:  Judge, I don't think I do.  Can
18    I look one second?  I think I have law
19    enforcement.  I think you're aware of that.
20         No, sir, I don't.  Law enforcement
21    next.
22         THE COURT:  You don't have a short one.
23    Okay.  Let's recess for the afternoon, then.
24         MR. VALESKA:  We're close to resting, Judge.
25    Just a couple more witnesses.
```

 1          THE COURT:  You got just a couple more

 2     witnesses?

 3          MR. VALESKA:  Yes, sir.

 4          THE COURT:  It's all right with you if we

 5     recess for the afternoon?

 6          MR. BAXLEY:  Yes, Your Honor.

 7          THE COURT:  Ladies and gentlemen, we'll

 8     recess for the evening, then.  And it will not be

 9     necessary for you to be sequestered or kept

10     overnight.  You can go to your own homes.  But

11     while you're out of the jury box and away from the

12     courthouse, do not discuss the case among

13     yourselves.  Do not discuss it with anyone else.

14     Do not allow anyone to discuss it with you.  And

15     if anyone approaches you and attempts to discuss

16     this case with you, you should let the Court know

17     immediately.  Do not try to make any independent

18     investigation on your own concerning the facts of

19     the case.  And do not watch any television

20     broadcasts concerning the events of this trial.

21     Don't read any newspaper accounts of the events of

22     the trial nor listen to any radio broadcasts.

23     There may not be any news accounts because I

24     haven't seen any news people around.  But if there

25     should be, just ignore those.  And if you will,

```
 1        go.  And if you'll just come back to the jury room

 2        at nine o'clock in the morning.  Thank you very

 3        much.

 4                    (Jury not present.)

 5                    (The proceedings for February 10, 2004,

 6                    were concluded.)

 7                    (Off the Record.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    IN THE CIRCUIT COURT OF HOUSTON COUNTY

2                         STATE OF ALABAMA

3     STATE OF ALABAMA,                    *
                                           *
4     v.                                   *      Case No. CC-02-225
                                           *
5     RUBEN COREY MCNABB,                  *
                                           *
6           Defendant.                     *

7

8

9              REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

10

11

12    Before:

              The Honorable Jerry M. White and jury
13
                       February 11, 2004
14

15

16    APPEARANCES:

17            For the State

18                    Douglas Albert Valeska, Esquire
                      District Attorney
19
                      Denise Bates, Esquire
20                    Assistant District Attorney

21            For the Defendant

22                    M. Hampton Baxley, Esquire
                      Dothan, Alabama
23

24
      Carla H. Woodall
25    Court Reporter

```
 1                        PROCEEDINGS
 2           MR. VALESKA:  Mr. Baxley and I have talked.
 3      He's willing to waive at this time the bringing
 4      Mr. Singleton in outside the presence of the jury
 5      and going into the probable cause on the search
 6      warrant at this time in front of you because it
 7      was already determined last time in front of you.
 8      As long as they could use what was done last time
 9      on the Record, I don't have a problem with that.
10           MR. BAXLEY:  Incorporate the arguments.
11           MR. VALESKA:  I will stipulate --
12           MR. BAXLEY:  My arguments aren't going to
13      change, his arguments aren't going to change, and
14      your rulings aren't going to change, and so there
15      is no need to waste the Court's time.
16           MR. VALESKA:  We can go straight to testimony
17      and we agree that they can raise the issue on
18      appeal if there's a conviction based on your
19      previous rulings on the previous trial.
20           THE COURT:  All right.  Bring the jury.
21           (Jury present.)
22                      JIMMY SINGLETON
23      having first been duly sworn, was examined and
24      testified as follows:
25                   DIRECT EXAMINATION
```

```
 1    BY MR. VALESKA:

 2    Q    Tell us your name, please, sir.

 3    A    Jimmy Singleton.

 4    Q    You've been put under oath, correct?

 5    A    Yes, sir.

 6    Q    Mr. Singleton, back on about June 7, 2001, tell

 7         the jury where you worked.

 8    A    Dothan Police Department.

 9    Q    What position did you hold at that time, please,

10         sir?

11    A    Criminal investigator.

12    Q    How long had you been a police officer

13         approximately at that time?

14    A    Ten years.

15    Q    Now, if I could, were you assigned to work the

16         case of the robbery at the Winn Dixie on Westgate

17         Parkway that occurred on June 7, 2001, in Dothan,

18         Alabama, Houston County?

19    A    Yes, I was.

20    Q    Can you tell the ladies and gentlemen of the

21         jury, Ruben Corey McNabb, was he arrested and

22         charged with first degree robbery?

23    A    Yes, sir, he was.

24    Q    Did you go to the scene shortly after the robbery?

25    A    Yes, sir, I did.
```

| 1 | Q | Did you try or attempt to obtain any fingerprints |
| 2 | | of any items in relationship to the office, any |
| 3 | | trays, anything that was touched? |
| 4 | A | Yes, sir, we did. |
| 5 | Q | And after you took those fingerprints, did you |
| 6 | | send them off? |
| 7 | A | Yes, sir, I did. |
| 8 | Q | Were you able to get a match on any of those |
| 9 | | fingerprints? |
| 10 | A | No, sir. |
| 11 | Q | Now, would you tell the ladies and gentlemen of |
| 12 | | the jury, before that day, had you worked other |
| 13 | | robbery cases? |
| 14 | A | Yes, sir. |
| 15 | Q | Would you tell the ladies and gentlemen of the |
| 16 | | jury, on those robbery cases, did you attempt to |
| 17 | | look for fingerprints on those cases? |
| 18 | A | Yes, sir, I did. |
| 19 | Q | Did you work burglary cases of homes or |
| 20 | | businesses before June 7th of 2001? |
| 21 | A | Yes, sir, I did. |
| 22 | Q | Tried to lift or find fingerprints on those cases? |
| 23 | A | Yes, sir. |
| 24 | Q | Is it unusual, can you tell the ladies and |
| 25 | | gentlemen of the jury, the number of cases you |

```
 1              worked as a police officer -- and let me ask you
 2              the number.  Would that have been many, many cases
 3              before June 7th of 2001 ones with burglaries or
 4              robberies or theft cases where you tried to find
 5              fingerprints and you couldn't find any?
 6    A    Yes, sir.
 7    Q    Now, would you tell the ladies and gentlemen of
 8              the jury, please, Mr. Singleton, did you also take
 9              some pictures of the crime scene?
10    A    Yes, sir.
11    Q    And when you got out there, the conditions of the
12              outside lighting; in other words, was it
13              completely light or was it still dark?  Let me
14              show you some pictures if I could.  Show you
15              State's 21 that's been admitted and State's 15
16              that's in evidence.  Using those if I could to ask
17              you, in other words, the sun up like it was twelve
18              o'clock in the daytime or still generally dark?
19    A    Generally dark.
20    Q    Now, let me show you State's Exhibit 23 and 16
21              that are in evidence if I could.  I ask you about
22              -- and 22, 17, show you those pictures as well as
23              24.  Now, I want to ask you, generally what part
24              of the store is that?  Can you tell us?
25    A    That's the office area of the store.
```

```
 1   Q   Does that indicate any type of physical evidence
 2       you saw inside the store that you attempted to
 3       take pictures of or send off for evidence or look
 4       for fingerprints?
 5   A   Yes, sir.
 6   Q   Did that include the trays in 16, 23, as well as
 7       the safe in 17?
 8   A   Yes, sir.
 9   Q   And 22.
10           State's 24, is that a door that shows the
11       office in relationship where the safe was kept --
12       the two safes?
13   A   Yes, sir.
14   Q   Now, if I could, let me show you State's Exhibit
15       18, 19, and 20, Mr. Singleton, in reference to 16
16       and 23 that are already in evidence, and I asked
17       you about some trays or metal cash registers or
18       drawers or if I could use the term a till.  Do you
19       know what I'm talking about in those pictures?
20   A   Yes, sir.
21   Q   Did you yourself with your own eyes, could you see
22       any type of impressions on any part of the metal
23       tops or the tills in relationship to any
24       impressions that were on them inside the office
25       where they had been pulled out of the safe for
```

| | | |
|---|---|---|
| 1 | | other money, envelopes, and metal coin holders |
| 2 | | were in relationship to those metal imprints on |
| 3 | | those tills? |
| 4 | A | Yes, sir. |
| 5 | Q | Now, you yourself, do you own shoes that have |
| 6 | | hard-type bottoms, leather soles? |
| 7 | A | Yes, sir. |
| 8 | Q | Do you own tennis shoes? |
| 9 | A | Yes, sir. |
| 10 | Q | If I could, have you been to crime scenes before |
| 11 | | June 7th of 2001 and seen impressions, once again, |
| 12 | | for different types shoes or boots before? |
| 13 | A | Yes, sir. |
| 14 | Q | On burglaries or robberies or theft cases or |
| 15 | | homicide cases? |
| 16 | A | Yes, sir. |
| 17 | Q | Can you always match up a shoe print with an |
| 18 | | impression that's found at the crime scene? |
| 19 | A | No, sir. |
| 20 | Q | Could you tell the ladies and gentlemen of the |
| 21 | | jury, after you took the pictures, collected the |
| 22 | | physical evidence, and sent it off for |
| 23 | | fingerprints, did you interview some of the |
| 24 | | witnesses at the robbery?  Did you interview some |
| 25 | | of the alleged witnesses? |

1    A    Yes, sir.

2    Q    Did you also have another investigator, Sergeant

3         Willie Williamson, who was assigned to assist to

4         work with you because of the case load?

5    A    Yes, sir.

6    Q    Now, tell the ladies and gentlemen of the jury,

7         when the sun came up, it actually got daylight

8         hours after -- on June 7th of 2001, did you go to

9         any particular location, any apartment complex

10        here in the City of Dothan with Sergeant

11        Williamson?

12   A    Yes, sir.

13   Q    What apartment complex did you go to?

14   A    Barstone.

15   Q    When you got to Barstone, were you looking for any

16        type of car, truck, or vehicle?

17   A    Yes, sir.

18   Q    Do you recall what type of vehicle you were

19        looking for?

20   A    Looking for a van -- an older model van, late

21        eighties, early nineties with wood grain paneling

22        on the side.

23   Q    Tell the ladies and gentlemen of the jury, when

24        you went into Barstone, you went right or left or

25        however you went in and made a complete circle,

```
 1              did you find any type of vehicle that fit that
 2              general description?
 3      A       Yes, sir, I did.
 4      Q       Now, was that -- at that time was that forty-eight
 5              -- seventy-two hours after the robbery, or a very
 6              short time?
 7      A       Very short time.
 8      Q       Now, if I could, Mr. Singleton, in relationship,
 9              did you see a tag on the vehicle of the van -- a
10              license tag?
11      A       Yes, sir.
12      Q       As a police officer doing investigative work, did
13              you run the tag to determine who owned the van or
14              who it was registered to?
15      A       Yes, sir.
16      Q       Who was it registered to?
17      A       McNabb.
18      Q       Do you see that person in the courtroom today?
19      A       Yes, sir.
20      Q       Now, can you tell the ladies and gentlemen of the
21              jury, if I ask you about doing a photographic
22              lineup, do you know what I'm talking about?
23      A       Yes, sir.
24      Q       Do you know if I asked you about doing a live
25              lineup versus a photographic lineup?
```

```
 1    A    Yes, sir.
 2    Q    Now, can you tell the ladies and gentlemen of the
 3         jury, working with Sergeant Williamson after you
 4         got a description of the van and you ran the tag,
 5         did you look for any other evidence as an
 6         investigator in relationship to looking to obtain
 7         a search warrant of anybody's residence?
 8    A    Yes, sir.
 9    Q    Now, let's go back to the robbery.  Did you make a
10         determination of allegedly how much cash was taken
11         -- approximately?  Just generally?  Small amount
12         or large amount?
13    A    Large amount.
14    Q    Any other items can you tell the jury in
15         relationship that you made a determination that
16         had been taken during the course of the robbery
17         from the safe at Winn Dixie in Dothan, Alabama,
18         Houston County, on June 7, 2001?
19    A    It was also food stamps taken and postage stamps
20         taken.
21    Q    Now, working other robberies, had you yourself
22         been in other businesses; in other words, food
23         stores like Winn Dixie when they collect cash in
24         the drawers, they take it to the office, do they
25         put it any type thing; in other words, to take it
```

```
 1              to the bank?  Do they keep two hundred thousand
 2              dollars cash in one little bag or is it bound in
 3              some manner or fashion?
 4       A      No.  It's usually, for instance, one dollar bills
 5              have a roll of, like, fifties and so on.  Twenty
 6              dollars bills, hundred dollars bills are
 7              separated.
 8                   MR. BAXLEY:  Your Honor, I object unless he
 9              has personal knowledge of the inner working of a
10              convenience store or food store.
11                   MR. VALESKA:  I believe I just asked him if
12              he had been to other businesses, particularly
13              Winn Dixie, to determine whether or not how they
14              bound their money, and he said he had.
15                   THE COURT:  Overruled.
16       Q      The term -- you said how it was bound.  Do you
17              have personal knowledge in relationship to what it
18              would be bound with, what type of thing that would
19              keep it altogether -- the money when you stack it
20              up?
21       A      It's called a money wrapper is what I call it.
22       Q      Thank you.
23                   Now, if I could, did you make a
24              determination as to the employees that were inside
25              the store at the time of the robbery?
```

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | And did you discuss with any of the employees |
| 3 | | about a description as to how or what the robbers |
| 4 | | looked like? |
| 5 | A | Yes, sir. |
| 6 | Q | Did you get a description in relationship to |
| 7 | | whether they were men -- males or females? |
| 8 | A | Yes, sir. |
| 9 | Q | Their race? |
| 10 | A | Males. |
| 11 | Q | Black or white? |
| 12 | A | Black. |
| 13 | Q | Now, can you tell the ladies and gentlemen of the |
| 14 | | jury, did you obtain a search warrant in this case? |
| 15 | A | Yes, sir, I did. |
| 16 | Q | When you obtained the information from the search |
| 17 | | warrant, did you gather information as part of the |
| 18 | | investigation in relationship to what you told the |
| 19 | | jury already about the robbery itself, correct? |
| 20 | A | Yes, sir. |
| 21 | Q | The vehicle that you went and determined in a |
| 22 | | short period of time, correct? |
| 23 | A | Yes, sir. |
| 24 | Q | Who owned the vehicle? |
| 25 | A | Yes, sir. |

| 1 | Q | Did you make a determination where McNabb lived in |
| 2 | | relationship to the location of the robbery -- the |
| 3 | | actual residence where he was living? |
| 4 | A | Yes, sir. |
| 5 | Q | Where did he live? |
| 6 | A | Barstone Apartments. |
| 7 | Q | And did you come to find the number of the |
| 8 | | apartment? |
| 9 | A | Yes, sir, I did. |
| 10 | Q | And did you determine who lived with him? |
| 11 | A | Yes, sir. |
| 12 | Q | Could you tell the ladies and gentlemen of the |
| 13 | | jury, did you do investigative work in |
| 14 | | relationship to city power and lights to see the |
| 15 | | location; in other words, the location where he |
| 16 | | lived, how the power or the lights was registered |
| 17 | | in whose name? Was that done? |
| 18 | A | Yes, sir. |
| 19 | Q | Now, did you take the information that you |
| 20 | | obtained and go before a judge in this circuit to |
| 21 | | obtain a search warrant? |
| 22 | A | Yes, sir, I did. |
| 23 | Q | Let me show you -- it's been marked -- if I could. |
| 24 | | State's Exhibit No. 12 for identification |
| 25 | | purposes, a copy, do you recognize what this is? |

```
 1    A    Yes, sir.
 2    Q    What is that?
 3    A    It's an affidavit for a search warrant.
 4    Q    And who obtained the search warrant?
 5    A    I did.
 6    Q    And the information that was placed in the search
 7         warrant, who did it come from?  What I mean, who
 8         provided the information to the judge that
 9         obtained the search warrant?
10    A    I did.
11    Q    And was it signed by a judge in this circuit in
12         this county?
13    A    Yes, sir.
14    Q    Which judge?
15    A    Mendheim.
16    Q    Honorable Brad Mendheim, a district judge?
17    A    Yes, sir.
18    Q    Then you obtained a search warrant from him.  When
19         you obtained the search warrant, would you tell
20         the ladies and gentlemen of the jury in the
21         probable cause that you discussed with Judge Brad
22         Mendheim he issued a search warrant for whose
23         resident and whose vehicles?
24    A    Mr. McNabb's.
25    Q    Now, after you got the search warrant, did you and
```

|    |   |                                                         |
|----|---|---------------------------------------------------------|
| 1  |   | Sergeant Williamson go and execute the search           |
| 2  |   | warrant or any other police officers at any             |
| 3  |   | particular location here in Houston County?             |
| 4  | A | Yes, sir, we did.                                       |
| 5  | Q | What -- where did you go?                               |
| 6  | A | We went to Mr. McNabb's apartment at Barstone.          |
| 7  | Q | Would you tell the ladies and gentlemen of the          |
| 8  |   | jury, when you got to the apartment with Sergeant       |
| 9  |   | Williamson and/or other officers, was anybody at        |
| 10 |   | the apartment?                                          |
| 11 | A | No, sir.                                               |
| 12 | Q | When you got to the door to execute the search          |
| 13 |   | warrant, did you yourself look at the door and see      |
| 14 |   | what the condition of the door was?                     |
| 15 | A | Yes.                                                    |
| 16 | Q | Was it open?  Was it locked?                            |
| 17 | A | When I got to the door, it was open.                    |
| 18 | Q | Who opened it?                                          |
| 19 | A | The Swat team.                                          |
| 20 | Q | That's what I want to ask about.  The Swat team.        |
| 21 |   | When they opened it, did they use physical force        |
| 22 |   | to open the door?                                       |
| 23 | A | Yes, sir.                                              |
| 24 | Q | Now, would you tell the ladies and gentlemen of         |
| 25 |   | the jury, when you went inside, did you execute         |

|     |   |                                                      |
|-----|---|------------------------------------------------------|
| 1   |   | the search warrant; in other words, and leave a      |
| 2   |   | copy after you and Sergeant Williamson and the       |
| 3   |   | other officers searched McNabb's residence in        |
| 4   |   | Dothan, Alabama, Houston County?                      |
| 5   | A | Yes, sir, we did.                                    |
| 6   | Q | Did you also search any of his vehicles at that      |
| 7   |   | time?                                                |
| 8   | A | No, sir.                                             |
| 9   | Q | Now, can you tell the ladies and gentlemen of the    |
| 10  |   | jury, the only people present were law enforcement   |
| 11  |   | officers, correct?                                   |
| 12  | A | Yes, sir.                                            |
| 13  | Q | Did you leave a copy of the search warrant after     |
| 14  |   | you did the search on the television or in the       |
| 15  |   | apartment?                                           |
| 16  | A | Yes, sir, I did.                                     |
| 17  | Q | Can you tell the ladies and gentlemen of the jury    |
| 18  |   | what you found in the apartment? And I want to       |
| 19  |   | limit it if I could, Mr. Singleton, in reference     |
| 20  |   | to any items in relationship to the alleged          |
| 21  |   | robbery on June 7th of 2001 at the Winn Dixie.       |
| 22  |   | Can you tell us?                                     |
| 23  | A | There was a black toboggan in the living room on     |
| 24  |   | the couch. There was a safe in the bedroom closet    |
| 25  |   | that contained food stamps with Winn Dixie stamp     |

1    on them.   There was a money wrapper in the safe

2    that contained a Winn Dixie stamp.   There was a

3    large amount of postage stamps in the safe.   There

4    was bullets to a firearm in the safe.   There was a

5    case of rolled pennies in a closet close to the

6    safe.

7    Q   Now, let me ask you.   The victims at the robbery,

8        have you talked to them to determine in any manner

9        or fashion when the robbery occurred what happened

10       to their hands?

11   A   Yes, sir.

12   Q   Did you find anything in the apartment in

13       reference to the victims that had been robbed as

14       to what they told you happened in relationship to

15       their hands?

16   A   Yes, sir.

17   Q   Tell the jury what you found in McNabb's apartment.

18   A   There was a bag of speaker wire.

19   Q   Now, could you tell the ladies and gentlemen of

20       the jury, I want to particularly ask you about

21       specifically clothing is what I want to ask you.

22       And I want to limit the clothing to my questions

23       if I could, Mr. Singleton, to foot wear.   If I

24       could ask you about some foot wear.   Did you find

25       any type of foot wear in the residence of McNabb's

| 1 | | apartment? |
|---|---|---|
| 2 | A | Yes, sir. |
| 3 | Q | What kind of foot wear did you find? |
| 4 | A | We found a couple of tennis shoes, and I want to |
| 5 | | say we found some boots. |
| 6 | Q | If I could, it's been a long time since the search |
| 7 | | warrant; in other words, today's date, would a log |
| 8 | | have been made and inventory recovered and where |
| 9 | | they were kept in the ordinary course of business |
| 10 | | at the Dothan Police Department? |
| 11 | A | Yes, sir. |
| 12 | Q | In fact, you're looking at that to refresh your |
| 13 | | memory as to whether there were any boots? |
| 14 | A | Yes, sir. |
| 15 | Q | Now, if I could, was Mr. McNabb's wife, was she |
| 16 | | present at the time the search was executed? |
| 17 | A | No, sir. |
| 18 | Q | Let me show you some pictures, if I could -- some |
| 19 | | evidence. I'm sorry. State's Exhibit 4 for |
| 20 | | identification purposes, do you recognize State's |
| 21 | | 4? |
| 22 | A | Yes, sir. |
| 23 | Q | Tell the jury what 4 is. |
| 24 | A | Speaker wire. |
| 25 | Q | Where was that found? |

| | | |
|---|---|---|
| 1 | A | In the bedroom of Mr. McNabb. |
| 2 | Q | Now, would you tell the ladies and gentlemen of |
| 3 | | the jury, did you take custody of it, you or |
| 4 | | Sergeant Williamson? |
| 5 | A | Yes, sir. |
| 6 | Q | Has it been marked, altered, or changed in any |
| 7 | | way except it's got a court's identification |
| 8 | | number today? |
| 9 | A | No, sir. |
| 10 | Q | Did you place it in this bag?  Do you recall? |
| 11 | A | I don't recall. |
| 12 | Q | Besides being in the bag, does the wire, the |
| 13 | | different types or colors, look to be the same |
| 14 | | type of wire? |
| 15 | A | Yes, sir. |
| 16 | Q | And does it look any different today? |
| 17 | A | No, sir. |
| 18 | | MR. VALESKA:  Offer State's 4, Judge White. |
| 19 | | MR. BAXLEY:  No objection, Your Honor, at |
| 20 | | this time. |
| 21 | | THE COURT:  Let it be admitted. |
| 22 | | (State's Exhibit No. 4 was admitted into |
| 23 | | evidence.) |
| 24 | Q | Show you State's 2 for identification purposes. |
| 25 | | Took it out.  I'm holding it in my hand.  Do you |

```
 1          recognize this, Mr. Singleton?
 2    A     Yes, sir.
 3    Q     What is State's 2?  Tell the jury.
 4    A     It's a bibbed toboggan.
 5    Q     And where was it found in the apartment?
 6    A     On the couch in the living room.
 7    Q     Did you take custody of it at that time when you
 8          executed the search warrant until it was brought
 9          into court today in this plastic bag, correct?
10    A     Yes, sir.
11    Q     Has it been marked or changed in any way that you
12          can tell except stuck in this identification bag
13          with a State's 2 on it and then it says a number
14          forty-one with whose initials on the back?
15    A     Those are mine.
16    Q     The forty-one, correct me if I'm wrong, does that
17          have to do with the evidence log in relationship
18          to the inventory when you recovered at the search
19          with your records?
20    A     Yes, sir.
21    Q     So it's in the same substantial condition the best
22          you can tell, correct?
23    A     Yes, sir.
24                MR. VALESKA:  Offer State's 2.
25                MR. BAXLEY:  No objection.
```

1          THE COURT:  Let it be admitted.

2                  (State's Exhibit No. 2 was admitted into

3              evidence.)

4    Q    Let me show you State's Exhibit 5 for

5         identification purposes.  5 for the Record.  Do

6         you recognize 5, Mr. Singleton?

7    A    Yes, sir.

8    Q    It also has a fifty on it.  Once again, can you

9         tell the jury what the number fifty is in black

10        marking is?

11   A    That's a number that we use in relationship to the

12        log sheet as far as keeping track of the evidence.

13   Q    Placed in the little plastic bag, State's 5 for

14        identification purposes, what is it?

15   A    It's a food stamp.

16   Q    And I ask you in relationship to the Winn Dixie to

17        your own personal knowledge in working the robbery

18        case about any kind of identification numbers that

19        would have been on anything from -- taken from the

20        safe.  Do you see anything on there in

21        relationship to what you found in the safe at

22        McNabb's house that corresponds belonging to the

23        Winn Dixie?

24   A    Yes, sir.  It's got their store stamp with their

25        store number on it.

| | | |
|---|---|---|
| 1 | Q | Can you tell me what the number is? |
| 2 | A | Four, twenty-six. |
| 3 | Q | That the way the food stamp is -- if I'm reading |
| 4 | | it wrong, it says value ten dollars this stamp |
| 5 | | with this U.S. Department of Agriculture food |
| 6 | | stamp having found in McNabb's safe? |
| 7 | A | Yes, sir. |
| 8 | Q | Been marked, altered, or changed except stuck in |
| 9 | | the bag with the court's identification number? |
| 10 | A | No, sir. |
| 11 | | MR. VALESKA:  Offer State's 5. |
| 12 | | MR. BAXLEY:  No objection. |
| 13 | | THE COURT:  Let it be admitted. |
| 14 | | (State's Exhibit No. 5 was admitted |
| 15 | | into evidence.) |
| 16 | Q | Go to State's 9 for identification purposes if I |
| 17 | | could, Mr. Singleton.  Looking at 9, it also has a |
| 18 | | forty-nine on it, correct? |
| 19 | A | Yes, sir. |
| 20 | Q | Forty-nine the identification number on your log |
| 21 | | for evidence that was seized from McNabb's |
| 22 | | residence you keep in the evidence log, correct? |
| 23 | A | Yes, sir. |
| 24 | Q | So State's 9, what is the item inside for |
| 25 | | identification purposes? |

| | | |
|---|---|---|
| 1 | A | It's a money wrapper. |
| 2 | Q | What denomination? |
| 3 | A | One thousand dollars. |
| 4 | Q | Any identification marks that you can tell that |
| 5 | | indicate it came from the Winn Dixie, please, sir? |
| 6 | A | Yes, sir. It's got their store stamp on it. |
| 7 | Q | Once again, what's the number? |
| 8 | A | F̶o̶u̶r̶ ̶t̶w̶e̶n̶t̶y̶ ̶s̶i̶x̶. |
| 9 | Q | Does it appear to be marked, altered, or changed |
| 10 | | in any way except it was put in the envelope and |
| 11 | | brought into court in a sealed condition? |
| 12 | A | No, sir. |
| 13 | Q | Same substantial condition? |
| 14 | A | Yes, sir. |
| 15 | | MR. VALESKA:  Offer State's 9. |
| 16 | | MR. BAXLEY:  No objection. |
| 17 | | THE COURT:  Let it be admitted. |
| 18 | | (State's Exhibit No. 9 was admitted into |
| 19 | | evidence.) |
| 20 | Q | State's 6 for identification purposes has an item |
| 21 | | inside, or items.  Can you tell me what the items |
| 22 | | are? |
| 23 | A | Postage stamps.  There's fifty books. |
| 24 | Q | There's handwriting, correct, in black marker? |
| 25 | A | Yes, sir. |

| | | |
|---|---|---|
| 1 | Q | Is that your handwriting with your initials? |
| 2 | A | Yes, sir. |
| 3 | Q | And does it indicate the denomination, the value |
| 4 | | of the stamps, what the price of the stamps are? |
| 5 | A | Thirty-four cents. |
| 6 | Q | And where were these stamps found in relationship |
| 7 | | to the search of McNabb's residence? |
| 8 | A | In the safe. |
| 9 | Q | Did you place them in this plastic bag for |
| 10 | | evidentiary purposes and put the writing of the |
| 11 | | identification of the number of books and the |
| 12 | | value with your initials and seal it up? |
| 13 | A | Yes, sir. |
| 14 | Q | Does it appear to be marked, altered, or changed |
| 15 | | in any way, these fifty books of stamps and these |
| 16 | | adhesive-type style if I could ask you that way |
| 17 | | that they are in, State's 6? |
| 18 | A | No, sir. |
| 19 | Q | Same substantial condition? |
| 20 | A | Yes, sir. |
| 21 | Q | Hadn't been marked or altered in any way? |
| 22 | A | No, sir. |
| 23 | | MR. VALESKA:  Offer 6. |
| 24 | | MR. BAXLEY:  No objection. |
| 25 | | THE COURT:  Let it be admitted. |

```
 1              (State's Exhibit No. 6 was admitted into
 2              evidence.)
 3    Q    Show you State's Exhibit No. 3 for identification
 4         purposes.  Do you recognize what 3 is, Mr.
 5         Singleton?
 6    A    Yes, sir.  It's ████████pennies.
 7    Q    Case ████pennies.
 8              Did you see that case of pennies anywhere in
 9         relationship to McNabb's residence at Barstone, I
10         believe it's J-141 Houston County, when you
11         executed the search warrant on this case in June
12         of 2001, please, sir?
13    A    Yes, sir.
14    Q    Where was it found?
15    A    In the close█████████bedroom.
16    Q    Now, any type of stamps in relationship to
17         identification marks what I want to ask you, store
18         number four twenty-six like on the thousand dollar
19         money wrapper or this food stamp which is on 5
20         that shows four twenty-six on the box of pennies?
21    A    No, sir.
22    Q    Did you discuss with the victims in relationship
23         to the robbery as to whether or not they kept
24         currency; in other words, metal money they got in
25         any manner or fashion from any institutions to use
```

| | | |
|---|---|---|
| 1 | | in their business in this form like this box of |
| 2 | | twenty-five dollars of pennies? |
| 3 | A | Yes, sir. |
| 4 | Q | And did you make a determination as to whether |
| 5 | | allegedly, and, once again, it stands to be proved |
| 6 | | to a jury, that was in the safe at the time of the |
| 7 | | alleged robbery and taken by the alleged robbers? |
| 8 | A | Yes, sir. |
| 9 | Q | You took custody of it, correct? |
| 10 | A | Yes, sir. |
| 11 | Q | Does it appear to be marked, altered, or changed |
| 12 | | in any way except it's got a court's |
| 13 | | identification number at the time you took custody |
| 14 | | until looking at it in court today? |
| 15 | A | No, sir. |
| 16 | Q | Same substantial condition? |
| 17 | A | Yes, sir. |
| 18 | | MR. VALESKA:  Offer State's 3. |
| 19 | | MR. BAXLEY:  Same condition as it was found |
| 20 | | in the apartment? |
| 21 | Q | Same condition as was found in the apartment, |
| 22 | | correct? |
| 23 | A | Yes, sir. |
| 24 | Q | And it's got a forty-two in other words for your |
| 25 | | evidence log is the only thing, correct? |

```
 1    A    Yes, sir.
 2              MR. VALESKA:  He said he had no objection.
 3              THE COURT:  Let it be admitted.
 4                   (State's Exhibit No. 3 was admitted into
 5                   evidence.)
 6    Q    Now, you see Ms. Patsy Roach right here, Mr.
 7         Singleton?
 8    A    Yes, sir.
 9    Q    Did you show her a photographic lineup of anybody
10         in relationship to the alleged robberies of this
11         case?
12    A    Yes, sir.
13    Q    Now, I know it's been a while.  Could you tell us
14         if you recall the best you can in reference to
15         when you did that, there's certain ways you can
16         show photographic lineups to witnesses,
17         particularly Ms. Roach in this case?
18    A    Yes, sir.
19    Q    Do you recall how you first did it?  What manner
20         or fashion or what type of equipment you used when
21         you first showed Ms. Roach a lineup of individuals?
22    A    We generate pictures out of a computer to produce
23         a photographic lineup, and the people that we put
24         in the lineup are similar in nature.
25    Q    So she looked at a photographic lineup from the
```

COURT OF CRIMINAL APPEALS No. CR-03-1141

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

## CIRCUIT COURT OF ___Houston___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC2002-225___ Volume III

CIRCUIT JUDGE ___Jerry M. White___

Type of Conviction / Order Appealed From: ___ROBBERY I___

Sentence Imposed: ___LIfe w/o Parole, and costs___

Defendant Indigent: ☒ YES ☐ NO

Ruben McNabb

Hon. David Hogg                         334-794-8559          **NAME OF APPELLANT**
(Appellant's Attorney)                          (Telephone No.)
188 N. Foster St. Ste 200
(Address)
Dothan, Al.   36303
(City)                    (State)                 (Zip Code)

V.

STATE OF ALABAMA

(State represented by Attorney General)                         **NAME OF APPELLEE**
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)


EXHIBIT
A

1        computer, correct?

2    A   Right.

3    Q   And did she also look at a second time, if I could

4        use the term, you correct me, but a photographic

5        lineup with five or six people, actual pictures in

6        the lineup?  Did she also do that?

7    A   Yes, sir.

8    Q   Would you tell the ladies and gentlemen of the

9        jury, at any time did you tell them when you did

10       that lineup that Ruben Corey McNabb, was he in

11       either one of those two lineups that Ms. Roach saw?

12   A   No, sir.

13   Q   Now, at the time you showed her that lineup, did

14       you know in fact he was one of the alleged two

15       robbers, a hundred percent sure?

16   A   No, sir.

17   Q   Now, she looked at the photographic lineups,

18       correct?

19   A   Yes, sir.

20   Q   And did she pick anybody out or identify anybody?

21   A   She picked out somebody and said that he looked

22       similar that --

23   Q   Did she -- I'm sorry, I cut you off.

24   A   Except for the mustache.

25   Q   Would you tell the ladies and gentlemen of the

| | | |
|---|---|---|
| 1 | | jury, once again, was McNabb in that photographic |
| 2 | | lineup? |
| 3 | A | No, sir. |
| 4 | Q | Now, if I could, Mr. Reeves, Ronald Reeves, you |
| 5 | | see him at the table, the other assistant |
| 6 | | manager?  Do you recognize him? |
| 7 | A | Yes, sir. |
| 8 | Q | Was he also shown a photographic lineup? |
| 9 | A | Yes, sir. |
| 10 | Q | Did you do that or Sergeant Williamson, or do you |
| 11 | | recall?  Or both of you? |
| 12 | A | Sergeant Williamson put the lineup together. |
| 13 | Q | Now, have you interviewed witnesses before that |
| 14 | | have been robbed, Mr. Singleton? |
| 15 | A | Yes, sir. |
| 16 | Q | That have actually had a gun put towards them or |
| 17 | | touch them or threats made toward them? |
| 18 | A | Yes, sir. |
| 19 | Q | Are all witnesses you've interviewed in |
| 20 | | relationship to before June 7, 2001, are they |
| 21 | | extremely calm like I'm asking you questions and |
| 22 | | you're answering in front of a jury?  Is that the |
| 23 | | way they are? |
| 24 | A | No, sir. |
| 25 | Q | Have you interviewed witnesses that were robbed |

| | | |
|---|---|---|
| 1 | | before after the robbery a day or two or a week |
| 2 | | later and they recall more information than they |
| 3 | | did when the robbery first occurred?  Have you |
| 4 | | done that? |
| 5 | A | Yes, sir. |
| 6 | Q | Is that unusual? |
| 7 | A | No, sir. |
| 8 | Q | You're a police officer for years? |
| 9 | A | Yes, sir. |
| 10 | Q | Ever fired your weapon? |
| 11 | A | No, sir. |
| 12 | Q | Were you present when weapons were fired in other |
| 13 | | cases the Dothan police officers made? |
| 14 | A | Yes, sir. |
| 15 | Q | They make loud sound when the weapon was fired? |
| 16 | A | Yes, sir. |
| 17 | Q | Did you observe the demeanor of the police |
| 18 | | officers when -- |
| 19 | | MR. BAXLEY:  I object.  What's the point of |
| 20 | | the question? |
| 21 | | MR. VALESKA:  Withdrawn.  Withdrawn. |
| 22 | | THE COURT:  I agree.  Sustained. |
| 23 | Q | Now, could you tell the ladies and gentlemen of |
| 24 | | the jury, did you ever go back with Sergeant |
| 25 | | Williamson, you yourself, and search any of the |

```
 1              vehicles that belonged to Ruben Corey McNabb or

 2              Yvette McNabb?

 3      A       Yes, sir.

 4      Q       Now, whose vehicle -- do you recall which vehicle

 5              you searched or looked into?

 6      A       We searched the van.

 7      Q       Now, and who had custody or who was driving the

 8              van at that time?

 9      A       Yvette McNabb.

10      Q       Now, can you tell the ladies and gentlemen of the

11              jury, did you find anything in the van that Ms.

12              McNabb was driving that you recall?

13      A       Without refreshing.  You know, I don't recall.

14              There was a lot of change scattered around in the

15              van.  But other than that, I don't recall.

16      Q       If I could ask you, do you recall if it refreshes

17              your memory finding the Defendant's driver's

18              license -- McNabb's?

19      A       I believe they were over the sun visor.

20      Q       If I could, let me show you, once again, an

21              exhibit.  I believe it's No. 10.  It is numbered

22              for identification purposes.  Looking at that, Mr.

23              Singleton, is that the driver's license that you

24              recovered with the consent for her when you

25              searched the van?
```

```
 1    A    Yes, sir.
 2    Q    Appear to be marked or changed in any way except
 3         it's in a plastic bag?
 4    A    No, sir.
 5              MR. VALESKA:  I offer State's 10, the
 6         driver's license.
 7              THE COURT:  Let it be admitted.
 8                  (State's Exhibit No. 10 was admitted
 9                  into evidence.)
10    Q    Now, I know it's been a while.  Did you have any
11         discussions when you searched Ms. -- Mr. and Ms.
12         McNabb's van what -- what do you recall about the
13         van?  What did it look like?  Can you tell me?
14    A    It was pretty nasty.  Pretty filthy.
15    Q    Outside any distinguishing marks in relationship
16         to talking to the victims about anything in
17         relationship to the robbery?  How the van looked?
18         In other words, the make-up, the structure?  What
19         was on the van is what I'm asking.
20    A    Had wood grain paneling on the side of it.
21    Q    And the model was an '89 to '92 range?  Do you
22         recall the year model?
23    A    Yes, sir.
24    Q    Let me go back and ask you.  Shortly after the
25         robbery when the sun was up and then even later
```

```
 1            that night on or about June 7th, did you take any

 2            employees over there to Barstone Apartments to

 3            look for a particular vehicle?

 4    A       Yes, I did.

 5    Q       Was that Ms. Prescott?

 6    A       Yes, it is.

 7    Q       And did she indicate or look at the van?

 8    A       Yes, sir.

 9    Q       Now, did she make any statements to you about

10            identifying the van?

11    A       She said she wasn't sure if the color of the van

12            was the same color, but that the wood grain

13            paneling was exactly the same as what she saw on

14            the van.

15    Q       And what about the relationship -- and I don't

16            know much about cars or vans, but the model or

17            year make, was that within the range or

18            description she gave you she identified what it

19            looked like?

20    A       Yes, sir.

21    Q       The search warrant you have in front of you,

22            correct?

23    A       Yes, sir.

24    Q       Or a copy of it.  Contains the information you

25            gave to Judge Mendheim when you obtained it and
```

```
 1            then you executed and left a copy, correct?

 2    A    Yes, sir.

 3    Q    Now, if I could ask you on June 7th, June 8th,

 4         June 9th -- well, I'll withdraw that.

 5              MR. VALESKA:  That's all I have.  Pass the

 6         witness.

 7                   Thank you very much, Judge White.

 8              THE COURT:  Mr. Baxley.

 9                      CROSS EXAMINATION

10    BY MR. BAXLEY:

11    Q    Back to the van questions since that's on

12         everyone's mind right now at the moment.  You say

13         you took Ms. Prescott over to see the van?

14    A    Yes, sir.

15    Q    You said Ms. Prescott said that looked exactly

16         like the wood grain?

17    A    She said it was the same type wood grain that the

18         vehicle that almost ran her over in the parking

19         lot.

20    Q    She never said the exact same.  According to your

21         report, you're saying it appeared to be the right

22         color.  That doesn't strike me as being an

23         exactness.

24              MR. VALESKA:  I'm going to object.  It

25         doesn't strike Mr. Baxley.  That's his opinion.
```

```
 1              THE COURT:  Well, I believe he's got a right
 2         to ask him what his report says.
 3              MR. VALESKA:  I have no objection to that --
 4              THE COURT:  The other part is argument.
 5              MR. VALESKA:  No objection to what he's
 6         asking what was in the report.
 7    Q    Ms. Prescott did not say this was the exact color
 8         wood grain, did she?
 9    A    She said the wood grain was the same.  She didn't
10         know about the color of the painted part of the
11         van.
12    Q    She couldn't identify that van to be the exact
13         van, could she?
14    A    No, sir.
15    Q    In your search warrant affidavit, you also state a
16         few things in there.  You state that Mr. McNabb
17         had a history of robbery.  Is that true?
18    A    Yes, sir.
19    Q    And was he ever convicted of robbery?
20              MR. VALESKA:  I object.  I object, Your
21         Honor.  The question that was asked by Mr. Baxley,
22         the information that you put in your search
23         warrant was whether Mr. McNabb was arrested for
24         robbery.  And he's answered yes.  He didn't put in
25         the search warrant whether there was a
```

```
 1        conviction.

 2               MR. BAXLEY:  Your Honor, he says --

 3               THE COURT:  Let me just see what it says.

 4               MR. VALESKA:  I don't mind him asking about

 5        it, Judge White, but just the form.

 6               THE COURT:  I know.

 7               MR. VALESKA:  I'll just withdraw.  Let him

 8        ask.  I don't object.

 9               THE COURT:  Where are you talking about?

10               MR. BAXLEY:  This part right here.

11               THE COURT:  McNabb has a history of carrying

12        concealed weapons, robbery, and driving.

13               MR. BAXLEY:  Right.

14               THE COURT:  Go ahead.

15   Q    That's really not true, is it?

16   A    Yes, sir.

17   Q    How is that true?

18   A    He was arrested for robbery according to the rap

19        sheet that we pulled on him in Florida.

20   Q    There had never been any conviction for robbery,

21        had there?

22   A    I believe it was reduced to larceny.  I'm not

23        sure.

24   Q    You're not sure.  That was something you put in

25        there, but weren't actually sure about it, even
```

```
 1            though you claim it was actually a robbery?
 2    A       He was actually charged with a robbery, yes, sir.
 3    Q       Never convicted of a robbery?
 4    A       I don't believe so.  That was in Florida.  I think
 5            it was reduced.
 6    Q       You also claim Ms. Roach picked out another person
 7            in the lineup; is that true?
 8    A       Yes, sir.
 9    Q       Now, was she ever shown a lineup with Mr. McNabb
10            in it?
11    A       I didn't show her one with Mr. McNabb in it.
12    Q       Why not?
13    A       I just didn't, sir.
14    Q       You just didn't show her one?
15    A       No, sir.
16    Q       But you still were talking to her, still got
17            statements from her?
18    A       I had statements from her, and I had talked to
19            her, yes, sir.
20    Q       Did you ever get her to sign a statement?
21    A       I don't recall without refreshing back through the
22            notes, sir.  It's been so long.
23    Q       You're welcome to look at the notes.
24    A       I don't see anything she signed.  I'm not saying
25            she didn't sign anything.  I don't remember.  But
```

1    I don't see anything in this book I have that she

2    signed.

3    Q    I'll move on from this, then.

4          Isn't it true there were no fingerprints or

5    anything else found at the scene that connect Mr.

6    McNabb with that crime scene?

7    A    That's true.

8    Q    And you looked everywhere to find these

9    fingerprints; is that correct?

10   A    Yes, sir.

11   Q    Now, on the photographs that are --

12          MR. BAXLEY:  May I approach, Your Honor?

13          THE COURT:  Sure.

14   Q    The photographs that are in evidence, there's some

15   pretty discernible fingerprints on things.  Would

16   that be true?

17   A    Yes, sir, there's foot prints.

18   Q    Now, would it be possible for an analysis to be

19   done on a foot print such as that to determine the

20   shoe it came from, the type shoe, size shoe,

21   something of that nature?

22   A    I'm sure it might be possible, yes, sir.

23   Q    Do you send off for those analysis?

24   A    No, sir, I didn't.

25   Q    Even though you had the evidence right there?

```
 1    A    Well --
 2    Q    You claimed a moment ago you sent off for those
 3         analysis on things, and now you're saying you
 4         didn't?
 5    A    Not on shoe prints.  On fingerprints.
 6    Q    Fingerprints.
 7              Anything else, though?  You just looked at
 8         fingerprints?
 9    A    No, sir.  We looked at the shoe prints and took
10         photographs, but we --
11    Q    Were you able to match up the shoes from any shoes
12         you confiscated from Mr. McNabb?
13    A    I didn't match any up, no, sir.
14    Q    As far as the fingerprints go, was there any
15         evidence or any statements from either of the
16         victims here that the robbers wore gloves?
17    A    No, sir.
18    Q    In fact, they didn't wear gloves as far as you
19         know; is that correct?
20    A    That's correct.
21    Q    Was it your opinion from the beginning that this
22         was an inside job?
23              MR. VALESKA:  I object.
24    Q    Did you ever formulate that opinion?
25              MR. VALESKA:  I object, Judge White, to what
```

```
 1          this officer's opinion is in relationship to his
 2          job.
 3               MR. BAXLEY:  Your Honor, he's investigating
 4          this robbery and had to theorize what went on at
 5          this robbery to conduct his investigation.  He's
 6          familiar with these things --
 7               THE COURT:  Was it your opinion -- do you
 8          mean was there any evidence?
 9               MR. BAXLEY:  Yes, sir.  Yes, sir.  I'll
10          rephrase the question.
11               MR. VALESKA:  That's fine.
12               THE COURT:  I overrule.
13     Q    Was there any evidence that this was an inside job?
14     A    No, sir.
15     Q    No evidence at all?
16     A    No, sir.
17     Q    Did you not state in an early deposition that you
18          considered this to be an inside job at one point?
19     A    Yes, sir.
20     Q    So why the difference in your testimony now?
21     A    I didn't have enough evidence to arrest anybody
22          for the inside job.  It was in my opinion at that
23          point that, you know, I thought somebody inside
24          was involved in it, but I didn't have the evidence
25          to arrest anybody that worked at the scene.  And
```

```
 1              there was two people involved in the robbery.  And
 2              I had enough evidence to arrest Mr. McNabb.
 3     Q    Well, there was some consideration that this was
 4              an inside job?
 5     A    Yes, sir.
 6     Q    But you just couldn't -- didn't have enough
 7              evidence to pin it on someone inside, so to speak?
 8     A    That's true.
 9     Q    You also claimed that you went to Barstone
10              Apartments on a hunch.  I want you to tell the
11              jury how you ended up at Barstone Apartments over
12              anywhere else in the entire city.
13                  MR. VALESKA:  I object to the form.  I don't
14              believe there was any testimony from this officer
15              that he went to Barstone --
16                  THE COURT:  Yeah, he did.  He testified he
17              took a witness to Barstone --
18                  MR. VALESKA:  I'll -- I'll withdraw.  Go
19              ahead.
20                  THE COURT:  I think he's asking --
21                  MR. VALESKA:  I'll withdraw.  I'll withdraw.
22              Mr. Baxley, I apologize.  Go ahead.
23     Q    On the night of the investigation, I'm assuming
24              you went to the Winn Dixie?
25     A    That's right.
```

```
 1   Q   You went to Barstone at some point.  What was the
 2       time period between the beginning of your
 3       investigation when you went to Barstone Apartments
 4       and how did you come to go to Barstone Apartments?
 5   A   I can refresh my notes.  I'm not sure.  I want to
 6       say that we went to Barstone the following day
 7       after the robbery, but I can look back and see
 8       exactly when.  I didn't go the night that I went
 9       to Winn Dixie.  I know that.
10   Q   I'm just curious.  What dragged you to Barstone
11       Apartments out of everywhere in the City of
12       Dothan?  Why did you go to Barstone Apartments?
13       What is it about Barstone Apartments that made you
14       go to Barstone Apartments?
15   A   Can I look?
16   Q   Yes, sir.  Feel free to.
17   A   I don't know why we went to Barstone at that time.
18   Q   So it was just a hunch?
19   A   It's possible and I don't recall.  It's been so
20       long that me and Sergeant Williamson were just
21       riding around looking for the van with wood grain
22       paneling on the side and we found one at the
23       apartment complex.  I don't recall why we wound up
24       at Barstone.
25   Q   This was just a random van in a parking lot with
```

```
 1              wood grain siding; is that true?

 2     A    Yes, sir.

 3     Q    Just all of a sudden everything falls into place?

 4     A    No, sir.

 5     Q    You just tell me that.  You happened upon this

 6              thing -- what, we have sixty-five thousand

 7              residents in Dothan and you happened upon one van

 8              that you claim was the one that was used in this

 9              robbery and just happened to be -- happened to

10              belong -- is this the luckiest investigation ever?

11     A    No, sir, I didn't say that.

12     Q    Well, tell us here.  I'm trying to connect --

13              there's got to be a connection between that and

14              the robbery.

15                   MR. VALESKA:  I object.  He's asked --

16                   THE COURT:  I sustain the objection.  He's

17              answered the question.  He said he didn't remember

18              why they went to Barstone.

19     Q    Did you have any conversation with Reggie Hill

20              prior to going to Barstone?

21     A    I'm sure I talked to him at the store during the

22              initial investigation of the robbery, and that was

23              prior to going to Barstone; so, yes, sir, I did.

24     Q    Is it possible you went to Barstone on a hunch to

25              find out about Reggie Hill?
```

216

```
 1    A    At that point, no, sir.

 2    Q    Did you know Reggie Hill lived there?

 3    A    Not at that point, no, sir.

 4    Q    Are you sure you didn't know at that point or are

 5         you just theorizing you didn't know at that point?

 6    A    I went back to the Winn Dixie the next day and got

 7         a list of the employees who lived there, of the

 8         employees who were at work.  But I did not know

 9         that Reggie Hill lived at the apartment at that

10         point.

11    Q    How many food stamps -- not food stamps.  How much

12         money in postage stamps was taken from the Winn

13         Dixie?

14    A    I don't believe I have that information, sir.

15    Q    It's on the front of your incident sheet.

16    A    It says nine hundred and seven dollars and forty

17         cents.

18    Q    Over nine hundred dollars in postage stamps were

19         taken from the Winn Dixie; is that correct?

20    A    Yes, sir.

21    Q    And how many postage stamps were found at the

22         McNabb household?  The value of that.

23    A    Well, there's fifty books of postage stamps that

24         are thirty-four cents each.  Then there's

25         forty-eight thirty-six -- that's thirty-three
```

217

```
 1              cents each, which the value of those is eleven

 2              dollars and eighty-eight cents.  I don't know what

 3              the value of the fifty books are without --

 4    Q    Fifty books.  So there's ten on each book here.

 5    A    And they are thirty-four cents each.

 6    Q    About a hundred and eighty dollars.  Does that

 7              sound correct to you?

 8    A    Close.

 9    Q    If you do the math.

10    A    And eleven eighty-eight on some additional ones

11              that we recovered.

12    Q    So over nine hundred dollars in stamps taken but

13              the only thing you found were exactly fifty books

14              in the McNabb household?

15    A    It wasn't exactly fifty books.

16    Q    Plus the thirty-three cent stamps?

17    A    Yes, sir.

18    Q    And explain to the jury where all this stuff was

19              located in the McNabb house when you went and

20              searched it.

21    A    All of what stuff?

22    Q    All of the stuff you found.  We got a box of

23              pennies.  We got stamps.  And these food stamps

24              and money wrapper.

25    A    Those items were found in the safe in the closet.
```

218

1    Q    You're discussing a safe.  What kind of safe are

2         we talking about here?  Is it a dial safe?  A big

3         safe?

4    A    No.  It's a small like a Century safe.

5    Q    One of those little box things.  Does it have a

6         handle on it?

7    A    Yeah.  Century safe.  It's actually called a safe.

8    Q    Big?  Or a little one?

9    A    I would say it was probably, I don't know, maybe

10        two foot by one foot.  It was in the evidence.

11   Q    Lunchbox size or --

12   A    Bigger than a lunchbox I would say.

13   Q    Much bigger?

14   A    Two lunchboxes.

15   Q    It wasn't a gigantic safe by any means?

16   A    No, sir.

17   Q    Was anything else in that safe?

18   A    There were some silver certificates -- two of

19        them.

20   Q    Was any silver certificates stolen from the Winn

21        Dixie?

22   A    I don't know, sir.  I mean, it's possible they

23        were in with the money and Winn Dixie didn't know

24        it.  There were thirty-one dollar food stamps.

25   Q    Any of those have Winn Dixie stamp on them?

```
 1   A   I don't recall without refreshing my memory and

 2       looking at them, sir.  There was also three, three

 3       eighty caliber bullets in the safe.  There was --

 4       the single postage stamps were also in the safe.

 5       The Winn Dixie money wrapper was in the safe.  The

 6       ten dollar food stamp was in the safe.

 7   Q   Where in the house was this safe located?

 8   A   In a bedroom closet floor.

 9   Q   Bedroom closet floor.

10           Was it out in the open or pushed back in a

11       corner somewhere?

12   A   It was just as you walk in the closet, and it was

13       laying on the floor on the bottom.

14   Q   Was it locked?

15   A   I don't believe it was.  I don't recall.

16   Q   So it was open.

17           Out of -- I think we can all -- testimony

18       has been presented that almost twenty thousand

19       dollars in cash was taken from the Winn Dixie.  Is

20       that your recollection?

21   A   Yes, sir.

22   Q   How much cash was found in McNabb's apartment?

23   A   Well, there was the box full of pennies.  There

24       was a pink-looking piggy bank that was filled with

25       an assortment of change.
```

```
 1    Q    Child's piggy bank?

 2    A    Yes, sir.  And there was silver certificates that

 3         were found.

 4    Q    So three one dollar silver certificates and

 5         twenty-five dollars in pennies; is that correct?

 6         That's all the cash that was found in that

 7         apartment?

 8    A    Plus the bank full of change.

 9    Q    Plus the piggy bank?

10    A    Yes, sir.

11    Q    Did you find a gun in that apartment?

12    A    No, sir.

13    Q    So out of all these things here, the only things

14         that physically are connected to the Winn Dixie

15         are food stamp and the money wrapper that are

16         stamped Winn Dixie; is that correct?

17    A    I would say --

18    Q    As far as physical recognition.

19    A    Yes, sir.

20    Q    And it is your testimony that you-all did consider

21         Reggie Hill at a suspect at one point?

22    A    Yes, sir.

23            MR. BAXLEY:  Nothing further right now, Your

24         Honor.  Reserve the right to recall.

25            THE COURT:  Anything else on redirect?
```

```
 1          MR. VALESKA:  No.  Ask if he could be

 2     excused.

 3          THE COURT:  Do you have any objection?

 4          MR. BAXLEY:  I'm sorry, I didn't hear.

 5          THE COURT:  To his being excused?

 6          MR. BAXLEY:  We might need him for recall,

 7     Your Honor.  After Ms. Williamson, might possibly

 8     not need him.

 9          THE COURT:  You can be excused, then.

10          MR. VALESKA:  The State rests.

11          THE COURT:  Ladies and gentlemen, I'm going

12     to let you go to the jury room.  We'll take a

13     little recess because you've been here over an

14     hour.  And just recall the instructions I've given

15     you about not discussing the case among yourselves

16     or with anyone else.  And we'll call for you in

17     about fifteen minutes.

18               (Jury not present.)

19          THE COURT:  Let the Record show that this is

20     out of the presence and hearing of the trial

21     jury.  Since the State has rested, you may have a

22     motion or motions to make.

23          MR. BAXLEY:  Just a motion to dismiss.  They

24     haven't met their prima facie burden of proof to

25     hold this charge, Your Honor.
```

```
 1              THE COURT:  And motion for judgment of

 2      acquittal at the close of the State's case is

 3      denied.

 4              Let's take about fifteen minutes.

 5          MR. BAXLEY:  Thank you, Your Honor.

 6              (Off the Record.)

 7          THE COURT:  Bring the jury.

 8              (Jury present.)

 9          THE COURT:  Mr. Baxley, who will your first

10      witness be?

11          MR. BAXLEY:  First witness will be Mr. Corey

12      McNabb, Your Honor.

13                  RUBEN CORY MCNABB

14      having first been duly sworn, was examined and

15      testified as follows:

16                  DIRECT EXAMINATION

17  BY MR. BAXLEY:

18  Q   Please state your name for the Judge and jury.

19  A   Ruben Corey McNabb.

20          THE COURT:  You're going to need to get a

21      little closer.

22  Q   Mr. McNabb, you understand you've been charged

23      with a very serious crime here?

24  A   Yes, sir.

25  Q   For the sake of everyone here, did you rob the
```

| | | |
|---|---|---|
| 1 | | Winn Dixie on Westgate Parkway on June 7, 2001? |
| 2 | A | No, I didn't. |
| 3 | Q | How can you be so sure about that? |
| 4 | A | I was in Orlando, Florida, when this happened. |
| 5 | Q | And how can you be so sure you were in Orlando at |
| 6 | | that time? |
| 7 | A | Because my car broke down.  Plus my little girl |
| 8 | | got out of school that Friday. |
| 9 | Q | Do you have a regular visitation schedule with |
| 10 | | that daughter down there? |
| 11 | A | Yes, sir. |
| 12 | Q | Who is this daughter?  Tell me about this |
| 13 | | daughter. |
| 14 | A | It's my little girl, Taquasia, that I have with a |
| 15 | | previous -- with another young lady.  And she was |
| 16 | | I say about six or seven years old at the time. |
| 17 | | Every summer I go pick her up for her to spend the |
| 18 | | summer with me, my wife, and my other little girl. |
| 19 | Q | So this was a regular visitation? |
| 20 | A | Yes, sir. |
| 21 | Q | When do you typically pick up Taquasia? |
| 22 | A | At the end of each school year. |
| 23 | Q | And about when was that? |
| 24 | A | That be about the end of -- the beginning of June, |
| 25 | | the end of May. |

224

```
 1    Q    So it fell within that range each year?  It wasn't
 2         a certain day?
 3    A    It's been within two to three days every year.
 4    Q    I'm going to show you a calendar here.  This is
 5         just a calendar of June, 2001.  June, 2001.  I
 6         think we can all agree that -- I think we can all
 7         agree the robbery took place on June 7th; is that
 8         correct?
 9    A    Yes, sir.
10    Q    Is that your understanding of things?
11    A    Yes, sir.
12    Q    When do you say you went to Orlando?
13    A    I went to Orlando that Sunday.
14    Q    Which Sunday is that?
15    A    The 3nd.
16    Q    June 3rd?
17    A    Yes, sir.
18    Q    How can you be so sure you went on June 3rd?
19    A    Because her mother had to be at work that Monday.
20    Q    And whose mother is that?
21    A    That's Taquasia's mother.
22    Q    So when did you return from Orlando, or did you
23         return from Orlando?
24    A    No, I never did return from Orlando.
25    Q    Why didn't you come back from Orlando?
```

| 1 | A | Because I was accused of this robbery. |
| 2 | Q | Now, you've been sitting here and there's been |
| 3 | | some testimony about Reggie Hill and your |
| 4 | | relationship with Reggie Hill. Can you explain |
| 5 | | your relationship with Reggie Hill to this jury? |
| 6 | A | When I met Reggie Hill around -- I say -- I moved |
| 7 | | up here in September of '99. I met Reggie Hill |
| 8 | | shortly after on the basketball court. We used to |
| 9 | | play basketball two to three times a week. We |
| 10 | | went out together. We cooked on the grill. He |
| 11 | | knew my little girls. And I say we had a pretty |
| 12 | | good standing relationship. |
| 13 | Q | Did you-all ever discuss each other's lives with |
| 14 | | each other? |
| 15 | A | Yes, sir. |
| 16 | Q | Did you know where each of you worked? |
| 17 | A | Yes, sir. |
| 18 | Q | Did you know about each other's families? |
| 19 | A | Yes, sir. |
| 20 | Q | So you're saying here you knew that he worked at |
| 21 | | the Winn Dixie? |
| 22 | A | Yes, sir. |
| 23 | Q | Did you know when he worked at the Winn Dixie? |
| 24 | A | I just knew he had the night shift. |
| 25 | Q | Did he know when and where you worked? |

```
 1    A    Yes, sir.
 2    Q    Did he know when and where -- and where did you
 3         work at that time?
 4    A    I worked at King Church Furniture.  He dropped me
 5         off there a couple of times.
 6    Q    What did you do at King Church Furniture?
 7    A    I'm a carpenter.
 8    Q    And what were your usual working hours there?
 9    A    From twelve to nine-thirty.
10    Q    A.m. or p.m?
11    A    From twelve noon to nine-thirty at night.
12    Q    Obviously you were in Orlando at the time of this
13         robbery according to your testimony.  You
14         mentioned a moment ago that you say your car broke
15         down?
16    A    Yes, sir.
17    Q    What happened to your automobile?
18    A    When I got down there -- well, on the way down, my
19         transmission started slipping on me.  I took it by
20         the shop and got an appraisal --
21    Q    Hold on a minute.  What shop did you take it to?
22    A    I took it to Greg's Automotive.
23    Q    And where is Greg's Automotive?
24    A    In Orlando, Florida.
25    Q    And what day did you take it -- well, what day did
```

```
 1        you arrive in Orlando?

 2   A    I arrived that Sunday.

 3   Q    That Sunday.

 4        So it was a one-day trip from Dothan to

 5        Orlando?

 6   A    Yes, sir.

 7   Q    When did you take the car to Greg's?

 8   A    I went to -- it was a couple of days -- well, when

 9        I initially got down there, it started getting

10        worser and worser.  So I took it by the shop.  It

11        would have to be like -- I want to say that

12        Tuesday or Wednesday I took it.  I took it to the

13        shop first and he told me --

14        MR. VALESKA:  I object to what he told him.

15        That's hearsay.

16        THE COURT:  I sustain the objection.

17        MR. VALESKA:  Not that was Greg's, but what

18        he said.  I'm sorry.  Go ahead.

19   Q    The automotive --

20        THE COURT:  You withdraw the objection?

21        MR. VALESKA:  No.  I withdraw the objection.

22        THE COURT:  Go ahead.

23   Q    So you say you took it to Greg's Auto?

24   A    Yeah, Greg's shop.

25   Q    On either on Tuesday or Wednesday?
```

```
 1    A    Yes, sir.

 2    Q    Did Greg give you a receipt or anything for that?

 3    A    Yes.  One of the people at his shop gave me a

 4         receipt.

 5    Q    I'm going to show you what's been marked as

 6         Defendant's 1.

 7                   (Defendant's Exhibit No. 1 was marked

 8                    for identification.)

 9         MR. VALESKA:  I need to ask him a question on

10         voir dire.

11         You saying somebody else gave him the receipt

12         besides Greg?  Is that what he said?

13         THE COURT:  I don't know what he said.  Take

14         him on voir dire.

15                      VOIR DIRE EXAMINATION

16    BY MR. VALESKA:

17    Q    This piece of paper that's marked Defendant's

18         Exhibit 1, was Greg the one who gave you that?

19    A    Yes.  One of the people at Greg's shop --

20    Q    No, sir.  The question was, did Greg give you

21         that?

22    A    One of the people at Greg's shop --

23         MR. VALESKA:  Judge, I would ask you to ask

24         him to answer the question.

25    Q    Was it Greg himself or a different person, please,
```

1       sir?

2  A   Did Greg hand me the receipt himself?

3  Q   Yes, sir.

4  A   No, sir.

5  Q   You're saying it's a different person?

6  A   Yes, sir.

7       MR. VALESKA:  Objection.  There's no

8      foundation.  We've got a different person.

9      There's no predicate been layed.  Judge, I move to

10     exclude because that's going to be hearsay what

11     somebody else did.

12       MR. BAXLEY:  Your Honor, we're simply -- I'm

13     simply introducing this to say he got a receipt --

14       THE COURT:  I overrule.  Go ahead.

15       DIRECT EXAMINATION CONTINUED

16  BY MR. BAXLEY:

17  Q   So you received a receipt from Greg's Auto Shop

18     for this repair?

19  A   Yes, sir.

20  Q   Does that receipt say when the car was brought in?

21  A   It says 6-6-01.

22  Q   So car to shop on 6-6.

23       In Orlando, Florida?

24  A   Yes, sir.

25  Q   What time of day or night did you take it in?  Do

```
 1        you recall that?
 2    A   Not right offhand, sir.
 3    Q   They --
 4    A   It was -- it have to be in the daytime.
 5    Q   Did they tell you when you could get your car
 6        back?
 7    A   He told me --
 8            MR. VALESKA:  I object to what somebody else
 9        told him.  That's hearsay.
10    Q   When were you promised the car --
11            MR. VALESKA:  I object.
12            THE COURT:  I sustain.  You can't say what
13        somebody else said.
14    Q   When did you expect the car to be back in your
15        possession?
16    A   A couple of days.
17    Q   A couple of days.
18            What exactly had to be done to the car?
19    A   The transmission had to be tooken out of it and
20        changed over.
21    Q   So a new transmission had to be placed in the
22        automobile?
23    A   Basically, yes, sir.
24    Q   Is that something that takes a day or two days or
25        what?  Do you have any idea?
```

```
 1    A    No, sir.

 2    Q    Did Mr. Hill ever come to your apartment?

 3    A    Frequently.

 4    Q    And did you ever -- did he ever have access to

 5         your keys at any time?

 6    A    Yes, sir.  He drove my vehicles, and I drove his.

 7    Q    Did -- now, your apartment itself, where was your

 8         apartment in relation to Mr. Hill's apartment?

 9    A    If you come into Barstone Apartments, you have to

10         go around to the left.  It's basically a one-way

11         around the apartments.  You come around the

12         apartment, I say thirty feet from the entrance is

13         my apartment.  You have to go all the way around

14         to the back to the corner on this side over here

15         to get to Reggie Hill's apartment.

16    Q    So they were pretty close to each other?

17    A    No.

18    Q    Not too close?

19    A    If you walk through the apartment complex, you

20         could walk right to my apartment.

21    Q    But just walking distance it definitely was?

22    A    If you went through the outside, it take you

23         longer.  My apartment sit on the inside of the

24         apartments.  But if you walk right through the

25         back, you could walk to Reggie's apartment from
```

| 1 | | there. |
|---|---|---|
| 2 | Q | You've obviously heard testimony a lot of items |
| 3 | | were found in your apartment.  That being stamps, |
| 4 | | money -- food stamps and money wrappers here and a |
| 5 | | black toboggan.  What do you know about those |
| 6 | | items? |
| 7 | A | I know about the food -- the -- these stamps |
| 8 | | here.  And this here. |
| 9 | Q | Do you know anything about the food -- |
| 10 | A | Food stamps and that money wrapper, I have never |
| 11 | | seen in my life. |
| 12 | Q | What would you have done with such a large number |
| 13 | | of stamps? |
| 14 | A | I've been to prison before.  I just got out of |
| 15 | | State of Florida prison September 28, 1999.  And |
| 16 | | that's how me and my wife wrote each other. |
| 17 | Q | You used stamps -- you had stamps from that? |
| 18 | A | Yes, sir. |
| 19 | Q | Reggie Hill also testified that you had asked him |
| 20 | | questions about how much money went through the |
| 21 | | Winn Dixie, what the night manager looked like, |
| 22 | | who the night manager was.  Do you recall having |
| 23 | | any of those conversations with him? |
| 24 | A | Not right offhand, no, sir. |
| 25 | Q | Did you ever ask him just general things about his |

1        work?

2   A   Yeah. We talked about -- we were friends. We

3        might talk about how was your day at work or he

4        might ask me how my day at work was. Just general

5        talking.

6   Q   But you never asked him anything about how to rob

7        a store, then?

8   A   I had no interest in robbing no stores. I was

9        making pretty good off my job I was working.

10   Q   We also know that your apartment was searched at

11        some point; is that correct?

12   A   Yes, sir.

13   Q   How were you notified your apartment had been

14        searched?

15   A   I was told by a friend over the phone.

16            MR. VALESKA: I object to what a friend told

17        him. That's hearsay.

18            THE COURT: He's just trying to establish

19        that -- how he found out his apartment had been

20        searched. I overrule.

21   Q   You were notified by a friend your apartment was

22        searched?

23   A   Yes, sir.

24   Q   And when was that, roughly?

25   A   13th -- 14th. Something like that.

1   Q   Somewhere in that area?

2   A   Yes, sir.

3   Q   Found out about search in that area.

4       And there's also been some testimony you

5       contacted the Dothan -- the Dothan Police

6       Department was either contacted you or you were

7       contacting them.  Can you tell us anything about

8       that?

9   A   Yes, sir.  After I found out about this here, I

10      did call the Dothan Police Department.  And the

11      dude was very rude with me.

12  Q   What did they tell you?

13  A   He told me -- well, he cussed me out basically.

14  Q   He cussed you out?

15  A   Yes, sir.

16  Q   Do you recall what the name of this officer was?

17  A   No, I don't.

18  Q   And you're saying you contacted him?

19  A   Yes.  I called up there.

20  Q   And what was your reason for calling the Dothan

21      Police Department?

22  A   I just wanted to find out basically why they went

23      in my wife's apartment.

24  Q   Why didn't you come back up here from Orlando?

25  A   Because of the threat he made.

| | | |
|---|---|---|
| 1 | Q | What kind of threat did he make to you? |
| 2 | A | He told me he was going to get my mother fucking |
| 3 | | ass as soon as -- when he seen me, he was going to |
| 4 | | get my mother fucking ass. He said it just like |
| 5 | | that. And living here in Dothan, when I did move |
| 6 | | here, I seen six cases where -- just, you know, |
| 7 | | police brutality and things like that -- |
| 8 | Q | Don't get into that kind of stuff. |
| 9 | | But you can sit here today and absolutely |
| 10 | | tell this Judge and jury, look them in the eyes, |
| 11 | | and say that you did not rob that Winn Dixie; is |
| 12 | | that correct? |
| 13 | A | I was in Orlando, Florida, with my little girl. |
| 14 | | MR. BAXLEY: Nothing further at this time, |
| 15 | | Your Honor. |
| 16 | | THE COURT: Mr. Valeska. |
| 17 | | CROSS EXAMINATION |
| 18 | | BY MR. VALESKA: |
| 19 | Q | Let me ask you, if I could, please, Mr. McNabb, |
| 20 | | it's your testimony that you went down to Orlando |
| 21 | | on what day? |
| 22 | A | Sunday. It would have to be the 3rd on that |
| 23 | | calendar. |
| 24 | Q | Now, where does your father live? |
| 25 | A | My father stays in Eufaula. |

| | | |
|---|---|---|
| 1 | Q | Now, let me ask you something.  Mr. Baxley said it |
| 2 | | takes one day to drive to Orlando, right? |
| 3 | A | No, it doesn't take one day to drive to Orlando. |
| 4 | Q | Shorter than that? |
| 5 | A | Very shorter. |
| 6 | Q | You went down on the 3rd and went to Orlando? |
| 7 | A | Yes, sir. |
| 8 | Q | That's when you left your house with your wife, |
| 9 | | correct? |
| 10 | A | No, sir. |
| 11 | Q | In fact, you left before that, didn't you?  You |
| 12 | | left Dothan before June 3rd, didn't you? |
| 13 | A | Yes, sir. |
| 14 | Q | In fact, you went to another town, didn't you? |
| 15 | A | Yes, sir. |
| 16 | Q | Tell the jury where you went. |
| 17 | A | Eufaula. |
| 18 | Q | So you were going down to pick up your little girl |
| 19 | | because it's your testimony that she got off the |
| 20 | | end of May or first of June, right? |
| 21 | A | Yes, sir. |
| 22 | Q | And you've told this jury that you left and went |
| 23 | | to Orlando on June 3rd, correct? |
| 24 | A | Yes, sir. |
| 25 | Q | Now, your wife, Yvette McNabb, had just had a |

| | | |
|---|---|---|
| 1 | | baby, correct? |
| 2 | A | ~~May 15th~~ |
| 3 | Q | May 15th. |
| 4 | | How many children were living in the house |
| 5 | | with you and her at Barstone Apartments on May |
| 6 | | 16th or 17th or whenever she came home with the |
| 7 | | baby?  How many other children? |
| 8 | A | One other child. |
| 9 | Q | So there were two children total, correct? |
| 10 | A | Yes, sir. |
| 11 | Q | Let me ask you something.  You quit your job, |
| 12 | | didn't you? |
| 13 | A | Yes, sir. |
| 14 | Q | You quit your job working for the church furniture |
| 15 | | company, correct? |
| 16 | A | Yes, sir. |
| 17 | Q | And it's your testimony you were a carpenter, |
| 18 | | correct? |
| 19 | A | Yes, sir. |
| 20 | Q | You weren't just a common laborer? |
| 21 | A | I was a carpenter, sir. |
| 22 | Q | Now, my question to you is, when you quit your |
| 23 | | job, when did you quit your job? |
| 24 | A | I would say -- well, let me put it like this |
| 25 | | here -- |

| | | |
|---|---|---|
| 1 | Q | No, the question was when did you quit your job. |
| 2 | | Give me the date, please, sir. |
| 3 | A | When was the last day I went to my job or when did |
| 4 | | I quit my job? |
| 5 | Q | When did you quit your job? |
| 6 | A | I never actually quit my job. |
| 7 | Q | When is the last day you worked? |
| 8 | A | It would have to be around the time my wife had my |
| 9 | | little boy was the last time I went to my job. |
| 10 | Q | So you had no income coming in after that, correct? |
| 11 | A | No, sir. |
| 12 | Q | And your wife was not working, correct? |
| 13 | A | No, sir. |
| 14 | Q | She had no income coming in, correct? |
| 15 | A | Yes, she did have income. |
| 16 | Q | What was the income she had coming in? |
| 17 | A | Well, she was getting maternity money from her |
| 18 | | company because she had been there for a while. |
| 19 | Q | Mr. McNabb, it was your testimony that she was |
| 20 | | getting money for how long, please, sir? |
| 21 | A | I can't say. |
| 22 | Q | Let me help you a little bit.  You recall when she |
| 23 | | gave testimony under oath before in front of you, |
| 24 | | correct? |
| 25 | A | Yes, sir. |

| | | |
|---|---|---|
| 1 | Q | You recall her saying she got only one week's |
| 2 | | worth of pay when she left Chick-fil-A? |
| 3 | A | I don't recall that. |
| 4 | Q | Do you deny that? |
| 5 | A | I don't recall. |
| 6 | Q | Let me ask you this.  If that was true, she only |
| 7 | | had one week and you only had one week, can you |
| 8 | | tell the jury how you were going to support your |
| 9 | | wife and two children if you had no income coming |
| 10 | | in? |
| 11 | A | We had a bank account. |
| 12 | Q | Where was your bank account? |
| 13 | A | I believe it was Southeast at the time. |
| 14 | Q | Excuse me?  Southeast?  Southeast bank? |
| 15 | A | Something like that, sir. |
| 16 | Q | In Dothan? |
| 17 | A | We had one here in Dothan, and then we had an |
| 18 | | account in -- |
| 19 | Q | In Orlando? |
| 20 | A | Yes, sir. |
| 21 | Q | Where in Orlando? |
| 22 | A | I want to say Washington Mutual. |
| 23 | Q | Where? |
| 24 | A | Washington Mutual if I'm not mistaken. |
| 25 | Q | Washington Mutual if you're not mistaken. |

```
 1              Let's go to -- it is true that you owned and

 2        your wife owned a van that had wood paneling,

 3        correct?

 4   A    Yes, sir.

 5   Q    You own a Buick LaSabre, correct?

 6   A    Yes, sir.

 7   Q    And you also own a tan Cadillac, correct?

 8   A    Yes, sir.

 9   Q    And it's true you had never had a problem, any

10        words, fights, disagreements with Reggie Hill, had

11        you?

12   A    No, sir.

13   Q    Now, what I want to ask you, it's your testimony

14        that you went to Orlando on June 3rd to pick up

15        your child, correct?

16   A    Yes, sir.

17   Q    How long did you stay in Orlando?  How many days?

18   A    I ended up staying there, sir.

19   Q    Well, my question was, how many days were you

20        going to stay down there?

21   A    I was going to get my little girl.

22   Q    Were you going to stay for fourteen days?  Was

23        that your original plan?

24   A    No, sir.

25   Q    Now, you were going to get your daughter?
```

```
 1    A    Yes, sir.

 2    Q    Were you going to pick your daughter up on Monday

 3         and come back?  Is that what happened?

 4    A    Yes, sir.

 5    Q    But your wife was here in Dothan with two children

 6         and she had just had a baby, and, yet, you stayed

 7         down in Orlando?

 8    A    Yes, sir.

 9    Q    Correct?

10    A    Yes, sir.

11    Q    Now, your wife came to Orlando on what day?

12    A    I want to say that following weekend.  Like,

13         Saturday.

14    Q    Saturday, correct?

15    A    Yes, sir.

16    Q    Now, let me ask you, if I could, you and your wife

17         weren't having any problems, were you?

18    A    Yes.  Because of me being out of town.  Frequently

19         as I was.

20    Q    So it's your testimony under oath, then, when you

21         left to go get your daughter, you and your wife

22         were having problems?

23    A    I wouldn't say problems --

24    Q    Were you split up or anything like that?

25    A    No, sir.
```

1    Q    Now, my question to you is, you got to Orlando,
2         right?
3    A    Yes, sir.
4    Q    And did you have communications with your wife?
5    A    Yes.
6    Q    How did you do that?  How would you talk to your
7         wife?
8    A    Over the phone.
9    Q    Cell phone or regular phone?
10   A    Over a regular phone.
11   Q    Did you talk to her every day?
12   A    I talked to her enough that --
13   Q    What I want to ask you about.  You just had a new
14        baby in the family.  Were you concerned about your
15        child?
16   A    Most definitely.
17   Q    So the question was, would you talk to her every
18        day?
19   A    It's been three years.  I can't tell you the
20        answer to that.  But I know I had contact with her
21        over that period, yes, sir.
22   Q    You told the ladies and gentlemen of the jury a
23        friend called you and told you the police had been
24        to the house; is that correct?
25   A    Yes, sir.

| | | |
|---|---|---|
| 1 | Q | Your wife didn't call you? |
| 2 | A | No, sir. |
| 3 | Q | My question to you is when your friend called and |
| 4 | | told you the police had been to your apartment, |
| 5 | | there was no arrest warrant at that time for you, |
| 6 | | was there? |
| 7 | A | I wouldn't know, sir. |
| 8 | Q | Did you ask the police if you were under arrest, |
| 9 | | Mr. McNabb?  You did, didn't you? |
| 10 | A | No, I didn't. |
| 11 | Q | You called them up.  Were you ugly to them? |
| 12 | A | No, I wasn't. |
| 13 | Q | They asked you to come in and talk with them about |
| 14 | | what occurred, didn't they? |
| 15 | A | Yes, sir. |
| 16 | Q | And you didn't come back? |
| 17 | A | Because of the way he approached me. |
| 18 | Q | Did you come back?  You wouldn't, would you? |
| 19 | A | Not at that time, no, sir. |
| 20 | Q | And let me tell you, you never came back to |
| 21 | | Dothan, Alabama, Houston County, to answer the |
| 22 | | charge of robbery, did you? |
| 23 | A | Yes, I did, sir. |
| 24 | Q | Is it not true you lived in Orlando? |
| 25 | A | Yes, sir. |

```
 1    Q   And isn't it true you never turned yourself in in
 2        Orlando?  You didn't, did you?
 3    A   Yes, I did.
 4    Q   Mr. McNabb, isn't it true they stopped you on a
 5        traffic violation?  Do you recall that?
 6    A   Yes, sir.
 7    Q   You gave them your brother's name, didn't you?
 8    A   Yes, sir.
 9    Q   So, once again, Mr. McNabb, here's the Orlando
10        Police Department that were running your license
11        and asking you who you were, and you lied to those
12        police officers using your brother's name once
13        again trying to get away, correct?
14    A   Yes, sir.
15    Q   Now, you had not had problems with Orlando Police
16        Department, had you?
17    A   Yes, I have.
18    Q   I want you to tell the ladies and gentlemen of
19        the jury, you went to see your father what day?
20    A   Like I said, it would have to be that Sunday.
21    Q   You went to see your father on Sunday.
22            In Eufaula?
23    A   Yes, sir.
24    Q   So you drove from Dothan to Eufaula, right?
25    A   Yes, sir.
```

```
 1    Q    After you saw your father, you drove all the way
 2         straight down to Orlando, correct?
 3    A    Yes, sir.
 4    Q    Didn't stop to see your wife again?
 5    A    No, sir.
 6    Q    Now, you get down to Orlando, who did you stay
 7         with?
 8    A    I stayed with my sister's sister, Daniella.
 9    Q    Is it fair on or about June 17th of 2001, you're
10         about six feet tall, right?
11    A    Yes, sir.
12    Q    You're about a hundred and ninety-seven --
13         hundred and ninety pounds?  Is that approximate
14         range?
15    A    Roughly two hundred pounds.
16    Q    Is it true you had your hair short back in June
17         7th in 19 -- I mean, 2001?
18    A    Yes.
19    Q    In May and June, did you keep your hair short?
20    A    I would say probably be about like this here
21         (indicating).
22    Q    Did you ever give testimony under oath you wore
23         your hair in dreadlocks?  You didn't, didn't you?
24    A    Short dreadlocks.
25    Q    When I asked you if your hair was short, you gave
```

```
 1           testimony in a deposition before under oath that
 2           on or about June 7th you had it in a dreadlock
 3           style, correct?
 4      A    Short in dreadlocks.
 5      Q    What I want to ask you about is, you go down to
 6           Orlando, you didn't have a job, right?
 7      A    No, sir.
 8      Q    You had children in Orlando that you had financial
 9           responsibilities to, correct?
10      A    Yes, sir.
11      Q    But, yet, you quit your job up here, right?
12      A    Yes, sir.
13      Q    Now, did you ever go back and talk with the people
14           at your job and tell them you wanted to take some
15           time off to be with your baby?
16      A    Yes, sir.
17      Q    You gave testimony under oath about that, correct?
18      A    Yes, sir.
19      Q    And you heard testimony under oath that you never
20           went back and talked to Mr. King, the owner,
21           correct?
22      A    No, I did talk to Jimmy.
23      Q    And you never talked to the manager, correct?
24      A    I talked to Eddie.
25      Q    You talked to Eddie who?
```

```
 1    A    I don't know his last name.
 2    Q    Let me ask you.  Look at this jury in the face and
 3         tell them testimony under oath before that you in
 4         fact -- witnesses got on the stand in front of you
 5         said you never talked to anybody, you just quit
 6         and never showed back up?  That's true, isn't it?
 7    A    No, it's not.
 8    Q    They didn't say that in front of you?
 9    A    No, sir.
10    Q    You deny that?
11    A    Yes, sir.
12    Q    Now, let me ask you this, if I could.  Reggie --
13         do you deny that you asked Reggie about the Winn
14         Dixie makes two hundred and fifty or three hundred
15         thousand dollars in money a week?  That kind of
16         business?  Did you ask him that?
17    A    If I did, it was in just a rough conversation.
18         Just like he asked me how much money we made at
19         Jimmy King's.
20    Q    Did you also ask how many people worked at
21         nighttime?
22    A    No, sir.
23    Q    Did you ever ask Mr. Reeves' name, the man that
24         had big muscular arms?
25    A    No, sir.
```

| | | |
|---|---|---|
| 1 | Q | Now, the question I want to ask you is, you told |
| 2 | | the jury you had been in prison? |
| 3 | A | Yes, sir. |
| 4 | Q | You have felony convictions, correct? |
| 5 | A | Yes, sir. |
| 6 | Q | Felony convictions for what?  Can you tell us? |
| 7 | A | For drug charges. |
| 8 | Q | How many? |
| 9 | A | Roughly four or five. |
| 10 | Q | Now, tell the ladies and gentlemen of the jury, |
| 11 | | when you called the police officer to inquire |
| 12 | | about what was happening at your house, you had |
| 13 | | not had any problems with Reggie Hill, correct? |
| 14 | A | No, sir. |
| 15 | Q | And were you and your wife on food stamps at that |
| 16 | | time here in Dothan?  You weren't, were you? |
| 17 | A | No, sir. |
| 18 | Q | Now, you mentioned that you got out of prison |
| 19 | | September of 1989; is what you said? |
| 20 | A | '99. |
| 21 | Q | '99? |
| 22 | A | September of '99, yes, sir. |
| 23 | Q | And then you moved to Dothan? |
| 24 | A | Yes, sir. |
| 25 | Q | The question I want to ask you, September of '99 |

| | | |
|---|---|---|
| 1 | | up through June 7th of 2001, it's your testimony |
| 2 | | that you still had stamps to this jury that your |
| 3 | | wife used or you used to write each other back and |
| 4 | | forth after all that time? |
| 5 | A | Yes, sir.  They were just in the safe. |
| 6 | Q | Now, let me ask you something.  What I want to ask |
| 7 | | you about, this is your toboggan, isn't it? |
| 8 | A | Yes, sir. |
| 9 | Q | In fact, you wore this toboggan, correct? |
| 10 | A | That's my little girl's toboggan. |
| 11 | Q | Well, I'm confused.  I just asked if it was your |
| 12 | | toboggan and you said yes.  Now you say it's your |
| 13 | | little girl's toboggan.  Which is it? |
| 14 | A | It's me and my little girl if you want to ask it |
| 15 | | like that. |
| 16 | Q | The question I want to ask you, this fifty books |
| 17 | | of stamps, was this in your safe? |
| 18 | A | I can't say precisely if these books of stamps |
| 19 | | were in the safe. |
| 20 | Q | Does it look like them? |
| 21 | A | We did have stamps in the safe.  I can't be |
| 22 | | precise and say those were in the safe. |
| 23 | Q | Let me ask you if I could, this authorized is |
| 24 | | signed Defendant's Exhibit by you, correct? |
| 25 | A | Yes, sir. |

| | | |
|---|---|---|
| 1 | Q | In other words, you signed that? |
| 2 | A | Saying that he could work on my car, yes, sir. |
| 3 | Q | And all this was filled out by the man you say |
| 4 | | that gave it to you? |
| 5 | A | Yes, sir. |
| 6 | Q | Now, let's go to State's Exhibit 5, the ten dollar |
| 7 | | food stamp that was found in your safe. |
| 8 | A | Yes, sir. |
| 9 | Q | And then let's look at State's 9, the money |
| 10 | | wrapper of a thousand dollars with the stamp of a |
| 11 | | thousand dollars found in your safe, correct? |
| 12 | A | That's what they said, sir. |
| 13 | Q | Well, let me ask you, if I could.  Do you dispute |
| 14 | | those items were found in your safe in your |
| 15 | | apartment here in Dothan?  You don't, do you? |
| 16 | A | Yes, I do dispute they was in my safe.  I have |
| 17 | | never seen those items. |
| 18 | Q | Is it your testimony that the police planted them |
| 19 | | in there?  Is that what you're telling this jury? |
| 20 | A | Somebody put them in there because me nor my wife |
| 21 | | know nothing about them. |
| 22 | Q | I want you to tell the ladies and gentlemen of the |
| 23 | | jury, your door at the apartment had a lock on it? |
| 24 | A | Yes, sir. |
| 25 | Q | Dead bolt, correct? |

| | | |
|---|---|---|
| 1 | A | Pretty raggedy. |
| 2 | Q | You had never had anybody break into your |
| 3 | | apartment before the police came and executed the |
| 4 | | search warrant, had you? |
| 5 | A | Well, according to Daniella -- |
| 6 | Q | According to who? |
| 7 | A | Daniella. |
| 8 | Q | I'm asking you. I'm not asking anybody else. |
| 9 | | You. Can you tell the jury that you yourself at |
| 10 | | the time you lived at Barstone ever saw your door |
| 11 | | with any forced marks or broken into? You can't, |
| 12 | | can you? |
| 13 | A | Daniella has told me -- |
| 14 | | MR. VALESKA: Judge, would you instruct the |
| 15 | | witness? I didn't ask about Daniella. |
| 16 | | THE COURT: I sustain the objection. |
| 17 | | No, you can't tell what somebody else |
| 18 | | said. He asked you a question. Had your door |
| 19 | | ever been forced open. |
| 20 | A | Yes, sir, it has been forced open. |
| 21 | Q | You saw it forced open? |
| 22 | A | No, sir. |
| 23 | Q | And let me ask you something. It was forced open, |
| 24 | | that make marks on it? |
| 25 | A | I wouldn't know, sir. I don't do burglaries. |

```
 1   Q   Let me ask you something.  My question to you is,
 2       it's your door you went in and out of in May and
 3       June and unlocked it and went in and out of it,
 4       correct?  Yes or no?
 5   A   I was told it would be opened up with a --
 6           MR. VALESKA:  Judge, would you ask him to
 7       answer --
 8           THE COURT:  I sustain the objection.
 9               I just told you you can't tell what
10       somebody else told you.
11   Q   Did you go in and out your door and unlock it
12       every time you went in and out when you lived in
13       that apartment?
14   A   Yes, I had a key.
15   Q   Did you ever make a report to yourself to the
16       manager at Barstone that anybody had jimmied,
17       forced, broken your door open in any manner or
18       fashion?  You didn't, did you, Mr. McNabb?
19   A   No, sir.
20   Q   Your wife never made a report to anybody there had
21       been any forced entry, the lock had been changed
22       or moved in any way that there were any marks,
23       correct?
24   A   Yes, sir.
25   Q   Now, my question to you is, you used a name.  What
```

```
 1        name did you use?

 2   A    What name --

 3   Q    Somebody's name.  A lady's name.

 4   A    Daniella.

 5   Q    Tell the jury how she's related to you.

 6   A    She's my sister's wife -- I mean, my wife's

 7        sister.

 8   Q    Now, my question to you, I want to ask you, when

 9        you left on the 1st, 2nd -- you left on the 2nd or

10        the 3rd.  Which day was it?

11   A    The 3rd.

12   Q    Went to Orlando, right?

13   A    Yes, sir.

14   Q    And then you were in Orlando you say on June 7th,

15        correct?

16   A    Yes, sir.

17   Q    When you went and stayed in Orlando, who did you

18        stay with?

19   A    I stayed at Daniella's house.

20   Q    Did you stay there all the time?

21   A    Yes, sir.

22   Q    Never went anywhere else?

23   A    I went all over the place in Orlando.

24   Q    That's what I'm asking about.  On June 7th, that

25        night particularly around four o'clock a.m., where
```

| 1 | | were you? |
| 2 | A | I was asleep. |
| 3 | Q | Asleep. At whose house? |
| 4 | A | Punkin's. |
| 5 | | THE COURT REPORTER: I'm sorry? |
| 6 | | THE WITNESS: Daniella's home. The same |
| 7 | | person. |
| 8 | Q | Now, let me ask you something. You also know that |
| 9 | | bullets were found inside your house, correct? |
| 10 | A | Yes, sir. |
| 11 | Q | Mr. Baxley asked some witnesses about you being |
| 12 | | charged with robbery in Florida. You were charged |
| 13 | | with robbery in Florida, weren't you? |
| 14 | A | I was never convicted. |
| 15 | Q | Were you arrested for robbery is the question. |
| 16 | | Yes or no? |
| 17 | A | Yes, sir. |
| 18 | Q | The case was plea bargained down to a larceny |
| 19 | | charge? |
| 20 | A | No, sir. |
| 21 | Q | You didn't serve time on that? |
| 22 | A | Yes, sir. |
| 23 | Q | What was the charge? |
| 24 | A | It was dropped down to battery theft. |
| 25 | Q | Battery and theft. And what is battery? Tell the |

1    jury.

2  A    Battery is when you get into a fight with

3    somebody.

4  Q    So you served time for that, correct?

5  A    Yes, sir.

6  Q    Now, what I want to ask you is, when you became

7    aware that the police had gone into your house,

8    your wife was up here with your two children,

9    right?

10  A    Yes, sir.

11  Q    And you didn't drive back up here to check on

12    them, did you?

13  A    No, sir.

14  Q    Now, let me ask you.  Have you ever owned a gun?

15  A    No, sir.

16  Q    Ever had a gun?

17  A    Yes, sir.

18  Q    And with a gun, you had bullets in it, right?

19  A    Yes, sir.

20  Q    And the question to you, are you aware if I

21    elicited testimony bullets found inside your safe,

22    three eighty, correct?

23  A    Yes, sir.

24  Q    Those weren't yours?

25  A    Yes, sir, they were mine.

| | | |
|---|---|---|
| 1 | Q | Now -- you're sure? |
| 2 | A | Yes, sir. |
| 3 | Q | You've told us the truth today, correct? |
| 4 | A | Yes, sir. |
| 5 | Q | Just like you didn't do the robbery, right? |
| 6 | A | Yes, sir. |
| 7 | Q | Now, you recall giving deposition under oath |
| 8 | | before where you were asked about those bullets? |
| 9 | | Do you remember that? |
| 10 | A | No, sir. |
| 11 | Q | Let me show you and refresh your memory and ask |
| 12 | | were you asked questions about the bullets under |
| 13 | | oath before on page one sixty-four when you were |
| 14 | | being examined by Mr. Baxley, your attorney today, |
| 15 | | correct? |
| 16 | A | Yes, sir. |
| 17 | Q | Look over here and I asked you about some bullets |
| 18 | | were found there. You understand that. And your |
| 19 | | answer was yes. You have no idea how those |
| 20 | | bullets would have gotten there. No, sir. Could |
| 21 | | those bullets have been just by accident. I can't |
| 22 | | answer that. Do you know anything about a gun. |
| 23 | | So you were asked about the bullets before, |
| 24 | | right? |
| 25 | A | Yes, sir. |

|     |   |                                                          |
|-----|---|----------------------------------------------------------|
| 1   | Q | At that time you denied you knew anything about          |
| 2   |   | the bullets, right?                                      |
| 3   | A | Yes, sir.                                                |
| 4   | Q | So today it's a different story.  You now admit in       |
| 5   |   | front of this jury those were your bullets,              |
| 6   |   | correct?                                                 |
| 7   | A | Yes.  After my memory was refreshed by my wife.          |
| 8   | Q | Well, I would like to ask you, your memory is            |
| 9   |   | refreshed by your wife.  I just asked you three          |
| 10  |   | questions ago or four questions ago about the           |
| 11  |   | bullets.  Is your wife in the courtroom today?          |
| 12  | A | No, sir.                                                 |
| 13  | Q | So when did your wife refresh your memory about          |
| 14  |   | what you gave a deposition for under oath?  When         |
| 15  |   | was that?                                                |
| 16  | A | We talked about that at the last trial.                  |
| 17  | Q | Sir, she came up with the depositions and went           |
| 18  |   | over them with you?  Is that what occurred?              |
| 19  | A | No, sir.  I just asked about the bullets.                |
| 20  | Q | Now, your wife was with you on June 7th of 2001,         |
| 21  |   | correct?                                                 |
| 22  | A | No, sir.                                                 |
| 23  | Q | Where was your wife?                                     |
| 24  | A | She was here in Dothan, Alabama.                         |
| 25  | Q | Now --                                                   |

| | | |
|---|---|---|
| 1 | A | June 7th. Yeah, she was here in Dothan, Alabama. |
| 2 | Q | Now, let's go to on your diagram -- did you ever |
| 3 | | have problems with your Buick before you went down |
| 4 | | to Florida? |
| 5 | A | Yes, sir. |
| 6 | Q | Did you ever work on it at the apartment complex? |
| 7 | A | Yes, sir. |
| 8 | Q | Mr. McNabb, you can tell the jury. Deposition |
| 9 | | under oath, you're aware of other people who gave |
| 10 | | a deposition under oath in front of you in |
| 11 | | relationship to that they saw you in Dothan on a |
| 12 | | Friday or Saturday working on your Buick, correct? |
| 13 | A | No, sir, I don't recall that. |
| 14 | Q | Well, let's look at Mr. Baxley's date so if I |
| 15 | | could on June of 2001, you would agree that the |
| 16 | | 8th is a Friday and the 9th is a Saturday, |
| 17 | | correct? |
| 18 | A | Yes, sir. |
| 19 | Q | Did you talk to your wife on June 14th? |
| 20 | A | Yes, sir. |
| 21 | Q | About them stopping and checking her car -- the |
| 22 | | van? |
| 23 | A | Yes, sir. That was around the time I called her |
| 24 | | -- the investigator I think it was. Whoever I |
| 25 | | talked to on the phone. |

|     |   |                                                                        |
| --- | - | ---------------------------------------------------------------------- |
| 1   | Q | Does it refresh your memory on June 15th, on a                         |
| 2   |   | Friday, you called Lieutenant Martin with the                          |
| 3   |   | Dothan Police Department?  Would that have been                        |
| 4   |   | after your wife told you they had searched the van                     |
| 5   |   | with her?                                                              |
| 6   | A | Yes, sir.                                                              |
| 7   | Q | And your wife came down you said on the following                      |
| 8   |   | Saturday?                                                              |
| 9   | A | Yes, sir.                                                              |
| 10  | Q | Now, you're positive that it's your testimony                          |
| 11  |   | that you know Daniella Turner?                                         |
| 12  | A | Yes, sir.                                                              |
| 13  | Q | And you've never talked with her about the                            |
| 14  |   | robbery; is that correct?                                              |
| 15  | A | No, sir.                                                               |
| 16  | Q | And you're sure that on the 3rd when you got there                     |
| 17  |   | you saw her?                                                           |
| 18  | A | I stayed there.                                                        |
| 19  | Q | And she would be able to say that's when you came                      |
| 20  |   | down on the 3rd; is that fair?                                         |
| 21  | A | Yes.  It's in the deposition.                                          |
| 22  | Q | Well, let me show you that deposition and ask you                      |
| 23  |   | if you were present when she testified on page one                     |
| 24  |   | sixty-eight when she indicated what day she saw                        |
| 25  |   | you right here that you didn't come to Orlando                         |

```
 1            according to her deposition under oath.  It was on
 2            the 4th and not the 3rd, Mr. McNabb.  Take a look
 3            at that and see if the question I asked you is
 4            true.
 5    A       Yes.
 6    Q       It is?
 7    A       Yes, sir.
 8    Q       So the question I want to ask you now, you say you
 9            got there on the 3rd.  You just told the jury she
10            saw you on the 3rd, correct?
11    A       Yes, sir.
12    Q       You stayed with her on the 3rd, correct?
13    A       Yes, sir.
14    Q       But you see in the deposition she gave under oath
15            she said she didn't see you and you stay there
16            until June 4th?
17    A       It's been three years since this happened, sir.
18            For me to sit here and tell you-all that I can
19            come up with date for date when things happened
20            three years ago, I would be dead wrong.  I would
21            be sitting here telling a lie then.  But I can
22            sure enough tell you specifics around that time
23            what happened.
24    Q       Thank you.
25                Now, my question is, would you answer my
```

| 1 | | question, please, sir, instead of giving an |
|---|---|---|
| 2 | | explanation?  The question is, she said under oath |
| 3 | | you saw her on the 4th.  It was not the 3th. |
| 4 | | That's when she first said you stayed with her. |
| 5 | | True or untrue, Mr. McNabb? |
| 6 | A | That's what she said in the deposition. |
| 7 | Q | Now, my question to you is, did your wife also |
| 8 | | show you her deposition, in other words, and go |
| 9 | | over that with you?  Yes or no? |
| 10 | A | No, sir. |
| 11 | Q | My question to you is, you just told the jury your |
| 12 | | mind, your memory is not as good today as it was |
| 13 | | back then, correct? |
| 14 | A | Exactly. |
| 15 | Q | Well, tell them when the deposition ago -- how |
| 16 | | long ago was that?  Was that a week ago or a month |
| 17 | | ago?  It wasn't, was it, Mr. McNabb? |
| 18 | A | No, sir. |
| 19 | Q | How long ago was the deposition?  Give us the -- |
| 20 | | tell us when the deposition was given under oath. |
| 21 | | How many months ago that was? |
| 22 | A | February of last year. |
| 23 | Q | Now, is your memory better today or was it better |
| 24 | | back then in February?  Which is it? |
| 25 | A | From reading the deposition I can't recall, sir. |

| | | |
|---|---|---|
| 1 | Q | So when you just told the jury that it's been a |
| 2 | | long time, you can't remember exact dates, what I |
| 3 | | want to ask you is, the last time there was a |
| 4 | | deposition under oath, it wasn't the same story |
| 5 | | about the dates, was it, Mr. McNabb, as it is |
| 6 | | today, correct?  It's different, isn't it? |
| 7 | A | Maybe the dates, yes, sir. |
| 8 | Q | You're charged with robbery in the first degree, |
| 9 | | correct? |
| 10 | A | Yes, sir. |
| 11 | Q | You know it's very important that you are claiming |
| 12 | | you were in Orlando; in other words, that's alibi, |
| 13 | | right?  True? |
| 14 | A | That's what you call it, sir. |
| 15 | Q | You were saying you were down there and you |
| 16 | | couldn't have done it, correct? |
| 17 | A | Yes, sir. |
| 18 | Q | You have told the jury that these people that saw |
| 19 | | you can verify you were down there on June 7th, |
| 20 | | correct? |
| 21 | A | Yes, sir. |
| 22 | Q | Now, I asked you about whether you went to any |
| 23 | | clubs or went out or went any other place.  Do you |
| 24 | | recall me asking you that? |
| 25 | A | No, sir. |

| | | |
|---|---|---|
| 1 | Q | Do you recall what Ms. Turner said from the time |
| 2 | | you first got down there when she saw you on June |
| 3 | | 4th until around June 14th you never left the |
| 4 | | house or stayed home the entire time?  Do you |
| 5 | | recall her giving a deposition saying that's what |
| 6 | | you did? |
| 7 | A | No, sir. |
| 8 | Q | Show you on one sixty-nine back then that's what |
| 9 | | she said.  Show you, Mr. McNabb.  He never went |
| 10 | | anywhere else other than my home to stay. |
| 11 | | Do you recall that? |
| 12 | A | Yes. |
| 13 | Q | Now, let me ask you if I could.  What I would like |
| 14 | | to ask you, if I could, on June 15th of 2001, your |
| 15 | | wife left Dothan and moved back down there to |
| 16 | | where you lived in Florida, right?  True? |
| 17 | A | June 15th? |
| 18 | Q | Sometime after that? |
| 19 | A | Sometime after that. |
| 20 | Q | She moved.  She left Dothan and came to Florida |
| 21 | | where you were living, right? |
| 22 | A | Yes.  Because of the police harassment. |
| 23 | Q | Police harassment. |
| 24 | | Well, let me ask you something, if I could. |
| 25 | | Of the police harassment, how were the Dothan |

| | | |
|---|---|---|
| 1 | | police harassing you when you were down in |
| 2 | | Florida?  They couldn't, could they? |
| 3 | A | The police harassing her.  That's what I said. |
| 4 | Q | The police harassing her. |
| 5 | | Let me ask you something.  If you hadn't been |
| 6 | | stopped by the Orlando police and given your |
| 7 | | brother's name -- and you did that is what you |
| 8 | | said, correct? |
| 9 | A | Yes, sir. |
| 10 | Q | In fact, when they tried to arrest you, you ran, |
| 11 | | didn't you? |
| 12 | A | Yes, sir. |
| 13 | Q | Tried to get away? |
| 14 | A | Yes, sir. |
| 15 | Q | Can you look at this jury, were you ever going to |
| 16 | | come back and answer the charge of robbery in the |
| 17 | | first degree which you had alibis showing you |
| 18 | | didn't do it?  Were you ever going to stand trial? |
| 19 | A | I never knew they had a warrant. |
| 20 | Q | You're telling me that your wife and Lieutenant |
| 21 | | Martin didn't tell you there was an arrest for |
| 22 | | your warrant? |
| 23 | A | No, sir, he didn't.  He just told me to come and |
| 24 | | speak to him. |
| 25 | Q | Well, tell this jury why you never came back if |

```
 1              you didn't think there was a warrant.

 2    A    Because of the police harassment.

 3    Q    Did you come back and help move your wife and your

 4         children?  In other words, she had just had a

 5         baby, did you come back and help them move out of

 6         town so they would be safe?  You didn't, did you?

 7    A    No, sir.

 8    Q    Now, how were you paying support for your other

 9         children, Mr. McNabb, if you weren't working

10         during this time?  Is that the money that you kept

11         in this bank account?

12    A    Yes, sir.

13    Q    Had you been in the Winn Dixie?  You had, hadn't

14         you?  Gone over there and purchased things before?

15    A    Not that I can recall.

16    Q    Did you discuss with your wife about how the food

17         stamps, the money clip -- the money wrapper got

18         into your house?

19    A    We never discussed that until it came up at trial

20         and we found out that they found these things in

21         our house.

22    Q    Well, let me ask you something.  You got the

23         bullets back, correct?  Or your wife did, didn't

24         you?

25    A    I guess so.
```

| | | |
|---|---|---|
| 1 | Q | You got some of your clothing back, didn't you? |
| 2 | A | Yes, sir. |
| 3 | Q | You did in fact own tennis shoes back then, |
| 4 | | correct? |
| 5 | A | Yes, sir. |
| 6 | Q | Did you own a blue jean jacket? |
| 7 | A | No, sir. |
| 8 | Q | You didn't, did you? |
| 9 | A | No, sir. |
| 10 | Q | Didn't own that? |
| 11 | A | No, sir. |
| 12 | Q | Let me ask you if I could.  Tell this jury on June |
| 13 | | 7th who you were with, 2001. |
| 14 | A | I was in Orlando, Florida. |
| 15 | Q | That's not what I asked you.  The question I asked |
| 16 | | you was look at this jury and tell them who you |
| 17 | | were with that day. |
| 18 | A | On June 7th I would have to be at Daniella's |
| 19 | | house. |
| 20 | | MR. VALESKA:  That's all.  Pass the witness. |
| 21 | | Thank you. |
| 22 | | THE COURT:  Anything further? |
| 23 | | MR. BAXLEY:  Yes, Your Honor. |
| 24 | | REDIRECT EXAMINATION |
| 25 | | BY MR. BAXLEY: |

1    Q    Mr. McNabb, Mr. Valeska got into, you know, the
2         fact that you did have a criminal history of
3         something there, and I want you to explain to this
4         jury what that -- what that -- the circumstances
5         around that robbery charge.
6    A    I had a friend who was -- an associate who was
7         staying with me.  One day I was working on one of
8         my cars, and I had my wallet in my pocket.  My
9         wallet fell out of my pocket.  He picked up my
10        wallet and stole the money out of it along with
11        the wallet.  I was charged -- me and him ended up
12        getting into a fight about this here.  Because I
13        been raised nobody going to take nothing from you
14        like that.  We got into a fright.  He ended up
15        calling the police on me because of the fight.
16        Because we got into a pretty good scuffle.  The
17        police charged me initially with robbery because
18        the laws of Florida say anytime you do something
19        with force, it's considered robbery.  Same as they
20        is here in Alabama.  When we went to court, the
21        judge would not accept my -- the charges as it was
22        with the circumstances surrounding it.  The
23        charges were dropped to battery and theft.  That's
24        what happened with that there.
25   Q    Mr. Valeska has gone into great detail about you

```
 1              fleeing and not wanting to come back to Alabama.

 2              Is there anything you can say to this jury that

 3              would tell you -- tell them otherwise?

 4    A    My wife had just had my son.  My little boy was

 5              roughly, what, three weeks old.  The police were

 6              so belligerent and -- the way they were treating

 7              me on the phone, I didn't want to -- you know what

 8              I'm saying?  Because my son had just been born.  I

 9              wanted to spend time with my son.  I'm being

10              straight up honest with you.  I'm a man.  I had

11              just had my first son.  I have three other

12              daughters.  And I just got my son.  I don't think

13              any man would just run and -- you know what I'm

14              saying?  I got my son.  That's the best I can

15              say.  I wanted to spend time with my child.

16    Q    Now, isn't it true that you were let out of

17              jail --

18              MR. VALESKA:  Objection.

19              THE COURT:  Let out of jail?

20              MR. BAXLEY:  Let out of jail about --

21                   (At which time the following proceedings

22                    were held at the bench outside of the

23                    hearing of the jury:)

24              MR. BAXLEY:  Your Honor, he's brought up

25              evidence of flight in this case and made an issue
```

1    here.  And I think it's -- that we can bring up

2    the evidence that he was mistakenly released from

3    the Houston County Jail and came back on his own

4    recognizance.

5         MR. VALESKA:  I can't get into there was an

6    escape warrant charge?  I can't get into that.

7    That's not what I asked him.  I asked him why he

8    didn't come back.  And he gave his explanation.

9    He never said, I didn't come back because there

10   was an escape warrant.  He never got into that.

11   He can't go into it now.

12        MR. BAXLEY:  Your Honor, he's brought up the

13   thing about flight.  He said he didn't come back

14   here because of that.  It's absolute a part.  He

15   did come back on his own volition.

16        MR. VALESKA:  You missed the point.  The

17   point is, Judge White, there was a warrant for

18   him.  He was stopped by the police.  He gave a

19   phony name.  He ran and escaped.  They arrested

20   him --

21        MR. BAXLEY:  Your Honor --

22        MR. VALESKA:  Can I finish?

23        MR. BAXLEY:  Yeah.

24        MR. VALESKA:  They took him into custody and

25   brought him back.  There's no willful return then,

1    Judge White. He was brought back and returned

2    because the sheriff's department made a mikstake

3    at a later point in time is not relevant to the

4    timeframe I asked him why he come back. That's

5    after the fact, Judge. And I didn't go into

6    that.

7        THE COURT: There was a warrant?

8        MR. VALESKA: There was a warrant.

9        MR. BAXLEY: He said he was not aware of that

10    warrant. And that's what I'm getting here, Your

11    Honor. When he was made aware of the warrant with

12    the escape charge, he came back. It was when he

13    was made aware of the warrant. And that is

14    absolutely pertinent and this jury should know.

15        MR. VALESKA: He's missing the point of the

16    escape warrant, Judge White, was after the robbery

17    indictment. You did the bond hearing. And that

18    has nothing to do with this time period. And I

19    didn't ask him --

20        THE COURT: Yeah.

21        MR. BAXLEY: It still has to do with the

22    case, though.

23        THE COURT: I sustain the objection.

24            (At which time the following proceedings

25            were held in open court:)

```
 1    Q    Mr. McNabb, you say that -- had you known about a
 2         warrant, you would have come back to Alabama?
 3    A    Yes, sir.
 4    Q    But you didn't know anything about a warrant in
 5         Alabama?
 6    A    No, sir.
 7              MR. BAXLEY:   Nothing further of this witness,
 8         Your Honor.
 9              MR. VALESKA:  No more questions.
10              THE COURT:  You may step down.
11                  Who will your next witness be?
12              MR. BAXLEY:  Ms. Yvette McNabb.
13                        YVETTE McNABB
14         having first been duly sworn, was examined and
15         testified as follows:
16                      DIRECT EXAMINATION
17    BY MR. BAXLEY:
18    Q    Ms. McNabb, can you state your name for the Judge
19         and jury?
20    A    Yvette McNabb.
21    Q    And what's your relationship with Corey McNabb?
22    A    He's my husband.
23    Q    How long have you-guys been married?
24    A    About five years.
25    Q    And do you understand why you're in court today?
```

272

```
1    A    Yes, I do.

2    Q    And is it safe to say you understand that your

3         husband was charged with first degree robbery?

4    A    Yes.

5    Q    The evidence has been presented that this robbery

6         occurred on June 7, 2001.  Is there any way

7         possible that Corey could have been at the Winn

8         Dixie on Westgate Parkway on June 7, 2001?

9    A    No.

10   Q    And why is that?

11   A    Because he was going to Orlando to get my

12        step-daughter, his daughter, for the summer.

13   Q    And when did he leave to go to Orlando?

14   A    He left June 2nd to go and see about my

15        father-in-law because he has dialysis, and he's

16        real sick.  So he went there first.  And then he

17        went from there to Orlando.

18   Q    Now, Corey has testified that this daughter he has

19        -- what's the mother's name?

20   A    Tawanna.

21   Q    Tawanna.

22             And Keisha is the daughter's name?

23   A    Taquasia.

24   Q    Taquasia is the daughter's name.

25             My understanding and what Corey testified to
```

```
 1              was there was a regular visitation rotation --
 2      A   . Yeah.  Every summer she come and be with us until,
 3              like, that -- roughly, like, the last week --
 4              weekend before school, that's when we take her
 5              back.
 6      Q      So regular trip he would make?
 7      A      Yeah.
 8      Q      And roughly when did he leave to go down and pick
 9              her up?
10      A      Like, the 3rd.  It had to have been the 3rd.
11              Because I'm sure he spent the night with Papa.
12              So, like, the 3rd.
13      Q      I'm talking about regular.  End of school,
14              beginning of June, end of May?
15      A      No.  Because sometimes we don't -- it depends on
16              when school ends.  So usually, like, that Friday
17              when school end, then he will go and pick her up.
18      Q      Some point that weekend after school ended, then?
19      A .    Yes.  Yes.
20      Q      Why are you so sure that he left at that exact
21              time?  What sticks out in your mind?
22      A      Because I had -- we had already talked to Tawanna,
23              and she -- like I said, we always have her for the
24              summer.  So we had already scheduled for us to
25              pick her up so Tawanna could do what she needed to
```

```
 1              do workwise and everything like that.

 2    Q    Were you in contact with Corey the whole time he

 3         was gone?

 4    A    Yeah.  He have a cell phone.

 5    Q    How often was the contact?

 6    A    Pretty frequent.  He called and checked on the

 7         kids because I had just had a baby.

 8    Q    Were you upset with him at any point because he

 9         was gone?

10    A    Well, yeah.  Yes and no.  Because I had -- like I

11         said, I had just had a baby.  So I didn't really

12         want him to go pick up Taquasia because I didn't

13         want to have to deal with three kids.  So, yeah,

14         I was a little hot.

15    Q    Where were you working at that time?

16    A    I worked for Chick-fil-A at Wiregrass Commons

17         Mall.

18    Q    And were you still working at the time you had

19         your baby?

20    A    No.  No.

21    Q    Were you given any sort of leave from your job?

22    A    Yeah.  My boss would -- they don't actually have,

23         you know, medical leave pay.  But my boss would,

24         you know, put time in for me to get checks because

25         it was his business.
```

```
 1    Q    Your boss was working with you pretty good?

 2    A    Yes.  Uh-huh.

 3    Q    How were you and Corey supporting yourselves

 4         during this time period?

 5    A    Well, we had money saved up, you know.  We had to

 6         get money up after having a baby.

 7    Q    Did you expect to take a little bit of time off?

 8    A    Well, of course, I was.  But, you know, him, too,

 9         because -- for the simple fact it was just us down

10         here.  We didn't have no family down here.  And my

11         father-in-law couldn't very well, you know, help

12         with anything.  And I was having complications

13         with my pregnancy also.

14    Q    Where would Corey ~~stay when~~ he went to Orlando?

15    A    He stayed at ~~my sister~~'s house.

16    Q    Is that what he typically did when he went to

17         Orlando?

18    A    When we all went, we always stayed over there.

19         She had a pretty big apartment.

20    Q    When did you first become aware of anything about

21         this Winn Dixie robbery?

22    A    When I came back home.  Because I left --

23    Q    Let's back up on, then.  Did you go to Orlando at

24         some point?

25    A    Yes.  Uh-huh.
```

```
 1    Q    When did you go to Orlando?

 2    A    On the 8th.

 3    Q    On the 9th.

 4         And why did you go to Orlando?

 5    A    So my family could see my new baby and go down

 6         there and, you know, be with Corey, too.

 7    Q    Had you-all planned to go down there for a little

 8         extended period of time?

 9    A    Not -- not really.  Not really.  Not at first.

10    Q    Not at first.

11         What made you decide to make an extended

12         period of time?

13    A    Because I wanted to see my mom and, you know, see

14         everybody.  Everybody wasn't there when we first

15         went.

16    Q    Now, the robbery we understand occurred on June

17         7th.  I think everyone is familiar with that date

18         now.  When did you first become aware of the

19         robbery and the accusations against your husband?

20    A    When I came back home.

21    Q    When did you come back home?

22    A    On the 13th.

23    Q    On the 13th.

24         And what did you find when you came home?

25    A    Well, my front door was busted.  My house was tore
```

```
 1              up.  And it was a search warrant with a list of
 2              stuff on the table.
 3     Q     The State has introduced a couple of things into
 4              evidence here I want you to look at, that being
 5              this food stamp and this other item.  Do you
 6              recognize either one of those things?
 7     A     No, I do not.
 8     Q     Were they in your house at any point?
 9     A     No.  I would have noticed that.
10     Q     How about postage stamps?
11     A     Those, no.  But I --
12     Q     Did you-all have a substantial amount of postage
13              stamps in your house at any point?
14     A     Not like that.  But we did have postage stamps
15              because Corey had been in jail before, and I did
16              send him a lot of stamps, and he did bring some
17              home with him.
18     Q     Would you lie to protect your husband today?
19     A     No.  No, I wouldn't.  If he hurt somebody, then,
20              you know, I would want -- even though I know he
21              would be away from me and my kids, the right thing
22              is the right thing.
23     Q     But you could sit here and testify with a straight
24              face and honestly look at these people in the eyes
25              and tell them that Corey was not in Dothan at that
```

```
 1        time?

 2    A   Yes, I can.

 3            MR. BAXLEY:  Thank you.

 4                    CROSS EXAMINATION

 5    BY MR. VALESKA:

 6    Q   I would like to ask you, ma'am, you say that he

 7        left to go to Orlando on what day?

 8    A   On the 2nd.

 9    Q   So if he testified he went on June 3rd, he's

10        wrong, correct?

11    A   Well, yes and no.  Like I said, he went June 2nd.

12        He went to my father-in-law's house, and then he

13        went from there.

14    Q   Would you agree that it's very important for your

15        husband to prove that he was not; in other words,

16        to show that he couldn't have done the robbery,

17        because on June 7th he was in Orlando, right?

18    A   Right.

19    Q   In other words, he has no burden, but we have the

20        burden, but the question is, so dates are

21        important?  Would you agree in this case?

22    A   Of course.

23    Q   So it's your testimony, then, you said he left on

24        which day to go to Orlando?

25    A   The 3rd, then.
```

| | | |
|---|---|---|
| 1 | Q | Which was it?  The 3rd or the 2nd? |
| 2 | A | The 2nd to my father-in-law's house.  From there |
| 3 | | he went to Orlando. |
| 4 | Q | The question was, what day did you say he went to |
| 5 | | Orlando? |
| 6 | A | Okay.  June 3rd. |
| 7 | Q | The question, your father-in-law lives where? |
| 8 | A | In Eufaula. |
| 9 | Q | And he spent the night up there, right? |
| 10 | A | Yes. |
| 11 | Q | You know that? |
| 12 | A | Of course. |
| 13 | Q | Because you talked to him? |
| 14 | A | Yes. |
| 15 | Q | On that cell phone? |
| 16 | A | Uh-huh. |
| 17 | Q | So if your husband gave testimony a little while |
| 18 | | ago in front of this jury under oath that he |
| 19 | | didn't spend the night, he just went up there and |
| 20 | | went to Orlando the same day, which one of you is |
| 21 | | mistaken?  You or your husband? |
| 22 | A | I don't know.  I know he told me where he was at, |
| 23 | | and I believed him. |
| 24 | Q | So the question, you didn't answer the question, |
| 25 | | then, did you, ma'am?  I asked you if your husband |

| | | |
|---|---|---|
| 1 | | gave testimony in front of this jury that he went |
| 2 | | to see his father on the 3rd and he didn't spend |
| 3 | | the night and he just saw him and drove down to |
| 4 | | Orlando the same day, I asked you what day he went |
| 5 | | and you said the 2nd, correct? |
| 6 | A | Yes. |
| 7 | Q | He left your house, correct? |
| 8 | A | Yes. |
| 9 | Q | He left the house where he just had this baby boy |
| 10 | | that he loved, right?  True? |
| 11 | A | Yes. |
| 12 | Q | And you-all weren't split up at that time, were |
| 13 | | you? |
| 14 | A | No. |
| 15 | Q | And you weren't having fights, though, were you? |
| 16 | | You and him. |
| 17 | A | No.  I was just upset about him going to get |
| 18 | | Taquasia. |
| 19 | Q | And you never been split up during this time, |
| 20 | | correct? |
| 21 | A | No. |
| 22 | Q | You never told anybody that? |
| 23 | A | No.  I don't tell nobody my personal business. |
| 24 | Q | My question to you, though, is, now I've asked you |
| 25 | | if your husband, who denies he did the robbery |

```
 1              says that he drove to see his father same day and

 2              went to Orlando the say day on the 3rd, never

 3              spent the night, never did that, either you or he

 4              is mistaken, correct?

 5     A        Because he went on the 2nd, not the 3rd.

 6     Q        So the question is, though, you know he spent the

 7              night because you talked with him, right?

 8     A        Sure.

 9     Q        On the cell phone?

10     A        Yes.

11     Q        Now, I want to ask you if I could, please, ma'am,

12              you had lived in the apartment with him.  Was it

13              J-141 Barstone or 171?  Which was it?

14     A        141.

15     Q        And that's Dothan, Alabama, Houston County?

16     A        Yes, it is.

17     Q        Isn't it true you quit your job in April working

18              at Chick-fil-A?

19     A        I didn't quit my job.  I took leave.

20     Q        You never went back to work there again, did you?

21     A        No.  Because I moved away.

22     Q        Well, I'll ask you about that in a minute, ma'am.

23              My question to you is, it's your testimony from

24              April 1st, April 10th, 15th, that you got a check

25              every week from Chick-fil-A up until the time you
```

```
 1            left town?  That's not?
 2      A     No, not every week.  No.
 3      Q     So in fact you got one week's check is all you got
 4            when you left?  Is that not true, ma'am?
 5      A     I can't remember.  That was a long time ago.
 6      Q     Well, ma'am, in other words, you had a child to
 7            support in the family, correct?
 8      A     Yes.
 9      Q     What was your husband's job?  What was his
10            position at this time when he was working in May
11            before?  Where did he quit his job?
12      A     He was working at King Church Furniture.
13      Q     Was he a carpenter?
14      A     Yes.
15      Q     My question is, he left his job and quit, correct?
16      A     He didn't quit.  He took a leave.
17      Q     Well, let me ask you.  When did he take this leave
18            from there?
19      A     Probably, like, about a couple of days before I
20            had Little Ruben.
21      Q     And that was what day?
22      A     I couldn't give you a date on that.
23      Q     What day did you have the baby, ma'am?
24      A     May 28th.
25      Q     So a day or two before, which would make it in
```

```
 1          May, correct?  Is that fair?

 2     A    Yeah.

 3     Q    You sure?

 4     A    That's fair.

 5     Q    It wasn't April?

 6     A    I don't think so.

 7     Q    He wasn't working, you weren't working, right?

 8     A    Right.

 9     Q    You already had another child in the house, right?

10     A    Uh-huh.

11     Q    So that's three mouths to feed, correct?

12     A    No.  Taquasia hadn't came down yet.

13     Q    Well, Taquasia lived where?

14     A    In Orlando.

15     Q    So no other child but --

16     A    No.  I only had my daughter, Dezeray, and I was

17          pregnant with Ruben.

18     Q    That's what I'm asking about.  Dezeray was in the

19          house, correct?

20     A    Uh-huh.

21     Q    That's what I said.  Another child, Dezeray.

22          You, Dezeray, and the Defendant, correct?

23     A    Right.

24     Q    So that's three mouths to feed, right?

25     A    Right.
```

| | | |
|---|---|---|
| 1 | Q | And, yet, you had both quit your jobs, right? |
| 2 | A | Right. |
| 3 | Q | No income coming in, correct? |
| 4 | A | Well, we had money saved up. |
| 5 | Q | Let's talk about.  Where was your money saved up? |
| 6 | A | I had -- we had a bank account at AmSouth and we |
| 7 | | had one at Washington Mutual in Orlando. |
| 8 | Q | And how would you get money to Washington Mutual |
| 9 | | in Orlando?  Would you mail the money down there? |
| 10 | A | No.  We went down there pretty often. |
| 11 | Q | Ma'am, the cars that you owned were a white 19 |
| 12 | | what? |
| 13 | A | '89. |
| 14 | Q | '89 van with wood paneling, correct? |
| 15 | A | Yes. |
| 16 | Q | And your husband owned a tan old-model Cadillac, |
| 17 | | correct? |
| 18 | A | Uh-huh. |
| 19 | Q | And an older Buick LaSabre, correct? |
| 20 | A | Yes. |
| 21 | Q | Did he have problems with the Buick LaSabre before |
| 22 | | he went to Orlando? |
| 23 | A | Not that I know of. |
| 24 | Q | Did he ever work on that Buick LaSabre during the |
| 25 | | the week of June 4th through June 9th, that |

| | | |
|---|---|---|
| 1 | | Saturday? |
| 2 | A | At home? |
| 3 | Q | Uh-huh. |
| 4 | A | He wasn't home so I couldn't tell you that. |
| 5 | Q | Now, ma'am, it's your testimony he left on June |
| 6 | | the 3rd or 2nd?  I'll ask you one more time.  Just |
| 7 | | tell me what it was.  I won't ask you again, I |
| 8 | | promise.  When he went to see his father, what |
| 9 | | day? |
| 10 | A | The 2nd. |
| 11 | Q | And my question is, you didn't see him again until |
| 12 | | what day? |
| 13 | A | The 9th when I went down to Orlando. |
| 14 | Q | Tell the jury on the 3rd, 4th, 5th, 6th, and |
| 15 | | particularly the 7th, you didn't see him, did you? |
| 16 | A | No. |
| 17 | Q | You don't know where he was, do you? |
| 18 | A | I know he told me he was in Orlando. |
| 19 | Q | That's what -- |
| 20 | A | And I spoke with my sister. |
| 21 | Q | That's what I want you to tell the jury.  You |
| 22 | | never saw him on June 7th, did you? |
| 23 | A | No. |
| 24 | Q | And you talked with him on the phone? |
| 25 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | It's a cell phone, right? |
| 2 | A | Uh-huh. |
| 3 | Q | Was it in your name or his name? |
| 4 | A | In his. |
| 5 | Q | What was the number? |
| 6 | A | I couldn't tell you that.  I don't -- |
| 7 | Q | Was the cell phone out of Houston County or was it |
| 8 | | out of Florida? |
| 9 | A | I couldn't answer that either. |
| 10 | Q | How did you pay the bill on the cell phone, then, |
| 11 | | ma'am?  Tell the jury that. |
| 12 | A | How I pay -- |
| 13 | Q | How the cell phone bill got paid. |
| 14 | A | Ruben pay his own phone bill. |
| 15 | Q | Ma'am, my question to you is you went down there |
| 16 | | on June 9th, right? |
| 17 | A | Uh-huh. |
| 18 | Q | You came back on what day? |
| 19 | A | The 13th. |
| 20 | Q | You sure it was the 13th? |
| 21 | A | I'm positive. |
| 22 | Q | You came back to your apartment, right? |
| 23 | A | Uh-huh. |
| 24 | Q | Now, let's go before June 7th of 2001.  You lived |
| 25 | | in that apartment a year? |

```
 1    A    Roughly.

 2    Q    You knew your neighbors?

 3    A    Not really.

 4    Q    Did some of your children play with the other

 5         children in the neighborhood -- the apartment

 6         complex?  They did, didn't they?

 7    A    One little girl used to play.

 8    Q    In fact, the people that lived directly behind

 9         you, who were those people?

10    A    Oh, I don't know.  I don't know them.

11    Q    Let me ask you if I could.  When your children

12         played with other children, they played out there

13         at the swings or in the area inside the apartment

14         complex by the open area by the basketball court?

15         Is that fair?

16    A    No.

17    Q    Where did they play?

18    A    Right at the park -- the park was right by my

19         house.

20    Q    That's what I'm talking about.  Inside the

21         apartment complex, correct?  That park?

22    A    Yes.

23    Q    Building around it is what I'm asking.

24    A    Okay.

25    Q    What I want to ask you, if I could, where did you
```

| | | |
|---|---|---|
| 1 | | stay in Orlando? |
| 2 | A | Now or then? |
| 3 | Q | When you went down there on the 9th. |
| 4 | A | To my sister's house. |
| 5 | Q | And you came back on the 14th or 13th? |
| 6 | A | The 13th. |
| 7 | Q | And before that, ma'am, before you went down to |
| 8 | | Orlando, there were no -- your door was not broken |
| 9 | | in any manner or fashion, was it? |
| 10 | A | It was messed up a little bit, but not -- not -- |
| 11 | | not tore down or anything. |
| 12 | Q | Tell this jury every time you would go in or out |
| 13 | | your door at the nighttime and daytime how you |
| 14 | | would get into your apartment door.  What would |
| 15 | | you have to do? |
| 16 | A | Use the key. |
| 17 | Q | Use the key. |
| 18 | | And there were how many locks on that door |
| 19 | | that you had to use to open that -- |
| 20 | A | Oh. |
| 21 | Q | You don't remember that? |
| 22 | A | I'm sorry. |
| 23 | Q | Ma'am, I'll refresh your memory.  Was there a |
| 24 | | door knob with a knock?  Does that help you? |
| 25 | A | I don't remember. |

| | | |
|---|---|---|
| 1 | Q | Ma'am, you don't remember how you got into your |
| 2 | | own apartment whether there was one door lock to |
| 3 | | turn to open the key?  You can't remember that -- |
| 4 | A | I can't remember.  I'm sorry. |
| 5 | Q | Let me help you.  There was a handle that you put |
| 6 | | the lock in with the door to turn the knob, |
| 7 | | correct?  You're not sure? |
| 8 | A | I don't think -- |
| 9 | Q | Was there also a deadbolt lock?  There was two |
| 10 | | lock on that door -- |
| 11 | A | No. |
| 12 | Q | There were, weren't there? |
| 13 | A | No.  It wasn't a dead bolt on there. |
| 14 | Q | It's a round cylinder you had to put the key above |
| 15 | | the handle what you put the key in to get in? |
| 16 | A | I think it was just on the knob part. |
| 17 | Q | Just one? |
| 18 | A | Yeah. |
| 19 | Q | Well, let me ask you something, ma'am.  Before |
| 20 | | June 7 of 2001, you would go to bed and sleep in |
| 21 | | that apartment, right? |
| 22 | A | Yes. |
| 23 | Q | You would sleep with your child in there, right? |
| 24 | A | Yeah. |
| 25 | Q | You would sleep with your husband in there, right? |

```
 1    A    Yes.
 2    Q    Would there be times when your husband was gone at
 3         nighttime and not come home at nighttime and you
 4         would be there with just you and your daughter?
 5         Would that ever occur?
 6    A    No, not if he wasn't at work.
 7    Q    If he was at work?  Were there times?
 8    A    No.
 9    Q    Did you ever lock the door when your husband was
10         not home?
11    A    I locked the door whoever home.
12    Q    You locked it because you wanted to be safe and
13         secure with you and your child, right?
14    A    Of course.
15    Q    What I want to ask you, ma'am, is your testimony
16         now there was problems locking that door in any
17         manner or fashion before June 7, 2001?  There
18         were?  Is that what you're saying?
19    A    No.  You just had to use a little force to open
20         it.  That's it.
21    Q    So the question is, you never made any reports to
22         the manager or the maintenance man there was
23         something with that door, you can get in it really
24         easily?
25    A    No.  They had came and fixed on it one time.
```

| | | |
|---|---|---|
| 1 | Q | When was that? |
| 2 | A | Like, when I first moved. |
| 3 | Q | So they came and fixed it the first time just |
| 4 | | after you moved in, right? |
| 5 | A | Yeah.  Like the side, you know how the door is the |
| 6 | | little part where the lock goes in, all that was |
| 7 | | messed up. |
| 8 | Q | What I want to ask you, and let's do May and June, |
| 9 | | there was no problems getting in then?  In other |
| 10 | | words, it was safe and secure, correct? |
| 11 | A | Yeah.  It wouldn't fall down or anything. |
| 12 | Q | But it had been fixed, right? |
| 13 | A | Well, I -- |
| 14 | Q | Could you take a credit card and use to get in |
| 15 | | that door?  You couldn't, could you? |
| 16 | A | I wouldn't know.  I wouldn't be able to tell that. |
| 17 | Q | You had to use your lock, didn't you?  The key? |
| 18 | A | Of course. |
| 19 | Q | Now, what I want to ask you, when you came home, |
| 20 | | you're aware your apartment had been searched, |
| 21 | | right? |
| 22 | A | Uh-huh. |
| 23 | Q | Did you call your husband and tell him? |
| 24 | A | No.  Not at first.  I was -- |
| 25 | Q | Help me, ma'am.  Your husband was down in |

```
 1            Orlando.  You had left him and come back after

 2            being down there how many days from the 9th

 3            through the 13th?

 4    A       Uh-huh.

 5    Q       And you brought his son, the baby, back with you,

 6            right?

 7    A       Yes.

 8    Q       And he was still down there?

 9    A       Uh-huh.

10    Q       Ma'am, why didn't he ride back with you?

11    A       Because he had his own car.  It was being worked

12            on.

13    Q       Well, let me ask you something.  You, the new

14            baby, your other child were all coming back and he

15            was going to stay down there, right?

16    A       Yeah.  Until he got his car taken care.

17    Q       When was he going to come back?

18    A       When his car was finished.

19    Q       I want you tell the ladies and gentlemen of the

20            jury, the police stopped you driving your van,

21            correct?

22    A       Yes.

23    Q       They asked you to follow them and come down to the

24            police station, and you did that, didn't you?

25    A       Yes, I did.
```

| | | |
|---|---|---|
| 1 | Q | You cooperated; is that fair to say? |
| 2 | A | Yes. |
| 3 | Q | You got down there and they asked you to search |
| 4 | | the van, correct? |
| 5 | A | Yes. |
| 6 | Q | Did they have any conversations with you about |
| 7 | | your husband? |
| 8 | A | They just asked me -- you know, asked me where he |
| 9 | | was at.  Things like that. |
| 10 | Q | On June 14th, that sounds like a Thursday when |
| 11 | | they asked you to come to the police station and |
| 12 | | they talked with you with your van down there? |
| 13 | A | The 14th. |
| 14 | Q | Does that ring a bell?  June 14th, you said you |
| 15 | | came back on the 13th -- |
| 16 | A | No.  Because it was the same day. |
| 17 | Q | The same day? |
| 18 | A | The same day I had come back. |
| 19 | Q | You knew where your husband was, right?  You knew |
| 20 | | he was down in Orlando? |
| 21 | A | Uh-huh. |
| 22 | Q | They asked you where your husband was? |
| 23 | A | Yes. |
| 24 | Q | And you didn't tell them, did you? |
| 25 | A | No. |

| | | |
|---|---|---|
| 1 | Q | And, ma'am, you knew the police were looking for |
| 2 | | him for a robbery, didn't you? |
| 3 | A | From the paper that I had seen at the house. |
| 4 | Q | So the question is, when you got back to Dothan, |
| 5 | | you knew the police were looking for your |
| 6 | | husband -- |
| 7 | A | No.  No.  No.  No. |
| 8 | Q | Ma'am -- |
| 9 | A | I didn't know anything about it until I came home. |
| 10 | Q | Well, home is the apartment in Barstone, correct? |
| 11 | A | Right. |
| 12 | Q | That's what I want to ask you about.  When you |
| 13 | | came home, you then were aware of it, correct? |
| 14 | A | Right. |
| 15 | Q | Called your husband, didn't you? |
| 16 | A | No, not at first. |
| 17 | Q | Ma'am, you're telling this jury your apartment was |
| 18 | | searched by the police and a search warrant was |
| 19 | | left and you never contacted your husband -- |
| 20 | A | No.  Because I was trying to find out what -- what |
| 21 | | was the paper they had sitting on the dining room |
| 22 | | table about.  It just -- it was just kind of short |
| 23 | | and brief.  It didn't have, you know, a lot of |
| 24 | | details on what really was going on. |
| 25 | Q | Do you remember the female police officers that |

| | | |
|---|---|---|
| 1 | | was a woman, Sergeant Willie Williamson, and |
| 2 | | Jimmy -- |
| 3 | A | Yes, I remember both of them. |
| 4 | Q | Have you seen them this week, today? |
| 5 | A | Yes. |
| 6 | Q | I don't need to bring them in, you know what they |
| 7 | | look like? |
| 8 | A | Yes. |
| 9 | Q | Is that fair? |
| 10 | A | That's fair. |
| 11 | Q | What I want to ask you, ma'am, did you tell them |
| 12 | | that you and your husband were split up at the |
| 13 | | time? |
| 14 | A | No. |
| 15 | Q | Did you tell them you hadn't seen your husband in |
| 16 | | two weeks? |
| 17 | A | No, I don't remember telling them that. |
| 18 | Q | Did you tell them you could not explain why the |
| 19 | | items that were taken during the search warrant; |
| 20 | | in other words, from the robbery, were in your |
| 21 | | apartment? |
| 22 | A | No, I couldn't. |
| 23 | Q | Did you tell them Mr. McNabb had not been home in |
| 24 | | two weeks? |
| 25 | A | I don't remember what I told them. |

```
 1    Q    Ma'am, do you want this jury to believe that you
 2         were with your husband on June 7th of 2001?  Is
 3         that what you're telling them?
 4    A    No, I wasn't with him on June 7th.  He was in
 5         Orlando.
 6    Q    Are you telling this jury that the police officers
 7         were asking you questions and you knew your
 8         husband was going to be charged or charged with
 9         robbery and you didn't call your husband and tell
10         him?
11    A    I didn't call him at first, no, I didn't.
12    Q    Did you ever call him?
13    A    Yes, I did.
14    Q    There's a warrant for robbery and they want to
15         arrest you for robbery in the first degree you did
16         didn't tell him, did you?
17    A    Not at first.
18    Q    He didn't come back to Dothan, did he, ma'am?
19    A    No.
20    Q    In fact, what happened then, you got your items
21         and left Dothan and moved down to where he was,
22         right?
23    A    Yes and no.
24    Q    Well, tell me how you got two vehicles to Orlando
25         where your husband was, his Cadillac and your van,
```

```
 1              when you're the only adult driving in that

 2              family.  How did the other vehicle get to Orlando?

 3              Who came and got it?

 4       A      The Cadillac got towed by the apartment complex I

 5              guess.

 6       Q      You just left it?

 7       A      Yeah.

 8       Q      Did you --

 9       A      It didn't work anyway.

10       Q      Did you ever inquire about it again?

11       A      No.

12       Q      How was your husband's hair back on June 9th?

13              How was he wearing his hair?

14       A      He had, like --

15       Q      Dreadlocks?

16       A      No.  Like he was trying to start it, though.

17       Q      Was it short hair?

18       A      Yeah.  About like that (indicating).

19       Q      Let me ask you something.  Did you ever have any

20              discussions with your husband about the bullets

21              that were found in your apartment?

22       A      No.

23       Q      Not at all?

24       A      (Witness nodded.)

25       Q      You wouldn't have allowed bullets in there?
```

```
 1    A    No, I wouldn't have allowed anything like that in
 2         my house.
 3    Q    Ma'am, you said your account was with AmSouth,
 4         correct?
 5    A    Yes.
 6    Q    How much money did you have in it?
 7    A    That's a long time ago.  I don't even have that
 8         account anymore.
 9    Q    That's what I want to ask you about.  Tell the
10         jury when you closed your account at AmSouth
11         Bank.  Was that after you knew they wanted to
12         arrest your husband for robbery?  It was, wasn't
13         it?
14    A    It probably was already closed before then.
15    Q    Then I'll ask you in response to what you told me
16         then, at the time you weren't working, there was
17         no money in that account, correct?
18    A    There was some money in there.
19    Q    How much money, ma'am?
20    A    I couldn't tell you.
21    Q    There wasn't enough to support three people or
22         four people with a new baby, was it?
23    A    Yes and no.
24    Q    Ma'am, did your husband go to work down there in
25         Orlando?
```

| | | |
|---|---|---|
| 1 | A | He did little odd jobs. |
| 2 | Q | What did he do for odd jobs?  Tell us.  While the |
| 3 | | Dothan police were looking to arrest him, what was |
| 4 | | his employment? |
| 5 | A | He was working on radios, doing -- |
| 6 | Q | He never took a job, is it fair to say, of someone |
| 7 | | that would require his social security or his |
| 8 | | license?  He didn't do that, did he? |
| 9 | A | Not that I know of.  I couldn't answer that. |
| 10 | Q | Was your testimony to the ladies and gentlemen of |
| 11 | | the jury you wouldn't lie or try to help your |
| 12 | | husband if he did something and committed a |
| 13 | | robbery, right? |
| 14 | A | Right. |
| 15 | Q | But you admit to this jury that you're husband you |
| 16 | | knew there was a warrant for robbery in the first |
| 17 | | degree, you moved back to Orlando, you lived with |
| 18 | | him all this time until the police picked him up |
| 19 | | and arrested him down there, true? |
| 20 | A | That's fair, yeah. |
| 21 | Q | You knew that he was wanted for a robbery up here, |
| 22 | | correct?  True? |
| 23 | A | Right.  While -- |
| 24 | Q | And my question to you, ma'am, did you become |
| 25 | | aware when he got arrested in Orlando that he used |

| | | |
|---|---|---|
| 1 | | his own brother's name and tried to hide and |
| 2 | | conceal who he was then?  Do you know that? |
| 3 | A | No, I didn't. |
| 4 | Q | Did you know when the police tried to arrest him |
| 5 | | he tried to run and get away then?  Did you know |
| 6 | | that? |
| 7 | A | After, yeah. |
| 8 | Q | You know Reggie Hill, correct? |
| 9 | A | Yeah.  Kind of. |
| 10 | Q | You can't tell this jury you ever saw Reggie Hill |
| 11 | | ever have any problems with your husband or |
| 12 | | anybody in your family, can you?  No words, no |
| 13 | | cussing, no threats, no problems of any kind, |
| 14 | | correct? |
| 15 | A | I don't know because I -- |
| 16 | Q | You didn't see anything is what I'm asking. |
| 17 | A | No. |
| 18 | Q | But you agree, it's fair to say, that your husband |
| 19 | | was friends with Reggie? |
| 20 | A | Yeah. |
| 21 | Q | They played basketball, they did? |
| 22 | | Let me ask you about the keys.  Mr. Baxley |
| 23 | | asked you about Mr. Hill having you-all's keys. |
| 24 | | You never had any keys go missing, did you? |
| 25 | A | We had two sets. |

```
 1    Q    Did you have a set go missing, ma'am?
 2    A    I can't answer that.
 3    Q    Did you ever make a police report that your keys
 4         were missing and your house key was missing?  You
 5         didn't, did you?
 6    A    No.  Because I have my own key.
 7    Q    It's your testimony under oath that on the 12th
 8         when the search warrant was executed at your
 9         residence, you were not in Dothan?
10    A    No, I was not.
11    Q    And if someone said they saw you going to the
12         laundry or carrying things, that wouldn't be true?
13    A    No.
14    Q    In fact, you're aware there were previous
15         witnesses that gave a deposition under oath,
16         ma'am, that said she saw you in Dothan on the day
17         the search warrant was executed in your apartment,
18         correct?
19    A    Huh-uh.  Because I wasn't there.
20    Q    You're aware they testified to that?
21    A    No, I'm not aware of that.
22    Q    Ma'am, are you aware that there was a deposition
23         given where your husband was seen on Saturday or
24         Friday after the robbery working on his Buick
25         LaSabre and he borrowed a wrench or a tool to work
```

```
 1              on the car?  Were you aware of that?

 2     A    I find that hard to believe.  He had plenty of

 3          tools.  He wasn't there anyway.

 4              MR. VALESKA:  That's all.  Pass the witness.

 5          Thank you.

 6              THE COURT:  Anything further, Mr. Baxley?

 7              MR. BAXLEY:  No, Your Honor, not right now.

 8              THE COURT:  You may step down.

 9                  Who is your next witness?

10              MR. BAXLEY:  I need to recall Mr. McNabb for

11          one moment, Your Honor.

12              THE COURT:  Okay.

13              RUBEN COREY MCNABB (Recalled)

14          having previously been sworn, was examined and

15          testified as follows:

16                  DIRECT EXAMINATION

17     BY MR. BAXLEY:

18     Q    Mr. McNabb, we showed you Defendant's Exhibit 1 a

19          moment ago.  And you say that was something you

20          received from the automobile repair shop?

21     A    Yes, sir.

22     Q    And has it changed in any form since you received

23          it?

24     A    No, sir.

25              MR. BAXLEY:  I move to admit No. 1.
```

```
 1              THE COURT:  Let it be admitted.
 2                   (Defendant's Exhibit No. 1 was admitted
 3                   into evidence.)
 4              MR. BAXLEY:  That's all I have.
 5                      CROSS EXAMINATION
 6    BY MR. VALESKA:
 7    Q    Can you give me the name of the person that fixed
 8         your car?
 9    A    Not right off.
10    Q    You can't, can you?  Can you give me the name of
11         who you paid the money to for that car getting
12         fixed?  It wasn't Greg, was it?
13    A    One of the people at his shop.
14    Q    You know Greg, don't you?
15    A    Yes, sir.
16    Q    And it wasn't Greg, was it?
17    A    No, sir.
18              MR. VALESKA:  That's all.
19              THE COURT:  You may step down.
20                   You don't have a short witness?
21              MR. BAXLEY:  I got a very short one, Your
22         Honor.  If I can recall Ron Reeves.
23              THE COURT:  You want to call Ron Reeves?
24              MR. BAXLEY:  Yes, Your Honor.
25                   RONALD REEVES (Recalled)
```

```
 1          having previously been sworn, was examined and
 2          testified as follows:
 3                      DIRECT EXAMINATION
 4  BY MR. BAXLEY:
 5  Q    Mr. Reeves, I'm going to show you what the State
 6       brought up a little while back, some speaker wire
 7       that was introduced.  Now, you saw that speaker
 8       wire a long time ago; is that correct, at another
 9       trial?  You saw that speaker wire a long time ago
10       at another trial; is that correct?
11  A    Yes.  Yes.
12  Q    And you testified then that that speaker wire is
13       not like the speaker wire you were tied up with;
14       is that correct?
15  A    That's correct.
16  Q    So the speaker wire the State has brought up and
17       shown is not like the speaker wire that you were
18       tied up with?
19  A    That's right.
20          MR. BAXLEY:  Nothing further.
21                      CROSS EXAMINATION
22  BY MR. VALESKA:
23  Q    The only question I have, Mr. Reeves.  Tell the
24       jury who had speaker wire in the office that had
25       Ms. Roach tie you up with.  Which person in this
```

```
 1          courtroom?

 2    A     Corey McNabb.

 3    Q     Any doubt in your mind?

 4    A     No doubt.

 5    Q     And let me ask you, if I could.  The speaker wire

 6          McNabb had when he took out of the black pouch,

 7          did he take that with or leave it there?

 8    A     He left it there.

 9    Q     I'm talking about the black pouch that had the --

10    A     The back pouch, yes, sir.

11    Q     Who took it?

12    A     Mr. McNabb.

13    Q     And I want to ask you, if I could.  You heard

14          testimony from Mr. McNabb and a receipt he

15          produced.  You heard him testify about that.  You

16          heard testimony about his wife saying that she

17          talked with him.  Would you tell the ladies and

18          gentlemen of the jury, any doubt in your mind, are

19          you a hundred percent sure beyond all doubt on

20          June 7, 2001, he's the man that robbed you?

21    A     Yes, sir, he's the man that robbed me.  I know his

22          voice.

23    Q     Now, I asked you about the voice now.  Is that the

24          same voice --

25    A     Same identical voice.
```

1        MR. VALESKA:  That's all.  Thank you very

2   much.

3        THE COURT:  We're ready to recess for lunch

4   now?

5        MR. BAXLEY:  Yes, Your Honor.

6        THE COURT:  Ladies and gentlemen, at this

7   time we'll recess for lunch.  While you're out of

8   the jury box and away from the courthouse, just

9   recall the instructions that I've given you about

10   not discussing the case among yourselves or with

11   anyone or allowing anyone to discuss it with you

12   or to discuss it in your presence.  If you will,

13   go to your lunch now and just be back in the jury

14   room here at one-fifteen.  Thank you very much.

15        (Jury not present.)

16        THE COURT:  We'll be at recess until

17   one-fifteen.

18        (Off the Record.)

19        THE COURT:  Bring the jury.

20        (Jury present.)

21        THE COURT:  Please, ma'am, let the Record

22   show the Defendant has rested.

23        Mr. Valeska, you are going on rebuttal

24   now?

25        MR. BAXLEY:  Your Honor, we're going to wait

```
 1              for the Defendant.
 2                   THE COURT:  I'm sorry.
 3                        The Defendant is now present.
 4                        Go ahead, Mr. Valeska.
 5                   MR. VALESKA:  Thank you very much.
 6                        We call Sherry Wisdom to the stand.
 7                        ~~SHERRY WISDOM~~
 8         having first been duly sworn, was examined and
 9         testified as follows:
10                        DIRECT EXAMINATION
11    BY MR. VALESKA:
12    Q    You been put under oath, correct?
13    A    Yes.
14    Q    Tell us your name.
15    A    My name is ~~Sherry Wisdom~~.
16    Q    Where is your place of employment or business or
17         occupation?
18    A    King Church Furniture.
19    Q    And who owns King Church Furniture?
20    A    Jimmy King.
21    Q    How long have you worked there?
22    A    Since December of '89.
23    Q    If I could, please, ma'am, you keep the payroll
24         records, the records in relationship to the
25         ordinary course of business of King Furniture?
```

```
 1    A    Yes, sir.

 2    Q    And what kind of business is this?  What does it

 3         make?

 4    A    We manufacture church furniture.

 5    Q    Ruben Corey McNabb, if I use that name, do you

 6         know that man?

 7    A    Yes, sir.

 8    Q    How do you know him?

 9    A    He worked for us.

10    Q    Could you tell the ladies and gentlemen of the

11         jury, his position that he had with you working

12         for the furniture company, was he a carpenter?

13    A    No, sir.  He was an upholsterer.

14    Q    Now, could you tell the ladies and gentlemen of

15         the jury, do you know approximately how long he

16         worked for you?

17    A    He began his employment on September 18th of 2000,

18         and his last day of work was May 15th of 2001.

19    Q    You're sure it was May 15th of 2001?

20    A    That's the last day he came to work.

21    Q    Would you tell the ladies and gentlemen of the

22         jury, was he given a leave of absence or maternity

23         leave or leave for his wife?

24    A    No.

25    Q    Would you tell the ladies and gentlemen of the
```

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | jury, after he left, did he ever come back or show           |
| 2  |   | up again or contact you in any way?                          |
| 3  | A | No, sir.                                                     |
| 4  | Q | Did you contact anybody in the business?                     |
| 5  | A | No.                                                          |
| 6  | Q | You sure?                                                    |
| 7  | A | I'm sure.                                                    |
| 8  | Q | The employees that worked there, please, ma'am,              |
| 9  |   | the supervisors, could I have their names besides            |
| 10 |   | yourself?                                                    |
| 11 | A | We have an owner, Jimmy King, and we have a shop             |
| 12 |   | foreman named Eddie Shouppe.                                 |
| 13 | Q | Mr. Shouppe still work there?                                |
| 14 | A | Yes, sir.  He's been there a little longer than             |
| 15 |   | me.                                                          |
| 16 | Q | Could Mr. McNabb have had any conversations with            |
| 17 |   | Mr. Shouppe, Eddie, about not coming back or not            |
| 18 |   | showing up?                                                  |
| 19 |   | MR. BAXLEY:  Object, Your Honor.  That's                    |
| 20 |   | hearsay.                                                     |
| 21 |   | THE COURT:  Well, I don't think -- he didn't                |
| 22 |   | ask what anybody said.  He said --                          |
| 23 | Q | To your knowledge did he have any conversation?             |
| 24 |   | That calls for a yes or no.                                  |
| 25 | A | No.                                                          |

| 1 | Q | And Eddie Shouppe still works there, correct? |
| 2 | A | Yes. |
| 3 | | MR. VALESKA:  That's all.  Pass the witness. |
| 4 | | THE COURT:  Mr. Baxley. |
| 5 | | CROSS EXAMINATION |
| 6 | BY MR. BAXLEY: | |
| 7 | Q | If Mr. McNabb stated he had a conversation with |
| 8 | | Eddie or Jimmy, would you be privy to all of their |
| 9 | | conversations with their employees? |
| 10 | A | Of course not. |
| 11 | Q | So it's possible he could have had a conversation? |
| 12 | A | No, it's not possible.  I checked with both Jimmy |
| 13 | | and Eddie before testifying to make sure. |
| 14 | Q | That's not -- you can't testify to what they said. |
| 15 | A | Okay. |
| 16 | Q | I'm asking you, is there any way possible outside |
| 17 | | of your presence that they could have had a |
| 18 | | conversation with him, yes or no? |
| 19 | A | Of course. |
| 20 | Q | And do you know if Mr. McNabb was present in |
| 21 | | Dothan, Alabama, on June 7, 2001? |
| 22 | A | On June 7th? |
| 23 | Q | Yes, ma'am. |
| 24 | A | No, I would have no idea. |
| 25 | | MR. BAXLEY:  Thank you.  No further |

```
 1          questions, Your Honor.

 2               MR. VALESKA:  No more questions.

 3               THE COURT:  Please, ma'am, you may step

 4          down.

 5               MR. VALESKA:  She can be excused.  She needs

 6          to go back to work.

 7               THE COURT:  Who will you have next?

 8               MR. VALESKA:  Stephanie Reeves.

 9                         STEPHANIE REEVES,

10          having first been duly sworn, was examined and

11          testified as follows:

12                         DIRECT EXAMINATION

13     BY MR. VALESKA:

14     Q    Tell us your name, please, ma'am.

15     A    Stephanie Reeves.

16     Q    Ms. Reeves, do you know Ruben Corey McNabb?

17     A    Yes, sir, I do.

18     Q    Do you know his wife, Yvette McNabb?

19     A    Yes, sir.

20     Q    Now, if I could, could you tell the ladies and

21          gentlemen of the jury, let's go back to on or

22          about May and into June of 2001, and tell the jury

23          where you lived at that time.

24     A    Barstone Apartments.

25     Q    And what was the close proximity -- how close did
```

```
 1              you live in any manner or relationship to where

 2              they lived in Barstone Apartments?

 3      A       Right next door.

 4      Q       Did you know the people that lived across from

 5              your apartment that lived next to them?

 6      A       Yes, sir.

 7      Q       Who were they?

 8      A       Wendy and Jonathan Cole.

 9      Q       Could you tell the ladies and gentlemen of the

10              jury, had you ever talked with Yvette McNabb

11              before June 14th of 2001?

12      A       Yes, sir.

13      Q       Did you ever talk to her?

14      A       (Witness nodded.)

15      Q       How many times did you talk to her?  Many times?

16      A       Uh-huh.

17      Q       Did you ever talk to McNabb himself, say hello or

18              speak to him?

19      A       Yes, sir.

20      Q       Can you tell the ladies and gentlemen of the jury,

21              between June 1st and June 15th of 2001, during

22              that time period, did you ever see Yvette McNabb

23              at the apartment complex in Dothan, Alabama,

24              Houston County during that time period?

25      A       Yes, sir, I did.
```

| | | |
|---|---|---|
| 1 | Q | You're sure? |
| 2 | A | I'm sure. |
| 3 | Q | Let's go particularly to the time the apartment |
| 4 | | was searched by the police department.  Were you |
| 5 | | aware of that? |
| 6 | A | Yes, sir. |
| 7 | Q | Can you tell the ladies and gentlemen of the jury, |
| 8 | | did you see Yvette McNabb on that day? |
| 9 | A | Yes, sir, I did.  That morning. |
| 10 | Q | Did you see her after the police searched the |
| 11 | | apartment? |
| 12 | A | Yes, sir.  The next following day. |
| 13 | Q | And did you ever see her again that you recall in |
| 14 | | reference to the day the police searched the |
| 15 | | apartment or the next day?  Did you see her again |
| 16 | | yourself? |
| 17 | A | The next day. |
| 18 | Q | And after that did you see her any more that you |
| 19 | | recall? |
| 20 | A | No, sir. |
| 21 | Q | You're positive you saw her on or about the 12th |
| 22 | | of June of 2001? |
| 23 | A | Yes, sir. |
| 24 | Q | And then you saw her the 13th, the next day? |
| 25 | A | Yes, sir. |

```
 1    Q    So if I would ask you if she testified under --
 2         excuse me, if she alleged she was in Orlando,
 3         Florida, on those occasions, would she be right or
 4         wrong?
 5    A    She would be wrong.
 6              MR. VALESKA:  Pass the witness.  Thank you
 7         very much.
 8                      CROSS EXAMINATION
 9    BY MR. BAXLEY:
10    Q    Ms. Reeves, do you know -- did you see either of
11         them on -- did you see Mr. McNabb in town on June
12         7, 2001?
13    A    No, sir, I didn't.
14              MR. BAXLEY:  Thank you.  No further
15         questions, Your Honor.
16                    REDIRECT EXAMINATION
17    BY MR. VALESKA:
18    Q    I would ask you, Mr. Baxley asked you if you saw
19         him on June 7, 2001.  Are you saying he wasn't in
20         town or you just didn't see him that day while you
21         were there?
22    A    I just didn't see him.
23              MR. VALESKA:  That's all.  Thank you.  She
24         can be excused.
25              THE COURT:  You want to excuse her.
```

```
 1              You're excused.  And you may step down.

 2       Thank you very much.

 3              MR. VALESKA:  Mary Bessie.

 4                        MARY BESSIE

 5       having first been duly sworn, was examined and

 6       testified as follows:

 7                        DIRECT EXAMINATION

 8  BY MR. VALESKA:

 9  Q    Tell us your name, please, ma'am.

10  A    It's Mary Kimberly Bessie.

11  Q    Now, if I could, let's go back to May and June of

12       2001.  Did you know anybody in this courtroom that

13       lived at Barstone Apartments?

14  A    Yes, sir.  Corey.

15  Q    Corey referring to the defendant at the table with

16       Mr. Baxley, correct?

17  A    Yes, sir.

18  Q    Did you know his wife?

19  A    Yes.

20  Q    During May and that period of time, do you know

21       what the physical condition of his wife in

22       relationship to their family what was taking

23       place?

24  A    She was pregnant.

25  Q    Would you tell the ladies and gentlemen of the
```

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | jury, did you see Corey McNabb, Ruben Corey                   |
| 2  |   | McNabb, or his wife, Yvette McNabb, many times               |
| 3  |   | before June 1, 2001, at the apartment complex?               |
| 4  | A | Yes, sir.                                                    |
| 5  | Q | Now, if I could, let me ask you, were you living            |
| 6  |   | in the apartment complex during this time period            |
| 7  |   | or just before June of 2001?                                 |
| 8  | A | I lived there.  Yes, sir, I did.  And right                 |
| 9  |   | before.                                                      |
| 10 | Q | Who were you living with?                                     |
| 11 | A | My brother and -- brother-in-law and sister.  They          |
| 12 |   | lived in Barstone.                                           |
| 13 | Q | Now, and can you tell the ladies and gentlemen of           |
| 14 |   | the jury, the apartment they lived in and you               |
| 15 |   | lived, was it close or far away from where the              |
| 16 |   | McNabbs lived?                                               |
| 17 | A | Right beside them.                                           |
| 18 | Q | Now, if I could, please, ma'am, did you know the            |
| 19 |   | lady that was going out as you were coming to               |
| 20 |   | testify?  Who that was?                                      |
| 21 | A | Yes, sir.                                                    |
| 22 | Q | Who was that?                                                |
| 23 | A | That's Stephanie.                                            |
| 24 | Q | Now, can you tell the ladies and gentlemen of the           |
| 25 |   | jury, let's go to June of 2001.  Particularly, did          |

```
 1              something happen to you or a member of your family
 2              on or about June 6th of 2001?
 3      A       Yes, sir.  My grandmother died.
 4      Q       I don't mean to be personal, but your grandmother
 5              passed away.  Was your other grandmother still
 6              alive or if I could use the term, was that your
 7              last grandmother?
 8      A       The last one.
 9      Q       And you're sure of the day she passed away?
10      A       Yes, sir.  That was on my brother's birthday.
11      Q       Did it affect you when your grandmother passed
12              away?
13      A       Yes, sir.
14      Q       When you found out, where did you go in
15              relationship to the apartment or where your family
16              that you had been living with?  Where did you go
17              when you found out about your grandmother?
18      A       Everybody came to my sister's house in Barstone.
19      Q       June 6, 2001, the apartment complex, were you
20              present sometime after nine o'clock at night?
21      A       Yes, sir.
22      Q       I don't mean to be personal, ma'am, but does
23              anybody in your family or did your sister or
24              brother-in-law, did they smoke cigarettes inside
25              the house?
```

| 1  | A | No, sir. |
|----|---|----------|
| 2  | Q | Were there children that lived in the house? |
| 3  | A | Yes, sir.  My daughter has asthma, and my son and |
| 4  |   | my niece, we don't smoke inside.  We go outside. |
| 5  | Q | You smoke cigarettes, correct? |
| 6  | A | Yes, sir. |
| 7  | Q | Did you have an occasion that night that your |
| 8  |   | grandmother passed away -- on whose birthday? |
| 9  | A | My brother's. |
| 10 | Q | Your brother's day, the same day, and go outside |
| 11 |   | of the apartment and smoke cigarettes? |
| 12 | A | Yes, sir. |
| 13 | Q | Were you upset? |
| 14 | A | Yes, sir. |
| 15 | Q | Did you see Ruben Corey McNabb on June 6th of 2001 |
| 16 |   | in Dothan, Alabama, Houston County, at the |
| 17 |   | Barstone Apartments? |
| 18 | A | Yes, sir. |
| 19 | Q | Any doubt in your mind? |
| 20 | A | No, sir. |
| 21 | Q | Did you speak to him? |
| 22 | A | Yes, sir. |
| 23 | Q | Did he speak to you? |
| 24 | A | Yes, sir.  I was crying.  And he asked me, he |
| 25 |   | said, are you okay.  I said, yeah.  I mean, I've |

1        seen him, and we're in the habit of saying hey.

2   Q   Where did he go in relationship when he spoke to

3        you when you were outside when I said the

4        apartments, the steps, sitting smoking, which

5        direction did he go?  Towards the parking lot or

6        back towards his apartment?

7   A   He was coming from the parking lot to his

8        apartment, and you have to pass right by my

9        apartment to get to where his is.

10   Q   And you see him in the courtroom today, correct?

11   A   Yes, sir.

12   Q   Any doubt in your mind you saw him on June 6,

13        2001, after ten o'clock p.m?

14   A   No, sir.

15   Q   Did you know what kind of vehicles he and his wife

16        drove?  When I say vehicles, cars or whatever.

17        What you saw?

18   A   I know that his wife drove a white van, and he had

19        two cars.  One of them didn't run, and the other

20        one he always -- it was, like, a brown bigger

21        older car that he used to go back and forth to

22        work.  But there was three vehicles altogether.

23   Q   If I could, did you become aware when the police

24        department executed a search warrant on his or his

25        wife's residence on or about June 12th?

1    A    Yes, sir.

2    Q    I want to ask you, on or about June 12th of 2001,

3          did you see his wife, Yvette McNabb, in Dothan,

4          Alabama, Houston County, at Barstone Apartments?

5    A    Yes, sir.

6    Q    What time did you see her in relationship to when

7          the police executed the search warrant?

8    A    I had already gone to work when the police kicked

9          the door in next door.  I had already -- was

10        already at work.

11    Q    Did you come back home?

12    A    Yes, sir.

13    Q    And when you came back home, the police, were they

14        still there or gone?

15    A    They were still there.

16    Q    Did you come to see Yvette McNabb in that location

17        on or about the 12th of 2001 in relationship to

18        her apartment or the general area?

19    A    On my way to work, I saw her.

20    Q    And what was she doing that you saw?

21    A    Just getting in the van.

22    Q    Did you see her again after -- before June 12th of

23        2001 going backwards on the 11th or the 10th or

24        the 9th?  Did you see her during that time period?

25    A    Yes, sir.

```
 1    Q    Now, if I could, after you saw Corey McNabb on or

 2         about June 6th of 2001 at ten o'clock, did you see

 3         him the next day that you recall, which would have

 4         been the 7th is what I'm asking about?  If you

 5         have an independent recollection, if you know.

 6    A    I remember -- no, sir.

 7    Q    Did you see him ever again after that in the

 8         apartment complex?

 9    A    No, sir.

10              MR. VALESKA:  That's all.  Pass the witness.

11              THE COURT:  Mr. Baxley.

12                        CROSS EXAMINATION

13    BY MR. BAXLEY:

14    Q    Ms. Bessie, do you recall testifying in this case

15         a year ago?

16    A    Yes, sir.

17    Q    And at that point you never mentioned anything

18         about having conversations with Mr. McNabb; is

19         that true?

20    A    I don't recall whether I said.  I don't remember

21         if anybody asked me that question or not.

22    Q    I asked you specifically -- you had a

23         relationship with his wife really and not Mr.

24         McNabb; is that true?

25    A    I spoke more with his wife than I did him.
```

```
 1   Q   And I asked you about that, and you didn't say
 2       anything about -- you basically have -- how did
 3       you put it?  You saw him in passing.  Is that
 4       better term -- is that a better term to say about
 5       your relationship with Mr. McNabb?  You saw him in
 6       passing?
 7   A   I saw him on his way to and from his apartment.
 8   Q   But you never really spoke, did you?
 9   A   Hello, how are you doing.  Neighborly.  We lived
10       right beside each other. .
11   Q   And did you see him rob the Winn Dixie on Westgate
12       Parkway?
13   A   No, sir.
14   Q   So you can't testify he was the person that robbed
15       that Winn Dixie?
16   A   No, sir.
17   Q   See him carrying bags of money into his apartment
18       or anything like that?
19   A   No, sir.
20   Q   Bring toboggans into his apartment?
21   A   Bringing toboggan -- no, sir.
22   Q   You didn't see anything like that?
23   A   No, sir.
24           MR. BAXLEY:  Thank you.
25                    REDIRECT EXAMINATION
```

BY MR. VALESKA:

1

2   Q    Did you ever see him wear a toboggan?

3   A    Yes, sir.

4   Q    Now, Mr. Baxley asked, in other words, when you

5        gave a deposition before under oath, the question

6        was about whether you said he had ever said

7        anything to you or you said anything to him.  I

8        might have missed it.  I want to ask you.  Do you

9        recall Mr. Baxley asking you in the deposition

10       under oath whether or not you actually spoke to

11       him?  He didn't in the deposition, did he?

12  A    No, he never asked me that.

13  Q    And the assistant district attorney who did the

14       deposition, the man identified if I could by the

15       name of Martin Adams, a lot younger than me, a lot

16       darker hair, he never asked you that, did he?

17  A    No, sir.

18            MR. VALESKA:  That's all.  Pass the witness.

19            MR. BAXLEY:  Nothing further.

20            THE COURT:  You may step down.  And you're

21       excused.  You may go.

22                    GREG BRYSON

23       having first been duly sworn, was examined and

24       testified as follows:

25                    DIRECT EXAMINATION

```
 1    BY MR. VALESKA:

 2    Q    Tell me your name, please, sir.

 3    A    Greg Bryson.

 4    Q    Mr. Bryson, do you run a business in Orlando,

 5         Florida?

 6    A    Yes.

 7    Q    What is the name of your business?

 8    A    Greg's Auto Repair.

 9    Q    And what kind of general business?  Can you tell

10         me what the business is?

11    A    We repair automobiles.

12    Q    I want to ask you in doing automobiles and doing

13         repair work in the state of Florida, when people

14         make payments, you collect that money, correct?

15    A    Yes.

16    Q    You have to report your income or pay taxes in the

17         state of Florida to the State of Florida as well

18         as to the federal government?

19    A    Yes.

20    Q    Do you have any type of documents in relationship

21         if someone comes in, you know, to ask for work to

22         be done on their vehicle, any kind of paperwork

23         that you use, in other words, to keep up with

24         those records, if there's an estimate or what's to

25         be done or where it's to be paid or how taxes are
```

```
 1        kept up?

 2   A    Yes.

 3   Q    Now, do you know Ruben Corey McNabb personally?

 4   A    Yes.

 5   Q    If I could show you State's Exhibit No. 1 --

 6        excuse me, Defendant's Exhibit No. 1 for

 7        identification purposes.  Looking at Defendant's

 8        Exhibit No. 1, is that a receipt from your

 9        business?

10   A    No.

11   Q    Is there a stamp on there that indicates a stamp

12        that is in fact used on your business in the

13        ordinary course of business that you-all have when

14        you stamp bills, correct?

15   A    Yes.

16   Q    Did you give Corey McNabb that receipt?

17   A    No.

18   Q    Can you tell the ladies and gentlemen of the jury

19        in looking at the receipt, in other words,

20        whatever work was allegedly done or written, is

21        the tax correct on that?

22   A    No.

23   Q    Could you tell the ladies and gentlemen of the

24        jury, the receipt itself, what I want to ask you

25        about and the paperwork that you use, do you have
```

```
 1              when you do billing or do estimates or a customer

 2              to keep records, is there more than one piece of

 3              paper attached to your estimates or your

 4              documentation?

 5     A    Yes.

 6     Q    What other color would be attached, if any, to the

 7              papers you use?

 8     A    Yellow.

 9     Q    And the other copy that's on top is what color?

10     A    White.

11     Q    There any carbon in there?

12     A    Yes.

13     Q    And why is there carbon in there?  Can you tell us

14              why that is kept in your business?

15     A    The -- when you write on the first copy, the

16              carbon copy on the second copy.

17     Q    Do you have a document, in other words, the

18              original that you keep versus the yellow copy you

19              would give the customer?

20     A    Yes.

21     Q    Have you done that many times?

22     A    Yes.

23     Q    And have you watched other employees of yours

24              write and do receipts?

25     A    Yes.
```

```
 1   Q    And have you seen the yellow copies as well as the

 2        other copies?

 3   A    Yes.

 4   Q    What I want to ask you, Defendant's Exhibit 1,

 5        would you take and look at it and it appears to be

 6        writing or the color of ink on there, correct?

 7   A    Yes.

 8   Q    What color does it appear?

 9   A    Blue.

10   Q    Anything on the back, could you tell us on

11        Defendant's Exhibit 1, that shows any type of

12        writing and any type of carbon in any way for any

13        writing to correspond on the front Defendant's

14        Exhibit No. 1, that receipt, in any way that would

15        show that there was a copy made of that?

16   A    No.

17             MR. VALESKA:   That's all.  Pass the witness.

18                     CROSS EXAMINATION

19   BY MR. BAXLEY:

20   Q    Mr. Bryson, the exhibit you've shown there, now,

21        you have people working for you, do you not?

22   A    Yes.

23   Q    Do your other employees possibly from time to time

24        do work outside of what you would know?

25   A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | Is there any possibility that one of your other |
| 2 | | employees wrote this up for Mr. McNabb? |
| 3 | A | Yes. |
| 4 | Q | So you can't sit here and say it is absolutely |
| 5 | | impossible for this invoice to come from your |
| 6 | | shop?  You can say it is possible this came from |
| 7 | | your shop? |
| 8 | A | It's not the receipt that I use personally. |
| 9 | Q | Right. |
| 10 | A | I didn't handwrite this receipt, no. |
| 11 | Q | You didn't handwrite it. |
| 12 | | But you can't say somebody else would from |
| 13 | | your shop? |
| 14 | A | No. |
| 15 | Q | Do you know Corey McNabb? |
| 16 | A | Yes. |
| 17 | Q | Are you familiar with him? |
| 18 | A | I mean, yeah, somewhat. |
| 19 | Q | Did you ever see him in Orlando? |
| 20 | A | Yes. |
| 21 | Q | You see him down there often? |
| 22 | A | Yes. |
| 23 | Q | Did he ever come to your shop any other time to |
| 24 | | get his car fixed? |
| 25 | A | Yes. |

```
 1    Q    So he had used your shop before?

 2    A    Uh-huh.   He has been there before.

 3    Q    Would you say Corey is someone who would commit

 4         robberies?

 5              MR. VALESKA:   I'm going to object.

 6              THE COURT:   I sustain the objection.

 7    Q    Do you know Mr. McNabb well enough to know his

 8         character?

 9    A    No.

10    Q    Did Corey strike you as someone who would commit a

11         robbery?

12              MR. VALESKA:   Objection.

13              THE COURT:   I sustain the objection.

14    Q    So you say that receipt, there's the potential

15         that it could have come from your business?

16    A    Yes.

17              MR. BAXLEY:   Thank you.

18                    REDIRECT EXAMINATION

19    BY MR. VALESKA:

20    Q    The only other question I would like to ask you,

21         please, sir, if I could, the receipts to your

22         business, the originals, are they kept on the open

23         counter where anybody could come in and get one?

24    A    Yes.

25    Q    I would like to ask you, Mr. Baxley asked, there's
```

```
 1        a possibility some other employee that worked for
 2        you could have used some type of receipt.  Is that
 3        a receipt that's used in your business that shows
 4        there's any carbon on the back so an actual
 5        estimate was done and kept in the ordinary course
 6        of business for your records?  It's not there, is
 7        it?
 8            MR. BAXLEY:  I object, Your Honor.  I didn't
 9        put it in that context.
10            MR. VALESKA:  I believe that's the rebuttal
11        I've already asked.  I have a right to ask him.
12            THE COURT:  What was the question?
13            MR. BAXLEY:  Talking about carbons on it.  I
14        said if there was employees that did work outside
15        of his business --
16            MR. VALESKA:  I'll withdraw and ask this way.
17   Q    Mr. Baxley asked if there were employees that
18        worked outside or possibilities that they could
19        have got a receipt or used a receipt.  Do those
20        employees keep the receipts and turn them in in
21        the ordinary course of your business?
22   A    I'm not following the question.
23   Q    In other words, are you responsible for work
24        that's done under your name for Greg's Complete
25        Auto Repair, in other words, to Florida Department
```

```
 1          of Revenue and or licensing as well as the federal

 2          government for taxes?

 3     A    Yes.

 4     Q    So the question would be, Mr. Baxley said if any

 5          employee could have possibly got a receipt like

 6          this, my question to you is the employees who

 7          worked for you on June 27, 2000, any of those

 8          mechanics still around?

 9     A    No.

10     Q    You know their names, correct, the records,

11          because they got paid, correct?

12     A    Yes.

13               MR. VALESKA:  That's all.

14               THE COURT:  I'm just a little bit confused.

15          You say your book has a white copy and a yellow

16          copy?

17               THE WITNESS:  Yes.

18               THE COURT:  Which copy do you give to the

19          customer?

20               THE WITNESS:  The yellow copy.

21               THE COURT:  The yellow copy.  Not the white

22          copy?

23               THE WITNESS:  No.

24               THE COURT:  You keep the white copy for your

25          records?
```

```
 1              THE WITNESS:  Yes.

 2              MR. BAXLEY:  Can I ask one more question,

 3         Your Honor?

 4              THE COURT:  Sure.

 5                   RECROSS EXAMINATION

 6    BY MR. BAXLEY:

 7    Q    One more follow-up with this.  Did you have an

 8         employee by the name of Travis Johnson?  Named

 9         Trap -- nicknamed Trap?

10    A    Yes.  Actually a subcontractor, yes.

11    Q    Subcontractor.  How does that work in your

12         business?

13    A    Subcontractors come in off the street, apply for

14         work.  I put them on a job.  They do it.  I pay

15         them right then and there.

16    Q    So that would not be something you kept up with?

17    A    You mean as in --

18    Q    As in the taxes and such that Mr. Valeska keeps

19         alluding to?

20    A    Yes.  I would keep up with the taxes.  But I would

21         get it from the customer itself, not from him.

22    Q    Is it possible Trap could have filled out a

23         receipt and used it under your name when he was in

24         the independent contract mode?

25              MR. VALESKA:  I object to what's possible.
```

```
 1              THE COURT:  Sustained.  Anything is
 2         possible.
 3              MR. BAXLEY:  No further questions, Your
 4         Honor.
 5              MR. VALESKA:  No more questions.  Ask if he
 6         could be excused.
 7              THE COURT:  You're excused.
 8              MR. VALESKA:  One last witness, Judge White.
 9         Very short.  Right here.  Call Willie Williamson
10         to the stand.
11                    WILLIE WILLIAMSON
12         having first been duly sworn, was examined and
13         testified as follows:
14                    DIRECT EXAMINATION
15    BY MR. VALESKA:
16    Q    Tell us your name.
17    A    Sergeant Willie Williamson.
18    Q    What I want to ask you, Sergeant Williamson, back
19         on or about June 14, 2001, you worked as a police
20         officer in the City of Dothan on that occasion?
21    A    Yes, I was.
22    Q    Can you tell the ladies and gentlemen of the jury
23         on June 14, 2001, were you working with
24         Investigator Jimmy Singleton with the Dothan
25         Police Department?
```

```
 1    A    Yes.
 2    Q    Did you have the occasion on June 14, 2001, to see
 3         a Yvette McNabb, who was the wife of Corey McNabb,
 4         in a white van with wood paneling?
 5    A    The Dodge mini-van, yes, sir.
 6    Q    That's what I'm asking about.
 7    A    1989.
 8    Q    And did you talk with her?
 9    A    Yes.
10    Q    And, Sergeant -- Investigator Singleton also
11         present?
12    A    Yes.
13    Q    What I want to ask you.  Did she make any
14         statements to you in your presence with Singleton
15         in reference to about her husband, Corey McNabb?
16    A    Yes, she did.
17    Q    Can you tell us what she said?
18    A    She said that they were split up and she hadn't
19         seen him for two weeks.
20    Q    Did she make any indications to you about the
21         items that were found in her house, anything about
22         those?
23    A    We asked her if she could explain why the items we
24         found in the house in her apartment, rather, they
25         were from a robbery so we were asking her why they
```

```
 1            would be there.  If her or her husband didn't have
 2            any knowledge of the robbery.  And she stated that
 3            he had not -- Mr. McNabb had not been home in two
 4            weeks.
 5     Q      Now, final question I want to ask you.  Did she
 6            indicate or tell you in any manner or fashion at
 7            that time that he was down in Orlando and she had
 8            just left him?  She didn't tell you that, did she?
 9     A      No, sir.
10                 MR. VALESKA:  Pass the witness.  Thank you,
11            Judge White.
12                 THE COURT:  Mr. Baxley.
13                        CROSS EXAMINATION
14     BY MR. BAXLEY:
15     Q      Sergeant Williamson, Ms. McNabb told you that
16            Corey had not been in town for two weeks; is that
17            correct?
18     A      She said she hadn't seen him in two weeks.
19     Q      Two weeks?
20     A      Right.
21     Q      Did you see Corey McNabb at that time?
22     A      No.
23                 MR. BAXLEY:  No further questions, Your
24            Honor.
25                      REDIRECT EXAMINATION
```

336

```
 1    BY MR. VALESKA:
 2    Q    In reference to seeing Corey McNabb on that day,
 3         did you go back to her and McNabb's apartment on
 4         or about June 18th of 2001 while she was still
 5         living in the same apartment?
 6    A    Yes.
 7    Q    Did you ascertain whether or not -- or where he
 8         was then from her?
 9    A    We had a tip that he might be there, and we went
10         to the residence.  Ms. McNabb was there.  She
11         allowed us entry into the home.  Mr. McNabb was
12         not there.
13    Q    At that point in time did she tell you once again
14         that he was down in Orlando, Florida?
15    A    No.
16              MR. VALESKA:  That's all.  Pass the witness.
17              MR. BAXLEY:  No further questions, Your
18         Honor.
19              THE COURT:  You may step down.
20              MR. VALESKA:  That's all we have, Judge
21         White.  State of Alabama rests.
22              THE COURT:  Let me ask the jury to go back to
23         the jury room and just recall the instructions
24         I've given to you about not discussing the case
25         among yourselves or with anyone else.  We'll call
```

```
 1        for you shortly.
 2                    (Jury not present.)
 3              THE COURT:  It's your opportunity to make any
 4        motion that you might want to make.
 5              MR. BAXLEY:  No motions, Your Honor.
 6              THE COURT:  No motions?
 7              MR. BAXLEY:  No motions.
 8              THE COURT:  Do you have some requested
 9        charges?
10              MR. BAXLEY:  Yes, sir, I do.
11              THE COURT:  Let's take about ten minutes, and
12        then we'll get started back.
13                    (Off the Record.)
14              THE COURT:  Bring the jury.
15                    (Jury present.)
16              THE COURT:  Gentlemen, you may argue your
17        case to the jury.
18                    (At which time closing arguments were
19                    made by Mr. Valeska.)
20              MR. BAXLEY:  Your Honor, that's
21        objectionable.  Talking about child support.
22        There's no child support order of that --
23              MR. VALESKA:  There was testimony he had
24        obligation to support other children in Florida.
25        I'll withdraw it and say he has obligation for
```

1    other children.

2                    (At which time closing arguments were

3                    continued by Mr. Valeska.)

4         THE COURT:  Mr. Baxley.

5                    (At which time closing arguments were

6                    made by Mr. Baxley.)

7         MR. VALESKA:  I object.  I object.  He got a

8    case of pennies himself.  I don't believe they

9    were ever offered into evidence or there's any

10   predicate that --

11        MR. BAXLEY:  Your Honor, I'm not attempting

12   to introduce pennies into evidence.

13        MR. VALESKA:  Go ahead.  I withdraw.  I

14   withdraw.

15        MR. BAXLEY:  I'm simply using a prop.

16        MR. VALESKA:  I'll withdraw.

17                    (At which time closing arguments were

18                    continued by Mr. Baxley.)

19        THE COURT:  Mr. Valeska.

20                    (At which time rebuttal arguments were

21                    made by Mr. Valeska.)

22        MR. BAXLEY:  I object to him testifying.  Is

23   he offering any testimony here?

24        THE COURT:  I think he's submitting.

25        MR. VALESKA:  What he's arguing about.

```
 1          THE COURT:  Go ahead.
 2                  (At which time rebuttal arguments were
 3              continued by Mr. Valeska.)
 4          THE COURT:  Now, ladies and gentlemen, you're
 5      the trial jury of this case of the State of
 6      Alabama versus Ruben Corey McNabb, and this
 7      Defendant is being placed upon trial before you
 8      here yesterday and today on an indictment which
 9      was returned by the grand jury of Houston County,
10      Alabama, back on or about the 30th day of August,
11      2001.  And this indictment charges the Defendant,
12      Ruben Corey McNabb, with robbery in the first
13      degree.  It says here that the grand jury of said
14      county charge that before the finding of this
15      indictment that Ruben Corey McNabb, whose name is
16      to the grand jury otherwise unknown, did in the
17      course of committing a theft of U.S. currency,
18      postage stamps, and food stamps, the property of
19      Winn Dixie, use force against the person of Ron
20      Reeves and Patsy Lynn Roach with the intent to
21      overcome their physical resistance or physical
22      power of resistance or did threaten the imminent
23      use of force against the person of Ron Reeves and
24      Patsy Lynn Roach, with the intent to compel
25      acquiescence to the taking of or escaping with the
```

1    property while the said Ruben Corey McNabb was

2    armed with a deadly weapon or a dangerous

3    instrument; to wit, a handgun, in violation of

4    Section 13A-8-41 of the Code of Alabama against

5    the peace and dignity of the State of Alabama.

6         Now, as I've said before, that charges

7    this Defendant here with robbery in the first

8    degree committed against the persons of Ron Reeves

9    and Patsy Roach, who have testified before you

10   here during the course of this trial.

11        Now, let me advise you, ladies and

12   gentlemen, that this indictment is not any

13   evidence in the case, and it must not and it

14   cannot be considered by you as any evidence of the

15   Defendant's guilt in this case.  This indictment

16   is merely the formal charge that has been placed

17   against this Defendant by the grand jury of this

18   county so that he could be brought for trial

19   before you, the petit jury, in order to make a

20   determination as to his guilt or innocence.  So

21   you must not and you cannot consider this as any

22   evidence against him.  It's just the vehicle by

23   which the charge gets from the grand jury of the

24   county to a petit jury for a trial and a

25   determination of guilt or innocence.

1          Now, I'm sure you're wondering what it

2    takes to make up the charge of robbery in the

3    first degree because that is what the Defendant is

4    charged with.  You know, I'm sure the question has

5    entered your mind.  Judge, you know, what is

6    robbery in the first degree?  How do we know what

7    robbery in the first degree is?  And I will just

8    read to you from the Code of Alabama what it says

9    that robbery is.

10         The Code of Alabama in Section 13A-8-41

11    Subsection A Subsection 1 says that a person

12    commits the crime of robbery in the first degree

13    if in the course of committing a theft he uses or

14    threatens the imminent use of force against the

15    person of the owner of the property or any person

16    present with the intent to overcome that person's

17    physical resistance or physical power of

18    resistance and in so doing he is armed with a

19    deadly weapon or a dangerous instrument.

20    Therefore, in order to constitute the offense of

21    robbery in the first degree in this particular

22    case, the State must have proven to you beyond a

23    reasonable doubt that this Defendant here, Ruben

24    Corey McNabb, committed or attempted to commit the

25    theft of U.S. currency, postage stamps, and food

1    stamps, which belonged to Winn Dixie; and that in

2    the course of committing or attempting to commit

3    that theft or in immediate flight after the

4    attempt or commission of the theft that the

5    Defendant used -- that the Defendant either used

6    force against the person of Ron Reeves and Patsy

7    Lynn Roach with the intent to overcome their

8    physical resistance or physical power of

9    resistance or that he threatened imminent use of

10   force against the person of Ron Reeves and Patsy

11   Lynn Roach with the intent to compel acquiescence

12   to the taking or escaping with that property, and

13   that -- and then, thirdly, at that time that the

14   Defendant was armed with a deadly weapon or a

15   dangerous instrument.

16          A person commits the crime of theft of

17   property if he knowingly obtains or exerts

18   unauthorized control over the property of another

19   with the intent to deprive the owner of that

20   property.

21          Our law says that a deadly weapon is a

22   firearm or anything manifestly designed or adapted

23   for the purpose of inflicting death or serious

24   physical injury.

25          The law also says that a person acts

```
 1          intentionally with respect to a result or to
 2          conduct when his purpose is to cause that result
 3          or to engage in that conduct.
 4                    Now, if you after weighing and
 5          considering all of the evidence in the case you
 6          believe beyond a reasonable doubt that the State
 7          has proven each of the elements that I have set
 8          out for you, the elements of robbery in the first
 9          degree as charged, then, of course, you should
10          find the Defendant guilty of robbery in the first
11          degree.  On the other hand, if you find that the
12          State has failed to prove beyond a reasonable
13          doubt any one or more of the elements of the
14          offense of robbery in the first degree, then, of
15          course, you cannot find the Defendant guilty of
16          robbery in the first degree.
17                    Now, just so that your understanding of
18          what it takes to constitute the offense of robbery
19          in the first degree is clear, I want to go over
20          the definition and the elements with you one more
21          time.
22                    The law says that a person commits the
23          crime of robbery in the first degree if in the
24          course of committing a theft he uses or threatens
25          the imminent use of force against the person of
```

1    the owner of the property or any person present

2    with the intent to overcome that person's physical

3    resistance or physical power of resistance and in

4    doing -- in so doing he is armed with a deadly

5    weapon or a dangerous instrument.

6           Therefore, in order for you to -- in

7    order for you to convict this Defendant, Ruben

8    Corey McNabb, of robbery in the first degree in

9    this case, you must be satisfied beyond a

10    reasonable doubt that the Defendant, Ruben Corey

11    McNabb, committed or attempted to commit a theft

12    of property, that being U.S. currency, postage

13    stamps, and food stamps which belonged to the Winn

14    Dixie Company.  And, then, secondly, that in the

15    course of attempting or attempting to commit the

16    theft or in immediate flight from the theft, the

17    Defendant either used force against the person --

18    of the persons of Ron Reeves and Patsy Lynn Roach

19    with the intent to overcome their physical

20    resistance or physical power to resist or

21    threatened imminent use of force against the

22    persons of Ron Reeves and Patsy Lynn Roach with

23    the intent to compel their acquiescence to his

24    taking or escaping with that property.  And at

25    that time that the Defendant was armed with a

1       deadly weapon or a dangerous instrument.

2               And you remember what I told you a

3       deadly weapon or a dangerous instrument is.  The

4       law just says that a deadly weapon is a firearm.

5       Therefore, I handgun as charged in the indictment

6       would be within the definition of a deadly

7       weapon.  A deadly weapon is a firearm or anything

8       manifestly designed, made, or adapted for the

9       purpose of inflicting death or serious physical

10      injury.

11              And then, of course, I told you that a

12      person commits the crime of theft of property,

13      stealing property, if he knowingly obtains or

14      exerts unauthorized control over the property of

15      another person or a company or a corporation with

16      the intent to deprive the owner of that property.

17              And I also told you what we mean by --

18      really, attempts to define intentionally are

19      almost sort of silly to me.  But -- because we all

20      know what intentionally means.  But I do want to

21      tell you what the law says that it means.  It says

22      that a person acts intentionally with respect to a

23      result or to conduct when his purpose is to cause

24      that result or to engage in that conduct.

25              Now, you ladies and gentlemen, of

```
 1        course, have heard many witnesses who have
 2        testified during the course of this trial.  We
 3        started this trial yesterday morning, I believe.
 4        So during the course of the day yesterday and all
 5        day today you've heard many witnesses who have
 6        testified.  And the Court instructs you that if
 7        you believe that any witness who testified,
 8        whether it was for the State or the Defendant, was
 9        interested in bringing about -- if you believe
10        that any witness was interested in either bring
11        about a conviction or an acquittal of this
12        Defendant, then the law says that you have the
13        right to take that interest into consideration
14        when you come to weigh and to consider that
15        witness' testimony and then give to that witness'
16        testimony whatever weight and whatever credit
17        that you deem it to be entitled.  Also, if you
18        believe that there has been any witness who has
19        testified during the course of this trial who you
20        believe has testified to you willfully falsely;
21        that is, if you believe that any witness has lied
22        to you about any material matter, then the law
23        gives you the right to cast aside that witness'
24        testimony and to say that you won't believe
25        anything that he or she has testified about.  On
```

1      the other hand, the law also says that if you

2      believe that any witness has testified to you

3      willfully falsely about any material matter, that

4      you could cast aside that part that you believe

5      the witness testified willfully falsely about and

6      refuse to believe it and then take that part of

7      the witness' testimony that you believe that he or

8      she has testified truthfully about and give to it

9      -- give to the truthful part whatever weight and

10     whatever credit that you ladies and gentlemen deem

11     it to be entitled.

12          Now, this Defendant, of course, as you

13     recall testified during the course of the trial in

14     his own behalf.  And the law gives him that right

15     and it gives him that privilege.  A defendant who

16     is being placed upon trial on a criminal charge in

17     a court of law in this country has the right to

18     refuse to testify, to stay off the witness stand,

19     or he can take the witness stand and give

20     testimony.  And the law says that when a defendant

21     does take the witness stand, that the jury would

22     not be justified in saying, well, he's the

23     defendant, he has something to gain in this case;

24     therefore, we're not going to believe anything

25     that he says or he testifies about.  You can't

```
 1          just refuse to consider his testimony.  The law
 2          says that you have to take his testimony and to
 3          weigh it and consider it along with all the other
 4          testimony in the case.  But when you do take his
 5          testimony and weigh it and consider it with all
 6          the other testimony in the case, the law does give
 7          you the right to consider the fact that he is the
 8          defendant in the case and he is interested in the
 9          result of your verdict, and then give to his
10          testimony whatever weight and whatever credit that
11          you ladies and gentlemen deem it to be entitled.
12                    Now, the Defendant, of course, went
13          into the trial of this case with a presumption of
14          innocence in his favor.  And that presumption of
15          innocence is a matter of evidence in his favor,
16          and it attends him throughout the trial until his
17          guilt is established to your satisfaction beyond a
18          reasonable doubt.  And, of course, if after you
19          have weighed and considered all of the evidence in
20          the case, that for the State and that for the
21          Defendant, if there -- if there remains in your
22          mind a reasonable doubt of his guilt; that is, a
23          doubt for which you can give a reason that came
24          from the evidence and from the evidence alone,
25          then, of course, he would be entitled to the
```

1    benefit of that doubt and would be entitled to an

2    acquittal at your hands.

3             You have heard these attorneys and the

4    Court use the term repeatedly reasonable doubt.

5    Of course, the reason being is because the law

6    requires that you must be satisfied beyond a

7    reasonable doubt as to the guilt of the party

8    being tried before you would be justified in

9    returning a verdict of guilty as against that

10   party. Now, ladies and gentlemen, that does not

11   mean that you must be satisfied beyond all doubt

12   and to an absolute certainty and to the point that

13   you could not possibly be mistaken. But it does

14   mean that if after you have weighed and considered

15   all of the testimony in the case, that for the

16   State and that for the Defendant, if it is your

17   fixed opinion, your fixed conviction and judgment,

18   that the Defendant is guilty, then within the

19   meaning of our law you are convinced beyond a

20   reasonable doubt.

21            The first thing that you should do when

22   you get back into the jury room is to select a

23   foreperson and allow your foreperson to preside

24   over the deliberations, to keep order, to take a

25   count of the vote once you're prepared to vote on

1    the case, and then to sign the verdict once a

2    verdict has been rendered. And, of course,

3    whatever verdict you render in this case, each and

4    every one of you must agree upon it. It must be

5    unanimous.

6           And, of course, if after you've weighed

7    and considered all of the evidence, that offered

8    by the State and that offered by the Defendant, if

9    you're convinced beyond a reasonable doubt that

10   this Defendant is guilty as charged, you should

11   find him guilty. And in that event the form of

12   your verdict would simply be, we, the jury, find

13   the Defendant, Ruben Corey McNabb, guilty of

14   robbery in the first degree as charged in the

15   indictment. You would not fix any punishment.

16   That would be left up to the Court. The law

17   leaves that within the discretion of the Court.

18          On the other hand, if after you have

19   weighed and considered all of the evidence, that

20   offered by the State and that offered by the

21   Defendant, if you're not satisfied beyond a

22   reasonable doubt that the Defendant is guilty as

23   charged, you should find him not guilty. In that

24   event the form of your verdict would be simply,

25   we, the jury, find the Defendant, Ruben Corey

1    McNabb, not guilty.  I have prepared for your use

2    in arriving at your verdict forms of verdicts in

3    line with those that I've just given you in the

4    Court's oral charge.

5         Now, there have been certain charges

6    that have been requested in this case that state

7    correct propositions of law and are to be taken by

8    you along with the Court's oral charge in arriving

9    at your verdict in this case.

10        I charge you, members of the jury, that

11   the presumption of innocence with which the

12   Defendant, Ruben McNabb, enters into the trial is

13   a fact in the case which must be considered with

14   all the evidence and is not to be disregarded by

15   you.

16        I charge you, members of the jury, that

17   circumstances, no matter how strong, which merely

18   arouse a suspicion of guilt cannot serve as a

19   basis for convicting Ruben McNabb.

20        I charge you, members of the jury, that

21   circumstances merely consistent with guilt or

22   causing suspicion thereof are not sufficient to

23   justify a conviction of Ruben McNabb.

24        I charge you, members of the jury, that

25   the Defendant, Ruben McNabb, should not be

1    convicted of a crime on mere suspicion of or fear

2    that he might have committed the act.  The theory

3    that the Defendant so committed the act must be

4    supported by the legal evidence before you.

5          I charge you, members of the jury, that

6    you cannot convict Ruben McNabb on mere

7    possibilities, surmise, suspicion, or speculation,

8    however strong they may be.  A verdict of guilty

9    based upon mere possibilities, surmise, suspicion,

10    or speculation would violate the oath that you

11    members of the jury have taken.  If after

12    carefully and fairly reviewing the facts you're

13    not satisfied of Ruben McNabb's guilt, then you

14    have a reasonable doubt and Ruben McNabb should be

15    found not guilty.

16          I charge you, members of the jury, that

17    in a robbery prosecution for robbery in the first

18    degree the State must among -- the State must

19    prove beyond a reasonable doubt that during the

20    course of the committing of a theft that Ruben

21    McNabb used force against or threatened the use

22    of force against the employees of Winn Dixie

23    located on Westgate Parkway with the intent to

24    overcome their physical resistance or physical

25    power of resistance or threatened the imminent use

1 of force against the employees of the Winn Dixie

2 located on Westgate Parkway with the intent to

3 compel acquiescence to the taking or escaping with

4 the property of the Winn Dixie located on Westgate

5 Parkway and Ruben McNabb was armed with a deadly

6 weapon or a dangerous instrument or caused serious

7 physical injury to the employees of Winn Dixie.

8 If the State cannot prove that beyond a reasonable

9 doubt, you must find the Defendant not guilty.

10  I charge you, members of the jury, that

11 in a robbery in the first degree prosecution the

12 State also must prove beyond a reasonable doubt

13 that the Defendant, Ruben McNabb, to the exclusion

14 of all others was one of the two alleged to have

15 committed the robbery of Winn Dixie located on

16 Westgate Parkway.  If the State does not prove

17 this beyond a reasonable doubt, you must find the

18 Defendant not guilty.

19  I charge you, members of the jury, in

20 order to convict Ruben McNabb of robbery in the

21 first degree, each of you must be convinced by the

22 evidence beyond a reasonable doubt of each and

23 every element of the crime of robbery in the first

24 degree.

25  I charge you, members of the jury, if

1    the State has left a reasonable doubt as to any

2    one of the individual elements of the crime of

3    robbery in the first degree, then that is enough

4    doubt to find the Defendant not guilty.

5        I charge you, members of the jury, that

6    in considering the evidence and testimony given in

7    the trial of this case, you should not attach any

8    more credibility to the testimony of any law

9    enforcement officer simply because he or she is

10   employed as a law enforcement officer than you

11   would to the testimony of anyone else.

12       I charge you, members of the jury, that

13   the Prosecution has the burden of proving the

14   Defendant guilty beyond a reasonable doubt. Some

15   of you may have served as jurors in civil cases

16   where you were told that it is only necessary to

17   prove that a fact is more likely true than not.

18   In criminal cases the Government's proof must be

19   more powerful than that. It must be beyond a

20   reasonable doubt. Proof beyond a reasonable doubt

21   is proof that leaves you firmly convinced of the

22   Defendant's guilt. There are very few things in

23   the world that we know with absolute certainty.

24   And in criminal cases the law does not require

25   proof that overcomes every possible doubt. If

1    based on your consideration of the evidence you

2    are firmly convinced that the Defendant is guilty

3    of the crime charged, you must find him guilty.

4    If on the other hand you think there's a real

5    possibility that he is not guilty, then you must

6    give him the benefit of the doubt and find him not

7    guilty.

8            Mr. Valeska, does the State have any

9    exception to the Court's charge?

10            MR. VALESKA:  Satisfied, Judge White.

11            THE COURT:  Mr. Baxley?

12            MR. BAXLEY:  Yes.  To number seven.

13            THE COURT:  I'll let you put your exception

14    in the Record.

15            Now, ladies and gentlemen, with that,

16    I'm going to allow you to retire and to make up

17    your verdict; and if you will, when you've reached

18    a verdict, just let the security officer or the

19    bailiff know by knocking on the door.  You may

20    retire at this time except Ms. Taylor and Ms.

21    Watford.  If the two of you will just keep your

22    seats and the remainder may retire.

23            (Jury not present.)

24            THE COURT:  You two ladies were the

25    alternates.  So you may go at this time and just

```
 1   come back at nine o'clock in the morning to the
 2   jury assembly room.   Thank you very much.
 3                (At which time the alternate jurors were
 4                excused.)
 5                (At 3:40 p.m. the jury began their
 6                deliberations.)
 7                (Off the Record.)
 8                (At 8:55 p.m. the Court was notified the
 9                jury had reached a verdict.)
10        THE COURT:  Bring the jury.
11                (Jury present.)
12        THE COURT:  Now, Mr. Wood, I understand that
13   you're the foreman of the jury; is that correct?
14        THE FOREPERSON:  Yes, sir.
15        THE COURT:  And the jury has reached a
16   verdict?
17        THE FOREPERSON:  Yes, sir.
18        THE COURT:  And you've handed it to me?
19        THE FOREPERSON:  Yes, sir.
20        THE COURT:  I'll read it.
21                It says, we, the jury, find the
22   Defendant, Ruben Corey McNabb, guilty of robbery
23   in the first degree as charged in the indictment.
24                (At which time the jury was polled by
25                the Court.)
```

1          THE COURT:  Let the Record show that the

2      Court polled the jury and that each and every

3      member of the jury replied that the verdict was

4      his or hers.

5          Now, with that, ladies and gentlemen,

6      you're discharged until nine o'clock in the

7      morning.  If you will, just come back to the

8      assembly room at nine in the morning.  Thank you

9      very much.

10          (At which time the jury was excused.)

11         THE COURT:  Mr. McNabb, approach the bench,

12      please.

13         THE DEFENDANT:  (Complied.)

14         THE COURT:  Now, Ruben Corey McNabb, the jury

15      having found you guilty of robbery in the first

16      degree as charged in the indictment, based upon

17      that jury verdict, I hereby adjudge you guilty of

18      robbery in the first degree as charged in the

19      indictment.

20          Do you have anything to say as to why

21      sentence of law should not be pronounced upon you

22      at this time in this case?

23         MR. BAXLEY:  Yes, Your Honor.  We ask for a

24      presentence investigation.

25         THE COURT:  Your having asked for a

1    presentence investigation, your sentencing hearing

2    is set for March 18th at nine o'clock a.m.  And

3    the probation officer is ordered to make an

4    investigation into and report back to the Court.

5         MR. BAXLEY:  What about the bond?

6         THE COURT:  No bond.

7         MR. VALESKA:  There's four priors.  It's life

8    without parole.  It's your discretion.

9         THE COURT:  Conviction of a Class A felony,

10   so there's no bond.

11            That will be the 18th day of March.

12   You're in the custody of the sheriff.

13               (The proceedings for February 11, 2004,

14                were concluded.)

15               (Off the Record.)

16

17

18

19

20

21

22

23

24

25

1              IN THE CIRCUIT COURT OF HOUSTON COUNTY

2                       STATE OF ALABAMA

3    STATE OF ALABAMA,             *
                                   *
4    v.                            *      Case No. CC-02-225
                                   *
5    RUBEN COREY MCNABB,           *
                                   *
6         Defendant.               *

7

8

9

             REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

10

11

12

13   Before:

14              The Honorable Jerry M. White

15                   March 18, 2004

16

17

     APPEARANCES:

18

                For the State

19

                     Amy Mendheim, Esquire
20                   Assistant District Attorney

21         For the Defendant

22                   M. Hampton Baxley, Esquire
                     Dothan, Alabama
23

24

     Carla H. Woodall
25   Court Reporter

<u>PROCEEDINGS</u>

1
2     THE COURT:  We'll take Ruben Corey McNabb

3     first.  Do you have a copy of the Code?

4         Mr. Baxley, I'll hear you insofar --

5     MR. BAXLEY:  I've got one problem here.  I'm

6     just now getting notice of previous convictions.

7     I got notice a long time ago about three

8     convictions.  They have added a fourth one to it,

9     and I just received notice about it.  I'm usually

10     allowed a reasonable amount of time, and five

11     minutes I don't think is too reasonable.

12     THE COURT:  So what are you asking?  Are you

13     asking for a continuance?

14     MS. MENDHEIM:  Judge, whether he has three or

15     four, it's not going to matter.

16     THE COURT:  That's true.

17         It appears that -- which one did you

18     not not get notice of?

19     MR. BAXLEY:  Well, I still really don't have

20     notice yet.

21     THE COURT:  What does the law say as to how

22     much time -- how much notice you have to have?

23     MR. BAXLEY:  Reasonable time prior to the

24     hearing the Defendant shall be given notice of

25     prior convictions that the State intends on using,

```
 1      Your Honor.  And I hate to say this, I mean, I've

 2      obviously got a little more work to do if they are

 3      saying another one is there.

 4           MS. MENDHEIM:  Judge, we would be happy to

 5      have him sentenced on three priors.  It's not

 6      going to make any difference whether it's three or

 7      four.

 8           THE COURT:  It really isn't.  If they prove

 9      three under the Habitual Offender Act.

10           MR. BAXLEY:  The only one we're arguing about

11      is the carrying a concealed firearm.

12           THE COURT:  Do what?

13           MR. BAXLEY:  There's a carrying a concealed

14      firearm, Judge, and it's not a felony under the

15      law; and, therefore, it can't --

16           THE COURT:  Well, you know, we never seem to

17      be ready --

18           MS. MENDHEIM:  Judge, I have -- we've got

19      three that are not in question.

20           THE COURT:  That are not?

21           MS. MENDHEIM:  Yes, sir.

22           THE COURT:  What are those?

23           MS. MENDHEIM:  Possession of cocaine with

24      intent to sell.

25           MR. BAXLEY:  One of the four I was never
```

```
1    given notice of.

2         THE COURT:  Okay.  Fine with me.  We will

3    continue it until next week.  I mean, if you feel

4    that that's going to make a difference for you,

5    then certainly we'll continue it.  I mean, we've

6    had forty days to get ready for today.

7         MR. BAXLEY:  Your Honor, I've gone by the

8    D.A.'s office several times.  And they have never

9    had this available for me.  I'm not trying to

10   berate Amy or anybody there.  I have definitely

11   tried to get these things.  I asked for notice of

12   those four.  I was never given those things.

13        THE COURT:  We'll set this March 24th, eleven

14   a.m.

15        MR. BAXLEY:  Even the investigation by

16   probation and parole does not have the one I'm

17   questioning as well.

18        THE COURT:  You know, all of this is purely

19   academic.  If anybody should know whether these

20   are true or not, he should know.

21        MR. BAXLEY:  Yes, sir.  And he's claiming

22   it's not.

23        THE COURT:  He says it's not?

24        MR. BAXLEY:  Yes, sir.

25        THE COURT:  Based on the fact she had
```

1    certified copies?

2        MR. BAXLEY:  Your Honor, my client has an

3    extensive criminal history.  Most of it

4    misdemeanors and things reduced to misdemeanors.

5    And, therefore, it could be some discrepancy

6    somewhere in the record keeping.

7        THE COURT:  I'm going to give you the benefit

8    of the doubt.  I will give you seven days.

9            (The proceedings for March 18, 2004,

10            were concluded.)

11            (Off the Record.)

1         IN THE CIRCUIT COURT OF HOUSTON COUNTY

2              STATE OF ALABAMA

3  STATE OF ALABAMA,        *

                           *

4  v.                 *    Case No. CC-02-225

                           *

5  RUBEN COREY MCNABB,     *

                           *

6     Defendant.        *

7

8

9

         REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

10

11

12

  Before:

13

         The Honorable Jerry M. White

14

           March 24, 2004

15

16

17  APPEARANCES:

18        For the State

19            Douglas A. Valeska, Esquire

             District Attorney

20

        For the Defendant

21

            M. Hampton Baxley, Esquire

22            Dothan, Alabama

23

24

  Carla H. Woodall

25  Court Reporter

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | (State's Exhibit No. 1 was marked for |
| 3 | identification for the purposes of the |
| 4 | sentencing hearing.) |
| 5 | THE COURT:  This sentencing hearing was |
| 6 | originally set for I believe it was March 17th -- |
| 7 | no, March 18th at nine o'clock a.m.  And it was |
| 8 | continued on that day because the Defendant |
| 9 | asserted that he was not aware of a conviction |
| 10 | that the State gave notice that they were going to |
| 11 | rely upon for sentencing in accordance with the |
| 12 | Habitual Offender Act. |
| 13 | Mr. Baxley, I will hear you now.  Do |
| 14 | you want him to go first? |
| 15 | MR. BAXLEY:  Yes, sir. |
| 16 | MR. VALESKA:  Judge, I've offered State's |
| 17 | Exhibit 1, the prior convictions of the Defendant, |
| 18 | certified exemplified priors in front of you from |
| 19 | the State of Florida, Judge White, in the case |
| 20 | showing you, the Court, that he has three felony |
| 21 | possession cases possession of cocaine with intent |
| 22 | to sell on three different cases as well as |
| 23 | carrying a concealed weapon case.  I can't use the |
| 24 | carrying a concealed weapon for purpose of |
| 25 | Habitual Offender, but you have a right to |

```
 1        consider that in relationship to the punishment
 2        you're going to give in the case.  The probation
 3        officer did a report in the case which is in front
 4        of the Court.  It talks about his priors, prior
 5        offenses, prior criminal activity.  I would remind
 6        the Court -- I apologize, I was not here for the
 7        18th sentencing hearing.  You continued it today.
 8        Served notice on the Defendant about his priors.
 9        But this Defendant did testify in the trial.  He
10        got up there and admitted during the trial that he
11        had prior convictions for drugs.  He gave
12        testimony on his own behalf.  So those are the
13        three prior felonies for purposes of Habitual
14        Offender under Section 13A-5-9 Subsection C, in
15        all cases where a defendant has previously been
16        convicted of three felonies and after such
17        conviction has committed another felony he or she
18        must be punished as follows.  And we go down to
19        Section C3, which says upon a conviction of a
20        Class A felony where the Defendant has no prior
21        convictions for any Class A felony, he or she must
22        be punished by imprisonment for life or with life
23        without the possibility of parole in the
24        discretion of the trial court.  So, Judge, the
25        range of punishment we have in this case to
```

1    consider that you can sentence him to life in the

2    penitentiary or life without parole.  Based on

3    McNabb's prior felony and the three felonies, and

4    the robbery in this case where a firearm was used

5    and threats made to the victims in this case, we

6    ask you to sentence him to life without parole

7    under the Habitual Offender Act, the three prior

8    felonies which we have served copies to you.

9            I would like to remind the Court also

10    when he was arrested in Florida he gave the name

11    of another individual, not even his own name,

12    saying he was Bryan Thomas.  And then the officers

13    checked and determined the photo he had that he

14    was not that person.  And that he also ran and

15    escaped from them at the time and they had to

16    chase him down and catch him.  That he had been --

17    from his own testimony he knew there was a warrant

18    for robbery in the first degree and he had gone

19    to Florida.  And as I recall the testimony, said

20    he never had any plans to come back to the state

21    of Alabama based on the robbery charge.  So based

22    on that we ask you to give him life without parole

23    so victims in this community, this state will

24    never have to face McNabb again with a deadly

25    weapon, a pistol, at the Winn Dixie like occurred

```
 1          to those victims.

 2                    Thank you.

 3               THE COURT:  Mr. Baxley?

 4               MR. BAXLEY:  Your Honor, taking those

 5          arguments into consideration Mr. Valeska has

 6          brought up, I would remind the Court that even

 7          though Mr. McNabb was found guilty of a jury of

 8          his peers, he still maintains his innocence and

 9          has maintained innocence from the beginning of

10          this process.  As you will recall after the

11          mistrial of this case, he came back to Alabama

12          voluntarily without any coercion whatsoever and

13          turned himself back in to face trial again.  Had

14          he been guilty of this, I would assume he would

15          have run somewhere else.  The man came back

16          voluntarily and to face trial.  Unfortunately the

17          jury did not see his side of the case.

18          Additionally, the facts of this case were all

19          circumstantial.  There were, you know, nothing

20          physically attached him to that scene.  There were

21          witness testimony.  I can't re-try the case here

22          in front of you.  But Mr. McNabb is a

23          twenty-eight-year-old man.  He has a long life

24          ahead of him.  There's absolutely no reason he

25          should stay -- not have the possibility of being
```

1    paroled at some point during his prison sentence.

2    We know for a fact here today that the range of

3    punishment.  We agree with that.  We have no other

4    option to face other than Habitual Offender Act.

5    Mr. McNabb does have a caring, loving family.  His

6    wife has come here every single time during the

7    process.  She has four children.  They need a

8    father in their life.  The man needs to be able to

9    get out of the system one day.  We need to allow

10   him rehabilitation for a certain amount of time

11   and then allow the possibility of parole to let

12   him out of the system one of these days, Your

13   Honor.  There's nothing that would state Mr.

14   McNabb might not eventually recover from whatever

15   things going on in his head that make him commit

16   crimes.  Of course, I still must temper that with

17   the fact that he has maintained his innocence

18   during this process.

19        Additionally, if you do refer to the

20   pardon and paroles investigation, the officer has

21   indicated that a medium to maximum sentence

22   range.  I assume that if the officer had found him

23   to be an absolute danger he would have simply

24   stated the maximum range.  Therefore, he has left

25   open the option based on his investigation of Mr.

```
 1        McNabb's past and his interrogation of Mr. McNabb
 2        himself that medium range would be in order here.
 3        Obviously there is no such thing as a medium
 4        range in this.  There's only life or life without
 5        the possibility of parole.  Therefore, we would
 6        suggest a lighter end of that range being life
 7        with the possibility of being paroled one of these
 8        days, Your Honor.
 9                And Mr. McNabb would like to make one
10        statement.
11             THE COURT:  Okay.
12             THE DEFENDANT:  Your Honor, I would just like
13        you to take into consideration that I did turn
14        myself in even though I did get found guilty, Your
15        Honor.  I would like a chance to go back home to
16        my wife and kids one day.
17             THE COURT:  All right.  It appears from the
18        probation officer's report that there was a
19        conviction that the State has not filed anything
20        on.  That he was charged with armed robbery back
21        in 1996, and it was reduced from armed robbery to
22        larceny for which he received a sentence to the
23        penitentiary of one year.
24             MR. BAXLEY:  That was a misdemeanor he was
25        convicted of, Your Honor.
```

 1              MR. VALESKA:  If I could point out, you hit

 2        the nail on the head.  He was charged with

 3        robbery.  And we asked him about that when he

 4        testified on the witness stand.  What occurred,

 5        you hit the nail on the head.  The district

 6        attorney, the state's attorney, plea bargained it

 7        down.  We did have the paperwork.  But they gave

 8        him a misdemeanor.  So I couldn't use it for

 9        felony.

10              THE COURT:  So that is not under Florida law

11        a felony?

12              MR. VALESKA:  No.  When they reduced it, it

13        became a misdemeanor.  He was charged with

14        robbery, which is a felony in Florida, and they

15        reduced the case.  And I asked him about that on

16        the witness stand in that case if you will recall.

17        But, once again, that shows prior criminal

18        activity on his behalf.

19              THE COURT:  Do you know what the

20        circumstances were?

21              MR. VALESKA:  Yes, sir.  I recall --

22              MR. BAXLEY:  Your Honor, I believe he

23        testified to that at trial and the circumstances

24        of that were that an individual friend of his

25        stole his wallet and he got the wallet back and

1      that some fight ensued about that transaction

2      there.  So that's what the testimony was at trial.

3      This was not some armed robbery at another grocery

4      store or anything of that nature.

5           MR. VALESKA:  I dispute that.  I recall the

6      paperwork when I had it in my hands, there was a

7      robbery.  The police were called.  And I can't

8      tell the Court if the victim did not show up to

9      testify.  But they did reduce it.  Once again, he

10     was charged with robbery.  As you can recall, the

11     Defense made the argument to you and the Defendant

12     himself on the stand, well, it wasn't robbery, it

13     was theft.  It was his own wallet.  Once again, if

14     it was his own wallet, he plead guilty, Judge, to

15     stealing his own wallet?  I do have the

16     paperwork.  But, once again, it was not a felony.

17          THE COURT:  I remember now.

18            Ruben McNabb, approach the bench,

19     please.

20          THE DEFENDANT:  (Complied.)

21          THE COURT:  Now, Ruben McNabb, the jury back

22     on February 11, 2004, having found you guilty of

23     robbery in the first degree, based upon that jury

24     verdict, I hereby adjudge you guilty of robbery in

25     the first degree as charged in the indictment.

373

```
 1              Do you have anything to say as to why
 2      sentence of law should not be pronounced upon you
 3      at this time in this case?
 4              THE DEFENDANT:  No, sir.
 5              THE COURT:  I hereby sentence you to
 6      imprisonment in the penitentiary of the State of
 7      Alabama for the term of your natural life without
 8      parole.
 9                      You're in the custody of the sheriff.
10                      State's 1 is admitted.
11                      (State's Exhibit No. 1 was admitted for
12                      the purposes of the sentencing hearing.)
13                      (The proceedings for March 24, 2004,
14                      were concluded.)
15                      (Off the Record.)
16
17
18
19
20
21
22
23
24
25
```

```
 1                  *  *  *  *  *  *  *  *  *  *  *

 2                      REPORTER'S CERTIFICATE

 3                  *  *  *  *  *  *  *  *  *  *  *

 4    STATE OF ALABAMA

 5    COUNTY OF HOUSTON

 6

 7           I, Carla H. Woodall, Court Reporter and

 8    Notary Public in and for the State of Alabama at Large,

 9    do hereby certify that the above-styled and numbered

10    cause was reported stenographically by me and is a true

11    and correct transcript of the testimony, objections,

12    motions, rulings of the Court, and was transcribed by

13    or under my direction and control.

14           I further certify that I have filed all

15    exhibits offered in the trial of this cause, if any,

16    with the Circuit Clerk of Houston County, Dothan,

17    Alabama, for incorporation into the Record on Appeal.

18           I further certify that I have on this day,

19    filed with the Clerk of the Court of Criminal Appeals,

20    the Attorney General, and the parties here involved, a

21    copy of the Reporter's Index to the Testimony and a

22    Certificate of Completion of Reporter's Transcript of

23    the said cause.

24           I further certify that I have filed the

25    original and three copies of this transcript in the
```

1    office of the Circuit Clerk of the Circuit Court of

2    Houston County, Dothan, Alabama.

3

4         Done this the 28th day of July, 2004.

5

6

7         _____
          Carla H. Woodall
          Court Reporter and Notary Public
8         State of Alabama at Large

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP 13 | CERTIFICATE OF COMPLETION<br>REPORTER'S TRANSCRIPT | Page Number<br><br>376 |

TO:    The Clerk of the Court of Criminal Appeals          Fax: (334) 242-4689
P. O. Box 301555
Montgomery, Alabama 36130-1555

Criminal Appeals Case Number          CR 03 - 1141

Ruben Corey McNabb          v.    State of Alabama
Appellant's Name                              Appellee

On appeal from the:    [✓] Circuit Court of
[ ] District Court of    Houston County
[ ] Juvenile Court of

Trial Court Case Number  CC-02-225

Notice of Appeal Date  3-30-2004

I, Carla H. Woodall , certify that I have this date completed and filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings in the above referenced case that were reported by me and were specifically designated by the appellant for inclusion on the Reporter's Transcript Order.  The transcript, which is numbered serially in the upper right-hand corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and the testimony of the witnesses. The original transcript concludes with the original of this notice and the copies of the transcript conclude with copies of this notice.  The page number appearing in the upper right-hand corner of this certificate is the last page of my portion of the transcript in this case.

Done this the  28  day of  July  , 2004 .

Carla H. Woodall
Court Reporter

FILING AND SERVICE OF THIS FORM:    Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on the municipal prosecutor rather than the attorney general and district attorney.

CERTIFICATE OF COMPLETION AND TRANSMITTAL
OF RECORD ON APPEAL BY TRIAL CLERK

Total pages
including this page
574

RUBEN McNABB
_____
        Appellant .

TO: The Clerk of the Court of
        Criminal Appeals of Alabama

V.

Case No. _____CC2002-225_____

State of Alabama
        Appellee

Date of Notice of Appeal _March 30, 2004_

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by

assembling _____170_____ pages of the Clerk's record, and _____403_____ pages of

the Court Reporter's transcript, and that one copy of each of the record on appeal
has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this _____2nd_____ day of _____August_____ , _____2004_____ .

Judy Bird
                                            _____
                                                    Circuit Clerk
Houston
_____
                                                        County